**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| ROBERT F. BACH AND DIANE M. BACH, On Behalf Of Themselves And All Others Similarly Situated,<br><br>                Plaintiffs,<br><br>v.<br><br>AMEDISYS, INC., WILLIAM F. BORNE, and DALE E. REDMAN,<br><br>                Defendants. | **Civil Action No.**<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Robert F. Bach and Diane M. Bach ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their Class Action Complaint against defendants, alleges upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Amedisys, Inc. ("Amedisys" or the "Company"), securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.

### NATURE OF THE ACTION

1.      This is a securities fraud class action on behalf of all persons who purchased or acquired Amedisys securities during the period from February 23, 2010 through and including May 13, 2010 (the "Class Period"). This class action is brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a); and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

2.    Defendant Amedisys is a provider of home health services to the chronic, co-morbid, aging American population. The Company operates in two segments: home health and hospice segments. The Company's home health agencies deliver a range of services in the homes of individuals who may be recovering from surgery, have a chronic disease or disability or terminal illness and need assistance with the essential activities of daily living. Its typical home health patient is Medicare eligible, approximately 83 years old, takes approximately 12 different medications on a daily basis and has co-morbidities. Its hospice agencies provide palliative care and comfort to terminally ill patients and their families.

3.    Throughout the Class Period, defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, defendants made false and/or misleading statements and/or failed to disclose: (1) that the Company's reported sales and earnings growth were materially impacted by a scheme whereby the Company intentionally increased the number of in-home therapy visits to patients for the purpose of triggering higher reimbursement rates under the Medicare home health prospective payment system as those excess visits were not always medically necessary; (2) that the Company's reported sales and earnings were inflated by said scheme and subject to recoupment by Medicare; (3) that the Company was in material violation of its Code of Ethical Business Conduct and compliance due to the scheme to inflate Medicare revenues; and (4) based on the foregoing, defendants lacked a basis for their positive statements about the Company, its prospects and growth.

4.    On April 27, 2010, *The Wall Street Journal* ("WSJ") reported that Amedisys has been taking advantage of the Medicare reimbursement system by increasing the number of in-home therapy visits in order to trigger additional reimbursements.  As reported in the article,

2

according to a former Amedisys nurse the excess visits that triggered additional reimbursements were "not always medically necessary." In the wake of this revelation, Amedisys securities fell $3.98 or 6.5%.

5.     On May 13, 2010, the WSJ did a follow up article where it reported that the Senate Finance Committee ("Committee") had started an investigation into the billing and operating practices of Amedisys. In a Committee letter dated May 12, 2010 to Amedisys, the Committee cited the findings of the WSJ article and requested the Company to produce documents dating as far back as 2006, concerning data on therapy visits, lists of physicians with the highest patient referrals to the Company, and copies of all marketing materials. In the wake of this additional revelation, Amedisys securities fell nearly 8% or $4.48.

6.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

9.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Amedisys is listed on the NASDAQ.

10.     In connection with the challenged conduct, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the

3

United States mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### Plaintiffs

11.     Plaintiff Robert F. Bach as set forth in his certification attached hereto purchased Amedisys securities during the Class Period and was damaged when the disclosures of the Company's improper practices caused the price of Amedisys shares to decline.

12.     Plaintiff Diane M. Bach as set forth in her certification attached hereto purchased Amedisys securities during the Class Period and was damaged when the disclosures of the Company's improper practices caused the price of Amedisys shares to decline.

### Defendants

13.     Amedisys provides home health and hospice services to the chronic, co-morbid, and aging American population. The Company is incorporated in Delaware and the address to its principal executive offices is 5959 South Sherwood Forest Boulevard, Baton Rouge, LA 70816. The aggregate number of shares of Amedisys securities outstanding as of April 22, 2010 is approximately 28.6 million shares. Amedisys is actively traded on the NASDAQ under the ticker symbol "AMED."

14.     Defendant William F. Borne ("Borne") was the founder of the Company and has been the Company's Chief Executive Officer and Chairman of the Board of Directors since 1982. Defendant Borne signed the Company's annual report filed with the SEC.

