# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ROBERT F. BACH, ET AL., | ) | CIVIL ACTION |
| | ) | |
| Plaintiff, | ) | No. 3:10-cv-00395-BAJ-CN |
| | ) | |
| vs. | ) | Consolidated with: |
| | ) | |
| AMEDISYS, INC., ET AL., | ) | No. 3:10-cv-00441-BAJ-CN |
| | ) | No. 3:10-cv-00464-BAJ-CN |
| Defendants. | ) | No. 3:10-cv-00468-BAJ-CN |
| | ) | No. 3:10-cv-00470-BAJ-CN |
| | ) | No. 3:10-cv-00480-BAJ-CN |
| | ) | No. 3:10-cv-00497-BAJ-CN |
| | ) | No. 3:10-cv-00505-BAJ-CN |
| | ) | No. 3:10-cv-00642-BAJ-CN |
| | ) | No. 3:10-cv-00732-BAJ-CN |
| | ) | |

## VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF <u>CORPORATE ASSETS, AND UNJUST ENRICHMENT</u>

**TABLE OF CONTENTS**

**Page**

I.      NATURE OF THE ACTION ...................................................................................1

II.     SUMMARY OF THE DEFENDANTS' WRONGFUL CONDUCT ...................................2

        A.      The Board and the New Medicare Reimbursement Rules.......................3

        B.      The Board Is on Notice ..............................................................................3

        C.      Suspicious Growth, Resignations, and Sell-Offs....................................4

        D.      The Wrongdoing Is Exposed ....................................................................5

III.    JURISDICTION AND VENUE ...............................................................................7

IV.     THE PARTIES....................................................................................................8

        A.      Shareholder Plaintiffs................................................................................8

        B.      Nominal Defendant Amedisys ..................................................................8

        C.      Director Defendants ...................................................................................9

        D.      Current Officer Defendants.....................................................................14

        E.      Former Officer Defendants .....................................................................15

V.      BACKGROUND INFORMATION .........................................................................17

        A.      Defendant Borne Reorganizes the Company..........................................17

        B.      The Board's Early Troubles ....................................................................18

        C.      Violations of the FCA and CIA ..............................................................20

        D.      Suspicious CFO Troubles .......................................................................22

        E.      Defendant Redman Hired Despite History of Corporate Scandal ........23

        F.      Suspicious Claims of Technology-Driven Growth.................................24

        G.      Sudden Departure of Defendants Graham and Schwartz Rings Alarms ...............27

VI.     DEFENDANTS' WRONGDOING EXPLAINED .......................................................28

        A.      Amedisys's Business Model....................................................................28

B.      Defendants' Illegal Scheme ....................................................................29

C.      Confidential Witnesses Confirm Emphasis on Threshold Visits...........................30

VII.    WEAK INTERNAL CONTROLS AND A STRONG INFORMATION SYSTEM AIDED THE INDIVIDUAL DEFENDANTS' ILLICIT SCHEME ................................34

A.      Weak Controls Enabled the Defendants' Wrongdoing ..........................................34

B.      Regular Reporting to Management and Individual Defendants' Access to Real-Time Information Further Enabled the Targeted Push for Additional Patient Visits ....................................................................................................35

VIII.   WHILE CAUSING AMEDISYS TO VIOLATE FEDERAL LAWS, DEFENDANTS ACKNOWLEDGE ADDITIONAL INTERNAL CONTROLS AND IMPORTANCE OF COMPLIANCE.......................................................................37

IX.    DEFENDANTS' MISLEADING STATEMENTS.............................................................41

A.      2005 Statements ....................................................................................................42

B.      2006 Statements ....................................................................................................44

C.      2007 Statements ....................................................................................................47

D.      2008 Statements ....................................................................................................51

E.      2009 Statements ....................................................................................................55

F.      2010 Statements ....................................................................................................59

X.     THE WRONGFUL CONDUCT BEGINS TO BE REVEALED.....................................62

A.      *The Wall Street Journal* Article ...........................................................................62

B.      The U.S. Senate Finance Committee Investigation ...............................................64

C.      The Defendants' Response and Resulting Fallout..................................................68

XI.    FIDICUARY DUTIES OF THE INDIVIDUAL DEFENDANTS...................................80

XII.   DAMAGES CAUSED TO AMEDISYS .........................................................................87

XIII.  DEFENDANTS' FIDUCIARY DUTIES.........................................................................89

A.      The Defendants' Control, Access, and Authority .................................................90

B.      The Defendants' Duties of Reasonable and Prudent Supervision.........................91

C.    Special Duties Imposed by Amedisys's Code of Ethical Business Conduct .........91

D.    Additional Fiduciary Duties of the Audit Committee Defendants .......................94

E.    The Individual Defendants' Breaches of Their Fiduciary Duties .........................96

XIV.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION...............96

XV.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ......................................98

A.    Demand Is Excused: Director Defendants Did Not Exercise Valid
        Business Judgment....................................................................................................98

B.    Demand Is Excused: Because Defendant Borne Dominates and Controls
        the Board...................................................................................................................100

C.    Demand Is Excused: The Audit Committee Defendants (Constituting a
        Majority of the Board) Face a Substantial Likelihood of Liability ...................101

D.    Defendants LaBorde, Netterville, and Ricchiuti Face Substantial Liability
        for Insider Selling ..................................................................................................103

E.    Demand Is Excused: Director Defendants Face a Substantial Likelihood of
        Liability...................................................................................................................103

F.    Defendant Borne Lacks Independence ..................**Error! Bookmark not defined.**

G.    Director Defendants Lack Independence or Otherwise Cannot Impartially
        Consider a Demand...............................................**Error! Bookmark not defined.**

COUNT I  Derivatively on Behalf of the Company Against the Individual Defendants for
        Breach of Fiduciary Duty..................................................................................109

COUNT II  Derivatively on Behalf of the Company Against the Individual Defendants
        for Waste of Corporate Assets .........................................................................111

COUNT III....................................................................................................................112

Derivatively on Behalf of the Company Against the Individual Defendants for Unjust
        Enrichment..........................................................................................................112

PRAYER FOR RELIEF ...............................................................................................112

JURY DEMAND ..........................................................................................................114

Plaintiffs, by their attorneys, submit this Verified Consolidated Shareholder Derivative Complaint against the defendants named herein.  Plaintiffs' allegations are based upon information and belief developed from the investigation and analysis of their counsel (except as to the allegations in paragraphs 22-25 below, which are made based on the personal knowledge of each plaintiff specified therein), which include, among other things, public filings by nominal defendant Amedisys, Inc. ("Amedisys" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, complaints in the pending federal securities fraud actions against the Company and certain members of its senior management, and other information available in the public domain.  To the best of plaintiffs' knowledge, information, and belief, the allegations herein not based on personal knowledge are likely to have evidentiary support after a reasonable opportunity for further investigation, discovery, and analysis.

## I.    NATURE OF THE ACTION

1.    This is a consolidated shareholder derivative action brought on behalf and for the benefit of Amedisys against its directors and certain of its current and former officers.  Amedisys provides multi-state home health and hospice services to the chronic, co-morbid, and aging American population.  The Company's typical patient is Medicare eligible, about eighty-three years of age, takes approximately twelve different medications on a daily basis, and has co-morbidities or the simulators presence of two or more.

2.    Plaintiffs seek to recover, on behalf of the Company, damages and other legal and equitable relief necessary or appropriate to remedy defendants' acts and omissions in violation of state law, including their breaches of fiduciary duties, waste of Company assets, and unjust enrichment, which occurred between as early as 2005 and the present (the "Relevant Period").  As alleged herein, defendants' conduct has caused Amedisys to suffer substantial monetary losses and other damages, such as to its reputation and goodwill.

## II.    SUMMARY OF THE DEFENDANTS' WRONGFUL CONDUCT

3.    During the Relevant Period, the Company's senior officers and directors caused Amedisys to provide medically unnecessary home therapy visits to trigger additional Medicare reimbursement payments.  Specifically, when Medicare paid a flat fee for the first nine home therapy visits and doubled the fee at the tenth visit, the Company's therapists were instructed to provide patients with ten visits in order to trigger extra Medicare payments.  After the Medicare reimbursement schedule changed in 2008 to provide additional payments at the sixth, fourteenth, and twentieth visits, the Company abandoned its push for the tenth visit and promoted reaching the now lucrative sixth, fourteenth, and twentieth visits.  By causing Amedisys to game the Medicare system in this fashion, the Company's officers and directors materially and artificially increased the Company's bottom line.  While pumping up the value of Amedisys's stock, certain of these officers and directors profited by selling their shares of Company stock at inflated prices.

4.    The wrongful actions taken by the Company's employees to increase the number of visits to meet Medicare benchmarks were expressly or implicitly approved and encouraged by Amedisys management and the Board of Directors ("Board").  Confidential sources confirm that the Company officials – namely, defendants William F. Borne ("Borne"), the Company's founder, Chief Executive Officer ("CEO"), and Chairman of the Board ("Chairman"), and Jeffrey D. Jeter ("Jeter"), the Company's Chief Compliance Officer and Corporate Counsel – pressured or incentivized Amedisys employees with managerial/supervisory roles to increase the number of tenth visits (or fourteenth visits beginning in 2008) provided to patients.  Confidential sources also tell of weekly meetings at which Amedisys employees were encouraged to provide patients with tenth (or later fourteenth) visits.

5.    The illegal and unlawful scheme perpetrated by defendants as detailed herein was widespread, prevalent, continued for at least five years, and was focused on boosting the bottom line in the Company's most important line of business.  As a result of the misconduct of the defendants individually-named herein, the Company has suffered and will continue to suffer

tremendous damage.  Among other things, the misconduct of the individually-named defendants has subjected the Company to numerous class action lawsuits for violations of the federal securities laws, a myriad of investigations by both the government and government regulatory agencies in connection with potential violations of the False Claims Act ("FCA") and other statutes, potential exclusion of furnishing services under federal health care programs (the key drivers of the Company's revenue), and the resultant damages, fines, penalties, costs, and expenses associated with each of these.  In fact, the Company admittedly has already expended millions in costs and expenses associated with the wrongful conduct of defendants and will continue to incur these costs and expenses, all to the detriment of the Company and its shareholders.

### A.    The Board and the New Medicare Reimbursement Rules

6.    Defendant Borne founded Amedisys in 1982 and has served as the Company's Chairman and CEO since then.  In 1997, Borne caused the Company's entire Board at the time (except for himself) to resign.  The four replacement directors – defendants Jake L. Netterville ("Netterville"), Ronald A. LaBorde ("LaBorde"), Peter F. Ricchiuti ("Ricchiuti"), and David R. Pitts ("Pitts") – remain on the Board to this day.

7.    In 1998, defendant Borne and the newly constituted Board transitioned Amedisys from operating home care nursing facilities, ambulatory surgery centers, and home infusion therapy locations to providing home health and hospice services in order to take advantage of new Medicare reimbursement rules that would take effect in 2000.  Specifically, under the new Medicare rules, rather than reimburse home health providers their costs plus a nominal profit, Medicare switched to a flat rate system under which Medicare would provide a flat fee of $2,200 for up to nine home therapy visits, and an additional $2,200 upon the tenth visit within a sixty-day period ("episode").

### B.    The Board Is on Notice

8.    Amedisys's transition from operating health care facilities to providing home health services was rocky at first.  Defendant Borne and the rest of the defendant Board members

were quickly put on notice, if they did not already know, of the dangers and risks associated with the healthcare services industry.

9.     For example, in 1999, the Company uncovered numerous improprieties associated with improperly documented and questionable home therapy visits.  After causing Amedisys to report these discoveries to the U.S. Department of Health and Human Services Office of the Inspector General ("HHS-OIG"), the Board knowingly approved a settlement agreement on behalf of the Company (and its wholly-owned subsidiary) with the federal government, wherein healthcare fraud violations associated with billing for healthcare services not rendered and other wrongful conduct were acknowledged.  Ultimately, at the direction of the Board, Amedisys paid back approximately $1.16 million to Medicare and entered into a three-year Corporate Integrity Agreement ("CIA") dated November 10, 2003 (the "2003 CIA"), which addressed the Company's violations from 1994 to 1999 of the FCA.  Likewise, in June 2001, defendants were forced to cause the Company to restate its financials for fiscal year 2000 and the first quarter of 2001 due to the improper recording of revenue related to its patients receiving therapy services.

### C.     Suspicious Growth, Resignations, and Sell-Offs

10.     Despite all of the above, by May 2005, under the direction of the Company's officers and directors, including defendant Borne and the other defendant Board's members, the Company appeared to begin a miraculous turnaround.  These officers and directors caused the Company to continue reporting record earnings growth, quarter after quarter, and year after year, from May 2005 and April 2010.  Indeed, at least twice during the Relevant Period, the Company's reported figures beat analysts' estimates by about 20%.

11.     Amedisys's Chief Financial Officer ("CFO") of four years, defendant Gregory H. Browne ("Browne"), unexpectedly resigned in June 2006.  His replacement, John Giblin ("Giblin"), lasted only four months.  Eventually, defendant Dale E. Redman ("Redman"), with a history of corporate scandal and failed businesses, was selected for the Company's lead financial position.

12.    On several occasions between February 2007 and April 2010, certain defendants (including defendant Borne), sold personally held shares of Amedisys shortly after the Company reported positive earnings news.  For example, soon after the Company announced earnings for third quarter 2007 that were 32% larger than the same period the year before, defendants Borne, Larry R. Graham ("Graham"), Jeter, LaBorde, Netterville, Ricchiuti, and Alice Schwartz ("Schwartz") collectively sold more than 444,000 shares of Amedisys stock for combined proceeds exceeding $20.5 million.

13.    Less than a year later, defendant Borne engaged in additional suspicious trading.  On July 29, 2008, Amedisys reported earnings for second quarter 2008 that beat analyst estimates by about 17.65%.  A couple weeks later, however, Citron Research ("Citron") released a report identifying several red flags regarding the Company's accounting and Medicare billing practices.  Citron's report sent Amedisys's stock tumbling, but not before defendant Borne was able to sell off a significant portion of his Amedisys stock for over $3 million in proceeds.

14.    More suspicious trading occurred approximately a year later.  On July 28, 2009, Amedisys reported second quarter 2009 earnings that exceeded analyst estimates by about 23.9%.  During the month that followed, defendants Borne, Graham, Netterville, and Ricchiuti sold over 90,000 of their Amedisys shares for total proceeds approaching $4 million – just ahead of shocking news on September 3, 2009, that defendants Graham, Amedisys's Chief Operating Officer ("COO") for ten years and recently appointed a member of the Board, and Schwartz, the Company's Chief Information Officer ("CIO") for five years, suddenly resigned from the Company.

### D.    The Wrongdoing Is Exposed

15.    On April 27, 2010, *The Wall Street Journal* (the "WSJ") published an article entitled "*Home Care Yields Medicare Bounty*," which reported that Amedisys was taking advantage of the Medicare reimbursement system.  The WSJ quoted a former Amedisys nurse who confirmed that Amedisys employees had been instructed or otherwise encouraged to provide the lucrative tenth visit to patients.  The WSJ also presented compelling statistical

evidence showing that between 2005 and 2007, the number of Amedisys patients who received ten visits per episode was disproportionate to the number of patients who received only nine visits.  Moreover, for 2008, after Medicare reimbursement policies changed to provide additional payments at the sixth, fourteenth and twentieth visits, the number of Amedisys patients receiving six, fourteen, or twenty visits significantly increased while the number of patients who received ten visits fell by half.

16.    Amedisys's market capitalization has plummeted following the revelation that the Company's years of record performance are attributable in material part to medically unnecessary home therapy visits.  In addition to the loss of its market value and harm to its image, reputation, and goodwill, Amedisys now must confront federal securities actions filed by purchasers of Amedisys securities and investigations by the SEC, U.S. Department of Justice ("DOJ") and the U.S. Senate Finance Committee.  Investigations by other governmental entities, such as the HHS-OIG, remain a distinct possibility.  Already having expended several million dollars in connection with these matters, Amedisys faces further significant and material expense, including potentially enormous criminal and civil fines, penalties and forfeiture under the FCA and other statutes, a CIA, and worst of all, exclusion from furnishing services under any federal health care program, including Medicare and Medicaid.  With close to 90% of the Company's revenues generated by Medicare payments, such an exclusion essentially would put Amedisys out of business.

17.    Also in the wake of the WSJ article and firestorm of investigations, Amedisys has reported disappointing earnings.  But litigation and investigation costs are not solely to blame.  Certain defendants, including Borne and Redman, admit that Amedisys is now providing fewer visits per patient.  Caught red-handed, the Company's current officers and directors named as defendants herein caused Amedisys to change its practices with regard to assessing patient acuity (a measurement of a patient's need for medical services based on the patient's medical condition) and the number of home therapy visits each patient should receive.

18.     Despite defendants Borne, Redman, and Jeter's breaches of fiduciary duty and the damage they caused to Amedisys, the Board – still comprised of defendants Borne, Netterville, LaBorde, Ricchiuti, and Pitts, with the addition of defendant Donald A. Washburn ("Washburn") – approved amendments to Borne's, Redman's, and Jeter's employment agreements effective as of January 3, 2011.  These new amendments include *increased salaries* for the three defendants, the potential for *more bonuses* and *equity awards*, and, for Borne, a *new car* every two years plus gas and maintenance costs.

## III.     JURISDICTION AND VENUE

19.     Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

20.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (i) Amedisys maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Amedisys, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

IV.     **THE PARTIES**

A.      **Shareholder Plaintiffs**

22.     Plaintiff Northumberland County Pension Fund (the "Northumberland Pension Fund") was a shareholder of Amedisys at the time of the wrongdoing complained of herein, has been a shareholder continuously since that time, and is a current shareholder.    The Northumberland Pension Fund, which maintains its principal offices in Pennsylvania, is a citizen of Pennsylvania.

23.     Plaintiff Laborers' District Council and Contractors' Pension Fund of Ohio (the "Ohio Laborers' Fund") was a shareholder of Amedisys at the time of the wrongdoing complained of herein, has been a shareholder continuously since that time, and is a current shareholder.  The Ohio Laborers' Fund, which maintains its principal offices in Ohio, is a citizen of Ohio.

24.     Plaintiff Paula Wendland ("Wendland") was a shareholder of Amedisys at times relevant to the wrongdoing complained herein, has been a shareholder continuously since that time, and is a current shareholder.  Wendland, a citizen of Ontario, Canada.

25.     Plaintiff Dan Himmel ("Himmel") was a shareholder of Amedisys at the time of the wrongdoing complained of herein, has continuously been a shareholder since that time, and is a current shareholder.  Himmel, a citizen of Florida.

B.      **Nominal Defendant Amedisys**

26.     Nominal defendant Amedisys is a Delaware corporation with its principal executive offices located at 5959 S. Sherwood Forest Boulevard, Baton Rouge, Louisiana. Amedisys is named in this complaint as a nominal defendant solely in a derivative capacity, and this consolidated shareholder derivative action is brought on its behalf.  Amedisys provides home health and hospice services to the chronic, co-morbid, and aging American population.  Its home health services include skilled nursing and home health aide services; physical, occupational, and speech therapy; and medically oriented social work to eligible individuals who require ongoing care.  The Company also offers clinically focused programs for chronic conditions and various

diseases, such as diabetes, coronary artery disease, congestive heart failure, orthopedics, complex wound care, geriatric surgical recovery, balance retraining, behavioral health, and stroke recovery, as well as various rehabilitative programs.  Amedisys also provides hospice services to patients using an interdisciplinary care team comprising of a physician, nurses, home health aides, social workers, therapists, dieticians, volunteers, counselors, chaplains, and bereavement coordinators.  The Company's hospice services include provision of medicines; medical equipment and supplies related to the hospice diagnosis; medication management to control pain and symptoms; physician services to manage medications; nursing and home health aide visits; volunteer services to provide companionship; and bereavement services.  Amedisys stock is traded on the NASDAQ under the symbol "AMED."

### C.    Director Defendants

27.    Defendant Borne is Amedisys's Chairman of the Board and CEO and has been since he founded the Company in 1982.  He was the Company's CFO from 1990 to 1996, Vice President from 1990 to 1995, and is a member of the Company's Compliance Committee.  Borne knowingly or recklessly failed to maintain adequate internal controls with respect to Amedisys's financial reporting and Medicare billing practices and made improper statements to the Company's shareholders.  Further, Borne either knowingly, recklessly, or grossly negligently approved or allowed the improper manipulations of the Company's Medicare billing practices by causing Amedisys's employees to visit patients more than was medically necessary.  The Company paid Borne the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|------|--------|-------|--------------|----------------------------------------|------------------------|
| 2009 | $750,000 | - | $2,437,531 | $1,072,500 | $58,423 |
| 2008 | $723,077 | - | $2,497,388 | $1,125,000 | $35,725 |
| 2007 | $664,994 | - | $2,178,120 | $714,500 | $111,407 |
| 2006 | $582,701 | $650,000 | $108,329 | - | $9,728 |
| 2005 | $396,153 | - | $259,989 | | |

While in possession of material, non-public information concerning the illicit Medicare billing practices at Amedisys and the Company's issuance of false and/or misleading public statements,

Borne sold 217,500 shares of his personally held stock for nearly $11 million in proceeds.  Borne is a citizen of Louisiana.

28.     Defendant LaBorde is Amedisys's Lead Director and has been since February 2003 and a director and has been since 1997.  LaBorde is a member of the Audit Committee and has been since at least May 2005.  He also is a member of the Company's Compensation Committee, the Nominating and Corporate Governance Committee, and the Investment Committee.   Previously, LaBorde served as an officer at Piccadilly Cafeterias, Inc. ("Piccadilly"), where he became CFO and was elected to the Board in 1992, and president and CEO of the corporation in June 1995.  Under LaBorde's direction, Piccadilly fell into bankruptcy and was forced to sell its assets and business in February 2004.  LaBorde knowingly or recklessly: (i) failed to cause the Company to maintain adequate internal controls with respect to Amedisys's financial reporting and Medicare billing practices; and (ii) reviewed and approved improper, public statements to Amedisys's shareholders.  Further, LaBorde either knowingly or recklessly approved or allowed the improper manipulations of the Company's Medicare billing practices by causing Amedisys's employees to visit patients more than medically necessary. Amedisys paid defendant LaBorde the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2009 | $100,500 | $124,999 | $225,499 |
| 2008 | $114,250 | $79,013 | $193,263 |
| 2007 | $55,500 | $84,152 | $139,652 |
| 2006 | $63,000 | $58,723 | $121,723 |

While in possession of material, non-public information concerning the illicit Medicare billing practices at Amedisys and the Company's issuance of false and/or misleading public statements, LaBorde sold 19,007 shares of his personally held stock for $942,537.75 in proceeds.  LaBorde is a citizen of Louisiana.

29.     Defendant Netterville is an Amedisys director and has been since 1997. Netterville is Chairman of the Audit Committee and has been since February 2003.  He also is a member of the Compensation Committee and the Nominating and Corporate Governance

Committee.  He is a Certified Public Accountant, has served as Chairman of the Board of the American Institute of Certified Public Accountants, Inc. ("AICPA") and is a permanent member of the AICPA's governing council.  Netterville has testified before the U.S. Senate Subcommittee on Securities on behalf of the accounting profession, and has been quoted in the WSJ as well as *The New York Times*.  Netterville knowingly or recklessly: (i) failed to cause the Company to maintain adequate internal controls with respect to Amedisys's financial reporting and Medicare billing practices; and (ii) reviewed and approved improper, public statements to Amedisys's shareholders.  Further, Netterville either knowingly or recklessly approved or allowed the improper manipulations of the Company's Medicare billing practices by causing Amedisys's employees to visit patients more than was medically necessary.  Amedisys paid defendant Netterville the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2009 | $97,500 | $124,999 | $222,499 |
| 2008 | $115,250 | $79,013 | $194,263 |
| 2007 | $55,500 | $84,152 | $139,652 |
| 2006 | $63,500 | $58,723 | $122,223 |

While in possession of material, non-public information concerning the illicit Medicare billing practices at Amedisys and the Company's issuance of false and/or misleading public statements, Netterville sold 35,000 shares of his personally held stock for over $1.7 million in proceeds. Netterville is a citizen of Louisiana.

30.    Defendant Pitts is an Amedisys director and has been since 1997.  Pitts is also a member of the Audit Committee and has been since at least May 2005.  He also is Chairman of the Company's Compensation Committee and a member of the Investment Committee and Nominating and Corporate Governance Committee.  Pitts has over forty years of healthcare experience.  Pitts has been President and CEO of Pitts Management Associates ("PMA"), a national hospital and health care management and consulting firm, since 1981 and Chairman and CEO of PMA since 1999.  Prior to founding PMA, Pitts was the CEO of the Ochsner Foundation Hospital in New Orleans and served in the federal government as the Executive Officer for

Health Affairs in the Office of the Secretary of Defense and the Executive Officer in the Office of the Air Force Surgeon General.  Pitts knowingly or recklessly: (i) failed to cause the Company to maintain adequate internal controls with respect to Amedisys's financial reporting and Medicare billing practices; and (ii) reviewed and approved improper, public statements to Amedisys's shareholders.  Further, Pitts either knowingly or recklessly approved or allowed the improper manipulations of the Company's Medicare billing practices by causing Amedisys's employees to visit patients more than was medically necessary.  Amedisys paid defendant Pitts the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2009 | $92,250 | $124,999 | $217,249 |
| 2008 | $107,250 | $79,013 | $186,263 |
| 2007 | $42,000 | $84,152 | $126,152 |
| 2006 | $50,000 | $58,723 | $108,723 |

Pitts is a citizen of Louisiana.