15.     Defendant Dale E. Redman ("Redman") has been the Company's Chief Financial Officer since February 2007. Defendant Redman signed the Company's quarterly and annual reports filed with the SEC.

4

16. The defendants referenced above in ¶¶ 14-15 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

17. Amedisys delivers care to its patients through its home health and hospice segments. Amedisys's services are primarily paid for by Medicare, which represented approximately 88%, 87%, and 89% of its net service revenue in 2009, 2008, and 2007, respectively. More specifically, home health Medicare revenue represented approximately 81%, 81%, and 83% of the Company's net service revenue in 2009, 2008, and 2007, respectively.

18. Between 2000 and 2007, under the Centers for Medicare & Medicaid Services' ("CMS") home health prospective payment program ("PPS"), home health agencies ("HHAs") such as Amedisys received a flat fee of $2,200 for up to nine home therapy visits. Medicare paid an additional reimbursement of $2,200 when a HHA made over nine therapy visits. Since January 2008, CMS eliminated the $2,200 additional payment at 10 visits and now provides additional payments at six, fourteen and twenty therapy visits.

### The Fraudulent Scheme

19. Beginning prior to the Class Period and continued throughout the Class Period, defendants had a monetary incentive to increase the number of home therapy visits to their patients. By increasing the number of home therapy visits when it was not medically necessary, but for the sole purpose of triggering extra Medicare payments, defendants inflated its home health Medicare revenue and provided crucial therapy services not in the best interests of patients. Specifically, the Company's therapists were instructed to schedule extra home therapy appointments to trigger the extra Medicare payments. In fact, a former Amedisys nurse was told

5

that "we have to have ten visits to get paid" even though the "tenth visit was not always medically necessary."

20.     Before 2008, Amedisys provided many of its patients just enough home therapy visits to trigger the extra $2,200 payment. In 2005, 2006 and 2007, very few Amedisys patients received nine therapy visits while a much higher percentage got 10 visits or more. Indeed in 2007, 28.5% of Amedisys's patients who received home therapy got 10 to 12 visits, thereby triggering the extra $2,200 Medicare payment. In January 2008, when CMS changed its reimbursement rules, Amedisys also modified their home therapy procedures in order to trigger the extra Medicare payments at six, fourteen and twenty visits. Indeed, in 2008, the percentage of Amedisys patients getting 10 visits dropped by 50%, while the percentage that received six, fourteen and twenty visits increased by 8%, 33% and 41%, respectively.

**Defendants' False and Misleading Statements**

21.     On February 23, 2010, the Company issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2009. The Company reported net service revenue of $405.5 million compared to $340.1 million in the fourth quarter of 2008. The Company further reported net income of $37.8 million, or $0.1.35 diluted earnings per share for the quarter, compared to $26.3 million, or $0.97 diluted earnings per share in the same period of the prior year. For the year, the Company reported net service revenue of $1.5 billion, compared to $1.2 billion in 2008. The Company further reported net income of $135.8 million for 2009, compared to $86.7 million in 2008.

22.     Defendant Borne commented on the results, stating, in relevant part:

> We had outstanding results for the fourth quarter and full year ending 2009. This marks the seventh consecutive year in which we have increased our earnings per share in excess of 20%.

6

23.     On the same day, the Company filed its annual report for the fourth quarter and year ended December 31, 2009 with the SEC on a Form 10-K which was signed by defendants. The Form 10-K reiterated the previously announced financial statements. In addition, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), the Form 10-K contained signed certifications by defendants Borne and Redman, stating that the Form 10-K "did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made."

24.     In addition, the Form 10-K stated the following:

Medicare Participation

As we expect to continue to receive the majority of our revenue from serving Medicare beneficiaries, our agencies must comply with regulations promulgated by the United States Department of Health and Human Services in order to participate in the Medicare program and receive Medicare payments. Among other things, these regulations, known as "conditions of participation," relate to the type of facility, its personnel and its standards of medical care, as well as its compliance with state and local laws and regulations.