31.    Defendant Ricchiuti is an Amedisys director and has been since 1997.  Ricchiuti is a member of the Audit Committee and has been since at least May 2005.  He also is Chairman of the Company's Investment Committee and a member of the Nominating and Corporate Governance Committee.  Ricchiuti is the Assistant Dean and Director of Research of Burkenroad Reports at Tulane University's A.B. Freeman School of Business and has been since 1993, and is a Clinical Professor of Finance at Tulane and has been since 1986.  He previously served as the Assistant State Treasurer & Chief Investment Officer, Department of the Treasury, for the state of Louisiana from 1988 to 1993.  Ricchiuti knowingly or recklessly: (i) failed to cause the Company to maintain adequate internal controls with respect to Amedisys's financial reporting and Medicare billing practices; and (ii) reviewed and approved improper, public statements to Amedisys's shareholders.  Further, Ricchiuti either knowingly or recklessly approved or allowed the improper manipulations of the Company's Medicare billing practices by causing Amedisys's employees to visit patients more than was medically necessary.  Amedisys paid defendant Ricchiuti the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2009 | $84,000 | $124,999 | $208,999 |
| 2008 | $82,250 | $79,013 | $161,263 |
| 2007 | $43,500 | $84,152 | $127,652 |
| 2006 | $51,500 | $58,723 | $110,223 |

While in possession of material, non-public information concerning the illicit Medicare billing practices at Amedisys and the Company's issuance of false and/or misleading public statements, Ricchiuti sold 7,950 shares of his personally held stock for nearly $397,314.80 in proceeds. Ricchiuti is a citizen of Louisiana.

32.    Defendant Washburn is an Amedisys director and has been since 2004. Washburn is a member of the Audit Committee and has been since at least May 2005. He also is Chairman of the Company's Nominating and Corporate Governance Committee and a member of the Compensation Committee. Washburn is and has been a private investor for more than five years. He also served as an Executive Vice President of Northwest Airlines, Inc. ("Northwest") from 1995 to 1998, and as Senior Vice President of Northwest from 1990 to 1995. Washburn knowingly or recklessly: (i) failed to cause the Company to maintain adequate internal controls with respect to Amedisys's financial reporting and Medicare billing practices; and (ii) reviewed and approved improper, public statements to Amedisys's shareholders. Further, Washburn either knowingly or recklessly approved or allowed the improper manipulations of the Company's Medicare billing practices by causing Amedisys's employees to visit patients more than was medically necessary. Amedisys paid defendant Washburn the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2009 | $83,250 | $124,999 | $208,249 |
| 2008 | $97,750 | $79,013 | $176,763 |
| 2007 | $43,000 | $84,152 | $127,152 |
| 2006 | $52,000 | $58,723 | $110,723 |

Washburn is a citizen of Oregon.

### D.   Current Officer Defendants

33.     Defendant Redman is Amedisys's CFO and has been since February 2007.  He is a member of the Company's Compliance Committee.  Prior to April 1999, he was Executive Vice President and CFO of United Companies Financial Corporation ("UCFC"), which was a publicly-traded, $1.7 billion home mortgage and home equity lender based in Baton Rouge, Louisiana.  Redman, along with the other members of UCFC's management team, was accused of hiding hundreds of millions of dollars worth of losses at UCFC, which filed for bankruptcy in the spring of 1999.   Similarly, in November 1995, Redman was elected to the Board of Piccadilly under Redman's direction, Piccadilly fell into bankruptcy and was forced to sell its assets and business in February 2004.  Defendant Redman knowingly or recklessly failed to cause the Company to maintain adequate internal controls with respect to Amedisys's financial reporting and Medicare billing practices.  Redman made improper statements to the Company's shareholders.  Further, Redman either knowingly, recklessly, or grossly negligently approved or allowed the improper manipulations of the Company's Medicare billing practices by causing Amedisys's employees to visit patients more than was medically necessary.   Amedisys paid Redman the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|------|--------|--------------|----------------------------------------|------------------------|
| 2009 | $411,538 | $828,768 | $455,813 | $20,765 |
| 2008 | $354,808 | $618,064 | $281,250 | $17,474 |
| 2007 | $252,692 | $321,100 | $164,850 | $14,491 |

Redman is a citizen of Louisiana.

34.     Defendant Jeter is Amedisys's Chief Compliance Officer/Corporate Counsel and has been since March 2004.  Jeter was also the Company's Vice President of Compliance/Corporate Counsel from April 2001 to March 2004.  Jeter is a member of the Compliance Committee.   Prior to joining Amedisys, Jeter served as an Assistant Attorney General for the Louisiana Department of Justice beginning in 1996, where he prosecuted healthcare fraud and nursing home abuse.  Jeter has also served as an instructor for the Federal Law Enforcement Training Center and the Louisiana Law Enforcement Commission.  Jeter

knowingly or recklessly failed to cause the Company to maintain adequate internal controls with respect to Amedisys's financial reporting and Medicare billing practices.  Further, Jeter either knowingly, recklessly, or grossly negligently approved or allowed the improper manipulations of the Company's Medicare billing practices by causing Amedisys's employees to visit patients more than was medically necessary.  Amedisys paid Jeter the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Award | Non-Equity Incentive Plan Compensation | All Other Compensation |
|------|--------|-------|--------------|--------------|----------------------------------------|------------------------|
| 2009 | $201,923 | - | $136,507 | - | $150,150 | $6,945 |
| 2008 | $173,269 | - | $169,358 | - | $135,000 | $9,150 |
| 2007 | $159,904 | - | $93,014 | - | $85,173 | $10,661 |
| 2006 | $124,935 | $70,000 | - | $19,393 | - | $5,622 |
| 2005 | $105,538 | $30,000 | - | - | - | - |

While in possession of material, non-public information concerning the illicit Medicare billing practices at Amedisys and the Company's issuance of false and/or misleading public statements, Jeter sold 19,001 shares of his personally held stock for $817,043 in proceeds.  Jeter is a citizen of Louisiana.

### E.    Former Officer Defendants

35.    Defendant Graham was Amedisys's COO from January 1999 to September 2009 and President from August 2004 to September 2009, when he resigned as an officer of the Company.  He was an Amedisys director from January 2009 until he resigned from the Board in or around September 2009.  Graham was also Senior Vice President of Operations from January 1998 to January 1999 and Vice President of Finance from April 1996 to January 1998.  Graham knowingly, recklessly, or grossly negligently approved or allowed the improper manipulations of the Company's Medicare billing practices by causing Amedisys's employees to visit patients more than was medically necessary.  Amedisys paid Graham the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Award | Non-Equity Incentive Plan Compensation | All Other Compensation |
|------|--------|-------|--------------|--------------|----------------------------------------|------------------------|
| 2009 | $433,077 | - | $1,690,032 | - | - | $2,612,677 |
| 2008 | $529,808 | - | $1,571,826 | - | $618,750 | $14,454 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 2007 | $488,942 | - | $632,505 | - | $391,519 | $12,951 |
| 2006 | $364,855 | $425,000 | $210,415 | $114,065 | - | $1,752 |
| 2005 | $315,230 | - | - | - | - | - |

While in possession of material, non-public information concerning the illicit Medicare billing practices at Amedisys and the Company's issuance of false and/or misleading public statements, Graham sold 113,153 shares of his personally held stock for over $4.5 million in proceeds. Graham is a citizen of Louisiana.

36. Defendant Schwartz was Amedisys's CIO from September 2004 to September 2009, when she resigned from the Company. Schwartz was also Amedisys's Senior Vice President of Clinical Operations from 2003 until her resignation in September 2009. Schwartz joined the Company in 1998 where she served in various leadership roles, such as Administrator and a Regional Director of Clinical Services. Schwartz knowingly, recklessly, or grossly negligently approved or allowed the improper manipulations of the Company's Medicare billing practices by causing Amedisys's employees to visit patients more than was medically necessary. Amedisys paid Schwartz the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Award | Non-Equity Incentive Plan Compensation | All Other Compensation |
|---|---|---|---|---|---|---|
| 2009 | $269,615 | - | $780,051 | - | - | $1,056,659 |
| 2008 | $323,077 | - | $569,260 | - | $262,500 | $6,409 |
| 2007 | $250,961 | - | $116,987 | - | $137,375 | $5,073 |
| 2006 | $169,803 | $122,962 | - | $95,109 | - | $4,507 |
| 2005 | $150,000 | $30,000 | - | - | - | - |

While in possession of material, non-public information concerning the illicit Medicare billing practices at Amedisys and the Company's issuance of false and/or misleading public statements, Schwartz sold 23,397 shares of her personally held stock for $922,175.28 in proceeds. Schwartz is a citizen of Louisiana.

37. Defendant Browne was the Company's CFO from June 4, 2002 until his resignation effective as of June 7, 2006. Browne knowingly or recklessly failed to maintain adequate internal controls with respect to Amedisys's financial reporting and Medicare billing practices. Further, Browne either knowingly, recklessly, or grossly negligently approved or allowed the improper manipulations of the Company's Medicare billing practices by causing

Amedisys's employees to visit patients more than was medically necessary. Amedisys paid Browne the following compensation as an executive:

| Year | Salary | Option Award | All Other Compensation |
|------|--------|--------------|------------------------|
| 2006 | $207,675 | $75,953 | $63,340 |
| 2005 | $232,788 | - | - |

Browne is a citizen of Texas.

38.    The defendants indentified in ¶¶27-32 are referred to herein as the "Director Defendants." The defendants identified in ¶¶28-32 are referred to as the "Audit Committee Defendants." The defendants identified in ¶¶27, 33-37 are referred to as the "Officer Defendants." The defendants identified in ¶¶27-29, 31, 34-36 are referred to as the "Insider Selling Defendants." Collectively, the defendants identified in ¶¶27-37 are referred to as the "Individual Defendants."

## V.    BACKGROUND INFORMATION

### A.    Defendant Borne Reorganizes the Company

39.    Amedisys was originally incorporated in Louisiana in 1982 as Analytical Nursing Management Corporation ("ANMC"). After completing a reverse acquisition with M&N Capital Corp in 1993, Amedisys reincorporated in Delaware and subsequently became a publicly traded company under the ticker, AMED. From 1993 to approximately 1998, Amedisys's business model was focused on operating home care nursing facilities, ambulatory centers, and home infusion therapy locations.

40.    In 1997, defendant Borne took advantage of his status as founder, CEO, and Chairman of the Company to take Amedisys in a new direction. Demonstrating his imperial command over the Company, Borne caused the entire Board (but for himself) to resign and started from scratch in appointing replacement directors. *Forbes* covered this changing of the guards in a November 1, 2004, article titled "*At Death's Door*":

> Borne decided one day in 1997 that he didn't have the expertise to take his company to the next level. So he met with every member of the board and persuaded each one to resign. His new directors included a principal in an

accounting firm [(Netterville)], the chief executive of a publicly traded restaurant chain [(LaBorde)], an adjunct professor of finance from Tulane University [(Ricchiuti)] and a health care consultant [(Pitts)].

(These same four individuals, as well as Borne, remain on the Board to this day.)

41.     At or around April 1998, Borne learned that Medicare was going to overhaul its approach to reimbursing healthcare providers for home health services.  Rather than pay home healthcare providers their costs plus a nominal profit, sometimes referred to as the "cost-plus" approach, Medicare planned to switch to a prospective payment system ("PPS").    Specifically, the new PPS reimbursement system was based on a flat fee of $2,200 for up to nine home therapy visits, and an additional $2,200 upon the tenth visit.  Borne decided to make an all-in bet based on the new Medicare guidelines, or, as *Forbes* referred to it in a November 1, 2004 article, "to risk it all on home nursing, … making him even more dependent on the ever-mutable Uncle Sam."

42.     Beginning in 1999, Amedisys restructured its operations to maximize Medicare reimbursement receivables under the new flat rate reimbursement system.  To do so, the Company, as reported in its Form 10-K filed with the SEC on March 19, 2001, for fiscal year 2000 ("2000 10-K"), "changed its strategy from providing a variety of alternate site provider health care services to becoming a leader in home health care nursing services."  To abate any investor concern over these drastic changes, Borne and the Individual Defendants then at the Company, promised gold at the end of the rainbow.  For example, the 2000 10-K, signed by Borne, LaBorde, and Netterville (Pitts and Ricchiuti either failed to or refused to sign the 2000 10-K), explained that the reorganization was driven in part by "the governmental reimbursement changes in the Medicare system that [would] now allow home care the ***opportunity to be profitable*** since the Prospective Payment System ("PPS") was implemented in October 2000."

### B.     The Board's Early Troubles

43.     In 1999, Amedisys unearthed "certain improprieties" at Amedisys's location in Monroe, Louisiana.  *Forbes* noted that the "host of improprieties" included "not documenting

home visits properly, arousing suspicions that they hadn't been made at all."    Amedisys
proceeded to conduct an internal investigation, after which it voluntarily reported the discovered
issues to the HHS-OIG.  Thereafter, Amedisys was subjected to an "extensive series of audits."

44.    To add fuel to the fire, on June 13, 2001, the Company issued a press release
announcing that the Company had overstated its revenues for the quarters ended December 31,
2000 and March 31, 2001.  Later, on August 20, 2001, Amedisys issued a Form 10-Q indicating
that the overstatement of revenues occurred because the Company had been recognizing revenue
for ten or more patient therapy visits when less than ten had visits had been rendered.  The
Individual Defendants then at the Company blamed the overbilling on a software glitch.  The
August 20, 2001 Form 10-Q states in relevant part:

> The Company has restated the Consolidated Financial Statements for the year
> ended December 31, 2000 and the quarter ended March 31, 2001 due to a ***net
> revenue overstatement*** for the fourth quarter of 2000 and the first quarter of 2001.
> The Medicare reimbursement changes effective October 1, 2000 required
> substantial changes to the Company's software application, both from an
> operational and an accounting perspective, including the recording of revenue
> related to patients receiving therapy services. ***Under the changed reimbursement
> system, if a patient, upon initial assessment by the nurse, is expected to require
> ten or more therapy visits in an episode, the expected reimbursement for that
> episode is increased ("therapy add-on"). If, upon completion of the episode, the
> expected therapy utilization of ten or more visits was not met, the provider is not
> entitled to the therapy add-on. The Company's software did not detect
> differences between the initial nurse's assessment that called for ten or more
> visits and the therapist's subsequent evaluation which indicated that fewer than
> ten visits were necessary.***

> The Company has modified its software and has changed certain processes to
> detect any discrepancies in assessed therapy need and to more closely monitor the
> patient's progress as it relates to scheduled therapy services.

45.    The Individual Defendants learned from the 2001 restatement that a failure to
reach ten visits, when a patient had been assessed for ten or more, would mean that the Company
would have to pay back money to Medicare.  Thus, after twice encountering issues involving
visits not rendered, the Individual Defendants caused Amedisys to shift tactics and instead
manipulate the actual number of visits provided to patients.  In the years that followed the 2001

restatement, the Individual Defendants encouraged, incentivized, or otherwise caused ten or more home therapy visits to be rendered to patients even when not medically necessary.

### C.    Violations of the FCA and CIA

46.    On November 10, 2003, the Company and its wholly-owned subsidiary, Amedisys Specialized Medical Services, Inc. ("ASMS"), entered into a settlement agreement with the DOJ and the HHS-OIG to resolve "certain civil and administrative monetary claims and causes of action" alleged by the federal government against ASMS ("2003 Settlement Agreement"):

> [u]nder the False Claims Act, 31 U.S.C. §§ 3729 et seq., as amended, under the Civil Monetary Penalties Law, 42 U.S.C. §§ 1320a-7a, under the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812, and under common law, for knowingly engaging in the following conduct during the period from 1994 to 1999…: [(i)] From 1994 - 1999, the Company's Monroe, Louisiana, office which was acquired in 1994, billed for services not rendered and submitted invalid cost report deductions[; and (ii)] [t]he billing for services not rendered was facilitated by the agency's alteration of records, falsification of physician/patient signatures and falsification of nurse's notes. The invalid cost report deductions consisted of salaries deducted for individuals who did not perform work for the Company.

47.    Under the 2003 Settlement Agreement, ASMS agreed to pay the government the sum of $1,156,587.90.  The 2003 Settlement Agreement, approved by the Board, was signed on behalf of ASMS by defendants Borne and Jeter.  It incorporated by reference the 2003 CIA executed by HHS-OIG, Amedisys, and ASMS, which addressed the Company's FCA violations from 1994 to 1999.

48.    The purpose of the 2003 CIA was to "*to promote compliance by [Amedisys and ASMS] officers, directors, employees, contractors, and agents with the statutes, regulations, and written directives of Medicare, Medicaid, and all other Federal health care programs*." The compliance obligations under the 2003 CIA continued for three years after its effective date. The 2003 CIA was signed on behalf of Amedisys and ASMS by defendants Borne and Jeter. Defendant Borne and the rest of the Director Defendants were all members of Board at the time the 2003 CIA and 2003 Settlement Agreement were executed.

49.    Under the 2003 CIA, Amedisys was required to maintain a compliance program that included, among other things, appointing a Corporate Compliance Officer "responsible for developing and implementing policies, procedures, and practices designed to ensure compliance with the requirements set forth in this CIA and with Federal health care program requirements," and who would be responsible for reporting to the Board; maintaining its existing Compliance Committee; maintaining its existing Standards of Conduct and "mak[ing] the promotion of, and adherence to, the 'Standards of Conduct' an element in evaluating the performance of all employees;" "maintain[ing], and update[ing] as necessary, its written Policies and Procedures regarding the operation of Amedisys' compliance program and its compliance with Federal health care program requirements;" providing appropriate training; engaging an "Independent Review Organization" such as an accounting, auditing, or consulting firm "to perform reviews at [ASMS] to assist Amedisys in assessing and evaluating its billing and coding practices and certain other obligations pursuant to this CIA and the Settlement Agreement," including a claims review, an unallowable cost review, and potentially a systems review; maintaining a disclosure program for employees and other individuals; requiring the reporting of Medicare overpayments and material deficiencies that led to substantial overpayments; and mandating annual reporting and certifications by the Chief Compliance Officer.

50.    On October 1, 2008, the Company acquired Home Health Corporation of America ("HHCA"). Prior to this acquisition, HHCA had entered into a CIA in 2005 ("2005 CIA") to resolve claims out of an illegal kickback scheme dating from February 1997 through May 1998. Though the wrongdoing at HHCA occurred before the Company acquired it, the provisions of the 2005 CIA are still binding on Amedisys. As set forth in the Company's Form 10-K for fiscal year 2008, which was filed with the SEC on February 17, 2009:

> We acquired certain assets and assumed certain liabilities of HHCA on October 1, 2008, which was subject to a five-year CIA with the Office of Inspector General for the United States Department of Health and Human Services ("OIG") as of the date of the transaction. HHCA entered into the CIA in 2005 as a result of the settlement of claims arising out of an alleged kickback scheme dating from February 1997 through May 1998. ***Although the ownership of the HHCA agencies has changed, the provisions of the CIA remain binding on us as***

*HHCA's successor and remain in effect until May 17, 2010, or until such time thereafter as the OIG reviews the final annual report submitted*. Based on our review of the CIA and discussions with both outside counsel and representatives of the OIG, we believe these contractual obligations and the associated risks are applicable solely to the six home health agencies acquired from HHCA in Pennsylvania, Maryland and Delaware. The CIA requires that we maintain HHCA's existing compliance program and provides for additional training requirements for certain staff involved in business development functions, the implementation of certain tracking and reporting processes related to financial relationships with referral sources, an annual, independent review of financial relationships with referral sources, and regular reporting to the OIG. The CIA also provides for stipulated penalties in the event of non-compliance by us, including the possibility of exclusion from the Medicare program. Although we believe that we are currently in compliance with the CIA, any violations of that agreement could have a material adverse effect on our business and consolidated financial condition, results of operations and cash flows.

The Company's 2009 Form 10-K ("2009 10-K") filed with the SEC on February 23, 2010, contained identical language. Thus, Amedisys has operated under two separate CIAs during the past seven years.

51.    Under the 2005 CIA, the Chief Compliance Officer must make periodic (at least quarterly) reports regarding compliance matters directly to the Board, and is authorized to report to the Board at any time any non-compliance. The 2005 CIA sets forth stipulated penalties for non-compliance, including the possibility of exclusion from Medicare.

### D.    Suspicious CFO Troubles

52.    Amedisys's accounting troubles went hand-in-hand with its turbulent CFO succession. In June 2006, Amedisys's CFO of four years, defendant Browne, unexpectedly resigned "in order to pursue other professional interests." To quell media and investor curiosities, defendant Borne claimed that "both Greg and the Company realized that the skill set going forward in the financial officer's role will require a CFO with a different profile." A few months later, Amedisys settled on Giblin, who had served for several years as CFO at Crawford, an international insurance services firm.

53.    Giblin's tenure with Amedisys was suspiciously brief. After starting at Amedisys in October 2006, Giblin abruptly resigned "for personal reasons" in February of 2007 according to an August 27, 2008 article, by *TheStreet* titled "*Amedisys' CFO Carousel Misses the Mark*."

*TheStreet* also noted that "Giblin, who spent 17 years at Crawford, lasted four short months at Amedisys."

### E.    Defendant Redman Hired Despite History of Corporate Scandal

54.    In the wake of Giblin's resignation, the Director Defendants approved the appointment of defendant Redman, who at the time served the board of a company run by defendant LaBorde, to replace Giblin as CFO.

55.    Defendant Redman served as CFO and Executive Vice President of UCFC from 1988 to April 1999 and as a director from 1983 to April 1999.  Under Redman's direction, UCFC largely attributed its rising earnings and stock price to its mortgage loan-backed bond sales.  As it turned out, the earnings attributed to these bond sales were achieved through various accounting manipulations in violation of Generally Accepted Accounting Principles ("GAAP").  As a result of these accounting improprieties, UCFC was required to restate its earnings and book a $605 million write-off that stunned investors and triggered UCFC's bankruptcy in the spring of 1999.  In the flood of litigation that followed, UCFC's meltdown was repeatedly likened to the Enron scandal.

56.    The fallout from Redman's stint as UCFC's CFO was costly.  Redman was named as a defendant in two major class actions that ultimately cost UCFC $30.5 million to settle.  In *Norman P. Lasky, et al. v J. Terrell Brown*, filed on December 17, 1999, investors alleged that Redman and other individual defendants knew or recklessly disregarded that UCFC's reported revenue, income, and earnings per share were artificially inflated as a result of overly-aggressive and improper accounting practices, which were inconsistent with GAAP and other principles of fair reporting.  In the end, UCFC agreed to pay investors $20.5 million to settlement the securities case.  Redman was also named as a defendant in a related action brought under the Employee Retirement Income Security Act that settled for $10 million.

57.    Defendant Redman's troubles were not limited to UCFC.  In November 1995, Redman was elected to the Board of Picadilly, a publicly traded retail restaurant business.  Five months prior to Redman's election to the Piccadilly board, defendant LaBorde was promoted to

President and CEO of Piccadilly.  Under the direction of LaBorde and Redman, Piccadilly failed miserably.  In February 2004, Piccadilly was forced to sell its assets and business as part of a Section 363 bankruptcy sale proceeding.

58.     *TheStreet* explains that "Redman worked for himself in the meantime, operating an obscure consulting firm for eight years before suddenly surfacing as Amedisys' CFO early last year."  Defendant Redman's time at Piccadilly, however, was not for waste.  As *TheStreet* article points out, Redman's boardroom ties to defendant LaBorde "may have helped" Redman land his job at Amedisys.

59.     Defendant Redman became Amedisys's CFO in February 2007.    When introducing Redman to Amedisys shareholders, the Individual Defendants then at the Company caused Amedisys to trumpet Redman's abilities and experience. But notably, no mention was made of what became of UCFC.  *TheStreet* explains this attempt to gloss over Redman's past in its August 27, 2008 article:

> In February 2007, Amedisys portrayed Dale Redman as a gifted CFO and highlighted his experience at United Companies Financial Corp. in particular, stressing that he had overseen finances for the "$1.7 billion NYSE mortgage company."

> The Company *failed to mention* that Redman was part of a management team accused of hiding hundreds of millions of dollars worth of losses at UCFC, however, and that the company's stock wound up almost worthless in the end.

**F.    Suspicious Claims of Technology-Driven Growth**

60.     From approximately 2005 to first quarter 2010, Amedisys reported tremendous revenue growth.  Amedisys attributed this growth, in part, to its "proprietary technologies."  The Company claimed that its Point of Care System ("PoC"), overseen by defendant Schwartz at times relevant hereto, provided the Company with an efficient means of submitting and tracking claims and giving healthcare professionals real-time access to patient data.  The Company, accordingly, claimed that the PoC gave the Company a significant competitive advantage in its industry.

61.    The Company's 2007 Annual Report to shareholders, for example, states the following in regard to the PoC System: "This integrated technology also allows us to be efficient, thus reducing the need for additional administrative staff and related expenses, which enables us to continue to be a low-cost provider.  Our integrated technology also provides a care coordination platform unlike any other in the home health industry."  Similarly, in a Form 8-K filed on March 5, 2008, the Company stated: "Our point of care system should be a competitive advantage with reimbursement changes."  The Company furthers stated in its Form 10-K for fiscal year 2008, "we believe that our consistent, high-quality care, comprehensive range of services, state-of-the-art information management systems and widespread service network give us a competitive advantage over most of our competitors."

62.    On August 12, 2008, Citron, the same company that had exposed a similar billing scandal at ArthroCare Corporation in 2008, released a report on Amedisys questioning the Company's Medicare billing practices and challenging the Company's premise that its success resulted from its PoC system (dubbed Amedisys's "secret sauce").  Citron sounded the alarm that Amedisys had been growing faster than one would expect for a Company dependent on Medicare reimbursements:

> Amedisys has been growing fast – rolling up competitors, growing revenues rapidly through acquisitions.  All the while it's been growing margins, too. Amedisys claims its computer systems for submitting and tracking claims gives it a huge competitive advantage in its business.  Considering nearly 90% of their business is Medicare reimbursement, it is really hard to "out-Medicare" your competition – its kinda like selling to Wal-Mart.

63.    Commenting on the Company's recently filed Form 10-Q for second quarter 2008, Citron stated the 10-Q "left many unanswered questions for those trying to assess the long term viability of [Amedisys's] business model."  For instance, Citron noted that the Company began reserving for uncollectible receivables, thus opening "*a huge can of worms from an accounting standpoint*" and "creating an irresistible potential for 'cookie jar' accounting."  Citron also observed that Amedisys was "running huge receivables," which had exploded by 20% from the

year prior, and suggested that Amedisys could use receivables to alter its earnings.  Moreover, Citron speculated that Amedisys was staying ahead of the pack by increasing revenue per admission: "In this case, in the second quarter, for example, AMED had about the same growth in admissions, slightly better growth in revenue per episode but TWICE the growth in total internal revenue as everyone else.  We believe that is because their revenue per admission soared …."