25.     Further, the Form 10-K represented the following concerning controls over its business system infrastructure:

**Controls over Our Business System Infrastructure**
We establish and maintain processes and controls over coding, clinical operations, billing, patient recertifications and compliance to help monitor and promote compliance with Medicare requirements.

***

•     *Billing*— We maintain controls over our billing processes to help promote accurate and complete billing. In order to promote the accuracy and completeness of our billing, we have annual billing compliance testing; use formalized billing attestations; limit access to billing systems; use risk forecasting methodologies; perform direct line supervisor audits; hold weekly operational meetings; use automated daily billing operational indicators; and take prompt corrective action with employees who knowingly fail to follow our billing policies and procedures in accordance with a well publicized "Zero Tolerance Policy".

7

- *Patient Recertification*—In order to be recertified for an additional episode of care, a patient must be diagnosed with a continuing medical need. This could take the form of a continuing skilled clinical need or could be caused by changes to the patient's medical regimen or by modified care protocols within the episode of care. As with the initial episode of care, a recertification requires approval of the patient's physician. Before any employee recommends recertification to a physician, we conduct an agency level, multidisciplinary care team conference. We also monitor centralized automated compliance recertification metrics to identify, monitor, and where appropriate audit, agencies that have relatively high recertification levels.

- *Compliance*— The quality and reputation of our personnel and operations are critical to our success. We develop, implement and maintain ethics, compliance and quality improvement programs as a component of the centralized corporate services provided to our home health and hospice agencies. Our ethics and compliance program includes a Code of Ethical Business Conduct for our employees, officers, directors and affiliates and a process for reporting regulatory or ethical concerns to our Chief Compliance Officer through a confidential hotline. We promote a culture of compliance within our company through persistent messages from our senior leadership concerning the necessity of strict compliance with legal requirements and company policies and procedures, and through publicizing and enforcing our Zero Tolerance Policy. We also employ a comprehensive compliance training program that includes: annual compliance testing; new hire compliance training; new acquisition compliance training; sales compliance training; new employee orientation compliance training; billing compliance training; and compliance presentations at all company functions.

26. As noted in the Form 10-K, the Company has an ethics and compliance program which includes a Code of Ethical Business Conduct. The Company's Code of Ethical Business Conduct states in relevant part:

**V. BILLING**

Amedisys officers and employees who are involved in the billing and collection function are expected to understand and comply with all billing-related policies and procedures established by the Company, as well as applicable requirements of third-party payors (including Medicare and Medicaid) to which home healthcare service and product claims are submitted.

8

Amedisys shall bill only for goods and services that are properly ordered and delivered or performed, as appropriate. In no event shall the Company bill for equipment beyond the date it is provided, and Amedisys should only bill for goods and services for which appropriate documentation exists.

All coding of services must conform to applicable government regulations and commercial payor instructions. All required billing information (including diagnosis coding) must be collected and recorded accurately. All contact with customers to obtain missing information must be properly documented.

Amedisys directors, officers and employees are expected to cooperate fully with all internal and external audits of the Company's billing system.

If you discover any coding error in the billing system, the matter should be brought to the attention of your supervisor so that he or she may determine the nature and magnitude of the problem and the appropriate corrective action. The Company's policy is to refund any overpayments received as a result of coding errors and to notify the appropriate carrier or commercial payor of the problem. All such matters should also be brought to the attention of your Director of Operations and, in the case of government billings, to the attention of the Chief Compliance Officer.

Amedisys may not routinely waive or write off co-payments and deductibles for services rendered. Such a practice could cause the Company to violate its contractual obligations to carriers as well as certain governmental regulations.

You should consult the Company's Billing Department and Finance Department for questions pertaining to government billing and commercial billing.