64.      Citron revealed that it had engaged a licensed private investigator to interview Amedisys's former employees in an attempt to explore the accounting red flags.  According to Citron, the interviewees presented consistent concerns:

- Amedisys pressured employees to manipulate OASIS [Outcomes and Assessment Information Set] scores in order to increase billings

- Local offices would receive calls from headquarters to influence the scores on Medicare patients (to justify higher billing)

- According to one former management employee…: 'Our old receivables were real high and were a real mess.  But no one at corporate would let us try and straighten up the mess.  The billing system is set up for failure and *there are no checks and balances*.'

65.      Citron's investigation also turned up evidence of possible "management paranoia." As Citron explained, "If management tries to control employees who believe something is amiss, look out."  Thus, Citron red-flagged a statement by a former Amedisys employee that "if you questioned Amedisys about anything, they would push you out and label you as a trouble maker …."

66.      Although Citron cautioned that it had not reached a conclusion that Amedisys was committing Medicare fraud, Citron advised that "Amedisys's near total dependence upon Medicare for its revenue has to be factored as a business risk."  Citron also questioned whether the Company's "secret sauce" could account for the Company's margins as opposed to, for

example, "increasing management pressure to push the envelope harder and harder to game the Medicare billing system."

### G.    Sudden Departure of Defendants Graham and Schwartz Rings Alarms

67.    In the wake of Citron's August 12, 2008 report, Amedisys struggled to regain credibility with Medicare and investors.  In February 2009, the U.S. Department of Health and Human Services announced it would begin rolling out a Medicare Recovery Audit Contractor ("RAC") program in March 2009, in an effort to identify improper Medicare payments and recover overpayments.  Additionally, in a second report released on October 15, 2009, Citron claimed that Amedisys had received numerous additional document requests from Medicare. Meanwhile, Amedisys's stock was taking a beating compared to its pinnacle just days before the first Citron article came out.  It was amidst this industry-wide and Company-specific scrutiny into fraudulent Medicare billing practices that defendants Graham and Schwartz unexpectedly resigned.

68.    Defendant Graham served as Amedisys's COO for over ten years and was an employee of the Company for thirteen years.  On July 30, 2009, transactions exceeding all his prior stock sales during the Relevant Period combined, Graham dumped 57,590 shares for $2,371,412 in proceeds.  Graham sold another 718 shares the next day.  Graham resigned two short months later on September 3, 2009, without a successor in place.

69.    Defendant Schwartz resigned on the exact same day as defendant Graham – she, too, without a succession plan.  Schwartz served as CIO from September 2004 until her sudden departure.  Schwartz's position as CIO placed her at the helm of Amedisys's PoC information system that tracked patient visits and Medicare reimbursements.  According to Citron, "[f]ormer employees have consistently reported to Citron that the laptop-based Point of Care program … is specifically designed to prompt workers to skew their Oasis scoring for higher reimbursement.  It is Citron's opinion that this explains why Amedisys's margins are the highest in the industry, not that their patients are 'sicker' than their competitors."

70.    Citron found the abrupt resignations of these key executives suspicious, adding that "Larry and Alice were the same people who were justifying Amedisys's higher than industry margins on a conference call in Q3 2008, explaining that they just treat 'a sicker population' than their competitors."  Citron further explained that the sudden departures represented a bad omen:

> Conversations and correspondence with a plethora of former employees from a variety of different offices has given Citron a deeper view into the underbelly of Amedisys's business.  As a result, it is our opinion that the abrupt executive departures aren't random circumstances, and are more likely a warning indicator of a more dangerous problem.  Citron challenges readers to cite a single other example where the resignation of top officers without notice or succession plan was not the harbinger of bad news.

## VI.    DEFENDANTS' WRONGDOING EXPLAINED

### A.    Amedisys's Business Model

71.    Amedisys delivers care to its patients through its home health and hospice segments.  Amedisys relies on Medicare payments for its continued financial health.  The Company's 2009 10-K stated that its "services are primarily paid for by Medicare, which represented approximately 88%, 87%, and 89% of [its] net service revenue in 2009, 2008 and 2007, respectively," and that it "expect[s] home health and hospice services reimbursed by Medicare to remain [its] primary focus over the near and intermediate term."

72.    Between 2000 and 2007, home health agencies ("HHAs") such as Amedisys, received a flat fee of $2,200 for up to nine home therapy visits. Medicare paid an additional reimbursement of $2,200 when a HHA provided a tenth therapy visit. The tenth visit was highly profitable to the Company because it would essentially double the Company's Medicare reimbursements for that episode.  At the same time, the incremental costs to the Company to provide a tenth visit were low.  On the average, Amedisys incurred less than $80 per patient visit. Beginning in January 2008, Medicare eliminated the $2,200 additional payment for the tenth visit, and since that time, has provided more modest additional payments at the sixth, fourteenth, and twentieth therapy visits.

73.     Before 2008, Amedisys provided many of its patients just enough home therapy visits to trigger the extra $2,200 payment.  In 2005, 2006, and 2007, very few Amedisys patients received nine therapy visits while a much higher percentage received ten visits or more.  For example, in 2007, 28.5% of Amedisys's patients who received home therapy received ten to twelve visits, thereby triggering the extra $2,200 Medicare payment.

74.     In January 2008, when the Center for Medicare and Medicaid Services ("CMS") changed its reimbursement rules, Amedisys also modified its home therapy procedures in order to trigger the extra Medicare payments at six, fourteen, and twenty visits.  Indeed, in 2008, the percentage of Amedisys patients receiving ten visits dropped by 50%, while the percentage that received six, fourteen, and twenty visits increased by 8%, 33%, and 41%, respectively.

### B.     Defendants' Illegal Scheme

75.     During the Relevant Period, the Individual Defendants directed or incentivized Amedisys employees to schedule extra home therapy appointments solely to trigger additional reimbursements from Medicare even when such visits were not medically necessary.  By increasing such appointments, the Company artificially inflated its home health care revenue from Medicare.

76.     Specifically, during the Relevant Period, the Individual Defendants caused or otherwise allowed Amedisys's staff to hold weekly meetings.  During these meetings, it was emphasized that Medicare was a major part of its revenue and encouraged its employees to maximize patient visits and sales of the Company's other services for purposes of increasing Medicare reimbursements to the Company.  As incentive to provide and bill for medically-unnecessary Medicare services, Amedisys offered special bonus payments to certain employees who exceeded the sales goals set for them by the Company.

77.     The Individual Defendants either knowingly, recklessly, or in conscious disregard of their duties, caused the Company to engage in a scheme whereby Amedisys employees would visit patients more often than was medically necessary in order to meet certain Medicare benchmarks that would entitle the Company to additional fees.  In particular, while the Director

Defendants approved or consciously turned a blind eye, defendants Borne, Jeter, and other corporate executives encouraged or incentivized employees in managerial/supervisory roles to increase the number of tenth (and later sixth, fourteenth, and twentieth) visits.

78.    The statistical evidence of this improper scheme is overwhelming.  In connection with its reporting on Medicare billing by Amedisys and other healthcare companies, The WSJ hired Henry Dove, a professor at Yale University's School of Public Health to analyze the number of Medicare home visits from Amedisys and various other healthcare companies and to determine "whether the number of visits coincided with Medicare financial incentives." Professor Dove determined that "the pattern of clustering visits at reimbursement trigger points was industry wide."  With regard to Amedisys, according to the April 27, 2010 article, in the WSJ, between 2005 and 2007, only 2.88% of the Company's patients received nine visits.  In comparison, over 9.5% of the Company's patients received ten visits, over three times more than those receiving nine visits.

79.    As stated above, Medicare changed the reimbursement structure under PPS in 2008.  After the change in billing in 2008, the amount of Amedisys patients receiving ten visits dropped by 50%, while the percentage of patients who received six, fourteen, and twenty visits increased by 8%, 33%, and 41%, respectively.

80.    Tracy Trusler, a former Amedisys nurse for two years, corroborated the existence of the scheme to the WSJ.  Ms. Trusler explained that "I was told 'we have to have ten visits to get paid.'"  Ms. Trusler also stated that "[t]he tenth visit is not always medically necessary." Instead, Ms. Trusler stated that her supervisors instructed her to look through patients' files to find those who were just shy of ten visits and call their assigned therapists to remind them to schedule an additional appointment.

### C.    Confidential Witnesses Confirm Emphasis on Threshold Visits

81.    Several former employees of Amedisys confirm that they and/or other employees at the Company were pressured to cause patients to receive at least ten home health therapy visits before 2008, and at least fourteen visits after the Medicare reimbursement rules changed after

2008.  In particular, confidential witnesses consistently stated that the Company's Directors of Operations ("DOOs") were, in particular, pressured and/or incentivized to increase the number of tenth (and later fourteenth) visits.  The DOOs would in turn push therapists and other employees – often at weekly meetings – to reach the lucrative tenth (or fourteenth) visits.

82.    DOOs are tasked with the oversight of clinical operations of one or more Amedisys offices assigned to them.  According to job descriptions posted by Amedisys on its website, DOOs, among other things:

(a)    Assure state and federal regulatory compliance applicable to home health and reimbursement issues;

(b)    Educate all staff members about state and federal rules and regulations… Continually monitors clinical episode management and provide direction/redirection as necessary;

(c)    Work with all members of the medical community to promote home care services…;

(d)    Ensure … continuous improvement of agency efficiency and fiscal success;

(e)    Are positioned for Career Advancements within Amedisys.

83.    Reconciling statements of the below confidential witnesses with the above information from the Company's website and with a report published by Marwood Group Advisory ("Marwood"), as discussed below, it is evident that each DOO reported to an Area Vice President of Operations, of which there were twenty at the Company as of September 11, 2009. According to an organizational chart prepared by Marwood, as of September 11, 2009, each Area Vice President of Operations reported to one of four Regional Vice Presidents of Operations; the Regional Vice Presidents of Operations reported to the Senior Vice President of Healthcare; the Senior Vice President of Healthcare reported to the President/COO of the Company; and the President/COO reported to Amedisys's CEO, defendant Borne.

84.    Confidential witness ("CW1"), a Registered Nurse, was employed at Amedisys from the spring of 2007 until approximately April 2010. CW1 was responsible for conducting

initial assessments and developing patients' plan of care/treatment. CW1 described his/her job duties as follows: admitting, recertifying, and/or discharging patients; communicating and coordinating patients care with referring physicians and Amedisys therapists and staff; providing patient care, and completing OASIS forms/paperwork. CW1 reported directly to the DOO of his/her office location.

85.     According to CW1, throughout the duration of CW1's employment Amedisys emphasized and instructed therapists to provide a specific number of visits to patients. Specifically, throughout 2007, CW1 confirmed he/she was instructed by his/her DOO to provide ten visits to patients, despite the fact that the tenth visit was not always medically necessary. Beginning in 2008, the DOO still instructed and emphasized that therapists provide a specific number of therapy visits despite the necessity; however, the number changed. Rather than emphasizing ten visits, the DOO instructed therapists provide six, fourteen, and/or twenty visits – with a particular emphasis on fourteen visits.

86.     The DOO instructed therapists to provide a specific number of visits during weekly case conference meetings. Case conference meetings were held every Tuesday, at which therapists and staff discussed a variety of topics, including the admission, recertification, or discharge of patients and the plan of care for patients. However, CW1 recalls that the case conference meetings focused on how to make more money for Amedisys rather than patient care. At these meetings, the DOO instructed therapists to reach visit frequency thresholds. The DOO stated at weekly case conference meetings that Company officials – in particular, defendants Borne and Jeter – wanted therapists to provide ten visits (or fourteen visits after 2008), because ten (and later fourteen) visits "looked better on the books."

87.     Confidential witness ("CW2"), a Physical Therapy Assistant, was employed at Amedisys for approximately six months in 2008. CW2 provided physical therapy to home health patients. After a therapist completed an initial assessment, CW2 was also responsible for conducting follow-up therapy visits. CW2 reported to his/her assigned physical therapist as well as his/her office's DOO.

88.    CW2, as well as other therapists, attended weekly meetings led by the DOO to discuss patients and their respective plan of care. Similar to what CW1 experienced at these weekly meetings beginning in 2008, CW2's DOO also emphasized the fourteenth visit for each patient. CW2 confirmed that he/she was advised to keep all patients above fourteen visits. Specifically, CW2 recalled occasions where the DOO would state, "we have twelve visits on this patient, how can we get to fourteen?"

89.    CW2 observed that the majority of patients receiving therapy were scheduled for fourteen therapy visits after the initial assessment. CW2 stated that the practice of scheduling so many visits upfront is not a common practice in the industry. In CW2's previous experience, similar patients were initially scheduled for six visits and then later reevaluated.

90.    Confidential witness ("CW3"), a former Area Vice President of Business Development, was employed by Amedisys for approximately ten months in 2008.  CW3's primary responsibility at Amedisys was the oversight of account executives in the State of Georgia. CW3 reported to a Regional Vice President of Business Development.

91.    CW3 worked closely with the DOO in his/her office. The DOO stated to CW3 that he/she was pressured by senior management to keep patients through fourteen therapy visits. The DOO also informed CW3 that if patients' therapy visits were in danger of falling below fourteen, nurses and therapists were encouraged to find ways to increase patients' visits.

92.    Confidential witness ("CW4"), a former Vice President of Business Development,[1] was employed at Amedisys from August 2008 to late 2009.  CW4 was responsible for all account executives[2] in Florida as well as Puerto Rico.  Between Florida and Puerto Rico, CW4 was directly responsible for fifty-eight Amedisys agency offices.  CW4

---

[1] Vice Presidents of Business Development report to the Senior Vice Presidents of Business Development. These Senior Vice Presidents report to the Company's President/COO, who in turn reports directly to defendant Borne, as Amedisys's CEO.

[2] Account executives are responsible for obtaining or otherwise increasing patient referrals by marketing Amedisys' services to physicians and hospitals.

reported to a Senior Vice President of Business Development.  CW4 stated that DOOs received a bonus determined by the office's revenue per patient. The higher the revenue per patient, the greater the bonus DOOs received.

## VII.   WEAK INTERNAL CONTROLS AND A STRONG INFORMATION SYSTEM AIDED THE INDIVIDUAL DEFENDANTS' ILLICIT SCHEME

### A.   Weak Controls Enabled the Defendants' Wrongdoing

93.   Several weaknesses or failures in corporate governance and internal controls at Amedisys enabled the Individual Defendants to perpetrate their illicit scheme year after year during the Relevant Period.

(a)   First, defendant Borne, in addition to his clout as founder, serves as both the Company's CEO and Chairman.   By holding the two most powerful positions at the Company, Borne has helped ensure that he can have his way with the Company without meaningful resistance.  Indeed, reflecting Borne's control over the other officers and directors at the Company, the Director Defendants on or around January 3, 2011, approved an amendment to Borne's employment agreement to give him many additional benefits, including a pay raise and entitlement to a new car every two years, despite his leading role in the wrongdoing alleged herein.

94.   As with the Company's CEO and Chairman positions, the Company's Corporate Compliance Officer and Corporate Counsel positions are held by a single person.  The Company was required to appoint a Corporate Compliance Officer position as part of the 2003 CIA.  But, rather than actually create a separate Corporate Compliance Officer position, defendant Borne and the Director Defendants caused the duties of the Corporate Compliance Officer to be assigned to defendant Jeter, who was already serving as the Company's Corporate Counsel and who continues to serve as Corporate Counsel.  As a result, Amedisys is not realizing many of the benefits of maintaining a separate Corporate Compliance Officer, including having an additional voice on compliance issues.

95.     The flawed structure of Amedisys's Board also helped propagate the wrongdoing alleged herein.  There are four committees of Amedisys' Board: Audit Committee, Nominating and Corporate Governance Committee, Compensation Committee, and Quality of Care Committee.  Each of these committees is comprised of the same five directors: defendants LaBorde, Netterville, Pitts, Ricchiuti, and Washburn.  The only director of Amedisys who does not serve on these four committees is the Company's Chairman and CEO, defendant Borne.  Because there is virtually no distinction between any of the committees and the Board as a whole – other than defendant Borne's absence – the benefits of having committees comprised of a smaller subset of the Board is lost.  For example, no group of directors is tasked to focus particularly on the Company's annual audit or monitor its internal controls.

**B.**     **Regular Reporting to Management and Individual Defendants' Access to Real-Time Information Further Enabled the Targeted Push for Additional Patient Visits**

96.     At least as early as September 11, 2009, the Company had in place a strong information reporting system that provided the Individual Defendants with access to key statistics, including the number of visits per episode.

97.     The Company's information reporting system was reviewed and discussed in a report that Marwood presented to Amedisys on September 11, 2009, titled: "Evaluation and Analysis of Compliance and Care Management Systems."  Marwood is a healthcare advisory and financial services firm specializing in analysis for corporations, financial sponsors, and other investors looking to evaluate the regulatory and reimbursement framework and risks associated with making direct investments in healthcare services, life sciences, and devices.

98.     In its report, Marwood discusses various reports made available to Amedisys's management: "The Company is able to produce multiple management reports, some of which condense information from a variety of sources into a format that is readily used by the management team."

99.     One management report is the Risk Stratification Matrix ("RSM"), which Marwood described as follows:

…[T]he Risk Stratification Matrix (RSM), is prepared twice each year and displays operational, financial, and clinical indicators, helping area and corporate management teams to prioritize agencies requiring more intensive oversight. Indicators used in the RSM include operational audit reports from the prior quarter; specific variances related to the revenue cycle; employee turnover statistics; publicly reported clinical outcomes; growth in Medicare admissions; turnover in key leadership roles at the agency level; condition level survey deficiencies; focused medical review; and performance improvement compliance. Additionally, if an agency has been acquired or has started operations during the prior 12 months, it is placed into a higher risk category.

100.    Marwood also discussed a monthly statistics report and daily report reviewed by

Amedisys's management:

In addition to this semi-annual Risk Stratification Matrix, **Company management reviews a key statistics report each month**, which contains information regarding the volume of patients served as well as key financial indicators specific to Medicare, such as revenue per episode; **visits per episode**; percentage of low utilization payment adjustments (LUPAs) or outliers (both of which are reimbursed differently than the standard episodic rate); the case mix; and information regarding therapy utilization.  **Key statistic reports are produced for each agency and rolled up into area, regional, and corporate reports.**

Technology used by the Company creates a daily report to assist local management teams in identifying patients who are at highest risk of emergent care or hospitalization.  The system creates a risk factor analysis by compiling scores on particular OASIS measures and stratifies the patients into risk categories.  The report is color-coded, with patients who fall into high or very high risk categories highlighted in red lettering. **The report is used by local Director of Operations in weekly care team conferences to prioritize care coordination and proactive intervention.**

101.    Further, Marwood described the Company's technology controls, stating in

relevant part:

Technological tools have been created to provide information to employees on an as-needed basis, and several types of controls are built into the systems. The amount of information available to employees is dependent upon the status of the employee. Reports at the agency level are available to agency employees, while area and corporate personnel have access to more extensive data.

**Compliance controls are built into the systems as well. For example, only certain personnel are authorized to change visit schedules or the results of clinical evaluations. The clinical program and management reports provide**

*assistance to the user in prioritizing information through the use of color codes. The fact that clinical records can be accessed from remote locations enhances the audit function of both the quality management and compliance departments, as auditors need not request records from local management teams.* In addition, the Company has implemented technology to prevent the alteration of patient records after a Quality Care Coordinator and the field clinician have approved its contents. This feature is intended to prevent compliance-related discrepancies, such as up-coding.

Regulatory auditors often focus reviews on ensuring adequate documentation that care was provided in accordance with physician orders. Accordingly, Amedisys has implemented a frequency-based scheduling program to help ensure that care is provided within the framework ordered by the physician in the plan of treatment. *The program also has controls which allow only certain employees to access and manipulate the schedule. Physician orders are required for every visit performed by a field clinician. In some instances, the number of visits provided can partially drive the amount of revenue received by a provider for an episode of care. The number of visits is determined at the start of care, and is included in the plan of treatment.*

*The point-of-care technology designed by Amedisys contains elements which prompt field clinicians to follow physician orders. When a patient's electronic file is opened by a clinician, pop-up reminders appear related to the plan of care, and the clinician is readily able to view physician orders*. In addition, if a physician orders new medications, or changes the dose of a medication, the plan of care is automatically updated when the order is entered into the electronic documentation system.

102.    Marwood also explained the special role of the Chief Compliance Officer, who presents a compliance report to the Board each quarter:

> The Company employs a Chief Compliance Officer (CCO), reporting directly to the Chief Executive Officer, who presents a compliance report to the Board of Directors each quarter. The CCO attends all Board and audit committee meetings and has the authority to attend an executive session of the Board in the absence of the Chief Executive and Chief Operating Officers.

## VIII.    WHILE CAUSING AMEDISYS TO VIOLATE FEDERAL LAWS, DEFENDANTS ACKNOWLEDGE ADDITIONAL INTERNAL CONTROLS AND IMPORTANCE OF COMPLIANCE

103.    On February 23, 2010, the Individual Defendants then at the Company (including defendants Borne, Redman, and the Director Defendants) caused Amedisys to file with the SEC its 2009 10-K, which set forth the Company's annual report for the fourth quarter and year ended December 31, 2009.  This form was signed by defendants Borne, Redman, Netterville, Pitts,

Ricchiuti, LaBorde, and Washburn. In addition, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), the 2009 10-K contained signed certifications by defendants Borne and Redman, stating that it did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

104.   In its 2009 10-K, the Company acknowledged that it received the majority of its revenue from Medicare, that Amedisys must comply with the "conditions of participation," including compliance with state and local laws and regulations, and acknowledged the potential adverse consequences to the Company of any non-compliance.  In particular, the 2009 10-K stated:

> *As we expect to continue to receive the majority of our revenue from serving Medicare beneficiaries, our agencies must comply with regulations promulgated by the United States Department of Health and Human Services in order to participate in the Medicare program and receive Medicare payments. Among other things, these regulations, known as "conditions of participation," relate to the type of facility, its personnel and its standards of medical care, as well as its compliance with state and local laws and regulations.* [The Center for Medicare and Medicaid Services] CMS has indicated that it will be revising the current home health conditions of participation but a publication date of such revisions has not been established.
>
> CMS has engaged a number of third party firms, including recovery audit contractors ("RACs") and Medicaid Integrity Contributors ("MICs"), to conduct extensive reviews of claims data and state and federal government health care program laws and regulations applicable to companies that operate home health and hospice agencies. These audits will evaluate the appropriateness of billings submitted for payment, and are expected to further intensify the regulatory environment surrounding the healthcare industry. In addition to identifying overpayments, audit contractors can refer suspected violations of law to government enforcement authorities.

105.   The Company acknowledged that non-compliance with certain federal laws and regulations, including the FCA, posed a material risk to its financial condition.  For example, the 2009 10-K stated:

> *We are subject to extensive government regulation. Any changes to the laws and regulations governing our business, or to the interpretation and enforcement of those laws or regulations, could have a material adverse effect on our business and consolidated financial condition, results of operations and cash flows.*

[E]xtensive Federal and state laws and regulations [regulate our industry].… Federal and state laws and regulations impact how we conduct our business, the services we offer and our interactions with patients and the public and impose certain requirements on us such as:

- licensure and certification;

- adequacy and quality of health care services;

- qualifications of health care and support personnel;

- quality and safety of medical equipment;

- confidentiality, maintenance and security issues associated with medical records and claims processing;

- relationships with physicians and other referral sources;

- operating policies and procedures;

- addition of facilities and services;

- **billing for services**; and

- reporting and maintaining records regarding adverse events.

*    *    *

Additionally, we are subject to various routine and non-routine reviews, audits and investigations by the Medicare and Medicaid programs and other Federal and state governmental agencies, which have various rights and remedies against us if they assert that we have overcharged the programs or failed to comply with program requirements. ***Violation of the laws governing our operations, or changes in interpretations of those laws, could result in the imposition of fines, civil or criminal penalties, and the termination of our rights to participate in Federal and state-sponsored programs and/or the suspension or revocation of our licenses. If we become subject to material fines or, if other sanctions or other corrective actions are imposed on us, our business and consolidated financial condition, results of operations and cash flows could be materially adversely affected***.

*    *    *

***We are subject to Federal and state laws that govern our financial relationships with physicians and other health care providers, including potential or current referral sources; certain agencies acquired by us from Home Health Corporation of America ("HHCA") are operating under a Corporate Integrity Agreement ("CIA")***.

106.    Further, the 2009 10-K also detailed the supposed internal controls that the Company had in place.  In particular, it stated:

**Controls over Our Business System Infrastructure**

We establish and maintain processes and controls over coding, clinical operations, billing, patient recertifications and compliance to help monitor and promote compliance with Medicare requirements.

\* \* \*

*Clinical Operations* — Regulatory requirements allow patients to be admitted to home health care if they are considered homebound and require certain clinical services. These clinical services include: educating the patient about their disease; an assessment of observation skills; wound care, administering injections or intravenous fluids; and management and evaluation of a patient's plan of care. *In order to help monitor and promote compliance with requirements, we complete audits of patient charts, we administer survey guideline education; we hold recurrent homecare regulatory education; we utilize outside expert regulatory services; and we have a toll-free hotline to offer additional assistance.*

*Billing*

*We maintain controls over our billing processes to help promote accurate and complete billing. In order to promote the accuracy and completeness of our billing, we have annual billing compliance testing; use formalized billing attestations; limit access to billing systems; use risk forecasting methodologies; perform direct line supervisor audits; hold weekly operational meetings; use automated daily billing operational indicators; and take prompt corrective action with employees who knowingly fail to follow our billing policies and procedures in accordance with a well publicized "Zero Tolerance Policy".*

\* \* \*

*Compliance* — The quality and reputation of our personnel and operations are critical to our success. We develop, implement and maintain ethics, compliance and quality improvement programs as a component of the centralized corporate services provided to our home health and hospice agencies. *Our ethics and compliance program includes a Code of Ethical Business Conduct for our employees, officers, directors and affiliates and a process for reporting regulatory or ethical concerns to our Chief Compliance Officer through a confidential hotline. We promote a culture of compliance within our company through persistent messages from our senior leadership concerning the necessity of strict compliance with legal requirements and company policies and procedures, and through publicizing and enforcing our Zero Tolerance Policy.* We also employ a comprehensive compliance training program that includes: annual compliance testing; new hire compliance training; new acquisition compliance training; sales compliance training; new employee orientation compliance training; billing compliance training; and compliance presentations at all company functions.