27.     The statements referenced above in ¶¶ 21-26 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them: (a) that the Company's reported sales and earnings growth were materially impacted by a scheme whereby the Company intentionally increased the number of in-home therapy visits to patients for the purpose of triggering higher reimbursement rates under the Medicare home health prospective payment system as those excess visits were not always medically necessary; (b) that the Company's

9

reported sales and earnings were inflated by said scheme and subject to recoupment by Medicare; (c) that the Company was in material violation of its Code of Ethical Business Conduct and compliance due to the scheme to inflate Medicare revenues; and (d) based on the foregoing, defendants lacked a basis for their positive statements about the Company, its prospects and growth.

## The Truth Begins to Slowly Emerge

### The Partial Disclosure on April 27, 2010

28.     On April 27, 2010, the WSJ published an article questioning whether Amedisys was improperly taking advantage of the Medicare reimbursement system by increasing the number of in-home therapy visits. The article disclosed the following in relevant part:

> Medicare reimbursements are determined in part by the number of at-home therapy visits each patient receives, with an extra fee kicking in as soon as a patient hits a certain number of visits. Between 2000 and 2007, Medicare paid companies a flat fee of about $2,200 for up to nine home therapy visits. It paid an additional reimbursement of roughly $2,200 if the therapy surpassed nine visits. That incentive was designed so that agencies didn't "stint" on therapy visits, says Laurence Wilson, the director of chronic-care policy group at the Centers for Medicare and Medicaid Services, the agency that runs Medicare.

> According to The Journal analysis, which was based on publicly available Medicare records, Amedisys provided many of its patients just enough therapy visits to trigger the extra $2,200 payment. In 2005, 2006 and 2007, very few Amedisys patients received nine therapy visits while a much higher percentage got 10 visits or more. In 2007, for instance, only 2.88% of patients got nine visits, while 9.53% of patients got 10 visits.

> "I was told 'we have to have ten visits to get paid,'" says Tracy Trusler, a former Amedisys nurse for two years in Tennessee, who has since left the company. Her supervisors, she says, asked her to look through patients' files to find those who were just shy of the 10-visit mark and call their assigned therapists to remind them to make the extra appointment.

> "The tenth visit was not always medically necessary," Ms. Trusler says.

> ***

The number of visits eligible for the extra reimbursement has a significant impact on home-health providers' receipts from Medicare and thus on overall revenue. While Amedisys doesn't break out the amount of revenue from the extra Medicare payment, the company says between 55% and 60% of its patients receive home therapy. In 2007, according The Journal's analysis, 28.5% of the patients who received therapy got 10 to 12 visits, thereby triggering the extra $2,200 Medicare payment. Such cases are highly profitable because they cost the company less than S80 per visit.

Medicare reimbursements for the entire home health-care industry are coming under increased scrutiny. The federal agency that advises Congress on Medicare payment issues, the Medicare Payment Advisory Commission, or MedPAC, warned last month that home health "overpayments contribute to the insolvency" of the Medicare trust fund as well as premium increases that beneficiaries must pay.

Medicare changed its reimbursement rules in January 2008 in an attempt to blunt the incentive for home health-care visits it created. It eliminated the $2,200 bonus payment at 10 visits and now pays an extra fee of a couple of hundred dollars at six, 14 and 20 therapy visits. "What we felt we could do is try to create some better incentives in the system for providing the level of service that beneficiaries actually needed," says Mr. Wilson from Medicare.

It wasn't until the change was made that MedPAC noticed the questionable home visit patterns. In its March report, the agency said that the industry-wide percentage of therapy visits in the 10-to-13 range dropped by about a third after the policy change in 2008.

The pattern of clustered visits around reimbursement targets is continuing: MedPAC found the number of therapy visits numbering six, 14 and 20 increased after the policy was changed in 2008.

During a MedPAC meeting in December, Arnold Milstein, a MedPAC commissioner, questioned whether all the home visits were appropriate. "Looking at the great speed with which the volume of services adapts to payment changes, which are breathtaking, it does suggest that there may be a problem with certifying the appropriateness of these services," Mr. Milstein said, according to a transcript of the meeting.

Based on the report, MedPAC suggested for the first time last month that the Secretary of Health and Human Services "review home health agencies that exhibit unusual patterns of claims for payment."