107.    These or similar statements were also stated in the Company's Form 10-K for fiscal year ending December 31, 2008, that the Individual Defendants then at the Company

caused Amedisys to file with the SEC on February 17, 2009 (the "2008 10-K"). In addition, the 2008 10-K stated:

> Our executive compliance committee includes our Chief Executive Officer, Chief Operating Officer and President, Chief Financial Officer, Chief Information Officer and Senior Vice President of Clinical Operations, Chief Compliance Officer, Senior Vice President of Human Resources and Senior Vice President of Internal Audit, and meets on a quarterly basis to establish the agenda for compliance initiatives and review the status of compliance initiatives and audits, as well as the operations of our Compliance Department.

## IX.    DEFENDANTS' MISLEADING STATEMENTS

108.    At least as early as 2005, the Individual Defendants caused Amedisys to issue statements that falsely and/or misleadingly reported the Company's true financial condition. Specifically, the Individual Defendants caused the Company's reported earnings to be inflated by withholding material information concerning the Company's illicit exploitation of Medicare discussed herein. Moreover, beginning at our around May 1, 2007, the Individual Defendants caused Amedisys to continuously report record earnings growth quarter after quarter, year after year, while continuing to conceal the true source of this purported success. As discussed below, the façade of explosive growth erected by the Individual Defendants was so divergent from reality that the Company's earnings beat analyst expectations by roughly 20% on at least two separate occasions.

109.    The improper statements the Individual Defendants caused or allowed Amedisys to issue were improper when made because they failed to disclose and misrepresented the following material adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)    the Company's reported sales and earning growth numbers were materially impacted by the Company's fraudulent scheme to improperly and unethically increase its billing and, thus, its Medicare revenue;

(b)    part of the Company's net service revenue and earnings were subject to recoupment by Medicare;

(c)    the Company's fiduciaries were in violation of the Code of Ethical Business Conduct (the "Code");

(d)    the Company lacked adequate internal controls, including, for example, in such areas as patient recertification and billing processes, and was unable to ascertain its true financial condition; and

(e)    as a result of the foregoing, the Company's positive financial results were materially overstated at all relevant times.

### A.    2005 Statements

110.    On May 3, 2005, the Individual Defendants then at the Company caused Amedisys to issue a press release that falsely and/or misleadingly stated financial results for the first quarter of 2005.  The Company reported record quarterly net income of $7.1 million, or $0.45 per diluted share, on record quarterly net service revenue of $70.4 million.  Also in the press release, defendant Borne referenced the Company's "record quarterly revenue" are indicative of the Company's strong, and ongoing, commitment to both organic grown and added that "[t]he Company believes that our internal growth rate of Medicare admissions, when combined with the additional acquisition opportunities, will allow Amedisys to continue delivering strong earnings growth for our shareholders."

111.    On May 3, 2005, the Individual Defendants then at the Company caused Amedisys to also hold an earnings conference call, during which, defendant Browne stated "[w]e're raising our annual earnings per share guidance for 2005 to $1.75 to $1.81 per diluted share on revenues which are expected to exceed 300 million, and the diluted shares will total approximately 15.9 million for the full 2005 year."

112.    On May 5, 2005, the Individual Defendants then at the Company caused Amedisys to file its quarterly report on Form 10-Q for the quarter ended March 31, 2005, with the SEC, which was signed by defendant Browne.  The Form 10-Q reiterated the previously-announced false and misleading financial results.  In addition, pursuant to SOX, the Form 10-Q contained signed certifications by defendants Borne and Browne, once again stating that the

Form 10-Q did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

113.    On August 2, 2005, the Individual Defendants then at the Company caused Amedisys to issue a press release that falsely and/or misleadingly stated financial results for the second quarter of 2005.  Characterizing the results for that period, defendant Borne stated "[o]ur continued commitment to both organic growth and selective acquisitions has resulted in the achievement of *record quarterly revenue and earnings per share*, as well as a *significant increase in net income*."  He further stated "[c]learly, we are extremely pleased with the results, and *we remain confident that Amedisys can continue to deliver strong revenue earnings growth* for our shareholders."

114.    On August 2, 2005, the Individual Defendants then at the Company caused Amedisys to also hold an earnings conference call during which defendant Graham stated, "[w]e are raising our earnings per share guidance for 2005 to $1.95 to $2.01 per share on revenues of approximately 370 million."  Defendant Graham, in summation, stated "we are pleased with our second-quarter results.  We continue to focus on being the premiere low-cost, high-quality provider in home health.  We believe that focus, execution, and commitment to clinical outcomes will separate us from our competition."

115.    On August 9, 2005, the Individual Defendants then at the Company caused Amedisys to file its quarterly report on Form 10-Q for the quarter ended June 30, 2005, with the SEC, which was signed by defendant Browne.  The Form 10-Q reiterated the previously-announced false and misleading financial results.  In addition, pursuant to SOX, the Form 10-Q contained signed certifications by defendants Borne and Browne, once again stating that the Form 10-Q did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

116.    On November 1, 2005, the Individual Defendants then at the Company caused Amedisys to issue a press release falsely and/or misleadingly stating the Company's financial results for the three-month period ended September 30, 2005.  Defendant Borne stated that "[o]ur *significant year-over-year increase in net income of 50 percent* for the third quarter is all the more gratifying given the extraordinary events of this quarter–Hurricanes Katrina and Rita occurred while Amedisys was integrating our recent significant acquisitions, particularly Housecall."

117.    On November 1, 2005, the Individual Defendants then at the Company caused Amedisys to also hold an earnings conference call, during which defendant Browne stated that "[o]ur revenues for the quarter of 112.2 million represent an increase of 92% on 2004, and reflected our continued strong internal growth."

118.    On November 9, 2005, the Individual Defendants then at the Company caused Amedisys to file its quarterly report on Form 10-Q for the quarter ended September 30, 2005, with the SEC, which was signed by defendant Browne.   The Form 10-Q reiterated the previously-announced false and misleading financial results.  In addition, pursuant to SOX, the Form 10-Q contained signed certifications by defendants Borne and Browne, once again stating that the Form 10-Q did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

**B.    2006 Statements**

119.    On February 22, 2006, the Individual Defendants then at the Company caused Amedisys to issue a press release falsely and/or misleadingly stating the Company's financial results for the fourth quarter and the fiscal year ended December 31, 2005.  Defendant Borne noted that "[o]ur results, both for the quarter and the full year, are indicative of Amedisys' *continued solid top-line growth, which has been a critical driver in the Company's ability to deliver strong earnings growth over the last three years*."

120.    On February 23, 2006, the Individual Defendants then at the Company caused Amedisys to also hold a conference call, during which defendant Graham stated that "[c]learly, our topline *growth remains strong*."

121.    On March 16, 2006, the Individual Defendants then at the Company caused Amedisys to file its 2005 Form 10-K with the SEC, which set forth the Company's annual report for the fourth quarter and year ended December 31, 2005 (the "2005 10-K").  This form was signed by defendants Borne, Browne, Netterville, Pitts, Ricchiuti, LaBorde, and Washburn. Additionally, pursuant to SOX, the 2005 10-K contained signed certifications by defendants Borne and Browne, stating that the 2005 10-K did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

122.    On May 2, 2006, the Individual Defendants then at the Company caused Amedisys to also hold an earnings conference call, during which defendant Borne stated that "[b]ased on this information, we are optimistic about our earnings potential, particularly in the second half of this year.  Last year, we experienced 60% top-line growth, 50% bottom-line growth, and nearly doubled our operating location, each of which went through a substantial operational integration process."

123.    On May 2, 2006, the Individual Defendants then at the Company caused Amedisys to issue a press release falsely and/or misleadingly stating the Company's financial results for the first quarter of 2006.  Defendant Borne stated that "[o]ur *record quarterly revenue* is indicative of the Company's strong, and ongoing, commitment to both organic growth and acquisitions, as well as the *continued significant demand for our services*."

124.    Also on May 2, 2006, the Individual Defendants then at the Company caused Amedisys to file its quarterly report on Form 10-Q for the quarter ended March 31, 2006, with the SEC, which was signed by defendant Browne.  The Form 10-Q reiterated the previously-announced false and misleading financial results.  In addition, pursuant to SOX, the Form 10-Q contained signed certifications by defendants Borne and Browne, once again stating that the

- 45 -

Form 10-Q did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

125.    On August 1, 2006, the Individual Defendants then at the Company caused Amedisys to issue a press release falsely and/or misleadingly stating the Company's financial results for the three-month period ended June 30, 2006.  The Company also stated that "[f]or the quarter ended June 30, 2006, the Company reported record quarterly net income of $9.1 million, or $0.55 per diluted share, on record quarterly net service revenue of $132.9 million.  Net service revenue increased by 66 percent when compared with the $80.1 million reported for the comparable period in the prior year."   Defendant Borne noted that "[w]e are continuing to experience *strong revenue growth* from both our organic properties and our acquisitions."

126.    On August 1, 2006, the Individual Defendants then at the Company caused Amedisys to also hold an earnings conference call, during which defendant Borne stated that "[t]his year, we will complete the integration by focusing on sales and site administration.  We believe there is a high unrealized potential in these markets that is becoming clearly evident in our record revenue."

127.    Also on August 1, 2006, the Individual Defendants then at the Company caused Amedisys to file its quarterly report on Form 10-Q for the quarter ended June 30, 2006, with the SEC.  The Form 10-Q reiterated the previously-announced false and misleading financial results. In addition, pursuant to SOX, the Form 10-Q contained a certification signed by defendant Borne, once again stating that the Form 10-Q did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

128.    On October 25, 2006, the Individual Defendants then at the Company caused Amedisys to issue a press release falsely and/or misleadingly stating the Company's financial results for the third quarter of 2006 ended on September 30, 2006.  The Company also stated that "the Company reported record quarterly net income of $10.6 million, or $0.64 per diluted share,

a 33 percent increase in earnings per share over the same quarter last year. These earnings were achieved on record quarterly net service revenue of $137.0 million." Defendant Borne noted that "[w]e are pleased with our improved operating results for the third quarter of 2006 and the *continuing momentum we are experiencing in many key areas of our business*." Additionally, Borne stated that "[w]e believe that our *continuing strong internal growth*, start ups, and selective acquisitions combined with ongoing efficiencies will drive earnings and enhance shareholder returns."

129.    On October 25, 2006, the Individual Defendants then at the Company caused Amedisys to also hold an earnings conference call, during which defendant Borne stated that "[t]he use of our point-of-care technology, local market-driven care coordination sites and disease management call center clearly separates us from our competitors in caring for our target population." Donald Loverich, Jr., then Amedisys's Treasurer and Principal Accounting Officer, also stated that "[i]n closing, we are pleased to increase our earnings per share guidance for 2006 to be in the range of $2.30 to $2.35 per share on revenues of approximately $530 million to $540 million. This guidance is based on approximately 16.5 million diluted shares."

130.    Also on October 25, 2006, the Individual Defendants then at the Company caused Amedisys to file its quarterly report on Form 10-Q for the quarter ended September 30, 2006, with the SEC. The Form 10-Q reiterated the previously-announced false and misleading financial results. In addition, pursuant to SOX, the Form 10-Q contained a certification signed by defendant Borne once again stating that the Form 10-Q did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

C.    **2007 Statements**

131.    On February 20, 2007, the Individual Defendants then at the Company caused Amedisys to issue a press release falsely and/or misleadingly stating the Company's financial results for the fourth quarter and the fiscal year ended December 31, 2006. The Company stated that "[f]or the quarter ended December 31, 2006, the Company reported record quarterly net

income of $11.4 million, or $0.48 per diluted share, on record quarterly net service revenue of $144.0 million." Defendant Borne noted that "[w]e have enjoyed *yet another year of record revenues and record net income*." Borne also stated that "[o]ur *earnings per share have grown over 20 percent in each of the past four years*. Further, we have worked diligently to position our balance sheet in a manner that allows us to aggressively pursue organic growth via start-ups and potential attractive acquisition candidates."

132. On February 20, 2007, the Individual Defendants then at the Company caused Amedisys to also hold a conference call, during which defendant Borne stated that "[t]his has been an exciting year for us. We posted *record revenues and record earnings* per share for 2006, fully integrated our significant 2005 acquisitions, declared a four for three stock split, raised $118 million in equity and retired substantially all of our debt. *Our revenues doubled in the past 24 months* as a result of both internal growth and acquisitions and our net income has nearly doubled over the same period." Giblin noted that "[o]ur fourth quarter revenues grew nearly 21% over the 2005 fourth quarter, to a quarterly record $144 million on *a 29% increase in completed episodes of care from 36,000 episodes in last year's fourth quarter to 47,000 in the current quarter*." Giblin also stated that "[o]perating income surged 61% to $19.1 million or 13.3% of net service revenue in the current quarter, from $11.8 million or 10% of revenue in the fourth quarter of 2005." In addition, Giblin noted that "[n]et income totaled $11.4 million in the quarter of $0.48 per diluted share, *a new quarterly record increasing 56%* from the $7.3 million or $0.34 per diluted share reported for last year's fourth quarter." Giblin further stated that "[f]or the full year 2006 *we grew our net service revenue by 42%* over the 2005 period, to a record $541.1 million on a 43% increase in completed episodes of care from 121,000 episodes in 2005 to 173,000 in 2006." Giblin added that "[n]et income totaled a record $38.3 million or $1.72 per diluted share in 2006, up 27% from $30.1 million or $1.41 per diluted share for 2005."

133. Also on February 20 2007, the Individual Defendants then at the Company caused Amedisys to file its 2006 Form 10-K with the SEC, which set forth the Company's annual report for the fourth quarter and year ended December 31, 2006 (the "2006 10-K"). This form was

signed by defendants Borne, Netterville, Pitts, Ricchiuti, LaBorde, and Washburn.  Additionally, pursuant to SOX, the 2006 10-K contained a signed certification by defendant Borne stating that the 2006 10-K did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

134.    On May 1, 2007, the Individual Defendants then at the Company caused Amedisys to issue a press release falsely and/or misleadingly stating the Company's financial results for the first quarter of 2007 ended March 31, 2007.  Defendant Borne stated that "[o]nce again, we have demonstrated our ability to maintain our position as the nation's leading market provider in the home health services industry as we again enjoyed *record quarterly revenues and record net income*."  Borne also stated that "[w]ith a strong balance sheet and positive results of operations, we are well positioned to continue to take advantage of future potential acquisitions that meet our corporate strategy and to initiate operations in markets that we feel have the most potential to add additional returns for the Company and our stockholders."

135.    On May 1, 2007, the Individual Defendants then at the Company caused Amedisys to also hold an earnings conference call, during which defendant Borne stated that "[c]learly, 2007 is starting out to be another exceptional year with record revenues of $154 million and record earnings of $0.51 per diluted share for the first quarter. In addition, *we generated exceptional cash flows during the quarter* with cash flows from operations totaling $35 million."  Defendant Redman noted that "[a]s Bill stated, this was an outstanding quarter for Amedisys. *We set a number of records.* Our first quarter revenues grew 21% over the 2006 first quarter to a quarterly record of $154 million. Net income was also a record at $13.3 million or $0.51 per diluted share based on 26.04 million shares outstanding. Operating income surged 63% to $20.7 million or 13.5% of net service revenue in the quarter. And that's from $12.7 million or 10% of revenue in the first quarter of 2006."

136.    Also on May 1, 2007, the Individual Defendants then at the Company caused Amedisys to file its quarterly report on Form 10-Q for the quarter ended March 31, 2007, with

the SEC, which was signed by defendant Redman. The Form 10-Q reiterated the previously-announced false and misleading financial results. In addition, pursuant to SOX, the Form 10-Q contained signed certifications by defendants Borne and Redman, once again stating that the Form 10-Q did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

137. On July 31, 2007, the Individual Defendants then at the Company caused Amedisys to issue a press release falsely and/or misleadingly stating the Company's financial results for the second quarter of 2007 ended June 30, 2007. Defendant Borne stated that *"[c]learly, the second quarter was another exceptional quarter for us, with record revenues and record earnings*." Borne also stated that "[o]ur results for the second quarter continue to support our strategic objective of being the leading provider of high-quality, low-cost home health services in the market. With a *strong balance sheet and positive results of operations*, we are well positioned to continue to take advantage of future growth opportunities through market expansion in both de novo start-ups and acquisitions."

138. On July 31, 2007, the Individual Defendants then at the Company caused Amedisys to also hold an earnings conference call, during which Defendant Borne noted that "*[c]learly, the second quarter was another exceptional quarter for Amedisys, with record revenues of $169 million and record earnings of $0.57 per diluted share.* In addition, we ended the quarter with total cash and cash equivalents of $97 million." Defendant Redman echoed that "[a]s Bill stated, we followed the first quarter of '07 with *another excellent quarter for Amedisys*." Redman further stated that "[n]et income of $14.9 million or $0.57 per share topped our record of $13.3 million for the first quarter of this year."

139. Also on July 31, 2007, the Individual Defendants then at the Company caused Amedisys to file its quarterly report on Form 10-Q for the quarter ended June 30, 2007, with the SEC, which was signed by defendant Redman. The Form 10-Q reiterated the previously-announced false and misleading financial results. In addition, pursuant to SOX, the Form 10-Q

contained signed certifications by defendants Borne and Redman, once again stating that the Form 10-Q did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

140.    On October 30, 2007, the Individual Defendants then at the Company caused Amedisys to issue a press release falsely and/or misleadingly stating the Company's financial results for the third quarter of 2007 ended September 30, 2007.  Defendant Borne stated that "[o]ur third quarter *results were very strong, as we set record revenue and earnings*."

141.    On October 30, 2007, the Individual Defendants then at the Company caused Amedisys to also hold an earnings conference call, during which defendant Borne stated that "*[o]ur third-quarter results were very strong*.  We set record revenues of $181 million and record earnings of $0.61 per diluted share excluding the alliance matter."  Defendant Redman emphasized that "[a]s Bill stated we completed another excellent quarter."

142.    Also on October 30, 2007, the Individual Defendants then at the Company caused Amedisys to file its quarterly report on Form 10-Q for the quarter ended September 30, 2007, with the SEC, which was signed by defendant Redman.  The Form 10-Q reiterated the previously-announced false and misleading financial results.  In addition, pursuant to SOX, the Form 10-Q contained signed certifications by defendants Borne and Redman, once again stating that the Form 10-Q did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

    D.    **2008 Statements**

143.    On February 27, 2008, the Individual Defendants then at the Company caused Amedisys to issue a press release falsely and/or misleadingly stating the Company's financial results for the fourth quarter and the fiscal year ended December 31, 2007.  The Company stated that it "posted record financial performance for the quarter with net service revenue and net income increasing 34.7% and 47.2%, respectively, over the fourth quarter of 2006."  Defendant

Borne noted that "[o]ur excellent fourth-quarter capped an outstanding year of financial performance during which we posted record revenue and net income results."  Borne also stated that:

> In addition to achieving *strong double-digit growth* in net service revenue and net income, this was the *fifth consecutive year that earnings per share growth has exceeded 20 percent*. This strong track record of financial performance is driven by execution of a long-term strategy focused on achieving consistent internal growth within our same-store base, complemented by de novo expansion, and selective external growth via strategic acquisitions. Our ability to execute this *successful growth strategy* is supported by a commitment to clinical excellence and maintaining a strong balance sheet.

144.    On February 27, 2008, the Individual Defendants then at the Company caused Amedisys to also hold a conference call, during which defendant Borne stated that "[o]ur results for the fourth quarter and full year were outstanding."  Defendant Redman also noted that "[a]s Bill stated *we have completed our exceptional 2007 performance with another strong quarter* for Amedisys."  Defendant Graham also stated that "I'm very pleased with our results in the fourth quarter and for the full year of 2007."  Graham emphasized that "we are very pleased with the performance during the quarter and the full year of 2007."

145.    Also on February 27 2008, the Individual Defendants then at the Company caused Amedisys to file its 2007 Form 10-K with the SEC, which set forth the Company's annual report for the fourth quarter and year ended December 31, 2007 (the "2007 10-K").  The 2007 10-K was signed by defendants Borne, Redman, Netterville, Pitts, Ricchiuti, LaBorde, and Washburn. Additionally, pursuant to SOX, the 2007 10-K contained signed certifications by defendants Borne and Redman, stating that the 2007 10-K did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

146.    On April 30, 2008, the Individual Defendants then at the Company caused Amedisys to issue a press release that falsely and/or misleadingly stated financial results for the first quarter of 2008.  Characterizing the results for that period, the Company stated that it

"posted *record financial performance* for the quarter with net service revenue and *net income increasing* 38.7% and 24.1%, respectively, over the first quarter of 2007." Also in the press release, defendant Borne stated "[w]e are very pleased with our first quarter operations." He further stated that "[i]n addition to an *excellent quarter financially where we reported record revenue and strong EPS* … we will continue to focus on the execution of our long-term strategy of growing the business both internally and externally, and delivering high quality, cost-effective care to the patients entrusted to our service."

147.    On April 30, 2008, the Individual Defendants then at the Company caused Amedisys to also hold an earnings conference call, during which, defendant Borne emphasized the Company's "*excellent results* for the first quarter." Defendant Redman also touted that the Company "begun 2008 with another strong quarter."

148.    Also on April 30, 2008, the Individual Defendants then at the Company caused Amedisys to file its quarterly report on Form 10-Q for the quarter ended March 31, 2008, with the SEC, which was signed by defendant Redman. The Form 10-Q reiterated the previously-announced false and misleading financial results. In addition, pursuant to SOX, the Form 10-Q contained signed certifications by defendants Borne and Redman, once again stating that the Form 10-Q did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

149.    On July 29, 2008, defendants caused the Company to issue a press release falsely and/or misleadingly stating the Company's financial results for the second quarter of 2008 ended June 30, 2008. *The Company's earnings reported for this period beat analyst consensus estimates by an astonishing 17%.* The Company also stated that "[w]e posted record financial performance for the three-month period ended June 30, 2008 with net service revenue and net income increasing 84.5% and 36.6%, respectively, over the three-month period ended June 30, 2007." Defendant Borne noted that "[w]e are very happy with our second quarter results."

150.    On July 29, 2008, the Individual Defendants then at the Company caused Amedisys to also hold an earnings conference call, during which, defendant Borne emphasized that the Company had "outstanding results for the second quarter." Defendant Redman also touted that the Company "followed the first quarter of 2008 with *another excellent quarter, highlighted by record revenue and earnings*."

151.    Also on July 29, 2008, the Individual Defendants then at the Company caused Amedisys to file its quarterly report on Form 10-Q for the quarter ended June 30, 2008, with the SEC, which was signed by defendant Redman. The Form 10-Q reiterated the previously-announced false and misleading financial results.  In addition, pursuant to SOX, the Form 10-Q contained signed certifications by defendants Borne and Redman, once again stating that the Form 10-Q did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

152.    On October 28, 2008, the Individual Defendants then at the Company caused Amedisys to issue a press release falsely and/or misleadingly stating the Company's financial results for the three-month period ended September 30, 2008.  The Company also stated that "[w]e posted record financial performance for the three-month period ended September 30, 2008 with net service revenue and net income increasing 77.7% and 16.2%, respectively, over the three-month period ended September 30, 2007."  Defendant Borne noted that "[t]his has been *another exceptional quarter and nine-months with record revenue and earnings per share*."

153.    On October 28, 2008, the Individual Defendants then at the Company caused Amedisys to hold an earnings conference call, during which defendant Borne emphasized the Company's "*outstanding results* for the third quarter." Defendant Redman similarly touted the Company's performance by stating that "[o]ur third quarter was *another excellent quarter for Amedisys, highlighted by record revenue and earnings*."

154.    Also on October 28, 2008, the Individual Defendants then at the Company caused Amedisys to file its quarterly report on Form 10-Q for the quarter ended September 30, 2008,

with the SEC, which was signed by defendant Redman. The Form 10-Q reiterated the previously-announced false and misleading financial results.  In addition, pursuant to SOX, the Form 10-Q contained signed certifications by defendants Borne and Redman, once again stating that the Form 10-Q did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

### E.    2009 Statements

155.    On January 6, 2009, the Individual Defendants then at the Company caused Amedisys to issue a press release falsely and/or misleadingly stating anticipated earnings for 2009.  Specifically, the Company stated that new service revenue in 2009 was anticipated to be in the range of $1.425 billion to $1.475, and diluted earnings per share was expected to be in the range of $4.10 to $4.30.

156.    On February 17, 2009, the Individual Defendants then at the Company caused Amedisys to issue a press release falsely and/or misleadingly stating the Company's financial results for the fourth quarter and the fiscal year ended December 31, 2008.  The Company also stated that "*[w]e posted record financial performance* for the fourth quarter with net service revenue and net income increasing 75.3% and 57.6%, respectively, over the fourth quarter of 2007." Defendant Borne noted that "[t]oday *we are reporting outstanding results, with record revenue and earnings* for both the fourth quarter and full year."  Borne also proclaimed that *"[t]his marks the sixth consecutive year that earnings per share growth has exceeded 20%*."

157.    On February 17, 2009, the Individual Defendants then at the Company caused Amedisys to hold an earnings conference call, during which defendant Borne stated that the Company "had *another year of outstanding results*."  Defendant Redman also stated that the "fourth quarter of 2008 was another excellent quarter for Amedisys, which ended a *tremendous year* in both financial performance and acquisition integration."