The Journal analysis found a similar pattern: In 2008, the percentage of Amedisys patients getting 10 visits dropped by 50%, while the percentage that got six visits increased 8%. The percentage of patients getting 14 visits rose 33% and the percentage getting 20 visits increased 41%.

*  *  *

In 2000, Medicare rolled out its new reimbursement system. It began paying a flat sum of about $2,200 for a 60-day period of care, no matter how many times a nurse went to a patient's home. The fee also included up to nine visits from occupational, physical or speech therapists. Doctors need to sign off on the number of visits in order for the company to be reimbursed.

Through 2007, an agency would receive the additional $2,200 if it sent a therapist to a patient's home 10 or more times during the same period.

The generous Medicare reimbursements are one reason the home health-care industry has grown so swiftly, according to MedPAC. There are now more than 10,400 home-health agencies in the U.S., up nearly 50% since 2002.

After the new reimbursement system was implemented in 2000, Amedisys's fortunes improved markedly. Its profits rose and its stock soared. Today, Amedisys has a market value of $1.7 billion.

29.     On April 27, 2010, the Company issued a press release announcing its financial results for the first quarter of ended March 31, 2010. The Company reported net service revenue of $413 million compared to $341.8 million in the first quarter of 2009. The Company also reported net income of $36.6 million, or $1.29 diluted earnings per share for the first quarter 2010, compared to $27 million or $0.99 diluted earnings per share a year earlier.

30.     On the same day, the Company filed its quarterly report for the first quarter ended March 31, 2010 with the SEC, which was signed by defendant Redman. The Form 10-Q reiterated the previously announced financial statements. In addition, pursuant to the SOX, the

12

Form 10-Q contained signed certifications by defendants Borne and Redman, stating that the Form 10-Q "did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made."

31.    As a result of the revelation by the article in the WSJ, Amedisys securities fell $3.98 or 6.5%.

32.    Though the WSJ article partially corrected defendants' prior misrepresentations, the statements referenced above in ¶¶ 29 and 30 above were materially false and/or misleading because they misrepresented and failed to disclose the adverse facts set forth in ¶ 27 (a)-(d), which were known to Defendants or recklessly disregarded by them.

### The Partial Disclosure on May 13, 2010

33.    Following the WSJ article, the Senate Finance Committee ("Committee") started an investigation into Amedisys's billing and operating practices. In a letter to Amedisys dated May 12, 2010, the Committee cited to the article and questioned whether Amedisys "intentionally increased utilization for the purpose of triggering higher reimbursements." The letter stated that the findings reported in the article suggests that Amedisys is "basing the number of therapy visits they provide on how much Medicare will pay them instead of what is in the best interests of patients." Moreover, the Committee's letter noted that when Medicare changed its payment rules in 2008 to provide additional reimbursement to patients when they had six, fourteen and twenty therapy visits, Amedisys "apparently changed their utilization patterns as a result of these payment policy changes." In addition, the Committee noted that the physician referral form associated with Amedisys's Balanced for Life program "raises concerns that the program may be taking advantage of Medicare payments in order to improve company profits." They also questioned marketing materials that aim to target seniors "to take advantage of

Medicare payments to improve profits." Accordingly, the Committee requested that Amedisys produce a variety of documents.

34.     The next day, the WSJ reported that the Committee had launched an investigation into the practices of Amedisys and whether the Company has "deliberately boosted the number of home therapy visits to trigger higher Medicare reimbursements." The article stated in relevant part the following:

> Companies "working with Medicare should not be allowed to target seniors or manipulate care simply to get higher reimbursement rates," said Sen. Max Baucus (D., Mont.), chairman of the finance committee, in a statement.
>
> "It appears that either the home health care reimbursement policy is flawed, some companies are gaming the system, or both," said Sen. Charles Grassley, (R., Iowa), ranking member of the committee. "We're working to figure out what's going on."
>
> ***
>
> The senators asked Amedisys to also provide information on its falls-prevention program called "Balanced for Life."
>
> More than 330 Amedisys locations offer "Balanced for Life" -- for which Amedisys has told investors that it receives an extra $1,000 to $2,000 per patient -- up from 33 locations in 2008.