158.    Also on February 17, 2009, the Individual Defendants then at the Company caused Amedisys to file its 2008 10-K with the SEC, which set forth the Company's annual

report for the fourth quarter and year ended December 31, 2008.  The 2008 10-K was signed by defendants Borne, Redman, Netterville, Pitts, Ricchiuti, LaBorde, and Washburn. In addition, pursuant to SOX, the 2008 10-K contained signed certifications by defendants Borne and Redman, stating that the 2008 10-K did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

159.    The Individual Defendants then at the Company caused Amedisys to falsely and/or misleadingly state in its 2008 10-K that the Company made efforts to ensure proper billing and compliance.   For example, the Company stated: "***We maintain comprehensive controls over our billing processes to help ensure accurate and complete billing.***"   The Company also stated that it "terminate[s] employees who knowingly fail to follow our billing policies and procedures in accordance with a well publicized 'Zero Tolerance Policy'." Similarly, the Company claimed:

> We develop, implement and maintain comprehensive ethics, compliance and quality improvement programs as a component of the centralized corporate services provided to our home health and hospice agencies…. We promote a culture of compliance within our company through persistent messages from our senior leadership concerning the necessity of strict compliance with legal requirements and company policies and procedures, and through publicizing and enforcing our Zero Tolerance Policy.

160.    The 2008 10-K also referenced the Code which states that "Amedisys is serious about ethical conduct and complying with all laws that affect our business. We will not take actions that undermine our ethical principles or violate legal requirements." In addition, the Code States that "[w]e also must maintain books and records and accounting controls for the entire Company that fairly and accurately reflect our income and expenses." Moreover, the Record Keeping section of the code states: "[n]ever enter false or misleading information into Company records."

161.    On April 28, 2009, the Individual Defendants then at the Company caused Amedisys to issue a press release falsely and/or misleadingly stating the Company's financial results for the first quarter of 2009 ended March 31, 2009. The Company also stated that "[w]e posted record financial performance with net service revenue and net income attributable to Amedisys, Inc., increasing 60.4% and 64.1%, respectively over the three-month period ended March 31, 2008." Defendant Borne noted that "[w]ith record revenue and earnings, the results of the first quarter were impressive." Borne also stated that:

> [W]e have positioned Amedisys to be the provider of choice for elderly patients with complex chronic conditions. By providing low-cost, outcome driven care targeted to a chronically ill patient population, we believe that Amedisys can effectively provide for the healthcare needs of the highest-cost Medicare beneficiaries. This will be accomplished through continued focus on our three pronged business strategy that has been the foundation of our success, namely: providing superior clinical services, growing our business aggressively and becoming as operationally efficient as possible.

162.    On April 28, 2009, the Individual Defendants then at the Company caused Amedisys to also hold an earnings conference call, during which defendant Borne emphasized that the Company had "***excellent results for the first quarter***." Defendant Redman also touted the Company's "***record revenue and earnings***."

163.    Also on April 28, 2009, the Individual Defendants then at the Company caused Amedisys to file its quarterly report on Form 10-Q for the quarter ended March 31, 2009, with the SEC, which was signed by defendant Redman. The Form 10-Q reiterated the previously-announced false and misleading financial results. In addition, pursuant to SOX, the Form 10-Q contained signed certifications by defendants Borne and Redman, once again stating that the Form 10-Q did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

164.    On July 28, 2009, defendants caused the Company to issue a press release falsely and/or misleadingly stating the Company's financial results for the three and six-month periods

ended June 30, 2009. *The earnings reported by the Company during this period beat analyst consensus estimates by a staggering 23.9%.* The Company stated that "[w]e posted *record financial performance* with net service revenue and net income attributable to Amedisys, Inc., increasing 20.9% and 72.1%, respectively over the three-month period ended June 30, 2008." Defendant Borne noted, in relevant part, "[t]he continued focus of our three pronged business strategy of providing superior clinical services, growing our business aggressively and becoming as operationally efficient as possible is evident in the *record revenue and earnings* that we are reporting today."

165.    On July 28, 2009, the Individual Defendants then at the Company caused Amedisys to also hold an earnings conference call, during which defendant Borne emphasized the Company's "*outstanding results for the second quarter*." Moreover, defendant Redman stated that the "second quarter of 2009 was an *excellent quarter* for Amedisys, as evidenced by our *strong earnings and cash flow performance*."

166.    Also on July 28, 2009, the Individual Defendants then at the Company caused Amedisys to file its quarterly report on Form 10-Q for the quarter ended June 30, 2009, with the SEC, which was signed by defendant Redman. The Form 10-Q reiterated the previously-announced false and misleading financial results.  In addition, pursuant to SOX, the Form 10-Q contained signed certifications by defendants Borne and Redman, once again stating that the Form 10-Q did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

167.    On October 27, 2009, the Individual Defendants then at the Company caused Amedisys to issue a press release falsely and/or misleadingly stating the Company's financial results for the three and nine-month periods ended September 30, 2009.  The Company stated that "[w]e posted *record financial performance* with net service revenue and net income attributable to Amedisys, Inc., increasing 20.7% and 53.0%, respectively, over the three-month

period ended September 30, 2008." Defendant Borne noted, in relevant part, "[w]e are pleased to report *another strong quarter*."

168.   On October 27, 2009, the Individual Defendants then at the Company caused Amedisys to also hold an earnings conference call, during which defendants Borne stated, "[w]e had an outstanding result for the third quarter, reporting net revenue of $388 million and earnings per diluted share of $1.29." Borne further stated that "*we achieved record revenue in earnings* per share for the quarter." Further, during the earnings conference call, in response to a question by an analyst regarding negative stories about the Company, Borne stated that "[w]e're a leader in the industry and industry leaders typically are targets. *We are the most transparent home health company in the nation*."

169.   Also on October 27, 2009, the Individual Defendants then at the Company caused Amedisys to file its quarterly report on Form 10-Q for the quarter ended September 30, 2009, with the SEC, which was signed by defendant Redman. The Form 10-Q reiterated the previously-announced false and misleading financial results. In addition, pursuant to SOX, the Form 10-Q contained signed certifications by defendants Borne and Redman, once again stating that the Form 10-Q did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

### F.    2010 Statements

170.   On February 23, 2010, the Individual Defendants then at the Company caused Amedisys to issue a press release falsely and/or misleadingly stating the Company's financial results for the three months and year ended December 31, 2009. The Company stated "[w]e posted record financial performance with net service revenue and net income attributable to Amedisys, Inc., increasing 19.2% and 43.5%, respectively, over the three-month period ended December 31, 2008." Defendant Borne noted, in relevant part, that "[w]e had outstanding results for the fourth quarter and full year ending 2009. This marks the seventh consecutive year in which we have increased our earnings per share in excess of 20%."

171.    On February 23, 2010, the Individual Defendants then at the Company caused Amedisys to also hold an earnings conference call, during which defendant Borne stated that the Company "achieved record revenue and earnings per-share growth."  Defendant Redman also stated that "2009 was highlighted by record revenue and earnings, a double-digit reduction in day revenue outstanding and $247 million in cash flow from operations."

172.    Also on February 23, 2010, the Individual Defendants then at the Company caused Amedisys to file its 2009 10-K with the SEC, set forth the Company's annual report for the fourth quarter and year ended December 31, 2009.  This form was signed by defendants Borne, Redman, Netterville, Pitts, Ricchiuti, LaBorde, and Washburn. In addition, pursuant to SOX, the 2009 10-K contained signed certifications by defendants Borne and Redman, stating that the 2009 10-K did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

173.    The Individual Defendants then at the Company caused Amedisys to falsely and/or misleadingly state in its 2009 10-K that the Company made efforts to ensure proper billing and compliance.  For example, the Company stated: "*We maintain comprehensive controls over our billing processes to help ensure accurate and complete billing.*"  The Company also stated that it "take[s] prompt corrective action with employees who knowingly fail to follow our billing policies and procedures in accordance with a well publicized 'Zero Tolerance Policy'."  Similarly, the Company claimed:

> We develop, implement and maintain ethics, compliance and quality improvement programs as a component of the centralized corporate services provided to our home health and hospice agencies.… We promote a culture of compliance within our company through persistent messages from our senior leadership concerning the necessity of strict compliance with legal requirements and company policies and procedures, and through publicizing and enforcing our Zero Tolerance Policy.

174.    Before the market opened on April 27, 2010, the Individual Defendants then at the Company caused Amedisys to issue a press release falsely and/or misleadingly stating the Company's financial results for the first quarter of 2010 ended March 31, 2010. The Company stated that "[w]e posted record financial performance with net service revenue and net income attributable to Amedisys, Inc., increasing 20.8% and 35.6%, respectively, over the three-month period ended March 31, 2009."

175.    That same day, the WSJ published an article questioning whether Amedisys was improperly taking advantage of the Medicare reimbursement system by increasing the number of in-home therapy visits.  Despite Amedisys's past earnings being called into doubt, defendants continued to tout the Company's performance.

176.    Also on April 27, 2010, the Individual Defendants then at the Company caused Amedisys to hold an earnings call during which the false and misleading financial results were repeated.  Defendant Redman emphasized that "Amedisys has again posted another great quarter."  In addition, when asked specifically about that day's article in the WSJ by an analyst, "how Amedisys can be so efficient at picking patients at billing so correctly so many times at generating such high degree of consistency about optimizing Medicare reimbursements under a specific rule," defendant Borne responded and stated, in part, that "[n]obody that we have come across has the type of approach and structure [that we do] and there is really something called leverage and critical mass.  And that is how we can be a little more effective."  Borne stated that "we are very specific with care algorithms."  In addition, Borne stated that "what we are trying to do as an organization is to be consistent in the assessment and the delivery of care, through care tracks, and the outcomes that we achieve.  And that is why we are so effective and consistent [at this], because that is where our strategy is."

177.    Also on April 27, 2010, the Individual Defendants then at the Company caused Amedisys to file its quarterly report on Form 10-Q for the quarter ended March 31, 2010, with the SEC, which was signed by defendant Redman. The Form 10-Q reiterated the previously-announced false and misleading financial results.  In addition, pursuant to SOX, the Form 10-Q

contained signed certifications by defendants Borne and Redman, once again stating that the Form 10-Q did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

## X.    THE WRONGFUL CONDUCT BEGINS TO BE REVEALED

### A.    *The Wall Street Journal* Article

178.    On April 27, 2010, the WSJ published an article questioning whether Amedisys was improperly taking advantage of the Medicare reimbursement system by increasing the number of in-home therapy visits. The article stated, in relevant part:

> Medicare reimbursements are determined in part by the number of at-home therapy visits each patient receives, with an extra fee kicking in as soon as a patient hits a certain number of visits. Between 2000 and 2007, Medicare paid companies a flat fee of about $2,200 for up to nine home therapy visits. It paid an additional reimbursement of roughly $2,200 if the therapy surpassed nine visits. That incentive was designed so that agencies didn't "stint" on therapy visits, says Laurence Wilson, the director of chronic-care policy group at the Centers for Medicare and Medicaid Services, the agency that runs Medicare.
>
> According to The Journal analysis, which was based on publicly available Medicare records, Amedisys provided many of its patients just enough therapy visits to trigger the extra $2,200 payment. In 2005, 2006 and 2007, very few Amedisys patients received nine therapy visits while a much higher percentage got 10 visits or more. In 2007, for instance, only 2.88% of patients got nine visits, while 9.53% of patients got 10 visits.
>
> "I was told 'we have to have ten visits to get paid,'" says Tracy Trusler, a former Amedisys nurse for two years in Tennessee, who has since left the company. Her supervisors, she says, asked her to look through patients' files to find those who were just shy of the 10-visit mark and call their assigned therapists to remind them to make the extra appointment.
>
> "The tenth visit was not always medically necessary," Ms. Trusler says.
>
> \*  \*  \*
>
> The number of visits eligible for the extra reimbursement has a significant impact on home-health providers' receipts from Medicare and thus on overall revenue. While Amedisys doesn't break out the amount of revenue from the extra Medicare payment, the company says between 55% and 60% of its patients receive home therapy. In 2007, according The Journal's analysis, 28.5% of the patients who received therapy got 10 to 12 visits, thereby triggering the extra $2,200 Medicare payment. Such cases are highly profitable because they cost the company less than $80 per visit.

Medicare reimbursements for the entire home health-care industry are coming under increased scrutiny. The federal agency that advises Congress on Medicare payment issues, the Medicare Payment Advisory Commission, or MedPAC, warned last month that home health "overpayments contribute to the insolvency" of the Medicare trust fund as well as premium increases that beneficiaries must pay.

Medicare changed its reimbursement rules in January 2008 in an attempt to blunt the incentive for home health-care visits it created. It eliminated the $2,200 bonus payment at 10 visits and now pays an extra fee of a couple of hundred dollars at six, 14 and 20 therapy visits. "What we felt we could do is try to create some better incentives in the system for providing the level of service that beneficiaries actually needed," says Mr. Wilson from Medicare.

It wasn't until the change was made that MedPAC noticed the questionable home visit patterns. In its March report, the agency said that the industry-wide percentage of therapy visits in the 10-to-13 range dropped by about a third after the policy change in 2008.

The pattern of clustered visits around reimbursement target" is continuing: MedPAC found the number of therapy visits numbering six, 14 and 20 increased after the policy was changed in 2008.

During a MedPAC meeting in December, Arnold Milstein, a MedPAC commissioner, questioned whether all the home visits were appropriate. "Looking at the great speed with which the volume of services adapts to payment changes, which are breathtaking, it does suggest that there may be a problem with certifying the appropriateness of these services," Mr. Milstein said, according to a transcript of the meeting.

Based on the report, MedPAC suggested for the first lime last month that the Secretary of Health and Human Services "review borne health agencies that exhibit unusual patterns of claims for payment"

The Journal analysis found a similar pattern: In 2008, the percentage of Amedisys patients getting 10 visits dropped by 50%, while the percentage that got six visits increased 8%. The percentage of patients getting 14 visits rose 33% and the percentage getting 20 visits increased 41%.

\* \* \*

In 2000, Medicare rolled on its new reimbursement system. It began paying a flat sum of about $2,200 for a 60-day period of care, no matter how many times a nurse went to a patient's home. The fee also included up to nine visits from occupational, physical or speech therapists. Doctors need to sign off on the number of visits in order for the company to be reimbursed.

Through 2007, an agency would receive the additional $2,200 if it sent a therapist to a patient's home 10 or more times during the same period.

The generous Medicare reimbursements are one reason the home health-care industry has grown so swiftly, according to MedPAC. There are now more than 10,400 home-health agencies in the U.S., up nearly 50% since 2002.

After the new reimbursement system was implemented in 2000, Amedisys's fortunes improved markedly. Its profits rose and its stock soared. Today, Amedisys has a market value of $1.7 billion.

179.    The revelation in the April 27, 2010 WSJ article above, that the Company was billing for a tenth visit that "was not always medically necessary" is directly at odds with the Company's claim in its Code that states: "Amedisys shall bill only for goods and services that are properly ordered and delivered or performed, as appropriate."  Further, the WSJ article noted that while physicians determine the number of visits necessary in order for the provider to be reimbursed, they "aren't required to see a patient in person to recommend them for home health-care or examine their progress," and "[s]ome rely on home therapists to provide guidance on the number of visits a patient requires."  The article quoted a doctor of internal medicine who said that "[g]enerally, I leave it up to the therapist because that's what they're best at," and "[i]t's pretty rare for me to disapprove of what they do."

180.    On April 27, 2010, the Company's value fell $3.98, falling from $60.50 per share to close at $56.52 per share – a decrease of 6.5%.

**B.    The U.S. Senate Finance Committee Investigation**

181.    The U.S. Senate Finance Committee subsequently launched an investigation into Amedisys's billing and operating practices. In a letter to Amedisys dated May 12, 2010, the Committee cited to the April 27, 2010 WSJ article, and questioned whether Amedisys "intentionally increased utilization for the purpose of triggering higher reimbursements."  The letter stated that the findings reported in the article suggest that Amedisys is "basing the number of therapy visits they provide on how much Medicare will pay them instead of what is in the best interests of patients."  Moreover, the U.S. Senate Finance Committee's letter noted that when Medicare changed its payment rules in 2008 to provide additional reimbursement to patients when they had six, fourteen, and twenty therapy visits, Amedisys "apparently changed their utilization patterns as a result of these payment policy changes."  In addition, the U.S. Senate Finance Committee noted that the physician referral form associated with Amedisys's Balanced for Life program "raises concerns that the program may be taking advantage of Medicare

payments in order to improve company profits." The Committee also questioned marketing materials that aim to target seniors "to take advantage of Medicare payments to improve profits." Accordingly, the Committee requested that Amedisys produce the following information:

1) For each calendar year from 2006 through 2009, provide data showing the distribution in one day intervals from 1 to 30 of therapy visits for therapy episodes (episodes which include at least one therapy visit) by both number and percentage.

2) For each year from calendar 2006 through 2009, provide data showing the average score at admission for Medicare patients that received therapy visits for each of the following activities of daily living as reported in the Outcomes and Assessment Information Set (OASIS):

a. Walking/Ambulation;

b. Hygiene;

c. Continence;

d. Dressing;

e. Eating;

f. Toileting; and

g. Transferring.

3) For each calendar year from 2006 through 2009, also provide:

a. The total number of Medicare home health patients that received therapy visits from your company for that year;

b. The total amount of Medicare reimbursement your company received for home health episodes that qualified for additional payments because of therapy visits provided; and

c. The total amount of Medicare reimbursement your company received.

4) All internal documents, records, and communications relating to the 2008 Medicare payment revisions for home health therapy visits from January 1, 2007 to the present. Please include all communications regarding changes to the Amedisys Medical Software applications as a result of the 2008 Medicare payment revisions. In addition, include copies of all audit reports conducted internally and externally including draft and unfinished versions.

5) All internal policies and guidelines regarding the number of therapy visits provided per home health episode. Please include any prior policies and guidelines from January 1, 2007 to the present, including all modifications to those policies.

6) For each state in which you provide home health services, provide a list of the 10 physicians from whom you received the highest number of referrals for home health services in each of the calendar years 2006, 2007, 2008, and 2009. For each physician, please include the physician's specialty, location, and the number of referrals.

7) For each physician identified in the response to question 6, please provide all payments or transfers of value from your company, or any entity acting at your company's direction, to that physician for calendar years 2006, 2007, 2008, and 2009. This information should include:

     a. The recipient's name, business address, and specialty;

     b. A description of the form of payment or transfer of value (cash, stock, travel, meals, etcetera);

     c. A description of the nature of payment or transfer of value (royalty, consulting, speaking fee, gift, etcetera); and

     d. The date of payment.

8) Provide copies of all marketing materials produced for patients and physicians for calendar years 2006, 2007, 2008, and 2009.

9) Provide all copies of guidance or instructions to marketing staff on appropriate physician and patient marketing practices (including payments and transfers of value to physicians) for calendar years 2006, 2007, 2008 and 2009.

10) Indicate whether your company has a compliance program, and if so:

     a. Indicate whether you provide a toll free number for purposes of reporting inappropriate marketing activities;

     b. Indicate the number of times in each of the calendar years 2006, 2007, 2008 and 2009 complaints were received regarding marketing activities as well as the nature and resolution of each complaint;

     c. Provide documentation on the compliance program including previous policies from 2006 to the present.

11) Provide copies of all physician attestation forms with an explanation of the process for physician attestations for calendar years 2006, 2007, 2008, and 2009.

12) Please explain the clinical criteria consulted by Amedisys in drafting each patient question on the Balanced for Life – Fall Risk Assessment physician attestation form.

13) Indicate whether you have medical directors serve each of your home health agencies. If so, please provide the following:

a. Identify the duties and responsibilities of medical directors for your home health agencies;

b. The average number as well as range of physicians that serve your home health agencies;

c. The five most common specialties that are represented by medical directors across all your home health agencies;

d. The average number of physicians in each of the specialties identified in question 12.b. that serve as medical directors at a home health agency of your company;

e. The percentage of medical directors that are employees of your company and the percentage of medical directors that serve under contractual arrangement; and

f. For medical directors that serve under contractual arrangement, identify the method of compensation as well as the average number and range of hours worked per week.

182.   On May 13, 2010, the WSJ, published an article entitled "*Senators Question In-Home Caregivers*," reported that the U.S. Senate Finance Committee had launched an investigation into the practices of Amedisys and whether the Company has "deliberately boosted the number of home therapy visits to trigger higher Medicare reimbursements."  The article stated, in relevant part, the following:

Companies "working with Medicare should not be allowed to target seniors or manipulate care simply to get higher reimbursement rates," said Sen. Max Baucus (D" Mont.), chairman of the finance committee, in a statement.

"It appears that either the home health care reimbursement policy is flawed, some companies are gaming the system, or both," said Sen. Charles Grassley, (R. Iowa), ranking member of the committee, "We're working to figure out what's going on."

* * *

- 67 -

The senators asked Amedisys to also provide information on its falls-prevention program called "Balanced for Life."

More than 330 Amedisys locations offer "Balanced for Life" – for which Amedisys has told investors that it receives an extra $1,000 to $2,000 per patient – up from 33 locations in 2008.

183.    After the publication of the WSJ article reporting on the U.S. Senate Finance Committee's investigation, the Company's share price fell another $4.48, or 8%, from the previous day's trading to settle at $51.73.

### C.    The Defendants' Response and Resulting Fallout

184.    In the aftermath of the WSJ's revealing report and the launch of the U.S. Senate Finance Committee's investigation, defendants Borne, Jeter, Redman, and the Director Defendants directly denied and/or caused the Company to deny wrongdoing concerning improper Medicare billing.  The investing public, however, no longer trusts current management, as reflected in the Company's now significantly devalued stock price.  Reasons to distrust management continue to grow in light of lackluster financial performance by the Company that suspiciously coincides with the increase in pubic scrutiny that Amedisys now faces.

185.    On May 13, 2010, defendants Borne, Jeter, Redman, and the Director Defendants caused the Company to issue a press release responding to the U.S. Senate Finance Committee letter.  While the press release claimed that the WSJ article, which was referenced in the Committee's letter, "told an incomplete story about the value of home health to patients, their families, and the overall healthcare system," Defendant Borne was quoted therein as stating "[w]e will cooperate with the Committee's inquiry. We also look forward to discussing with the Senators the many benefits and advantages home health care provides for the millions of Americans our industry serves."

186.    After the close of trading on June 30, 2010, Amedisys issued a press release, which was attached to a Form 8-K filed with the SEC on July 1, 2010.  The press release announced that the Company received notice of a formal investigation from the SEC.  In addition, the Company reported that it had received a subpoena from the SEC relating to the

matter under review by the U.S. Senate Finance Committee, which requested production to the SEC of all documents provided by the Company to the Committee.

187.    That same day, the Company reported that it submitted its initial response to the U.S. Senate Finance Committee on June 4, 2010, made an additional submission on June 25, 2010, and that it "anticipates making additional submissions of information to the Committee." The Company also admitted that it could give no assurances as to the timing or outcome of the Committee's inquiry.  Similarly, the Company admitted that no assurances could be given as to the timing or outcome of the SEC investigation.

188.    On July 1, 2010, Amedisys's value dropped from the previous day's closing price of $43.98 per share to $39.34 per share, a loss of $4.64 per share, or 10.5%.

189.    Between June 10, 2010 and July 28, 2010, at least four lawsuits were filed by Amedisys shareholders in this Court against the Company and certain of its officers and directors.  Styled as putative class actions, and now consolidated before this Court, these actions allege that the Company and certain members of senior management and the Company's Board violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and §78t(a); and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, by making materially false and/or misleading statements, as well as failing to disclose material adverse facts, about the Company's business, operations, and prospects from February 23, 2010, through and including May 13, 2010.

190.    In a press release issued after the markets closed on July 12, 2010, the Company announced its preliminary results for the second quarter of 2010.  It estimated that its second-quarter net income at $1.12 per share, instead of the $1.36 expected by analysts. The Company's net income per share for this quarter was down by $0.15 cents per share from one year earlier. Amedisys also reported "nonrecurring costs of 17 cents per share primarily associated with realignment of operations, and the Senate Finance Committee and SEC investigations."

191.    Market reaction to the Company's July 12, 2010 press release was instantaneous. Amedisys shares, which had closed at $35.02 on July 12, opened at $28.99 on July 13, 2010, and

sank as low as $24.66 before closing at $26.57. In a mere twenty-four hours, Amedisys lost 24% of its value. R.W. Baird, RBC Capital Markets, and Jeffries, among others, promptly downgraded the Company's shares. Indeed, during the Company's guidance conference call on July 13, 2010, Michael Snow, Amedisys's COO, stated that "the result[s] of this quarter [has] been a wake up call." Nevertheless, defendant Borne, commenting on the April 27, 2010 article, in the WSJ, asserted that the reporter presented an "unbalanced story." The Company attempted to reassure investors that "despite these distractions, we're focused on operating our current business. We have a pre-planned operating strategy, deliver[] great quality of care to our patients, grow our business, and become as efficiently as possible."

192.    Also during the July 13, 2010, conference call, defendant Redman clarified that approximately $0.04 of the $0.17 per share, of non-recurring costs disclosed in the July 12, 2010 press release, related to legal and investigation costs. Redman stated: "[l]ooking at the $0.17 that we identified is non-recurring costs in the second quarter. About three quarters of that related to the operational realignment and eventually other quarter[s] had to do with sort of extraordinary costs related [t]o legal and the Senate Finance Committee and that sort of thing."

193.    On July 14, 2010, analysts downgraded the Company's stock. The Company's value fell 3% that day, closing at $25.76.

194.    In an obvious effort to engage in some form of damage control, defendants Borne, Jeter, Redman, and the Director Defendants caused the Company to file a Form 8-K with the SEC on July 16, 2010, which included a press release as an exhibit that the Individual Defendants had caused the Company to issue the day before. The letter asserted that the April 27, 2010 WSJ article, was "based upon an inaccurate understanding of a very complex industry and the ever-changing population that we serve, and that it overlooked some important facts ...." According to this letter, among the "key factors" that justified the Company's billing practices were that "Amedisys has been taking care of patients who are increasingly sicker and debilitated, and therefore who need more therapy visits." Of course, this position simply disagrees with the statement of the former Amedisys employee noted in the April 27, 2010 WSJ article, who had

stated that "[t]he tenth visit was not always medically necessary" and the statistical analysis set forth in the article.