35.     On May 13, 2010, after the market learned of the letter, Amedisys securities fell nearly 8% or $4.48 and closed at $51.73. In comparison, the S&P went down 1.2% on May 13, 2010 and the S&P Healthcare Index went down only .95%.

## CLASS ACTION ALLEGATIONS

.   36.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Amedisys securities during the Class Period (the "Class"); and were damaged thereby. Excluded from the Class are defendants herein, the officers and directors of the

14

Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

37.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Amedisys securities were actively traded on the Nasdaq. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Amedisys or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

38.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

39.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

40.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;
- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Amedisys;

15

- whether the Individual Defendants caused Amedisys to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Amedisys securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

41. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

42. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Amedisys securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the Nasdaq, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased and/or sold Amedisys securities between the time the defendants failed to disclose or misrepresented

16

material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

43. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## CLAIMS FOR RELIEF

### COUNT I

**(Against All Defendants For Violations of
Section 10(b) And Rule 10b-5 Promulgated Thereunder)**

44. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

45. This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

46. During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Amedisys securities; and (iii) cause Plaintiffs and other members of the Class to purchase Amedisys securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

17

47.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Amedisys securities and options. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Amedisys's finances and business prospects.

48.     By virtue of their positions at Amedisys, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

49.     Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Amedisys securities from their personal portfolios.

50.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers

18

and/or directors of Amedisys, the Individual Defendants had knowledge of the details of Amedisys internal affairs.

51.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.    Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Amedisys.   As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Amedisys's businesses, operations, future financial condition and future prospects.    As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Amedisys securities was artificially inflated throughout the Class Period.   In ignorance of the adverse facts concerning Amedisys's business and financial condition which were concealed by defendants, Plaintiffs and the other members of the Class purchased Amedisys securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants and were damaged thereby.

52.     During the Class Period, Amedisys securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of Amedisys securities and options at prices artificially inflated by defendants' wrongful conduct.   Had Plaintiffs and the other members of the Class known the truth, they would not have purchased said shares and options, or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiffs and the Class, the true value of Amedisys securities and

19

options were substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Amedisys securities and options declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

53.    By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

54.    As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

55.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

56.    (a)    During the Class Period, the Individual Defendants participated in the operation and management of Amedisys, and conducted and participated, directly and indirectly, in the conduct of Amedisys's business affairs. Because of their senior positions, they knew the adverse non-public information about Amedisys's misstatement of income and expenses and false financial statements.

(b)    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Amedisys's financial condition and results of operations, and to correct promptly any public statements issued by Amedisys which had become materially false or misleading.

20

(c)     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Amedisys disseminated in the marketplace during the Class Period concerning Amedisys's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Amedisys to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Amedisys within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Amedisys securities and options.

57.     Each of the Individual Defendants, therefore, acted as a controlling person of Amedisys. By reason of their senior management positions and/or being directors of Amedisys, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Amedisys to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Amedisys and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

58.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Amedisys.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representative;

21

B.     Requiring defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand trial by jury of all issues that may be so tried.

Dated:  June 7, 2010

By: _____

Michael E. Ponder
Louisiana Bar Number 10580
21105 Waterfront East
Maurepas, Louisiana 70449
Telephone: (225) 612-0980
Facsimile: (225) 661-8665

POMERANTZ HAUDEK GROSSMAN
& GROSS LLP
Marc I. Gross
Jeremy A. Lieberman
100 Park Avenue, 26th Floor
New York, New York 10017
Telephone: (212) 661-1100
Facsimile: (212) 661-8665

22

POMERANTZ HAUDEK GROSSMAN
& GROSS LLP
Patrick V. Dahlstrom
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184

BRONSTEIN GEWIRTZ &
GROSSMAN LLC
Peretz Bronstein
60 East 42nd Street
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296

Counsel for Plaintiffs