195.    The so-called "Open Letter to Shareholders" generated substantial press coverage. For example, a July 16, 2010 article by the *Associated Press* entitled "*Amedisys Defends Company in Shareholder Letter*" stated, in pertinent part:

> BATON ROUGE, La. (AP) -- Amedisys Inc. has issued a letter to its shareholders defending its home health care practices that have fallen under federal investigation.
>
> In the 21-page letter, released after financial markets closed Thursday, Amedisys challenged questions raised by The Wall Street Journal, which examined Amedisys and three other home health providers.
>
> The Journal analyzed Medicare data and reported that Amedisys and other providers appeared to boost the number of visits they made to patients to 10 or above -- the threshold at which Medicare reimburses providers an additional $2,200. As a result, the Senate Finance Committee launched an investigation.
>
> Amedisys, LHC Group Inc., Almost Family Inc. and Gentiva Health Services, in federal securities filings, have reported received formal notice of investigations and subpoenas for documents from the Securities and Exchange Commission. All have said they are cooperating.
>
> In its letter, Amedisys said all care is prescribed by the doctors and its physician consultants are not compensated for referrals. In 2009, physician consultants received an average of about $2,600 for the year, Amedisys said.
>
> The letter also said the Journal appeared to assume -- inaccurately -- a static patient base in 2007 and 2008 when it analyzed visits and payments.
>
> "The key factors impacting our shifting patient population include the trend that Amedisys has been taking care of patients who are increasingly sicker and debilitated and therefore who need more therapy visits," the letter said. "At the same time, other factors have resulted in Amedisys also taking care of more low acuity patients who require relatively fewer visits."
>
> Amedisys also said it exceeded the national average by 7.1 percent in providing visits not compensated by Medicare. Over 2008 and 2009, those visits totaled more than $95 million, the company said.
>
> "We stand by the integrity of our company and employees," the letter said. "We believe the WSJ article is based upon an inaccurate understanding of a very complex industry and the ever-changing population that we serve, and that it overlooked some important facts."
>
> Since May 13, when the Senate committee letter was sent to the companies requesting information, Amedisys shares have fallen by roughly half to a Thursday close of $26.76.

196.    Indeed, as the market digested the Company's "Open Letter to Shareholders," investors demonstrated during the week afterward that they were not favorably impressed with the proclamations of innocence offered by defendants.   By July 23, 2010, Amedisys's value reached a near-nadir for the year by dropping from a closing price of $26.76 on July 15, 2010, to $23.46, amounting to a decline of $3.30, or over 12%.

197.    On July 19, 2010, CRT Capital Group LLC released an analyst report that characterized the July 15, 2010 letter to shareholders, as both "not compelling" and "misleading." The report stated in part:

> **Shareholder Letter Not Only Not Compelling, Despite Most Favorable Spin Possible on Data, Reimbursement Rules.** Finally, late last week, AMED released an open letter to shareholders, which was the Company's position paper in its own defense. We found the arguments to not only be non-compelling, but also in some cases to be misleading. For example, AMED asserted that it often provides uncompensated therapy services because the number of visits is above the 20-visit bonus point. We believe from our study of the reimbursement system that the incremental revenue from 19 to 20 visits is more than the marginal cost of an additional therapy visit: the increment is designed cover more than just the 20th visit.

198.    On August 9, 2010, Amedisys issued a press release reporting the Company's financial results for the three and six-month periods ended June 30, 2010.   The Company provided updated guidance for its expected performance in 2010, stating that "[n]et service revenue is anticipated to be in the range of $1.625 billion to $1.650 billion, excluding the effects of future acquisitions, if any are made.   The press release further noted that "[d]iluted earnings per share is expected to be in the range of $4.20 to $4.50 based on an estimated 28.8 million shares outstanding. This guidance does not include the effects of any share repurchases or the effects of future acquisitions, if any are made."   Defendant Borne, characterizing the results, stated that "[a]lthough our results for the second quarter were below our expectations we are optimistic about our future and the action plans that we have put into place to revitalize our growth."

199.   In its August 9, 2010 press release, the Company also reported the Board "authorized a stock repurchase program of up to $60.0 million of our common stock. Purchases may be made through open market and privately negotiated transactions, at times and in such amounts as management deems appropriate, including pursuant to one or more Rule 10b5-1 trading plans. The share repurchase program is scheduled to expire on September 30, 2011." This repurchase program appears to be an attempt by defendants Borne, Redman, and the Director Defendants to again artificially increase the value of the Company's stock and regain investor confidence in the Company.  On an earnings conference call that same day, defendants Borne and Redman discussed the Board's authorization of the repurchase of Company shares. But neither officer offered any substantive reason for the share repurchases.  Borne claimed that it was a "sound and strategic use of the Company's cash" and Redman declared it an "appropriate use" of Amedisys's capital.

200.   Also on that August 9, 2010, earnings conference call defendants discussed the Company's disappointing second quarter 2010 results and provided an update on the ongoing government investigations.  Defendant Borne admitted that Amedisys's results for second quarter 2010 were "below expectations."  He also explained that Amedisys shared its submission to the U.S. Senate Finance Committee with the SEC and was "preparing additional information that the SEC has requested."  Borne added: "We are working to minimize the impact of these external distractions, and we are focused on growing our core business."  Defendant Redman disclosed that the Company incurred approximate $8 million in costs during the first half of 2010 "for the realignment of [the Company's] operations, including training, agency closings, severance as well as legal fees associated with the Senate Finance Committee inquiry and the SEC investigation."

201.   On September 22, 2010, defendants at the Company at the time caused Amedisys to file a Form 8-K with the SEC, which disclosed that the Company had issued a press release announcing "that it will close approximately 13 agencies (nine Home Health and four Hospice)

locations and consolidate another 26 locations (23 Home Health and three Hospice) into existing locations."  The Form 8-K further stated as follows:

> The Company also plans to discontinue the start-up process associated with 28 prospective Home Health agencies.  These actions are expected to be completed by the fourth quarter of 2010.
>
> As a result of these actions, the Company expects to incur charges in the range of $6 to $8 million in the third quarter and approximately $1 million in the fourth quarter of 2010. These charges include lease terminations of approximately $4 to $5 million and other charges, including severance payments, of approximately $3 to $4 million. The cash outflow for other charges of $3 to $4 million is expected to be incurred during the fourth quarter of 2010. Lease terminations will be paid either through the remainder of the lease term or through a lease termination option, if available. These estimates are preliminary and based on a number of assumptions and could change materially.

202.    Less than a week later, on September 28, 2010, Amedisys issued a press release, attached to a Form 8-K filed with the SEC that same day, announcing that it had received a civil investigative demand ("CID") issued by the DOJ pursuant to the FCA.  In its announcement, the Company noted that it had received the CID on September 27, 2010, and that "[t]he CID requires the delivery of a wide range of documents and information to the United States Attorney's Office for the Northern District of Alabama, relating to the Company's clinical and business operations, including reimbursement and billing claims submitted to Medicare for home health services, and related compliance activities. The CID generally covers the period from January 1, 2003, through the present."

203.    After the Company's September 28, 2010 announcement of the DOJ investigation, the Company's market capitalization suffered a huge one-day loss of 16%, falling to $24.02 per share at the close of the market on September 28, 2010, from its closing price of $28.43 on the day before.  In all, between April 14, 2010, when the Company's stock reached its one year high of $62.99 per Company, and September 28, 2010, the Company's value plunged $38.97 a share, or 60%, thereby wiping out market capitalization of over $1 billion.

204.    Also on September 28, 2010, CRT Capital Group LLC issued an analyst report stating that:

[B]ased on our extensive analysis of AMED's reported results, we have long been concerned that the "unexplained revenue growth" from 2003 onward could be related to flaws in the company's billing and supervisory/compliance procedures, beginning with AMED's 2003 initiation of a "revenue enhancement program" that increased billings in Medicare in 2004 by 4% unilaterally.

205.    On October 26, 2010, the Company issued a press release disclosing the Company's financial results for the third quarter of 2010 ended September 30, 2010. Characterizing these results, defendant Borne stated in the press release:

The quarter's results reflect the volume fall-off we began experiencing in the second quarter. We have implemented a number of initiatives to better align our cost structure with current volume and improve our revenue moving forward. We continue to invest in delivering the highest quality care with a focus on operational efficiency and believe the long term prospects for the company are strong. These actions will better position the company moving forward.

206.    In the October 26, 2010 press release, the Company also provided updated guidance for 2010, stating that "[n]et service revenue is anticipated to be in the range of $1.625 billion to $1.645 billion, excluding the effects of future acquisitions, if any are made…. Diluted earnings per share is expected to be in the range of $4.20 to $4.35 based on an estimated 28.8 million shares outstanding. This guidance does not include the effects of any share repurchases or the effects of future acquisitions, if any are made." The Company also reported the following

Three-Month Periods Ended September 30, 2010 and 2009

- Net service revenue increased $16.4 million or 4.2% to $404.7 million compared to $388.3 million in 2009, with $8.4 million of the increase related to growth through base/start-up agencies.

- ***Net income attributable to Amedisys, Inc. decreased $14.3 million or 39.8% to $21.6 million compared to $35.9 million in 2009***.

- ***Diluted earnings per share decreased 41.0% to $0.76 compared to $1.29 per diluted share in 2009.*** The weighted average number of diluted shares outstanding increased to approximately 28.5 million compared to 27.9 million in 2009.

- ***Earnings before interest, taxes, depreciation and amortization ("EBITDA") decreased 32.7% to $46.5 million compared to $69.1 million in 2009***.

- After adding back $6.3 million ($3.8 million, net of income tax) or $0.13 per diluted share in certain items*, the following would have been our adjusted results:

  - Net income attributable to Amedisys, Inc. decreased 29.1% to $25.5 million compared to $35.9 million in 2009.

  - Diluted earnings per share decreased 31.0% to $0.89 compared to $1.29 per diluted share in 2009.

  - EBITDA decreased 24.9% to $51.9 million compared to $69.1 million in 2009.

<u>Nine-Month Periods Ended September 30, 2010 and 2009</u>

- Net service revenue increased $132.0 million or 11.9% to $1.2 billion compared to $1.1 billion in 2009, with $100.7 million of the increase related to growth through base/start-up agencies.

- ***Net income attributable to Amedisys, Inc. decreased $7.6 million or 7.7% to $90.5 million compared to $98.0 million in 2009***.

- ***Diluted earnings per share decreased 10.4% to $3.18 compared to $3.55 per diluted share in 2009***. The weighted average number of diluted shares outstanding increased to approximately 28.5 million compared to 27.6 million in 2009.

- ***EBITDA decreased 5.2% to $180.6 million compared to $190.4 million in 2009***.

- After adding back $7.5 million ($4.6 million, net of income tax) or $0.16 per diluted share in certain items*, the following would have been our results:

  - Net income attributable to Amedisys, Inc. decreased 3.1% to $95.0 million compared to $98.0 million in 2009.

  - Diluted earnings per share decreased 5.9% to $3.34 compared to $3.55 per diluted share in 2009.

  - EBITDA decreased 1.7% to $187.2 million compared to $190.4 million in 2009.

The Company characterized the "certain items" noted by the asterisks above, as follows:

During the three-month period September 30, 2010 we incurred certain costs associated with the realignment of operations ***including*** severance and ***legal***

*expenses related to the United States Senate Committee on Finance inquiry and SEC investigation*. In addition, for the nine-month period ended September 30, 2010 certain costs include the reversal of accrued bonuses during the second quarter of 2010. We also incurred costs associated with our exit activities for the three-and nine month periods ended September 30, 2010, which includes $0.9 million for the write-off of intangibles. During the three-month period ended September 30, 2010 we settled our Georgia indigent care liability and during the three-month period June 30, 2010 we received the Centers for Medicare and Medicaid Services ("CMS") bonus payments as the result of the pay for performance demonstration. The following details these items for the three and nine-month periods ended September 30, 2010:

| | For the three-month periods ended September 30, 2010 | | | For the nine-month periods ended September 30, 2010 | | |
|---|---|---|---|---|---|---|
| | (Income) Expense | Net of tax | EPS | (Income) Expense | Net of tax | EPS |
| Georgia indigent care liability | (3,676) | (2,242) | (0.08) | (3,676) | (2,242) | (0.08) |
| CMS bonus payment | — | — | — | (3,587) | (2,188) | (0.08) |
| Exit activities | 6,904 | 4,212 | 0.15 | 8,340 | 5,087 | 0.18 |
| Certain costs | 3,051 | 1,861 | 0.06 | 6,403 | 3,906 | 0.14 |
| Total | 6,279 | 3,831 | 0.13 | 7,480 | 4,563 | 0.16 |

207.    On October 26, 2010, defendants held an earnings conference call for third quarter 2010, during which they discussed the Company's second consecutive quarter of disappointing financial results. As in the previous quarter, defendant Borne admitted that the Company's third quarter performance "did not meet expectations." Defendant Redman explained that during the third quarter of 2010, the Company incurred approximately $10 million in costs from "the realignment of [Amedisys's] operations, including agency closings, severance and write-off of intangibles, as well as legal fees associated with the Senate Finance inquiry and the SEC investigation." Redman also stated that the Company spent approximately $12 million that quarter to repurchase its own stock.

208.    Later during the October 26, 2010 conference call, analysts drilled into defendants Borne and Redman with piercing questions. In response to an analyst question regarding the cause of Amedisys's stock decline, Borne noted a decline in therapy visits per episode:

**Kevin Campbell** - Avondale Partners – Analyst

First, I want to start with the pricing. If you look at the revenue per completed episode it looks like it went down a little bit sequentially from 2Q to 3Q, so I was hoping maybe you could talk about what caused that change and what we should expect going forward. Should we expect it to continue to climb for a period and

then stabilize? Should it be stable here, etc.? So if you could talk on pricing that would be great.

**Bill Borne** - *Amedisys, Inc. - Chairman, CEO*

I think I can help you with that. We had some -- remembering that therapy visits, helped with additional revenue per episode, saw a few -- ***fewer therapy visits per episode***, which softens revenue a little bit. We are not really rolling out additional Balance for Life programs. Maybe just hit or miss here or there, but nothing concerted. We are fairly well concentrated in the portfolio now.

209.    In regard to the number of visits per episode reported by the Company, Sheryl Skolnick, analyst from CRT Capital Group, expressed concerns regarding the Company's reported visits per episode and the apparent "behavior change" in Amedisys clinicians, including how they assess acuity of patients.  Mike Snow, the Company's COO, and defendant Redman repeatedly noted a decrease in the number of patient visits between second and third quarters of 2010.   The exchange between Skolnick, Snow, and Redman proceeded in relevant part as follows:

**Sheryl Skolnick** - *CRT Capital Group - Analyst*

Okay, I want to turn to questions about the actual performance of the business and what trends we're seeing and versus not seeing here.

Let me just ask it this way, your pricing is down sequentially. You addressed that issue of declining acuity in that -- it sounds as if you're saying that it is going to be stable to flattish. Your recert rate, being specific here, your rate is also likely to stabilize, perhaps decline a little bit.

***But I am very concerned here.*** The number of visits per episode is up. The acuity is down, and you're facing a significant price compression next year, which one of my colleagues I think had deftly pointed out, gives you fewer arrows in the quiver to offset this.

***There is a behavioral change that has been undertaken by your clinicians, which -- okay, that is an explanation, but why they felt the need to change their behavior is still a question.***

***Where I am going with this is why should I not be worried that all of these changes in pattern, the drop in acuity, the drop in research, the change in behavior, the compression of price, why doesn't that add up to something that would make the DOJ ask questions?***

Mike Snow - *Amedisys, Inc. - COO*

**Well, I'm not going to speculate on what the DOJ might or might not look at. But I will say that our episodes -- our visits per episode are actually going down. I know what you're looking at. You can maybe get some more information through our Q, but the visits are actually going down. Primarily that is some of the softer therapy visits I mentioned earlier.**

                    *        *        *

**Mike Snow** - *Amedisys, Inc. - COO*

Well, we have drawn -- what we have assumed all along is that visits are related to acuity. So if we are assuming, as I have said earlier, that acuity will be somewhat flat, we would expect the same in our visits.

Now, with that being said, I think the underlying theme for us is doing the right number for the patient, and matching that visit count with the patient. So some of this is about making sure that we have strong care tracks by diagnosis and have our folks adhere to those care tracks, where clinically appropriate. And that is where it what we are focused on doing.

**Dale Redman** - *Amedisys, Inc. - CFO*

We actually did have a decline in visits per episode from the **second** to the **third** quarter.

210.    Also on October 26, 2010, Amedisys filed its quarterly report on Form 10-Q for the quarter ended September 30, 2010, with the SEC. The Form 10-Q reiterated the previously-announced disappointing results financial results for third quarter 2010.

211.    On November 3, 2010, defendant Borne reiterated the disappointing third quarter 2010, results during a conference call. Borne stated: "Everybody knows in this room that Amedisys has had challenges. For the first time in literally five years we missed a quarter in earnings."

212.    Despite defendants Borne's, Jeter's, and Redman's substantial roles in the wrongdoing alleged herein, on or around January 3, 2011, the Director Defendants approved amendments to Borne's, Jeter's, and Redman's employment agreements. A Form 8-K released by Amedisys on January 7, 2011, disclosed that effective January 3, 2011, Borne would be entitled to, among other things:

(a)    ***an increase in annual base salary*** from $650,000 to $750,000;

(b)    participate in the Company's annual ***cash bonus*** incentive plan;

(c)    be eligible for certain annual ***equity-based awards***, which must in part be based on tenure as opposed to performance;

(d)    receive a host of ***additional benefits*** pertaining to compensation, pension, welfare, and benefit programs, including deferral, health, medical, dental, long-term disability, travel, and accident and life insurance plans;

(e)    payment of a whole life insurance policy with premiums of up to $25,000 a year; and

(f)    ***a new automobile*** at least every two years, as well as ***reimbursement of all maintenance, insurance, and gas expenses***.

213.    The January 7, 2011 Form 8-K, also revealed that the Director Defendants approved amendments to defendants Jeter's and Redman's employment agreements.  Jeter's base salary was increased from $155,000 to $250,000 and Redman's base salary was increased from $300,000 to 425,000.  Both Jeter and Redman are now entitled to, among other things, to participate in the Company's annual cash bonus incentive plan and to be eligible for annual equity awards.  However, neither Jeter nor Redman received certain benefits given to Borne, including entitlement to: (i) whole life insurance policy premium payments; and (ii) use of an automobile, and reimbursement of all maintenance, insurance, and gas expenses associated therewith.

## XI.    FIDICUARY DUTIES OF THE INDIVIDUAL DEFENDANTS

214.    The Insider Selling Defendants – Borne, Graham, Jeter, LaBorde, Netterville, Ricchiuti, and Schwartz – breached their fiduciary duties to Amedisys by selling their holdings of Company stock while in possession of non-public information concerning the Company's true financial condition.  Because of their positions with the Company, the Insider Selling Defendants knew that the statements the Company and certain defendants made publicly were incorrect and improper.  They also knew that the effect of these misstatements would be to inflate Amedisys'

stock price.   At other times, the Insider Selling Defendants sold Amedisys stock with foreknowledge of events that would adversely affect the Company's stock price.

215.   Rather than come clean regarding Amedisys's illicit Medicare billing practices or seek to correct the Company's public statements, the Insider Selling Defendants took advantage of this undisclosed information to sell their personally held stock for considerably more than it was worth.   Indeed, defendants Graham, Jeter, and Schwartz sold well over half of their Amedisys stock between February 1, 2007 and April 26, 2010 ("Insider Selling Period"). Defendant Borne, the founder, CEO, and Chairman of Amedisys, sold nearly 50% of his holdings of Company stock during the same period.   Meanwhile, defendants Netterville and Ricchiuti each sold more than 30% of their personal holdings of Amedisys stock.   The following chart details the percentages of personal Amedisys holdings disposed of by the Insider Selling Defendants during the Insider Selling Period:

**William F. Borne**

| | |
|---|---|
| Shares Sold During Insider Selling Period | 217,500 |
| Shares Remaining After Sales | 217,771 |
| Total Shares Before Sales | 435,271 |
| **Total Proceeds from Sales** | **$10,929,968.10** |
| **% of Total Ownership Sold During Insider Selling Period** | **49.97%** |

**Larry R. Graham**

| | |
|---|---|
| Shares Sold During Insider Selling Period | 113,153 |
| Shares Remaining After Sales | 18,562 |
| Total Shares Before Sales | 131,715 |
| **Total Proceeds from Sales** | **$4,523,647.25** |
| **% of Total Ownership Sold During Insider Selling Period** | **85.91%** |

**Jeffrey D. Jeter**

| | |
|---|---|
| Shares Sold During Insider Selling Period | 19,001 |
| Shares Remaining After Sales | 9,325 |
| Total Shares Before Sales | 28,326 |
| **Total Proceeds from Sales** | **$817,043.00** |
| **% of Total Ownership Sold During** | **67.08%** |

| Insider Selling Period | |
|---|---|

**Ronald A. LaBorde**

| Shares Sold During Insider Selling Period | 19,007 |
|---|---|
| Shares Remaining After Sales | 15,520 |
| Total Shares Before Sales | 34,527 |
| **Total Proceeds from Sales** | **$942,537.75** |
| **% of Total Ownership Sold During Insider Selling Period** | **55.05%** |

**Jake L. Netterville**

| Shares Sold During Insider Selling Period | 35,000 |
|---|---|
| Shares Remaining After Sales | 47,564 |
| Total Shares Before Sales | 82,564 |
| **Total Proceeds from Sales** | **$1,707,630.00** |
| **% of Total Ownership Sold During Insider Selling Period** | **42.39%** |

**Peter F. Ricchiuti**

| Shares Sold During Insider Selling Period | 7,950 |
|---|---|
| Shares Remaining After Sales | 17,883 |
| Total Shares Before Sales | 25,833 |
| **Total Proceeds from Sales** | **$397,314.80** |
| **% of Total Ownership Sold During Insider Selling Period** | **30.77%** |

**Alice Schwartz**

| Shares Sold During Insider Selling Period | 23,397 |
|---|---|
| Shares Remaining After Sales | 8,207 |
| Total Shares Before Sales | 31,604 |
| **Total Proceeds from Sales** | **$922,175.28** |
| **% of Total Ownership Sold During Insider Selling Period** | **74.03%** |

216.    The timing of the Insider Selling Defendants' sales is highly suspicious, as in paragraph 218 below, which demonstrates how significant spikes in sales by Amedisys insiders coincided with significant events discussed herein.  For example, in an apparent pump-and-dump manner, certain Insider Defendants sold large amounts of stock soon after the issuance false or misleading statements that did not reflect the Company's true financial condition, including:

(a)    a May 1, 2007 earnings report for first quarter 2007, that claimed Amedisys' revenues were up 21% compared to the same quarter the year prior;

(b)    a October 30, 2007 earnings report for third quarter 2007, that claimed a 32% revenues increase compared to the same period the year prior;

(c)    a July 29, 2008 earnings report for second quarter 2008, that claimed revenues exceeding analyst consensus estimates by over 17%; and

(d)    a July 28, 2009 earnings report for second quarter 2009, that claimed revenues exceeding analyst consensus estimates by almost 24%.

217.    The sales of Insider Selling Defendants also peak just prior to public disclosure of negative events that caused steep drops in Company's stock price, including the release of Citron's August 12, 2008 article, the sudden resignations of defendants Graham and Schwartz, and the release of the WSJ's April 26, 2010 article, that exposed Amedisys's manipulation of the number of patient visits to maximize Medicare billings.

218.    The below graph illustrates how the large volume of selling by Amedisys insiders corresponded with significant events affecting the Company's stock price during the Insider Selling Period:



219.    The Insider Selling Defendants' sales were timed to maximize profit from the Individual Defendants scheme to artificially inflate Amedisys' stock price throughout the Insider Selling Period.    For instance, following defendants' misleading statements made on July 29, 2008, the Company's stock spiked to its all time high of approximately $66 a share.    During a narrow fourteen-day window between when Amedisys' stock reached its climax and Citron cast doubts about Amedisys's accounting, defendant Borne pocketed $3,296,500 in proceeds from selling of 52,500 Amedisys shares, amounting to 24% of the total Amedisys stock that Borne dumped during the Insider Selling Period.    Similarly, defendant Graham cashed in 58,308 shares of Amedisys stock for $2,404,734 about a month before he and defendant Schwartz suddenly resigned from the Company.    These sales, evidently made with foreknowledge of Graham's (and perhaps Schwartz's) imminent departure, amounted to over half of Graham's total sales of Amedisys during the Insider Selling Period.

220.    Later, in apparent anticipation of the WSJ's article that would expose Amedisys' manipulation of the number of home health visits, defendants Borne, LaBorde, and Netterville collectively sold 40,667 of their Amedisys shares for a combined profit of over $2.43 million in the first few months of 2010.  Borne, LaBorde, and Netterville had non-public foreknowledge that the WSJ was developing an article that would expose the Company's practice of delivering medically unnecessary therapy visits in order to trigger additional Medicare payments.  On a guidance conference call on July 13, 2007, Borne specifically admitted that the Company had been in communication with the WSJ and was making attempts to dissuade the journal from publishing the damaging article:

> We shared quite a bit of information with the Wall Street Journal report. Explained how the home health industry works, highlighting our business model, innovations, clinical outcomes and our focus on quality. In fact, we provided the reporter with an opportunity to meet with our patients, visit our offices and speak with our staff.

> After countless hours of correspondence with this reporter, we were disappointed that she presented what we believe to be an unbalanced story, excluding much of the data that we shared with her in the spirit of full cooperation.

221.    Each of the of the Insider Selling Defendants' sales during the Insider Selling Period is listed in the chart below:[3]

| Insider Sales: February 1, 2007 - April 26, 2010 | | | | |
|---|---|---|---|---|
| Defendant | Transaction Date | Shares | Price | Proceeds |
| BORNE | 11/9/2007 | 1,100 | $41.10 | $45,210.00 |
| | 11/9/2007 | 100 | $41.11 | $4,111.00 |
| | 11/9/2007 | 55,000 | $41.13 | $2,262,150.00 |
| | 11/9/2007 | 3,800 | $41.15 | $156,370.00 |

---

[3]  Some of the sales by the Insider Selling Defendants were purportedly made pursuant to SEC Rule 10b5-1 trading plans.  Regardless, the Insider Selling Defendants adopted the trading plans while in possession of non-public information concerning the Company's true financial condition, including that the improper public statements of the Company and certain Individual Defendants artificially inflated Amedisys' stock price.  As a result, the Insider Selling Defendants are not eligible for any safe harbor protection otherwise afforded under SEC Rule 10b5-1 for using trading plans.

| | 11/12/2007 | 5,000 | $41.55 | $207,750.00 |
|---|---|---|---|---|
| | 3/3/2008 | 12,500 | $42.19 | $527,375.00 |
| | 5/5/2008 | 12,500 | $50.92 | $636,500.00 |
| | 8/1/2008 | 10,834 | $62.26 | $674,524.84 |
| | 8/1/2008 | 1,666 | $62.53 | $104,174.98 |
| | 8/4/2008 | 20,000 | $62.37 | $1,247,400.00 |
| | 8/5/2008 | 10,000 | $62.52 | $625,200.00 |
| | 8/8/2008 | 10,000 | $64.52 | $645,200.00 |
| | 2/17/2009 | 12,500 | $50.26 | $628,250.00 |
| | 7/28/2009 | 12,500 | $41.28 | $516,000.00 |
| | 10/27/2009 | 12,500 | $40.85 | $510,625.00 |
| | 12/28/2009 | 12,500 | $50.00 | $625,000.00 |
| | 2/23/2010 | 5,947 | $59.70 | $355,057.90 |
| | 2/23/2010 | 6,553 | $60.46 | $396,194.38 |
| | 2/23/2010 | 12,500 | $61.03 | $762,875.00 |
| | | **217,500** | | **$10,929,968.10** |
| | | | | |
| GRAHAM | 5/3/2007 | 4,444 | $35.25 | $156,651.00 |
| | 5/3/2007 | 3,556 | $35.25 | $125,349.00 |
| | 5/3/2007 | 444 | $35.25 | $15,651.00 |
| | 5/22/2007 | 27,444 | $37.50 | $1,029,150.00 |
| | 10/30/2007 | 10,000 | $44.25 | $442,500.00 |
| | 10/30/2007 | 1,778 | $44.25 | $78,676.50 |
| | 5/8/2009 | 7,179 | $37.74 | $270,935.46 |
| | 7/30/2009 | 21,827 | $41.13 | $897,744.51 |
| | 7/30/2009 | 12,583 | $41.20 | $518,419.60 |
| | 7/30/2009 | 23,180 | $41.21 | $955,247.80 |
| | 7/31/2009 | 718 | $46.41 | $33,322.38 |
| | | **113,153** | | **$4,523,647.25** |
| | | | | |
| JETER | 11/2/2007 | 13,334 | $43.00 | $573,362.00 |
| | 11/2/2007 | 3,500 | $43.00 | $150,500.00 |
| | 11/2/2007 | 2,167 | $43.00 | $93,181.00 |
| | | **19,001** | | **$817,043.00** |
| | | | | |
| LABORDE | 2/14/2007 | 1,333 | $33.75 | $44,988.75 |
| | 5/22/2007 | 2,000 | $37.50 | $75,000.00 |
| | 11/14/2007 | 1,000 | $45.00 | $45,000.00 |
| | 12/20/2007 | 1,000 | $48.00 | $48,000.00 |
| | 4/30/2008 | 667 | $52.00 | $34,684.00 |
| | 4/30/2008 | 340 | $52.00 | $17,680.00 |
| | 7/14/2008 | 1,000 | $55.00 | $55,000.00 |
| | 7/17/2008 | 1,000 | $60.50 | $60,500.00 |
| | 12/24/2009 | 189 | $50.00 | $9,450.00 |
| | 12/28/2009 | 4,811 | $50.00 | $240,550.00 |
| | 1/19/2010 | 5,667 | $55.00 | $311,685.00 |
| | | **19,007** | | **$942,537.75** |
| | | | | |

| | | | | |
|---|---|---|---|---|
| NETTERVILLE | 4/30/2008 | 3,000 | $50.00 | $150,000.00 |
| | 11/20/2008 | 2,000 | $33.64 | $67,280.00 |
| | 8/11/2009 | 5,000 | $44.58 | $222,900.00 |
| | 8/12/2009 | 5,000 | $44.57 | $222,850.00 |
| | 8/13/2009 | 10,000 | $43.96 | $439,600.00 |
| | 1/20/2010 | 10,000 | $60.50 | $605,000.00 |
| | | **35,000** | | **$1,707,630.00** |
| | | | | |
| RICCHIUTI | 11/2/2007 | 250 | $42.87 | $10,717.50 |
| | 12/4/2007 | 250 | $43.38 | $10,845.00 |
| | 1/3/2008 | 300 | $49.09 | $14,727.00 |
| | 2/4/2008 | 250 | $43.07 | $10,767.50 |
| | 3/4/2008 | 250 | $43.44 | $10,860.00 |
| | 4/2/2008 | 34 | $41.63 | $1,415.42 |
| | 4/2/2008 | 216 | $41.68 | $9,002.88 |
| | 5/2/2008 | 350 | $53.04 | $18,564.00 |
| | 6/3/2008 | 350 | $50.60 | $17,710.00 |
| | 7/2/2008 | 350 | $51.24 | $17,934.00 |
| | 8/4/2008 | 400 | $62.90 | $25,160.00 |
| | 9/8/2008 | 350 | $50.74 | $17,759.00 |
| | 10/2/2008 | 300 | $48.29 | $14,487.00 |
| | 2/19/2009 | 500 | $48.48 | $24,240.00 |
| | 8/4/2009 | 400 | $44.74 | $17,896.00 |
| | 9/2/2009 | 400 | $43.60 | $17,440.00 |
| | 10/2/2009 | 400 | $42.08 | $16,832.00 |
| | 11/3/2009 | 400 | $40.42 | $16,168.00 |
| | 1/5/2010 | 500 | $51.53 | $25,765.00 |
| | 2/2/2010 | 550 | $56.93 | $31,311.50 |
| | 3/2/2010 | 600 | $60.55 | $36,330.00 |
| | 4/5/2010 | 550 | $57.06 | $31,383.00 |
| | | **7,950** | | **$397,314.80** |
| | | | | |
| SCHWARTZ | 2/14/2007 | 7,611 | $33.75 | $256,871.25 |
| | 2/14/2007 | 1,777 | $33.75 | $59,973.75 |
| | 11/1/2007 | 8,889 | $41.71 | $370,760.19 |
| | 11/1/2007 | 1,779 | $41.71 | $74,202.09 |
| | 12/20/2007 | 3,341 | $48.00 | $160,368.00 |
| | | **23,397** | | **$922,175.28** |
| | | | | |
| **TOTAL:** | | **444,085** | | **$20,507,746** |

## XII.    DAMAGES CAUSED TO AMEDISYS

222.    The Individual Defendants caused the Company to: (i) manipulate the number of Amedisys employee visits to patients in order to take advantage of Medicare's reimbursement benchmarks, and (ii) disseminate improper financial statements.  As a result of this wrongful

conduct on the part of the Individual Defendants, the Company has lost substantial credibility in the marketplace, as reflected by a market capitalization loss of over $1 billion, or in excess of 60%, from its fifty-two week high earlier this year.

223.    Further, as a direct and proximate result of the Individual Defendants' wrongdoing, Amedisys has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a)    costs incurred from responding to the U.S. Senate Finance Committee's requests for documentation;

(b)    costs incurred from responding and defending itself in any SEC investigations;

(c)    costs incurred from responding and defending itself with regard to a CID issued by the DOJ;

(d)    costs incurred from defending and paying any settlement in the class action for violations of federal securities laws; and

(e)    costs incurred from compensation and benefits paid to the Individual Defendants who breached their duties to Amedisys.

224.    Amedisys has repeatedly acknowledged that it faces severe impacts from the above-noted federal investigations, though with some degree of obfuscation. The Company's July 12, 2010 press release, noted that the Company faced "nonrecurring" per-share costs of $0.17, "primarily associated with realignment of operations, and the Senate Finance Committee and SEC investigations." The portion of this cost figure – which translates into almost $5 million – attributable to government investigations, however, will continue to recur and accumulate as they progress. Indeed, in the Company's Form 10-Qs filed on August 9, 2010 and October 26, 2010, the Company noted the following:

> **We are the subject of a number of inquiries by the federal government, any of which could result in substantial penalties against us**.

*    *    *

> An adverse outcome in these investigations could include the commencement of civil and/or criminal proceedings, substantial fines, penalties and/or administrative remedies, including the loss of right to participate in the Medicare program. In addition, resolution of these matters could involve the imposition of additional and costly compliance obligations. Finally, if these investigations continue over a long period of time, they could divert the attention of management from the day-to-day operations of our business and impose significant administrative burdens on us. These potential consequences, as well as any adverse outcome from these investigations or other investigations initiated by the government at any time, could have a material adverse effect on our business and our consolidated financial condition, results of operations and cash flows.

In its Form 10-Q filed on October 26, 2010, for the third quarter of fiscal year 2010, the Company noted that "[o]ther general and administrative expenses increased $2.5 million, which included $1.8 million in legal fees incurred as a result of the Senate Finance Committee inquiry, the SEC investigation and related litigation."

225.    Further, Amedisys faces a severe financial impact if the DOJ determines that the above-described fraudulent billing practices violated the FCA.  As noted in a September 29, 2010 WSJ article "*Justice Launches Probe of Amedisys*," the Company could lose its ability to do business with Medicare if it is found to have submitted false claims to the government.  Short of that draconian and catastrophic outcome, the Company, as it previously has acknowledged, could be liable for $5,500 to $11,000 for each false claim submitted to the government for payment, as well as treble damages.

226.    The above-described misconduct by the Individual Defendants also has irreparably damaged Amedisys's corporate image and goodwill.  For the foreseeable future, the Company also will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that Amedisys's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## XIII.  DEFENDANTS' FIDUCIARY DUTIES

227.    By reason of their positions as officers, directors, and/or fiduciaries of Amedisys and because of their ability to control the business and corporate affairs of Amedisys, the Individual Defendants owed and owe Amedisys and its shareholders fiduciary obligations of

trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Amedisys in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Amedisys and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

228. Each director and officer of the Company owes to Amedisys and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly-held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

**A.    The Defendants' Control, Access, and Authority**

229. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Amedisys, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

230. Because of their advisory, executive, managerial, and directorial positions with Amedisys, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and growth prospects of Amedisys. While in possession of this material, non-public information, the Individual Defendants made improper representations regarding the Company, including information regarding Amedisys's financial results.

231. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Amedisys, and was at all times acting within the course and scope of such agency.

**B.     The Defendants' Duties of Reasonable and Prudent Supervision**

232.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)     exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)     when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence;

(d)     properly and accurately guide investors and analysts to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health;

(e)     remain informed how Amedisys conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)     refrain from acting upon material, inside corporate information to benefit themselves.

**C.     Special Duties Imposed by Amedisys's Code of Ethical Business Conduct**

233.    Both the Officer Defendants and Director Defendants are subject to special duties imposed by the Company's Code.  In a Form DEF 14A Proxy Statement filed with the SEC on

May 6, 2005, the Company stated: "[t]he Board has … adopted a Code of Ethical Business Conduct that is applicable to all our directors, officers and employees, including our Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer."  Indeed, the Code states that "every director, officer and employee of the Company is expected to understand and follow the policies and guidelines outlined in this Code."

234.    The Code mandates that the Officer Defendants and Director Defendants act ethically and comply with the law.  The Code proclaims: "Amedisys is serious about ethical conduct and complying with all laws that affect our business.  We will not take actions that undermine our ethical principles or violate legal requirements."  The Code points out that "if investors believe that the price of our Company's stock or other securities is subject to unfair manipulation by the Company or its officers, employees or directors, they will lose faith in us."  Thus, the Code states that its basic purpose is to "ensure [the Company's] business is conducted with integrity and in compliance with applicable governmental laws, rules and regulations."  The Code also warns that "***[a]ny director, officer or employee*** who ***violates the policies and guidelines in this Code*** will be subject to disciplinary action, up to and including termination of employment or removal as a director ***and may be personally liable to the Company*** and/or its shareholders and/or third parties (including but not limited to the federal and state government)."

235.    The Code provisions relative to billing and the ethical obligations impose duties on Amedisys officers and employees who shoulder accounting and financial responsibilities.  Among other things, these officers and employees must comply with Medicare requirements, refrain from billing for services improperly or inappropriately rendered, and bring coding errors involving government billings to the attention of the Chief Compliance Officer.  In recognition of the "critical importance" that the Company's public filings with the SEC be accurate and timely, CEO (defendant Borne) and accounting and financial personnel (including defendant Redman as CFO) must also must act honestly, with integrity, and in compliance with applicable rules and regulations.  Moreover, these individuals must promote integrity throughout the

Company and promptly report any conduct believed to be in violation of the law or the Code to the Chair of the Audit Committee.  The Code states in relevant part as follows:

**BILLING**

Amedisys ***officers and employees*** who are involved in the billing and collection function ***are expected to understand and comply with*** all billing-related policies and procedures established by the Company, as well as ***applicable requirements of third-party payers (including Medicare and Medicaid***) to which home healthcare service and product claims are submitted.

***Amedisys shall bill only for goods and services that are properly ordered and delivered or performed, as appropriate.*** In no event shall the Company bill for equipment beyond the date it is provided, and Amedisys should only bill for goods and services for which appropriate documentation exists.

All coding of services must conform to applicable government regulations and commercial payor instructions. All required billing information (including diagnosis coding) must be collected and recorded accurately. All contact with customers to obtain missing information must be properly documented.

Amedisys directors, officers and employees are expected to cooperate fully with all internal and external audits of the Company's billing system.

If you discover any coding error in the billing system, the matter should be brought to the attention of your supervisor so that he or she may determine the nature and magnitude of the problem and the appropriate corrective action. The Company's policy is to refund any overpayments received as a result of coding errors and to notify the appropriate carrier or commercial payor of the problem. ***All such matters should also be brought*** to the attention of your Director of Operations and, ***in the case of government billings, to the attention of the Chief Compliance Officer.***

Amedisys may not routinely waive or write off co-payments and deductibles for services rendered. Such a practice could cause the Company to violate its contractual obligations to carriers as well as certain governmental regulations.

*        *        *

**SPECIAL ETHICS OBLIGATIONS FOR EMPLOYEES WITH ACCOUNTING AND FINANCIAL REPORTING RESPONSIBILITIES**

***As a publicly owned company it is of critical importance that the Company's filings with the Securities and Exchange Commission be accurate and timely***. Depending on their position with the Company, officers and employees may be called upon to provide information to assure that the Company's public reports are complete, fair and understandable. The Company expects all of its personnel to take this responsibility seriously and to provide prompt and accurate answers to inquiries related to the Company's public disclosure requirements.

*The Company's Chief Executive Officer and all accounting and finance personnel bear a special responsibility for promoting integrity throughout the organization, with responsibilities to stakeholders both inside and outside of the Company. The Chief Executive Officer and all accounting and finance personnel have a special role both to adhere to these principles themselves and also to ensure that a culture exists throughout the Company as a whole that ensures the fair and timely reporting of the Company's operating results and financial condition.*

Because of this special role, the Chief Executive Officer and all accounting and finance personnel, including the Chief Financial Officer, senior financial officers and controllers, are required to comply with the following obligations, and each agrees that he or she will:

- *Act with honesty and integrity*, avoiding actual or apparent conflicts of interest in personal and professional relationships.

- *Provide information that is accurate, complete, objective*, relevant, timely and understandable to ensure full, fair, accurate, timely, and understandable disclosure in reports and documents that the Company files with, or submits to, government agencies and in other public communications.

- *Comply with rules and regulations of the jurisdictions in which the Company conducts business and other appropriate private and public regulatory agencies.*

- *Act in good faith*, responsibly, and with due care, competence and diligence, *without misrepresenting material facts* or allowing one's independent judgment to be subordinated

                    *        *        *

- Promote and *be an example of ethical behavior* as a responsible partner among peers, in the work environment and the community.

- Achieve responsible use of and control over all assets and resources employed by or entrusted to the individual.

- *Promptly report to the Chair of the Audit Committee any conduct that the individual believes to be a violation of law or this section of the Code*, including any transaction or relationship that reasonably could be expected to give rise to such a conflict.

### D.    Additional Fiduciary Duties of the Audit Committee Defendants

236.    The Audit Committee Defendants who sat as members of the Company's Audit Committee assumed additional fiduciary duties in connection with their service on this committee.    According to the Audit Committee's Charter, in effect since July 2005, and substantially the same as amended in December 2008, the purpose of the Audit Committee is to "oversee the accounting and financial reporting processes of the Company and the audits of the

financial statements of the Company."  Under its Charter, the Audit Committee is required, among other things:

> [w]ith respect to accounting principles and policies and financial reporting:
>
> > \*       \*       \*
>
> to *inquire* of the Company's chief executive officer and chief financial officer as to the existence of any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information, and as to the existence of any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting;
>
> > \*       \*       \*
>
> to *meet* with management, the independent auditors and, if appropriate, the director of the internal auditing department:
>
> > \*       \*       \*
>
> *to discuss*, as appropriate: (a) any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; (b) analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; and (c) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company;
>
> > \*       \*       \*
>
> *to discuss with the Company's General Counsel any significant legal, compliance or regulatory matters that may have a material effect on the financial statements or the Company's business, financial statements or compliance policies…;*
>
> to *discuss and review* the type and presentation of information to be included in earnings press releases; to *discuss* the types of financial information and earnings guidance provided, and the types of presentations made, to analysts and rating agencies;
>
> > \*       \*       \*
>
> [W]ith respect to reporting and recommendations:

- 95 -

to **prepare** any report or other disclosures, including any recommendation of the Audit Committee, required by the rules of the SEC to be included in the Company's annual proxy statement[.]

**E.      The Individual Defendants' Breaches of Their Fiduciary Duties**

237.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duty of loyalty, good faith, and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Amedisys, the absence of good faith on their part, and a knowing or willful disregard for their duties to the Company and its shareholders that the Individual Defendants were aware posed a risk of serious injury to the Company.

238.    The Individual Defendants breached their duty of loyalty by allowing Individual Defendants to cause, or by themselves causing, the Company to engage in the manipulation of care and documentation thereof for its patients and misrepresent its financial condition and results.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  Because of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of investigations by the U.S. Senate Finance Committee, the SEC, and the DOJ, as well as four class action lawsuits consolidated in this Court that allege violations of securities laws.  Thus, Amedisys has expended, continues to expend, and will expend in the future, significant and material sums of money as a direct result the breaches of fiduciary duties by the Individual Defendants.

**XIV.   CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

239.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

240.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was engaging in a scheme to manipulate the amount of times its employees visited patients in order to fraudulently increase the amount of payments that Amedisys received from Medicare; (ii) enhance the Individual Defendants' executive and directorial positions at Amedisys and the profits, power, and prestige that they enjoyed as a result of holding these positions; and (iii) deceive the investing public, including shareholders of Amedisys, regarding the Individual Defendants' management of Amedisys's operations, the Company's financial health and stability, and its future business prospects that had been misrepresented by Individual Defendants.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

241.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

242.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

243.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

244.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with

knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## XV.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

245.    Plaintiffs bring this action derivatively in the right and for the benefit of Amedisys to redress injuries suffered, and to be suffered, by Amedisys as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Amedisys is named as a nominal defendant solely in a derivative capacity.   This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

246.    Plaintiffs will adequately and fairly represent the interests of Amedisys in enforcing and prosecuting its rights.

247.    Plaintiffs were Amedisys shareholders of the Company at times relevant the wrongs of which they complain.  Since becoming shareholders, Plaintiffs have continuously been Amedisys shareholders.

248.    The current Board of Amedisys consists of the following six individuals: defendants Borne, LaBorde, Netterville, Pitts, Ricchiuti, and Washburn, also known herein as the "Director Defendants."

249.    Plaintiffs did not make a pre-suit demand on the Amedisys Board to bring these derivative claims because such demand would have been a futile and useless act, and therefore, is legally excused.

### A.    Demand Is Excused: Director Defendants Did Not Exercise Valid Business Judgment

250.    The Director Defendants' challenged misconduct at the heart of this case constitutes the direct facilitation of improper, unethical, and illegal conduct, including knowingly and consciously presiding over the Company's systematic manipulations of the Company's billing practices, as well as actively covering up this misconduct through certain of the Director

Defendants' participation in making misleading statements and assurances. As the ultimate decision-making body of the Company, the Board affirmatively adopted, implemented, and condoned a business strategy based on deliberate and widespread violations of applicable law. Breaking the law is not a legally protected business decision and such conduct can in no way be considered a valid exercise of business judgment. Accordingly, demand on the Board is excused.

251. A derivative claim to recoup damages for harm caused to the Company by unlawful activity represents a challenge to conduct that is outside the scope of the Board's business judgment—conduct for which the Director Defendants face potential personal liability. Simply put, violating the law, approving the violations of applicable law by others, or knowingly looking the other way while refusing to prevent others under the Board's control from violating the law are all forms of misconduct that cannot under any circumstances be examples of legitimate business conduct. The protections of the "business judgment rule" do not extend to such malfeasance. Nor can such malfeasance ever constitute the "good faith" required of corporate fiduciaries.

252. Significantly, Amedisys's dependence on Medicare for continued survival, quarterly Board meetings with its Chief Compliance Officer, and supposed imposition of corporate integrity agreements renders it impossible for the Board to claim ignorance of its duties to ensure that the Company operates its business lawfully and ethically. The Company's CEO and Chairman of the Board, defendant Borne, and its Corporate Counsel, defendant Jeter, signed the 2003 CIA. Every member of the Board except defendant Washburn was also on the Board at the time that the Company, Borne, and Jeter entered into the 2003 CIA. Each Director Defendant also signed at least one of the Company's annual reports that contained misleading, public statements. The Director Defendants knew of the importance of the Company's compliance with the FCA and its relationship with the regulatory agencies administering Medicare. Each Director Defendant was also on the Board in 2008 when the Company acquired HHCA, which entered into the 2005 CIA. Therefore, each Director Defendant knew or was reckless in not knowing about the Company's requirement not to manipulate its billing practices.

The manipulation of the Company's billing practices became particularly apparent to insiders after the CMS changed how it provided additional payments to HHAs. In response, the Company's employees' visitation of patients changed dramatically to meet these new benchmarks. The Director Defendants' tacit or express approval for the continued manipulation of the visits to the Company's patients in order to increase billings to Medicare cannot be regarded as a valid exercise of business judgment.

**B.    Demand Is Excused: Defendant Borne Dominates and Controls the Board**

253.    Defendant Borne is an imperial CEO who dominates and controls a hand-picked Board that has done his bidding for over a decade. Borne has clung to his chairman position on the Board since he founded the Company in 1982.

254.    The very composition and structure of the Board favors defendant Borne by minimizing independence and eliminating basic checks and balances. Except for defendants Washburn (who joined the Board in 2004) and Borne, each Director Defendant has served on the Board since 1997. Each director – save Borne – serves on each of the Company's four Board committees, including the Audit Committee.

255.    The Director Defendants have no excuse for allowing Amedisys, under defendant Borne's domination, to deceive the U.S. government and the investing public quarter after quarter, year after year. The Director Defendants include a former chairman of the AICPA (Netterville), a former Executive Officer for Health Affairs in the Office of the Secretary of Defense ("Pitts"), an Assistant Dean and clinical professor of finance at Tulane (Ricchiuti), and a former Executive Vice President of Northwest (Washburn). But as was the case with the Board of Enron Corporation, the glowing resumes of the Director Defendants has proven to be of little benefit to Amedisys's shareholders in terms of addressing illicit practices at the Company.

256.    Reflecting Borne's control over the other officers and directors at the Company, the Director Defendants recently approved an amendment to Borne's employment agreement to give him many additional benefits despite his leading role in the wrongdoing alleged herein. The new amendments entitle Borne to, among other things: (i) an ***annual base salary increase*** from

$650,000 to $750,000; (ii) entitlement to participate in *cash bonuses* and *equity-based awards*; (iii) various *additional benefits* pertaining to compensation, pension, welfare, and benefit programs, including deferral, health, medical, dental, long-term disability, travel, accident and life insurance plans; and (iv) *a new automobile* no less than every two years, as well as *reimbursement of all maintenance, insurance, and gas expenses*.

### C.   Demand Is Excused: The Audit Committee Defendants (Constituting a Majority of the Board) Face a Substantial Likelihood of Liability

257.   The Audit Committee Defendants (LaBorde, Netterville, Pitts, Ricchiuti, and Washburn), which constitute a majority of the Board, cannot impartially consider a demand because they face a substantial likelihood of liability.

(a)   The Audit Committee Defendants are current members of the Audit Committee, and were members of this committee at all relevant times during the Relevant Period. Each such defendant was required to "oversee the accounting and financial reporting processes of the Company" and to discuss "major issues as to the adequacy of the Company's internal controls." Further, the Charter for the Audit Committee mandates that these directors "discuss and review the type and presentation of information to be included in earnings press releases" and "the types of financial information and earnings guidance provided, and the types of presentations made, to analysts and rating agencies." Thus, the Audit Committee Defendants were responsible for overseeing and directly participating in the dissemination of Amedisys's publicly-filed financial statements.

(b)   At a minimum, the Audit Committee Defendants utterly, consciously, and systemically failed to exercise their oversight responsibilities required by the Audit Committee Charter by: (i) failing to inquire of the Company's CEO and CFO as to the existence of any fraud, whether or not material, namely the practice of arranging medically-unnecessary therapy appointments in order to receive additional Medicare payments, that involves management or other employees who have a significant role in the Company's internal controls over financial reporting; (ii) failing to inquire of the Company's CEO and CFO as to the existence of any

significant deficiencies or material weaknesses in the design or operation of internal controls over financial reporting, namely the practice of arranging medically-unnecessary therapy appointments in order for the Company to receive additional Medicare payments, that are reasonably likely to adversely affect the Company's ability to record, process, summarize, and report financial information; (iii) failing to meet with management about major issues as to the adequacy of the Company's internal controls, namely the practice of arranging medically-unnecessary therapy appointments in order for the Company to receive additional Medicare payments; (iv) failing to discuss with the Company's CEO, CFO, and other relevant management the type and presentation of information to be included in earnings press releases, as well as the types of financial information and earnings guidance provided, and the types of presentations made, to analysts and ratings agencies such that none of the foregoing would rely upon artificially-inflated income statements and projections derived from income generated and to be generated by medically-unnecessary therapy appointments in order for the Company to receive additional Medicare payments; (v) failing to discuss with the Company's General Counsel significant legal, compliance, or regulatory matters that would have a material effect on the financial statements or the Company's business, financial statements, or compliance policies, such as non-compliance with the FCA, criminal statutes, and Health and Human Services civil penalties described in the 2009 10-K that would result from the practice of arranging medically unnecessary therapy appointments in order to receive additional Medicare payments; and (vi) approving the dissemination of the improper press releases and financial statements filed with the SEC, including the improper 2009 10-K that the Audit Committee Defendants signed, as alleged above.

(c)    Defendant Pitts has significant expertise in healthcare administration. According to the Company's website, he has held the highest positions of management in Pitts Management Associates, a national hospital and healthcare management and consulting firm. The Company's website further notes that defendant Pitts "has more than forty years experience in hospital operations, health care planning and multi-institutional organizations, and has served

in executive capacities in a number of hospitals, multi-hospital systems and medical schools," and that he "is certified in hospital and health care administration and is a Fellow of the American College of Healthcare Executives."   Given defendant Pitts' significant personal expertise in health care administration, he had a heightened fiduciary duty as a member of the Board and of the Audit Committee to properly discharge the duties noted herein.  Nevertheless, Pitts breached his duties as alleged herein.

(d)    The utter, conscious, and systemic failure of the Audit Committee Defendants to exercise their responsibilities as required by the Audit Committee Charter, all of which culminated to date in the securities fraud class actions, the U.S. Senate Finance Committee investigation, the SEC investigation, the DOJ civil investigative demand, the precipitous drop in the Company's market capitalization, all of which may lead to potentially severe criminal and/or civil penalties, damages and legal expenses, constitutes a breach of their duties of good faith and loyalty such that they face a substantial likelihood of personal liability for their actions/inactions.

## D.    Demand Is Excused: Defendants LaBorde, Netterville, and Ricchiuti Face Substantial Liability for Insider Selling

258.    Defendants LaBorde, Netterville, and Ricchiuti sold a substantial amount of Amedisys stock during the Insider Selling Period.  LaBorde, Netterville, and Ricchiuti sold over 55%, 42%, and 30%, respectively, of their Amedisys holdings between February 1, 2007 and April 26, 2010, for combined proceeds of approximately $3 million.  These defendants sold their Amedisys shares while in possession of non-public information concerning the Company's true financial condition, including that the improper public statements of the Company and certain Individual Defendants artificially inflated Amedisys' stock price.   In doing so, LaBorde, Netterville, and Ricchiuti breached their fiduciary duties.

## E.    Demand Is Excused: Director Defendants Face a Substantial Likelihood of Liability

259.    Further, defendants Borne, LaBorde, Netterville, Pitts, and Ricchiuti have all been on the Board since 1997, and thus, were on the Board when the Company violated the FCA,

which led to the 2003 CIA.  Borne, LaBorde, Netterville, Pitts, Ricchiuti, and Washburn were on the Board when the Company bought HHCA, which subjected the Company to the 2005 CIA. Pursuant to the 2005 CIA, the Board met at least quarterly with the Chief Compliance Officer. The Company's manipulation of its billing practices was systemic throughout the Company, lasted at least five years, and could possibly subject the Company to exclusion from Medicare, the Company's only major source of income.  Moreover, pursuant to the 2005 CIA, the Board received quarterly compliance reports from the Chief Compliance Officer, who also attends Board meetings and may report to the Board at any time regarding any noncompliance.  Despite the red flags alerting them to the Company's need for adequate internal controls over its billing practices and the importance of continued involvement of Medicare to the Company, and despite the Board's quarterly meetings with the Chief Compliance Officer, defendants Borne, LaBorde, Netterville, Pitts, Ricchiuti, and Washburn either approved, or in reckless disregard of their duties, were unaware of, the manipulation occurring at Amedisys concerning its billing practices through unnecessary visitations.  In light of the above, the only way the members of the Board could not have known about the Company's illegal and unethical practices was through conscious disregard of their duty of loyalty.  Therefore, Borne, LaBorde, Netterville, Pitts, Ricchiuti, and Washburn face a substantial likelihood of liability, excusing a demand.

260.    The Director Defendants caused the Company to expend resources repurchasing its own shares in order to artificially inflate the Company's market capitalization and, thereby, hide or otherwise minimize the public perception of the damage that the Individual Defendants caused to Amedisys.  By causing the stock repurchases for their improper, self-serving purpose, the Director Defendants breached their fiduciary duty of loyalty, thus further exposing the Director Defendants to a substantial likelihood of personal liability.

**F.     Demand is Excused: Director Defendants Lack Independence or Otherwise Cannot Impartially Consider a Demand**

261.    There is reason to doubt that defendant Borne could independently and objectively consider a demand to bring an action against himself and the other defendants herein as follows:

(a)     Borne founded the Company and is its CEO and Chairman.  On November 10, 2003, Borne entered into the 2003 CIA.  Borne was also CEO when Amedisys acquired HHCA, and correspondingly, Amedisys became subject to the 2005 CIA.  Borne also made and signed misleading public statements, as explained herein.  Further, as CEO of the Company, Borne runs the daily operations of Amedisys.  Therefore, he is responsible for the Company's lack of adequate internal controls, violations of applicable law, and violations of the consent decree.  He also is a named defendant in the securities fraud class actions consolidated in this Court that arise out of the misconduct alleged herein.  A derivative action is likely to expose his own misconduct and increase his probability of liability to the plaintiffs in the security fraud actions and other possible litigation, and potentially even expose him to criminal penalties.  Therefore, Borne faces a substantial likelihood of liability, raising a reasonable doubt about whether he could consider a demand in an independent and disinterested fashion; and

(b)     Borne's principal professional occupation is his employment with Amedisys, pursuant to which he received and continues to receive substantial monetary compensation and other benefits as set forth in more detail above.  Accordingly, Borne lacks independence from defendants LaBorde, Netterville, Pitts, Ricchiuti, and Washburn, defendants who are not disinterested and/or independent and who exert influence over Borne's compensation by virtue of their positions as members of the Compensation Committee.  This lack of independence renders Borne incapable of impartially considering a demand to commence and vigorously prosecute this action.

262.    The Director Defendants were required to act upon any information of illegal or unethical conduct to protect the Company from continued violations of applicable law being committed in its name. Rather than doing so, these defendants, in violation of their legal

obligations, consciously ignored the information presented to them and about which they were otherwise made aware concerning the Company's extensive legal and ethical violations.  Further, despite the Director Defendants having knowledge of the claims and causes of action raised by plaintiffs, and despite the fact that Amedisys has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Amedisys any part of the damages Amedisys suffered and will suffer thereby.

263.    For example, under the Company's "Zero Tolerance Policy" as set forth in the 2009 10-K, the Director Defendants are required to terminate themselves, as well defendants Redman and Jeter, who are the Company's CFO, and Chief Compliance Office/Corporate Counsel, respectively, all of whom "may be personally liable to the Company and/or its shareholders and/or third parties (including but not limited to the federal and state government)" for violating the Code.  The Director Defendants have yet to terminate themselves or defendants Redman and Jeter, or seek reimbursement from them, defendants Browne and Schwartz (former officers from during the Relevant Period) or themselves, in connection with the Company's fraudulent Medicare billing practices, all of which gives rise to a reasonable doubt that the Director Defendants could independently and impartially consider a demand to bring an action against themselves on behalf of the Company.

264.    Moreover, instead of taking action against the Individual Defendants, the Director Defendants caused Amedisys to issue a twenty-page "Open Letter to Shareholders," included as an exhibit to a Form 8-K filed with the SEC on July 16, 2010.  Rather than offering a candid acknowledgment of the billing problems at the Company to shareholders, this letter posited that the Company did nothing wrong, and that among other factors unrelated to the fraudulent activity, the aging and increasingly acute nature of the patients accounted for the increased billing activity.  With regard to the government investigations and reports from the WSJ, this letter stated:

**Senate Finance Committee Inquiry**: We have made a number of submissions to the Senate Finance Committee, and expect to make additional submissions as we cooperate with its inquiry. We are confident that our responses will aid the SFC in better understanding our complex industry and therapy utilization in general. We believe the information we have provided, and will provide, will underscore for the SFC the significant value that Amedisys and the home health care industry brings to patients, their families, and the nation's healthcare system.

**SEC Investigation**: We also have received a subpoena from the Securities and Exchange Commission for documents that appear to relate to the matters under review by the Senate Finance Committee. Given the public nature of these matters it is possible that we could receive questions and interest from other regulatory authorities. We intend to cooperate with, and present our views and perspectives regarding these matters in connection with, any such inquiry.

*       *       *

**Wall Street Journal Article:** We stand by the integrity of our company and our employees. We believe the WSJ article is based upon an inaccurate understanding of a very complex industry and the ever-changing population that we serve, and that it overlooked some important facts, which we have pointed out to the SFC.

This purported "inaccurate understanding" of the healthcare industry in which Amedisys operates and alleged overlooking of facts, however, not only triggered investigations by the SEC, U.S. Senate Finance Committee, and DOJ into the Medicare billing practices of Amedisys, but also prompted the SEC to investigate similar types of billing issues with two other major industry participants. These SEC investigations were announced on July 12, 2010 – shortly after the U.S. Senate Finance Committee received documents from Amedisys. Moreover, the "Open Letter to Shareholders" demonstrates that the Director Defendants recognize that they face a substantial likelihood of personal liability, cannot be impartial and thus, deny that any wrongdoing has taken place. As a result, the members of the Board face a substantial likelihood of liability for their conduct and demand is, therefore, excused.

265.    The Director Defendants are likewise conflicted from and unable to pursue the Company's claims against the Officer Defendants. Any effort to directly prosecute such claims against the Officer Defendants for their direct roles in the violations of applicable law carried out in Amedisys's name would necessarily expose the Board's own culpability for the very same conduct. Indeed, all of the Director Defendants were members of the Board when the Company acquired certain HHCA assets and liabilities, including the 2005 CIA; and all of the Director

Defendants signed the 2009 10-K, which described in detail the serious legal difficulties the Company would face if it were found to have engaged in improper Medicare billing practices, including but not limited to, the penalties for violating the FCA.  Thus, given that the Board was required to be regularly informed concerning the Company's compliance or non-compliance with applicable laws, any effort by the Director Defendants to hold the Officer Defendants liable would lead the Officer Defendants to defend on the ground that their own conduct was consistent with corporate policy and practice, as established by and known to the Director Defendants.

266.    As alleged herein, defendants LaBorde, Netterville, Pitts, Ricchiuti, and Washburn each earned well over $200,000 for their services as Board members in 2009. Because the Company is a material source of their personal income, they lack independence and impartiality as to whether to initiate litigation against themselves on behalf of the Company.

267.    The acts complained of constitute violations of the fiduciary duties owed by Amedisys's officers and directors and these acts are incapable of ratification.

268.    Each of the Director Defendants authorized and/or permitted the improper statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if such suit was instituted by them.

269.    If Amedisys's current and past officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this complaint by directors and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of Amedisys.  But the directors' and officers' liability insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by Amedisys against these Individual Defendants, known as the "insured versus insured exclusion."  As a result, if these directors were to cause Amedisys to sue themselves or

certain of the officers of Amedisys, there would be no directors and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If no directors and officers' liability insurance exists, then the current directors will not cause Amedisys to sue the Individual Defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

270.    Plaintiffs did not make any demand on the shareholders of Amedisys to institute this action since such demand would have been a futile and useless act for at least the following reasons:

(a)    Amedisys is a publicly-held company with over 29 million shares outstanding and thousands of shareholders as of October 21, 2010;

(b)    making demand on such a number of shareholders would be impossible for plaintiffs who have no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)    making demand on all shareholders would force plaintiffs to incur excessive expenses, assuming all shareholders could be individually identified.

### COUNT I

**Derivatively on Behalf of the Company Against the Individual Defendants
for Breach of Fiduciary Duty**

271.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

272.    As alleged in detail herein, the Individual Defendants, by reason of their positions as officers and directors of Amedisys and because of their ability to control the business and corporate affairs of Amedisys, owed Amedisys fiduciary obligations of due care and loyalty, and were and are required to use their utmost ability to control and manage Amedisys in a fair, just, honest, and equitable manner.

273.    Each of the Individual Defendants had actual or constructive knowledge that they had authorized or caused the Company to engage in the fraudulent billing scheme set forth herein, and then improperly misrepresent the financial results of the Company and fail to correct the Company's publicly reported financial results. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

274.    The Audit Committee Defendants breached their fiduciary duties of loyalty by approving the improper statements and omissions as described herein.  The Audit Committee Defendants also completely and utterly failed in their duties of oversight, including their duties of oversight of the financial and reporting process, and of reviewing earnings press releases and the steps management has taken to monitor and control this, as required by the Audit Committee Charter in effect at the time.

275.    All of the Director Defendants failed in their duties of oversight over the Company's financial and reporting process and breached their fiduciary duty of loyalty by failing to ensure that an adequate system of internal control was in place.  Additionally, the Director Defendants approved or made improper statements in the Company's 2009 10-K, as explained herein.

276.    At the time of the stock sales set forth herein, the Insider Selling Defendants – Borne, Graham, Jeter, LaBorde, Netterville, Ricchiuti, and Schwartz – knew the information described above and sold Amedisys stock on the basis of such information.

277.    The information described above was proprietary, non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which Insider Selling Defendants used for their own benefit when they sold Amedisys common stock.

278.    At the time of their stock sales, the Insider Selling Defendants – Borne, Graham, Jeter, LaBorde, Netterville, Ricchiuti, and Schwartz – knew the true facts about, among other things, the manipulation of the number of home therapy visits provided by the Company in order to trigger extra Medicare payments.  The Insider Selling Defendants' sales of Amedisys common

stock while in possession and control of this material adverse, non-public information was a breach of their fiduciary duty of loyalty.

279.    Because the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits they obtained thereby.

280.    The Director Defendants also breached their fiduciary duty of loyalty by causing the Company to expend resources repurchasing its own shares in order to artificially inflate the Company's market capitalization and, thereby, hide or otherwise minimize the public perception of the damage that the Individual Defendants caused to Amedisys.

281.    But for the abdication of the Individual Defendants' fiduciary duties, the Company would not have been damaged.    Accordingly, all of the Individual Defendants breached their fiduciary duties.

282.    As a direct and proximate result of Individual Defendants' failure to perform their fiduciary obligations, Amedisys has sustained and will continue to sustain significant damages. As a result of the misconduct alleged herein, these defendants are liable to the Company.

283.    Plaintiffs, on behalf of Amedisys, have no adequate remedy at law.

## COUNT II

### Derivatively on Behalf of the Company Against the Individual Defendants for Waste of Corporate Assets

284.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

285.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets: (i) by failing to cause the Company to maintain sufficient internal controls over its reporting and billing process;  (ii) by failing to properly consider the interests of the Company and its public shareholders; (iii) by failing to conduct proper supervision; (iv) by paying undeserved incentive compensation to certain of its executive officers; and (v) by incurring

potentially hundreds of millions of dollars in liability from the securities class action lawsuits and investigations by the U.S. Senate Finance Committee, SEC, and DOJ.

286.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

287.    Plaintiffs, on behalf of Amedisys, have no adequate remedy at law.

**COUNT III**

**Derivatively on Behalf of the Company Against the Individual Defendants
for Unjust Enrichment**

288.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

289.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Amedisys.

290.    Plaintiffs, as shareholders and representatives of Amedisys, seek restitution from the Individual Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

291.    Plaintiffs, on behalf of Amedisys, have no adequate remedy at law.

**PRAYER FOR RELIEF**

Plaintiffs therefore request, on behalf of Amedisys, judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Directing Amedisys to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Amedisys and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the

Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

       1.      a proposal to remove from the Board those members who have breached their fiduciary duties to Amedisys;

       2.      a proposal to strengthen the Company's controls over financial reporting;

       3.      a proposal to strengthen the Company's controls over its Medicare billing practices;

       4.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

       5.      a proposal to strengthen the Company's policies against insider trading and enhance the Company's remedies against insider traders, including clawback provisions;

       6.      a provision to permit the shareholders of Amedisys to nominate candidates for election to the Board;

       7.      a proposal to prohibit an individual from simultaneously serving as the Company's CEO and the Company's Chairman of the Board;

       8.      a proposal to prohibit an individual from simultaneously serving as the Company's Chief Compliance Officer and Company's Corporate Counsel;

       9.      a proposal to prohibit the same individual(s) from serving on each and every committee of the Board; and

       10.      a proposal to strengthen Amedisys's oversight of its disclosure procedures;

       C.      For extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiffs on behalf of Amedisys have an effective remedy;

D.     Awarding to Amedisys restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

E.     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated: January 18, 2011                              Respectfully submitted by:

ROBBINS UMEDA LLP
BRIAN J. ROBBINS (admitted *pro hac vice*)
KEVIN A. SEELY (admitted *pro hac vice*)
JAY N. RAZZOUK (admitted *pro hac vice*)


s/Jay N. Razzouk
_____
JAY N. RAZZOUK

600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile:  (619) 525-3991

COHEN, PLACITELLA & ROTH, P.C.
STEWART L. COHEN (admitted *pro hac vice*)
STUART J. GUBER (admitted *pro hac vice*)
JILLIAN A.S. ROMAN (admitted *pro hac vice*)
2900 Two Commerce Square
2001 Market Street
Philadelphia, PA 19130

Telephone: (215) 567-3500
Facsimile: (215) 567-6019

BRANSTETTER, STRANCH &
    JENNINGS, PLLC
J. GERARD STRANCH, IV (admitted *pro hac vice*)
MICHAEL G. STEWART (admitted *pro hac vice*)
JOE P.LENISKI, JR. (admitted *pro hac vice*)
STEVEN J. SIMERLEIN
227 Second Avenue North, 4th Floor
Nashville, TN 37201
Telephone: (615) 254-8801

Facsimile: (615) 250-3937

*Co-Lead Counsel for Derivative Plaintiffs*

CLAYTON AND FRUGE
ANTONIO M. CLAYTON (21191)
MICHAEL FRUGE (26287)
607 N. Alexander Ave.
Port Allen, LA 70767
Telephone: (225) 344-7000

ROBEIN, URANN, SPENCER, PICARD
    & CANGEMI, APL
JULIE RICHARD-SPENCER (#20340)
2540 Severn Avenue, Suite 400 (70002)
Post Office Box 6768
Metairie, LA 70009-6768
Telephone: (504) 885-9994
Facsimile: (504) 885-9969

*Co- Liaison Counsel for Derivative Plaintiffs*

565888

<u>VERIFICATION</u>

I, Steven J. Simerlein**,** hereby declare as follows:

I am a member of the law firm of Branstetter, Stranch & Jennings, PLLC, counsel for Laborers' District Counsel and Contractors' Pension Fund of Ohio, which is a plaintiff in the within entitled derivative action.  I have read the complaint, a substantially similar version of which I understand is to be filed on or about January 18, 2010, and know the contents of it.  I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

I make this Verification because plaintiff is absent from the County of Davidson where I maintain my office.

Executed this January 18, 2011, at Nashville, Tennessee

_____
Steven J. Simerlein

<u>VERIFICATION</u>

I, Charles E. Erdman Jr., hereby declare as follows:

The Northumberland County Pension Fund is a shareholder plaintiff in the within entitled derivative action.   I have read the complaint, a substantially similar version of which I understand is to be filed on or about January 17, 2010, and know the contents of it.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:


Dated: _____1/14/11_____

_____
Charles E. Erdman Jr.

<u>VERIFICATION</u>

I, Hamilton Lindley, hereby declare as follows:

I am a member of the law firm of Goldfarb Branham LLP, counsel for Paula Wendland, who is a plaintiff in the within entitled derivative action. I have read the complaint, a substantially similar version of which I understand is to be filed on or about January 18, 2010, and know the contents of it. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

I make this Verification because plaintiff is absent from the County of Dallas where I maintain my office.

Executed this January 18, 2011, at Dallas, Texas

HAMILTON LINDLEY

<u>VERIFICATION</u>

I, Daniel Himmel, hereby declare as follows:

I am a shareholder plaintiff in the within entitled derivative action.  I have read the complaint, a substantially similar version of which I understand is to be filed on or about January 17, 2010, and know the contents of it.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 1-14-11

DANIEL HIMMEL

**CERTIFICATE OF SERVICE**

I hereby certify that on January 18, 2011, a copy of the foregoing Verified Consolidated

Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and

Unjust Enrichment was filed electronically with the Clerk of Court using the CM/ECF system.

Notice of this filing will be sent to all counsel of record listed below by operation of the Court's

electronic filing system.  I also certify that I have mailed by United States Postal Service this

filing on to the following non-CM/ECF participants listed below.

| **VIA ELECTRONIC MAIL** | |
|---|---|
| POMERANTZ HAUDEK GROSSMAN<br>   AND GROSS, LLP<br>Jeremy A. Lieberman<br>jalieberman@pomlaw.com<br>Marc I. Gross<br>migross@pomlaw.com | PERRY DAMPF<br>Michael E. Ponder<br>judgeponder@gmail.com<br><br>DUE', PRICE GUIDRY, PIEDRAHITA<br>   & ANDREWS<br>Brandon Scott Andrews<br>sandrews@dueprice.com |
| NEBLETT, BEARD & ARSENAULT<br>Richard J. Arsenault<br>rarsenault@nbalawfirm.com<br>Charles Michael Bollinger<br>mbollinger@nbalawfirm.com | KAHN SWICK & FOTI, LLC<br>Lewis Stephen Kahn<br>lewis.kahn@ksfcounsel.com<br>Paul S. Balanon<br>paul.balanon@ksfcounsel.com |
| MORROW, MORROW, RYAN<br>   & BASSETT<br>Patrick Craig Morrow<br>pmorrow@mmrblaw.com | DEGRAVELLES, PALMINTIER, HOLTHAUS<br>   & FRUGE<br>Michael Carter Palmintier<br>mpalmintier@dphf-law.com |
| HARRELL & NOWAK<br>Eric R. Nowak<br>enowak@harrell-nowak.com<br>Shirin E. Harrell<br>sharrell@harrell-nowak.com | CLAYTON & FRUGE<br>Tony Clayton<br>tclaytonlaw@aol.com<br>Michael Paul Fruge<br>michaelfruge@claytonfrugelaw.com |
| OATS & HUDSON<br>James C. Carver<br>jcarver@oatshudson.com | COHEN, PLACITELLA & ROTH<br>Jillian A. S. Roman<br>jroman@cprlaw.com |
| ROBEIN, URANN, SPENCER, PICARD<br>   & CANGEMI, APLC<br>Julie Richard-Spencer<br>jrichard@ruspclaw.com | HYMEL DAVIS & PETERSON<br>Richard Ieyoub<br>rieyoub@hymeldavis.com |

| | |
|---|---|
| SQUITIERI & FEARON, LLP<br>Stephen J. Fearon , Jr<br>stephen@sfclasslaw.com<br>Caitlin Duffy<br>caitlin@sfclasslaw.com<br>Olga Anna Posmyk<br>olga@sfclasslaw.com | ROBBINS UMEDA LLP<br>Brian J. Robbins<br>notice@robbinsumeda.com<br>Kevin A. Seely<br>kseely@robbinsumeda.com<br>Jay N. Razzouk<br>jrazzouk@robbinsumeda.com |
| BOHRER LAW FIRM<br>Philip Bohrer<br>phil@bohrerlaw.com<br>Scott E. Brady<br>scott@bohrerlaw.com | LEMMON LAW FIRM, L.L.C.<br>Andrew Allen Lemmon<br>andrew@lemmonlawfirm.com<br>Irma L. Netting<br>irma@lemmonlawfirm.com |
| KING & SPALDING, LLP<br>David E. Meadows<br>demeadows@kslaw.com<br>Michael R. Smith<br>mrsmith@kslaw.com<br>Michael B. Wakefield<br>mwakefield@kslaw.com<br>Darren A Shuler<br>dshuler@kslaw.com<br>David Tetrick , Jr<br>dtetrick@kslaw.com | FARUQI & FARUQI, LLP<br>Jacob A. Goldberg<br>jgoldberg@faruqilaw.com<br>Michael R. Smith<br>mrsmith@kslaw.com<br>Gerald D. Wells , III<br>jwells@faruqilaw.com |
| KANTROW, SPAHT, WEAVER &<br>    BLIZTER<br>Richard Franklin Zimmerman , Jr<br>richard@kswb.com<br>Julie Moffett McCall<br>julie@kswb.com | DONALD L. BECKNER & ASSOCIATES<br>Donald L. Beckner<br>don@donaldbeckner.com |
| GAUDRY, RANSON, HIGGINS &<br>    GREMILLION<br>Thomas W. Darling<br>tdarling@grhg.net | GOLDFARB BRANHAM<br>Hamilton Lindley<br>hlindley@goldfarbbranham.com |
| ROBBINS GELLER RUDMAN & DOWD<br>    LLP<br>Douglas Wilens<br>dwilens@rgrdlaw.com | |
| **VIA U.S. MAIL** | |
| ROBBINS GELLER RUDMAN & DOWD<br>    LLP<br>Darren J Robbins<br>655 West Broadway, Suite 1900<br>San Diego, CA 92101 | BERNSTEIN LITOWITZ BERGER &<br>    GROSSMAN LLP<br>Gerald H Silk<br>1285 Avenue of the Americas<br>New York, NY 10019 |

s/Jay N. Razzouk

ROBBINS UMEDA LLP
JAY N. RAZZOUK (admitted *pro hac vice*)
600 B Street, Suite 1900

San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile:  (619) 525-3991

*Co-Lead Counsel for Derivative Plaintiffs*