**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| ) | |
| ) | |
| ROBERT F. BACH, et al.                ) | **Consolidated Securities Class Action** |
| ) | |
| versus                ) | **Civil Action No. 10- 00395-BAJ-CN** |
| ) | |
| AMEDISYS, INC., et al.,                ) | **Consolidated with:** |
| ) | |
| ) | **No. 10-464-BAJ-CN** |
| ) | **No. 10-470-BAJ-CN** |
| ) | **No. 10-497-BAJ-CN** |
| ) | |
| ) | |

## CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

I.    NATURE OF THE ACTION ................................................................ 1

II.   JURISDICTION AND VENUE ........................................................... 9

III.  THE PARTIES................................................................................... 9

      A.    Co-Lead Plaintiffs .................................................................. 9

      B.    Defendants ............................................................................ 10

IV.   CLASS ACTION ALLEGATIONS ................................................. 14

V.    MEDICARE'S PROSPECTIVE PAYMENT SYSTEM ("PPS").................. 16

      A.    The HHRG Scoring System and Medicare's Home Health Care Payment Grid.. 17

      B.    The Severe Legal Consequences of Seeking Reimbursement from Medicare for Services That Are Not Medically Necessary ..................... 25

      C.    Pre-2008:  Medicare's 10-Therapy Visit Threshold ............................. 27

      D.    Post-January 2008:  Medicare Replaces the 10-Therapy Visit Threshold with a Revised Payment Schedule ................................ 29

      E.    The Financial Incentives to Avoid "LUPAs" ....................... 30

VI.   AMEDISYS'S HIGHLY-CENTRALIZED COMPUTER SYSTEM AND DATA-MONITORING CAPABILITIES ................................ 31

VII.  DEFENDANTS' FRAUDULENT CONDUCT ................................ 35

      A.    Amedisys's Provision of Medically Unnecessary Visits to "Hit" (or Modestly Exceed) Medicare's Enhanced Payment Thresholds ................ 38

            1.    Witness Statements Relating to Defendants' Abuse of Medicare's 10-Therapy Visit Threshold During the First Half of the Class Period (2005-2007) ........................................... 38

            2.    Witness Statements Relating to Defendants' Abuse of the Revised Therapy Visit Thresholds under the 2008 PPS System During the Second Half of the Class Period (2008-2010) ...................... 46

            3.    Statistical Analysis Confirms Defendants' Massive Abuse of Medicare's PPS System During the Class Period ........................ 54

      B.    Amedisys's Fraudulent Provision of Medically Unnecessary Visits to Avoid LUPAs................................................................. 62

C.      Amedisys's Fraudulent Practices With Respect to Patient Recertifications......... 65

D.      Amedisys's Fraudulent "Upcoding" Practices.................................................... 72

E.      Amedisys's Payments of Illegal Remuneration to Physicians............................ 79

VIII.   THE TRUTH BEGINS TO EMERGE ............................................................. 81

IX.     POST-CLASS PERIOD DISCLOSURES FURTHER ILLUSTRATE THE
        SIGNIFICANT NEGATIVE IMPACT OF AMEDISYS'S FRAUD ............................ 97

X.      DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS MADE
        DURING THE CLASS PERIOD .................................................................. 100

XI.     ADDITIONAL ALLEGATIONS OF SCIENTER......................................... 159

        A.      Home Health Care Reimbursed by Medicare Is Amedisys's "Core" Business.. 159

        B.      Defendant Borne's Remarks at an Internal Amedisys Meeting Support a Strong
                Inference of Scienter ....................................................................... 164

        C.      The Existence of the Amedisys Compliance Committee Supports a Strong
                Inference of Scienter ....................................................................... 165

        D.      Defendants' Access to Information Reported on the Amedisys Fraud Hotline
                Supports a Strong Inference of Scienter ............................................ 165

        E.      The Sudden Resignations of Multiple Key Executives During the Class Period
                Support a Strong Inference of Scienter.............................................. 166

        F.      The Manipulation of Amedisys's Computer Systems Supports a Strong Inference
                of Scienter.................................................................................... 168

        G.      Financial Motives of Individual Defendants Support a Strong Inference of
                Scienter ....................................................................................... 169

        H.      Defendants' Insider Sales Support a Strong Inference of Scienter.................... 170

                1.      Defendant Borne's Insider Stock Sales...................................... 172

                2.      Defendant Graham's Insider Stock Sales ................................. 175

                3.      Defendant Browne's Insider Stock Sales.................................. 178

                4.      Defendant Jeter's Insider Stock Sales...................................... 179

                5.      Defendant Schwartz's Insider Stock Sales .............................. 180

                6.      Expiration Dates of Options Exercised.................................... 182

       I.      Defendants' Fraudulent Scheme Has Triggered Numerous Government Investigations ................................................................................................ 183

XII.   LOSS CAUSATION ................................................................................................ 184

XIII.  NO SAFE HARBOR ................................................................................................ 187

XIV.  PRESUMPTION OF RELIANCE ............................................................................ 187

XV.   CLAIMS FOR RELIEF ......................................................................................... 189

Lead Plaintiffs the Public Employees' Retirement System of Mississippi ("Mississippi PERS") and the Puerto Rico Teachers' Retirement System ("Puerto Rico TRS") bring this consolidated class action alleging violations of the federal securities laws against Defendant Amedisys, Inc. ("Amedisys" or the "Company") and seven current or former members of the Company's senior management (collectively, "Defendants") on behalf of themselves and all other persons and entities who purchased or otherwise acquired the publicly traded securities of Amedisys from August 2, 2005 through and including September 28, 2010 (the "Class Period") and were injured thereby as alleged herein (the "Class").[1]

## I.    NATURE OF THE ACTION

1.    This action arises out of the Defendants' fraudulent scheme to improperly inflate the reimbursement payments that Amedisys received from Medicare for providing home health services to the Company's patients.  As discussed more fully below, Defendants accomplished this scheme by, among other things:  (i) pressuring and intimidating Amedisys nurses and therapists into providing medically unnecessary treatment visits to patients for the Company to hit highly-lucrative Medicare reimbursement triggers and avoid having to refund fees for costly "LUPAs" (defined below); (ii) providing false information to Medicare that misrepresented the nature and severity of its patients' medical conditions and functional capabilities in order to obtain higher Medicare reimbursements (a practice known as "upcoding"); (iii) certifying or

---

[1]    The individually named defendants are Amedisys's Chairman and chief executive officer ("CEO"), William Borne ("Borne"); its former chief operating officer ("COO") (from January 1999 until his sudden resignation on September 3, 2009), Larry Graham ("Graham"); its current chief financial officer ("CFO") (from February 2007 to the present), Dale Redman ("Redman"); its former CFO (from May 2002 to October 2006), Gregory Browne ("Browne"); its former CFO (from October 2006 to February 2007), John F. Giblin ("Giblin"); its former chief information officer (from September 2004 until her sudden resignation on September 3, 2009), Alice Ann Schwartz ("Schwartz") and its current chief compliance officer, Jeffrey Jeter ("Jeter") (collectively, the "Individual Defendants").

recertifying patients for medically unnecessary 60-day treatment episodes, including (but by no means limited to) certifying or recertifying patients to participate in its "Balanced for Life" ("BFL") program, and certifying or recertifying patients who were no longer homebound as required by Medicare rules; and (iv) paying or otherwise improperly inducing physicians to increase the physicians' patient referrals to Amedisys.  Despite their knowledge (or at least reckless disregard) of Amedisys's unlawful billing practices, throughout the Class Period the Defendants issued materially false and misleading public statements that misrepresented Amedisys's compliance with governing law, and failed to disclose that Amedisys's reported revenues, earnings and earnings per share were materially inflated by fraudulent Medicare billing practices.  Accordingly, and unbeknownst to the investing public, Amedisys securities traded at materially inflated prices throughout the Class Period.  As information concerning the true nature and extent of Amedisys's practices gradually became known, however, the value of Amedisys securities plummeted, causing Lead Plaintiffs and the Class to suffer enormous losses.   In contrast, during the Class Period the Individual Defendants (notably Amedisys's CEO, William Borne) reaped illicit proceeds of roughly *$23.4 million* from engaging in lucrative insider sales of their Amedisys shares at inflated prices.

2.      Amedisys is a publicly-traded corporation listed on the NASDAQ Global Select market under the ticker symbol "AMED."  Amedisys provides home health services to aging individuals who may be recovering from surgery, or who have a chronic disease or disability or other condition, and who require home-based nursing, therapy or other assistance.  As Amedisys acknowledges in its public filings, at all material times the Company has been (and remains) critically dependent on Medicare reimbursement payments as its primary source of revenue: indeed, Medicare payments consistently represented roughly *90%* of the Company's net service

revenue during the 2005-2009 time period.  The legitimacy of Amedisys's reported revenue streams from provision of health care services, and any threats to Amedisys's ability to continue to receive payments from Medicare, were highly material to Amedisys and its shareholders throughout the Class Period, as services performed in return for Medicare reimbursement comprised the Company's core business operation.

3.      From 2000 through the end of 2007, under Medicare's home health Prospective Payment System ("PPS"), home health care companies such as Amedisys received a flat fee from Medicare of approximately $2,200 for providing a patient with up to nine home therapy visits.  Home health visits are categorized as either "therapy visits" – which are patient visits performed by physical therapists ("PTs"), occupational therapists ("OTs") or speech therapists ("STs") – and "non-therapy visits," which refer to all other types of visits (including visits from nurses or home health aides).  Under Medicare's PPS system, Medicare reimburses home health care companies in advance for a substantial portion of the total payment to which they are entitled for a given patient, with payment based on (1) a predetermined rate schedule established by Medicare, and (2) a pre-treatment assessment of the given patient's condition (performed by nurses and therapists on what is termed an "OASIS" form) and proposed plan of care during a standardized 60-day time period, known as an *"episode."*

4.      From 2000 through the end of 2007, Medicare also paid an *additional* reimbursement amount of approximately $2,200 (on a per patient basis) when a home health care company provided at least ten (10) *therapy* visits to the same patient during a 60-day treatment episode.  Indeed, under the PPS system in place through the end of 2007 (the "2000-2007 PPS System"), a health care company's reimbursement payment for therapy visits essentially doubled upon hitting the 10th visit.  Beginning in January 2008, however, Medicare eliminated the

$2,200 additional payment for reaching 10 visits, and replaced it with a revised system (the "2008 PPS System") that provided for significant increased payments at six (6), fourteen (14) and twenty (20) therapy visits (and which also provided for additional, but less significant, payments payable upon reaching certain other thresholds).

5.      In addition, throughout the Class Period, Medicare's PPS system provided for what is known as a low-utilization payment adjustment ("LUPA") for patients who receive fewer than five (5) total visits (whether therapy or nursing) within a 60-day episode.  LUPAs are financially expensive and undesirable from the perspective of home health care companies such as Amedisys, because Medicare makes payments on them based only on a very low service-specific, per-visit amount.

6.      Home health care companies, however, are forbidden by federal law from seeking reimbursement for services that are not **medically necessary,** and a health care company that increases patient visits to meet Medicare triggers and/or avoid LUPAs (absent medical necessity) commits Medicare fraud.  For example, under the Social Security Act, companies such as Amedisys are only permitted to provide home health services to beneficiaries who (1) are **homebound**, (2) have **medical necessity** (*i.e.*, need intermittent skilled nursing care, physical therapy, speech therapy or occupational therapy), and (3) are under a physician's plan of care. The penalties for violating these requirements include civil liability under the False Claims Act (which prohibits the making of false statements to government agencies in connection with government contracts), criminal prosecution, and exclusion from the Medicare system for entities convicted of Medicare fraud.

7.      As detailed herein, Lead Plaintiffs' allegations against Defendants are based in substantial part on interviews with a wide range of former Amedisys employees from Amedisys

branches across the country who have described how Amedisys used its highly sophisticated and centralized data monitoring capabilities to create a "big brother" environment in which management systematically applied pressure down the chain to cause Amedisys nurses and therapists (collectively referred to herein as "clinicians") and their supervisors in the field to change patient evaluations and to provide medically unnecessary visits in order to trigger significant additional Medicare payments and/or avoid LUPAs.

8.    The evidence of a highly-coordinated scheme at Amedisys to defraud Medicare through the provision of unnecessary home health care visits is also strongly supported by detailed statistical analysis of millions of Medicare records undertaken by Lead Plaintiffs' consulting experts (including Amedisys-specific data which Medicare makes available only to certain government approved researchers, and not to the general public).  Specifically, as detailed below, the distribution of therapy visits received by Amedisys patients during the 2005-07 period reflects a remarkably consistent – and *highly* unusual – clustering of patients who hit (or only slightly exceeded) the critical 10 visit payment threshold that was in place under the 2000-2007 PPS System.  Equally remarkable, the same statistical analysis shows that in 2008 – when Medicare changed the key therapy visit trigger thresholds to 6, 14 and 20 visits, the percentage of Amedisys patients receiving 10 (or only slightly more) therapy visits *plummeted* more than 50% (compared to 2005-2007), while the number of Amedisys patients receiving exactly (or only slightly more than) 6, 14 and 20 therapy visits *increased* significantly.  This detailed statistical analysis, combined with the extensive and detailed confidential witness statements detailed herein, provides a coherent, consistent and compelling inference of Amedisys's manipulation of the Medicare payments system on a massive scale.

9.      Similarly, the Complaint's allegations that Defendants coordinated and executed a scheme to defraud the Medicare system by systemically pressuring its employees to engage in "upcoding" patient medical data (so that Amedisys would seemingly qualify for the higher reimbursement rates reserved for more seriously ill or impaired Medicare patients) are strongly supported by dozens of confidential witnesses.  Indeed, as detailed herein, the array of fraudulent and manipulative practices that Defendants orchestrated throughout the Class Period (further described below) caused many of Lead Plaintiffs' confidential witnesses to quit in disgust, while others were fired for attempting to stand up to Amedisys's fraudulent practices.

10.      The truth concerning the nature and extent of the fraud was hinted at by a dissident analyst as early as August 2008, but did not begin to be more fully revealed until a series of partial disclosures beginning on April 26, 2010.  On that date, after the close of the market, the *Wall Street Journal* ("*WSJ*") reported on its own statistical analysis of aggregate Amedisys-specific Medicare data that had been performed at its request by Professor Henry Dove of Yale University.  This analysis (although less detailed than Lead Plaintiffs' later statistical analysis), strongly suggested that Amedisys had manipulated the pre-2008 Medicare reimbursement system to an unusual degree, inasmuch as the distribution of therapy visits received by Amedisys patients during the 2005-07 period reflected a very large and unusual number of patients who received exactly 10 therapy visits, and a similarly remarkable shift in the number of patients who received exactly 6, 14 or 20 visits in 2008 when the revised Medicare system providing for significantly enhanced payments at those levels went into effect. In response to the *WSJ's* revelations, on April 27, 2010, Amedisys's stock price declined 6.58% (or $3.98) to close at $56.52 on heavy trading.

11.    Shortly thereafter, after the market closed on May 12, 2010, it was announced that the Senate Finance Committee had initiated an investigation into Amedisys's billing and operating practices, including into whether Amedisys had "intentionally increased utilization for the purpose of triggering higher reimbursements."  In response, on May 13 Amedisys's stock price fell a further 7.97%, or $4.48, to close at $51.73 on heavy trading.  And six weeks later, on June 30, 2010, the market learned that the U.S. Securities and Exchange Commission ("SEC") had launched a *formal* investigation into Amedisys, and had served it with a subpoena seeking documents relating to its alleged abuses of the Medicare payments system.  In response to this further news, on July 1, 2010, Amedisys shares fell a further 10.55% (or $4.64) to close at $39.34, on heavy trading.

12.    As Amedisys's practices came under increasing scrutiny (which caused the Company to scale back its improper revenue inflating practices), the Company's financial performance also began to suffer.  For example, on a conference call on July 13, 2010, Amedisys – while continuing to deny that it had engaged in any improper conduct – announced that its earnings per share would be approximately 3 cents per share lower than it had previously expected.  In response to this announcement of the Company's drop in revenue and profit as a result of the April 26, 2010 *WSJ* article, the formal SEC investigation and the ongoing Senate Finance committee investigation, on July 13, 2010 the price of Amedisys shares plummeted 24.13%, or $8.45, to close at $26.57, on heavy trading.

13.    Finally, on September 28, 2010, Amedisys disclosed that it had received a civil investigative demand ("CID") from the U.S. Attorney's Office for the Northern District of Alabama "pursuant to the federal False Claims Act."  The CID demanded production of a wide range of documents and information related to the Company's "clinical and business operations,

including reimbursement and billing claims submitted to Medicare."  As the *WSJ* reported that same day, a company that is found liable for submitting false claims to Medicare is subject to damages, potentially massive fines in the amount of $5,500 to $11,000 for *each* false claim submitted, and forfeiture of its ability to do future business with Medicare.   In response to this further news, on September 28, 2010 Amedisys shares fell 15.51% (or $4.41) to close at $24.02, on heavy trading.

14.      The extent to which Amedisys had manipulated the Medicare system and inflated its reported revenue and earnings during the Class Period was further revealed on October 26, 2010, when Amedisys released its operating results for the quarter ending September 30, 2010. That quarter was the first full quarter after publication of the April 26, 2010 *WSJ* article and the commencement of the Senate and SEC investigations.   Not surprisingly, given the enhanced public scrutiny and Amedisys's inability to continue to manipulate the Medicare payment system, during that quarter ending September 30, 2010, rather than reporting record revenue and earnings growth, as it had consistently done during the Class Period, Amedisys reported a 39.8% (or $14.3 million) reduction in net income (from the prior year) to $21.6 million, and a 41% reduction in earnings per share from $1.29 (in the prior year) to $0.76.

15.      Throughout the Class Period, Defendants issued regular quarterly revenue and earnings reports, and repeatedly assured investors that Amedisys was in compliance with applicable federal laws.  As detailed herein, however, Defendants knew or recklessly disregarded that Amedisys had manipulated and defrauded the Medicare reimbursement system on a massive scale throughout the Class Period, and that the Company's reported statements of revenue, earnings and earnings per share were all inflated and materially false and misleading.  Lead Plaintiffs, on behalf of themselves and the Class members whom they seek to represent, now

bring this action to recover damages for the substantial losses they have suffered as a result of Defendants' false and misleading statements in violation of the federal securities laws.

## II.    JURISDICTION AND VENUE

16.    This action arises under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

17.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331.

18.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  At all relevant times, Amedisys maintained its headquarters and principal place of business in this District.  Many of the acts and transactions that constitute the violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

19.    In connection with the acts alleged in the Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications and the facilities of national securities exchanges.

## III.    THE PARTIES

### A.    Co-Lead Plaintiffs

20.    Court-appointed Co-Lead Plaintiff the Public Employees' Retirement System of Mississippi ("Mississippi PERS") is a pension fund established for the benefit of current and retired public employees of the State of Mississippi, including individuals employed by the state's public school districts, municipalities, counties, community colleges, state universities, libraries and water districts.  Mississippi PERS provides benefits to over 60,000 retirees, and is

responsible for providing retirement benefits to more than 250,000 current public employees.  As set forth in its previously submitted certification filed with its motion to be appointed a lead plaintiff, Mississippi PERS purchased shares of common stock of Amedisys during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

21.    Court-appointed Co-Lead Plaintiff Puerto Rico Teachers' Retirement System ("Puerto Rico TRS") is a single employer pension plan that provides retirement, death, and disability benefits to teachers in the Commonwealth of Puerto Rico, including all current and pensioned teachers of the Department of Education.  As set forth in its previously submitted certification filed with its motion to be appointed a lead plaintiff, Puerto Rico TRS purchased shares of common stock of Amedisys during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

**B.    Defendants**

22.    Defendant Amedisys is a provider of home health services to the chronic, co-morbid,[2] aging American population.  It was originally incorporated in Louisiana by its founder, defendant Borne, in 1982, and became a publicly traded company in August 1994.  Its common stock is traded on the NASDAQ Global Select Market under the trading symbol "AMED."  As of December 31, 2009, Amedisys owned and operated 521 Medicare-certified home health agencies (referred to herein as "branches"), plus 65 Medicare-certified hospice agencies, in 40 states within the United States, the District of Columbia and Puerto Rico.  Amedisys's principal executive offices are located at 5959 S. Sherwood Forest Boulevard, Baton Rouge, LA 70816.

---

[2]    The term "co-morbid" refers to a disease, disorder or condition that occurs or exists simultaneously with another disease, disorder or condition (including the presence of one or more diseases or disorders in addition to a primary disease or disorder).

Amedisys's services are paid for primarily by Medicare, with Medicare reimbursements accounting for roughly 93%, 93%, 89%, 87% and 88% of the Company's net service revenue in 2005, 2006, 2007, 2008 and 2009, respectively.

23.     Defendant William F. Borne has served as CEO and Chairman of the Board of Directors of Amedisys since it was founded.  Borne was a direct, substantial and primary participant in the securities fraud alleged herein.  As detailed herein, Borne signed *all* of the false and misleading Amedisys Form 10-Qs and Form 10-Ks filed with the SEC during the Class Period.  Defendant Borne also participated in the issuance of materially false and misleading quarterly press releases reporting results issued during the Class Period and made false and misleading statements during quarterly Amedisys conference calls with analysts and investors held on May 3, 2005, August 2, 2005, November 1, 2005, February 23, 2006, May 2, 2006, August 1, 2006, October 25, 2006, February 20, 2007, May 1, 2007, July 31, 2007, October 30, 2007, February 27, 2008, April 30, 2008, July 29, 2008, October 28, 2008, February 17, 2009, April 28, 2009, July 28, 2009, October 27, 2009, February 23, 2010, April 27, 2010, August 9, 2010, and October 26, 2010.

24.     Defendant Larry Graham served as the COO from January 1999 until September 3, 2009, when the Company announced his abrupt resignation, effective that day, to "pursue other interests."  As detailed herein, Defendant Graham was a direct, substantial and primary participant in the wrongdoing.  During the Class Period, Defendant Graham signed the materially false and misleading Amedisys Form 10-K for 2008 (filed with the SEC on February 17, 2009). Defendant Graham participated in the preparation of the materially false and misleading quarterly press releases reporting operating results issued during his tenure as COO, and also made false and misleading statements during quarterly Amedisys conference calls with analysts

and investors held on May 3, 2005, August 2, 2005, November 1, 2005, February 23, 2006, May 2, 2006, August 1, 2006, October 25, 2006, February 20, 2007, May 1, 2007, July 31, 2007, October 30, 2007, February 27, 2008, April 30, 2008, July 29, 2008, October 28, 2008, February 17, 2009, April 28, 2009, and July 28, 2009.

25.    Defendant Dale E. Redman has served as the Company's CFO since February 2007.  Redman was a direct, substantial and primary participant in the securities fraud alleged herein.  As detailed herein, Redman signed all of the false and misleading Amedisys Form 10-Qs and Form 10-Ks filed with the SEC starting with the Form 10-Q for the first quarter of 2007 through the end of the Class Period.  Defendant Redman also participated in the preparation of the materially false and misleading quarterly press releases reporting operating results issued during his tenure as CFO, and made false and misleading statements during quarterly Amedisys conference calls with analysts and investors held on May 1, 2007, July 31, 2007, October 30, 2007, February 27, 2008, April 30, 2008, July 29, 2008, October 28, 2008, February 17, 2009, April 28, 2009, July 28, 2009, October 27, 2009, February 23, 2010, April 27, 2010, August 9, 2010, and October 26, 2010.

26.    Defendant John F. Giblin served as the Company's CFO from October 2006 until February 2007, when he abruptly left the Company "for personal reasons."  Giblin was a direct, substantial and primary participant in the securities fraud alleged herein.  As detailed herein, Giblin signed the following materially false and misleading Amedisys public filings during the Class Period:  the Company's 2006 Form 10-K (filed with the SEC on February 20, 2007) and 2007 Form 10-K (filed on February 27, 2008).  Defendant Gilblin also participated in the preparation of the materially false and misleading quarterly press releases reporting operating results issued during his tenure as CFO, and made false and misleading statements during

quarterly Amedisys conference calls with analysts and investors held on October 25, 2006, and February 20, 2007.

27.     Defendant Gregory Browne served as the Company's CFO from May 2002 until October 2006, when he left Amedisys "to pursue other professional interests." Browne was a direct, substantial and primary participant in the securities fraud alleged herein. As detailed herein, Defendant Browne signed the following false and misleading Amedisys public filings during the Class Period: the Company's first quarter 2005 Form 10-Q (filed with the SEC on May 5, 2005), second quarter 2005 form 10-Q (filed on August 9, 2005), third quarter 2005 Form 10-Q (filed on November 8, 2005), 2005 Form 10-K (filed on May 16, 2006), first quarter 2006 Form 10-Q (filed with the SEC on May 2, 2006). Defendant Browne also participated in the preparation of the materially false and misleading quarterly press releases reporting operating results issued during his tenure as CFO, and made false and misleading statements during quarterly Amedisys conference calls with analysts and investors held on May 3, 2005, November 1, 2005, February 23, 2006, and May 2, 2006.

28.     Defendant Alice Ann Schwartz served as the Company's Chief Information Officer ("CIO") from September 2004 until September 3, 2009, when the Company announced her abrupt resignation, effective that day, to "pursue other interests." As detailed herein, Defendant Schwartz was a direct, substantial and primary participant in the wrongdoing. As discussed below, during the Class Period, Schwartz made false and misleading statements during the Class Period, including during an Amedisys conference call with analysts and investors held on October 28, 2008.

29.     Defendant Jeffrey Jeter started with Amedisys in 2001 and presently serves as the Company's Chief Compliance Officer and Corporate Counsel. As detailed herein, Defendant

Jeter was a direct, substantial and primary participant in the wrongdoing. As discussed below, during the Class Period, Jeter made false and misleading statements during the Class Period, including during an Amedisys conference call with analysts and investors held on October 28, 2008.

## IV.    CLASS ACTION ALLEGATIONS

30.    Lead Plaintiffs bring this action on their own behalf and as a class action, pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of all persons and entities who purchased or otherwise acquired the publicly traded securities of Amedisys from August 2, 2005 through and including September 28, 2010, and were damaged thereby as alleged herein. Excluded from the Class are: (i) the defendants; (ii) members of the immediate family of any defendant; (iii) any person who was an officer or director of Amedisys during the Class Period and any members of their immediate family; (iv) any firm, trust, corporation, officer, or other entity in which any defendant has a controlling interest; and (v) the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

31.    The Class is so numerous that joinder of all Class members is impracticable. Amedisys common stock was actively traded on the NASDAQ, an efficient market, throughout the Class Period. While the exact number of Class members can only be determined by appropriate discovery, Lead Plaintiffs believe that Class members number in the tens of thousands. During the Class Period there were millions of shares of Amedisys common stock outstanding. Based upon the volume of trading of Amedisys's common stock during the Class Period, it is believed that tens of thousands of investors purchased Amedisys common stock during the Class Period, rendering joinder of all such purchasers impracticable.

32.     Lead Plaintiffs' claims are typical of the claims of the members of the Class. Lead Plaintiffs and all Class members sustained damages as a result of the wrongful conduct complained of herein.

33.     Lead Plaintiffs will fairly and adequately protect the interests of the Class members and have retained Court-appointed counsel competent and experienced in class action and securities litigation.  Lead Plaintiffs have no interests that are contrary to or in conflict with those of the Class members that they seek to represent.

34.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged herein.

35.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether the Company's SEC filings, press releases and other public statements made by Defendants during the Class Period contained misstatements of material fact, or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading;

(c)     whether defendants acted with the requisite state of mind in omitting and/or misrepresenting material facts in documents filed with the SEC, press releases and

15

other public statements;

(d)    whether the market price of Amedisys's publicly-traded securities during the Class Period were artificially inflated due to the material misrepresentations complained of herein; and

(e)    whether the Class members have sustained damages and, if so, the appropriate measure thereof.

36.    Lead Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

37.    Notice can be provided to the record owners of Amedisys securities via first class mail using techniques and forms of notice similar to those customarily used in securities class actions.

**V.    MEDICARE'S PROSPECTIVE PAYMENT SYSTEM ("PPS")**

38.    Medicare uses a prospective payment system, or "PPS".  A PPS is a method of reimbursing service providers in advance ("prospectively") for a substantial portion of the total payment to which they are entitled for a given patient, based on (a) a predetermined rate schedule established by Medicare, and (b) a pre-treatment assessment of the given patient's condition and proposed plan of care during a standardized 60-day time period, known as an ***"episode."***  Medicare uses a prospective payment system in part because it has determined that paying certain service providers (such as home health care companies) in advance will encourage them to commence the actual provision of medically necessary services without any undue delay, and that such a system is therefore in the best interests of Medicare patients.  The system is also intended to provide fair compensation to home health care companies (such as Amedisys) for providing high quality care to homebound patients who truly have the greatest medical needs – including those patients who have the most severe clinical problems, who are the least able to

heal or function without home treatment from a nurse or therapist, or who have other conditions that actually require a larger number of home health care visits.

A.    **The HHRG Scoring System and Medicare's Home Health Care Payment Grid**

39.    A key element of Medicare's PPS system for home health care companies involves the Home Health Resource Group ("HHRG") classification or scoring system.  Under the HHRG scoring system, a particular score – known as the ***HHRG score*** – is determined for each patient.  The HHRG score is, in effect, used as a short-hand to summarize and categorize certain relevant medical characteristics of a given patient and the expected level of home health care services that such patient will require.  Moreover – and of particular relevance here – for each HHRG score there is a corresponding payment amount that Medicare will pay to a home health company for providing skilled home care services to that patient.  Because the key elements of a patient's HHRG score are initially determined or estimated prior to the start of a given 60-day treatment "episode," the system allows Medicare and the home health care company to determine prospectively both (a) the *total* amount that the home health care company is entitled to receive for a given patient, and (b) the partial payment amount (typically 60% of the total) that the home health care company is entitled to receive in advance for its services.

40.    The HHRG scores themselves, and the related "payment grid" used to determine the amount of the home health care company's payment, have been developed (and periodically revised) by Medicare based on government-commissioned studies of historical Medicare data and home health care costs.  The first Medicare PPS for home health was implemented in 2000 and was operational from 2000 through 2007.  Effective January 1, 2008, a revised home health payment system was implemented.

41.    A patient's HHRG score is based on information that the home health care company collects about each patient, before the start of home treatment, on a form known as the **"OASIS"** (which stands for **O**utcome and **AS**sessment **I**nformation **S**et).  The OASIS form is basically a long questionnaire covering the patient characteristics and attributes specified in Medicare's Home Health Patient Tracking Sheet.  The information collected on the OASIS – including the patient's HHRG score – is thereafter reported to Medicare as part of the home health care company's request for reimbursement.

42.    As noted above, Medicare payments are based on services provided within a standardized 60-day time period known as an "episode."  If treatment is authorized beyond the initial 60-day period, the patient is "re-certified" for treatment, and each subsequent 60-day period is a new "episode."  A typical home health care patient's first "episode" typically begins when the patient is discharged from a hospital following surgery or other medical treatment or directly from a physician's office, but is deemed to require post-hospitalization nursing and/or therapy services at home.  In the typical scenario, the patient and his or her physician will first choose a particular home health agency to provide care.  After they have selected a home health care company (or the local branch thereof, commonly known as an "agency"), a nurse or therapist *from that company* will evaluate the patient's medical condition, complete the OASIS form and prepare a proposed treatment plan or "plan of care" – and will also initially determine the critically important HHRG score on which the company's payment from Medicare is based.

43.    A patient's HHRG score – for example, C2F3S3 – is comprised of three separate components:  the clinical (or "C") score, the functional (or "F") score, and the service utilization (or "S") score.

44.     The "C" score component of the overall HHRG score is used to characterize the patient's **clinical** condition – *i.e.*, the patient's medical diagnoses that may impact the nature of the patient's treatment – and is based on the information collected about the patient on the OASIS form.  The clinical score is meant to incorporate information from each of the OASIS categories.  Based on a patient's diagnoses and other clinical characteristics recorded in the OASIS, patients in the 2008 PPS System are given a clinical score on a scale of 1 to 3 (*i.e.,* a score of C1, C2 or C3), which is meant to be based on the nature and severity of their *primary* home care diagnosis and the other factors noted above.  Patients with relatively mild clinical diagnoses and conditions are categorized as C1, whereas only those patients with more serious medical diagnoses are meant to be categorized as C3.

45.     The "F" component of the HHRG score, which is also meant to be based on information collected in the OASIS form, is intended to measure the patient's **functional** characteristics – *i.e.*, how well the patient can take care of him or herself.  Specifically, the functional score is based on total points derived from an assessment of the following OASIS functional skill sets:  (i) dressing; (ii) bathing; (iii) toileting; (iv) transferring (*e.g.*, the ability to get into and/or out of a bath, or to move from a chair into a bed, *etc*.); and (v) locomotion.  As with "C scores," a patient will receive an "F score" on a scale of 1 to 3 (*i.e.,* and F1, F2 or F3) based on his or her functional skills.  A patient with only mild functional impairment should receive an "F score" of "F1," whereas a patient who relies heavily on the care of a nurse or therapist to eat, bathe and medicate him or herself is more likely to be categorized as F3.

46.     The "S" score component of the HHRG score refers to service utilization, and is determined based primarily on the number of ***therapy*** visits (as opposed to *non*-therapy visits, such as nursing visits) that the patient is expected to receive during the course of the upcoming

60-day episode (subject to adjustment later based on the number of visits ultimately received). The distinction between therapy visits and non-therapy visits in determining the "S" score is very important under the Medicare payment system -- and is equally important to understanding much of Amedisys's fraudulent conduct. A *therapy* visit is a home health visit by a ***therapist***, such as a physical therapist ("PT"), occupational therapist ("OT") or speech therapist ("ST"). By contrast, *all other visits* (such as home visits by a nurse or home health aide) are referred to as "*non-therapy* visits." The term "***therapy episode***" is used to refer to a 60-day treatment episode that includes at least one therapy visit. The term "***non-therapy episode***" is used to refer to a 60-day treatment episode that does not include any therapy visits. As discussed below, "therapy episodes" are typically far more lucrative for home health care companies (such as Amedisys) than "non-therapy episodes."

47.    During the first part of the Class Period (through December 31, 2007), the "S" score for a given episode could range between 0 and 3 (*i.e.,* S0, S1, S2 or S3), and was determined based on a points system predicated on the answers to the following two questions:

(1)    Where was the patient during the 14 days preceding his or her evaluation? Depending on the answer to this question, anywhere from zero to a maximum of three (3) points would result. Under the "S score" point system in place through December 31, 2007, a patient would receive

- zero (0) "points" if the patient had been discharged from an acute treatment hospital in the prior 14 days;

- one (1) point if the patient had NOT been in an acute hospital during the prior 14 days; and

- two (2) additional "points" if the patient was in a skilled nursing facility and/or rehabilitation hospital during the prior 14 days.

(2)    The ***number of therapy visits*** that the patient was expected to receive. Depending on the answer to this question, under the "S score" point system in place through December 31, 2007, a patient would receive EITHER zero (0) OR four (4) points, as follows:

20

- *zero points* for receiving less than 10 therapy visits; but

- *four* points for receiving 10 or more therapy visit.

Depending on the total number of "S-score" points (which could range from 0 to a maximum of 7), the patient's "S-score would then be determined as follows:

- if total points < 3, then "S score" = 0;

- if total points = 3, then "S score" = 1;

- if total points = 4 to 6, then "S score" = 2; and

- if total points = 7, then "S score" = 3.

48.    Because any patient receiving 10 or more therapy visits under the 2000-2007 System was given at least 4 points, any patient receiving ten or more therapy visits automatically qualified for an "S score" of at least S2 or S3.  (Indeed, under the 2000-2007 points system, there was no way that a patient could qualify for a relatively high S2 or S3 score – thereby entitling Amedisys to much higher reimbursement – unless that patient received at least 10 therapy visits, because if the patient received nine or fewer therapy visits, the maximum number of "points" they could receive would be 3, in which case their resulting "S score" could be no higher than S1.)  *And reaching the 10 therapy visit level – and thereby triggering an S score of at least S2 – was of key financial importance to Amedisys under the 2000-2007 PPS system, because it would receive approximately **$2,200 more** for providing a patient with 10 therapy visits than it would for providing the same patient with nine (or fewer) therapy visits.*

49.    Under the revised 2008 PPS system that went into effect on January 1, 2008, a patient's "S-score" *per se* (which is now calculated under a different "points" methodology, and can now range from S1 to S5) no longer directly affects the amount of Medicare reimbursement. In other words, there is typically no difference between the amount payable with respect to

patients who have the same "C" and "F" scores, regardless of how much their "S scores" may differ. Instead, under the PPS system that went into effect on January 1, 2008, the role previously played by the "S score" in determining payment levels for a patient with a particular combination of "C" and "F" scores has been replaced with a payment matrix that considers the following two factors:

(1)     the **_total number of therapy visits_** actually received during the 60-day episode for which payment is being sought; and

(2)     whether payment is being sought for services provided during the patient's _first_ or _second_ 60-day treatment episode (_i.e.,_ for an **_"early episode"_**), or whether the payment is being sought for services provided during a patient's _third or later_ 60-day treatment episode (_i.e.,_ for a **_"late episode"_**).[3]

Under the 2008 PPS system, the number of therapy visits provided has therefore remained a key determinant and driver of a home health care company's reimbursement payments from Medicare – except that instead of 10 therapy visits per patient per episode being the sole critical visit threshold, under the 2008 PPS system a home health care company now receives significantly enhanced payments upon reaching the 6, 14 or 20 visit levels (and much more modest additional payments for reaching 7, 10, 11, 16 or 18 therapy visits).[4]

---

[3]      In general, under the revised PPS system, home health care providers receive somewhat greater compensation for providing services to patients who are being treated in a "late episode" than they do for providing services to patients who are in their first or second episode.

[4]      Under the new 2008 PPS System, although the precise amounts vary depending on a patient's "C" and "F" scores, a home health agency receives roughly $600 more for an early episode and roughly $800 more for a late episode for reaching the 6 therapy visit level; roughly $675 more for an early episode and roughly $765 more for a late episode for reaching the 14 therapy visit level; and roughly $1,500 more for an early episode and roughly $1,230 more for a late episode for reaching the 20 therapy visit level. The "bumps" payable for reaching certain intermediate "sub-thresholds" are all significantly smaller.

50.     The "S" score under the pre-2008 system – and the number of visits actually performed under the revised 2008 system – cannot be finally determined until after the number of therapy visits actually performed during a given episode is known.  However, under both systems, a patient's OASIS form will include an estimate of the number of therapy visits to be provided during the upcoming 60-day "episode."  This estimate is meant to be included in the initial OASIS form, after the home health care agency's nurse (or therapist) and the patient's physician have conferred and decided upon the patient's treatment (which is thereafter documented in the patient's plan of care).  This estimate then provides the basis for calculating the home health care company's "upfront" payment (which is equal to roughly 60% of its estimated total payment entitlement under the relevant Medicare PPS payment grid) – although a home health care company's final payment is ultimately subject to revision (either up or down) at the end of the episode when the number of therapy visits actually provided is known.

51.     Medicare rules require the patient's physician to approve the medical treatment plan, after which the patient's home treatment will commence, and in theory the physician's treatment recommendations must be based on the physician's assessment of the relevant medical necessities -- and should not and must not be or dictated or unduly influenced by nurses, therapists or other representatives of the home health care company.   In practice, however, and as confirmed by CWs 9, 13, 15, 22, 26, 41 and 50, among others, many (if not most) physicians rely heavily on – and effectively defer to – the home care treatment recommendations of the home health care company's nurses and therapists because (a) most physicians are very busy and (b) the home health care nurses and therapists are typically most directly involved in interacting with and observing the patient.  Similarly, physicians typically rely heavily on, and defer to, subsequent recommendations of home health care company nurses and therapists with respect to

23

proposed modifications to a patient's treatment plan[5], and with respect to "recertifications" of patients for additional 60-day treatment "episodes."

52.    The role of home health care company employees in filling out the OASIS forms and establishing recommended patient treatment plans – and their roles in thereby determining the C, F and S components of a given patient's HHRG score (or the number of total therapy visits rather than the "S score" after December 31, 2007) – give home health care companies significant opportunities to defraud Medicare's PPS payment system by manipulating the number of therapy visits, primary and secondary diagnoses.  Indeed, a patient's HHRG score (with certain limited exceptions) basically determines the amount of Medicare's payment to the home health care company.  Specifically (and based on the theory that higher compensation is appropriate for the treatment of sicker and less functional patients and those who require more than a certain number of therapy visits) the Medicare payment matrix provided that the *higher* a patient's "C" and "F" scores, the *larger* the payment that the home health company would receive from Medicare for providing services to that patient – ***and also provided that a home health company's compensation would be* significantly *higher for a given patient if that patient reached the 10 therapy visit threshold (under the pre-2008 system), or the 6, 14 or 20 therapy visit threshold (under the 2008 PPS System).***[6]

---

[5]    For example, a patient's initial plan of care may be modified to provide for additional therapy visits.

[6]    Specific payment amounts may be affected by certain other factors, such as a cost adjustment based on the geographic location where services are rendered (to account for the differences in the costs of medical services in different parts of the country).  However, the "C" and "F" components of the HHRG score – and the number of therapy visits per episode (whether considered as the key driver of the "S score" under the 2000-2007 system or considered as a raw number under the 2008 PPS System) (*see* ¶¶47-49 above) – have been the key determinants of Medicare compensation to home health care companies throughout the Class Period.

B.      **The Severe Legal Consequences of Seeking Reimbursement from Medicare for Services That Are Not Medically Necessary**

53.      The guiding principle of the Medicare payment system is that medical necessity – and not private financial gain – governs the provision of home health care services to Medicare patients.  In other words, Medicare is meant to pay only for treatments that are medically necessary, and if a home health care company requests reimbursement for treatment that does not meet that standard it is committing Medicare fraud.  Provision of such excessive and medically unnecessary services wastes potentially enormous amounts of taxpayer money, while diverting limited medical resources from other patients with legitimate medical needs.

54.      Medicare defines "medically necessary" services as those that "are needed for the diagnosis or treatment of [a patient's] medical condition, meet the standards of good medical practice in the local area, and are not mainly for the convenience of [the patient] or [his or her] doctor."  *See* www.medicare.gov/Glossary.  In addition, the Social Security Act further defines the eligibility and coverage requirements for Medicare home health benefits by stating that home health services shall be provided only to beneficiaries who (1) are *homebound*, (2) have *medical necessity* (*i.e.*, need intermittent skilled nursing care, physical therapy, speech therapy or occupational therapy), and (3) are under a physician's plan of care.  *See* Social Security Act §§ 1814(a)(2)(C) and 1835(a)(2)(A), 42 U.S.C. §§ 1395f and 1395n(a)(2)(A).

55.      The penalties for failing to comply with these requirements are severe.  A home health care company's submission of a false Medicare claim can result in civil liability under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733.  The civil FCA statute protects the government from being overcharged or sold substandard goods or services, and provides that it is illegal to knowingly or recklessly submit false or fraudulent claims for payment to Medicare. Filing false claims can result in fines of up to three times any loss incurred by Medicare on any

25

fraudulent claims, *plus* an additional $11,000 for *each* false claim filed.  Under the statute, each instance of an item or a service fraudulently billed to Medicare counts as a separate false claim, so civil fines and penalties can add up quickly to staggeringly large amounts in the case of a company that has systematically defrauded Medicare.

56.    Under the FCA's civil liability provisions, specific intent to defraud is not required.  Instead, the statute's provisions define "knowing" to include not only actual knowledge, but also instances in which the person or entity acted with deliberate ignorance of, or reckless disregard for, the truth or falsity of the information contained in claims for payment submitted to the federal government.  Further, the FCA contains whistleblower provisions that allow private citizens to sue on behalf of the United States (through so-called "*qui tam*" suits), and to receive a percentage of any recoveries obtained by the government from any person or entity found liable for defrauding Medicare.[7]

57.    A home health agency that bills Medicare for services which it should know are not medically necessary also can be prosecuted for fraud by the Office of the Inspector General of the Department of Health and Human Services ("OIG").  Under the federal Exclusion Statute, 42 U.S.C. § 1320a-7, the OIG is also legally required to exclude from participation in all federal health care programs individuals or entities convicted of Medicare fraud.  In addition, the OIG has discretion to exclude home health care companies from participating in Medicare for, *inter alia,* providing unnecessary or substandard services, submitting false or fraudulent claims to a federal health care program, or engaging in unlawful kickback arrangements.

58.    In addition, the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), is a criminal law that prohibits the knowing and willful payment of "remuneration" to induce or

---

[7]    There is also a criminal false claims statute, codified at 18 U.S.C. § 287.  Criminal penalties for submitting false claims include imprisonment and criminal fines.

reward patient referrals or the generation of business involving the provision of any medical products or services (*e.g.*, drugs, supplies, or health care services for Medicare patients) where the cost of providing such goods or services is reimbursable by Medicare.  "Remuneration" as used in this statute includes anything of value, and can take many forms besides cash, and providing remuneration in exchange for referrals of patients whose treatment is covered by federal health care programs is a federal crime.  The AKS statute covers both the payors of kickbacks (those who pay or offer to pay remuneration) as well as the recipients of kickbacks (those who solicit or receive remuneration).  Criminal penalties and administrative sanctions for violating the AKS include fines, jail terms and exclusion from participation in Medicare and other federal health care programs.  Under the Civil Monetary Penalties Law, persons or entities who pay or offer to pay kickbacks also face civil penalties.

### C.    Pre-2008:  Medicare's 10-Therapy Visit Threshold

59.    Medicare's initial PPS payment system for home health agencies was established under the Balanced Budget Act of 1997.  That Act provided that, beginning in 2000, home health agencies would be paid based on services provided during each 60-day episode of care, rather than on a per-visit basis (which had been the payment method prior to the year 2000).   As detailed above, the 2000-2007 PPS System also established payment amounts based on each patient's clinical characteristics, functional status and service utilization (as reflected in the patient's HHRG scores), resulting in a payment grid with 80 HHRG categorizations.  The basic "payment grid" HHRG chart that was in effect during 2007 is reprinted at Appendix A.  (The 2007 HHRG chart basically reflects the same structure, HHRG score grid and payment levels, adjusted for inflation, as earlier versions of the same chart dating back to 2000).

60.    As described in the previous section, a central component of Medicare's home health care PPS system is the number of *therapy* visits provided to a patient within a 60-day

"episode" of care.  From 2000 through the end of 2007 (as measured in 2007 adjusted dollars), home health care companies would receive between $1,231 and $3,935 from Medicare for providing anywhere from 1 to 9 therapy visits to a given patient during a given 60-day therapy episode (with the variation within this range depending **not** on the number of visits provided, but solely on whether the patient's "C" and "F" score were relatively small or large, and on whether the patient was entitled to certain additional S-score "points" for having been in a skilled nursing facility or rehab hospital (but not an acute hospital) during the previous 14 days).  However, once a patient received his or her **tenth** (10th) therapy visit, under the 2000-2007 PPS System the receipt of that 10th visit triggered an additional payment to the home health care company of approximately $2,200.[8]  Accordingly, throughout the first half of the Class Period (*i.e.*, through December 31, 2007), Defendants had strong financial incentives to try to maximize the number of its patients who reached the 10 therapy visit threshold.

61.    Under the 2000-2007 PPS system, Medicare did not provide any additional payments for therapy visits beyond the 10 therapy visit threshold, on the theory that the additional payment of roughly $2,200 that was made upon completion of the 10th therapy visit represented reasonable compensation to a home health care company, on an averaged basis, for the costs of serving all of their Medicare patients who required 10 or more therapy visits (regardless of whether the actual number of therapy visits provided to a given individual patient was 10, 15, 20 or some other number greater than 9 during a given 60-day episode).[9]

---

[8]    The range of additional payments for 10 or more therapy visits is from $2,052 through $2,640, and is lower for patients with lower C and F scores and higher for patients with higher C and F scores.

[9]    There are certain limited exceptions, not material to the analysis herein.  For example, Medicare does allow additional payments for certain small numbers of "outlier" patients who

Accordingly, although Defendants had a strong financial incentive to provide at least 10 therapy visits to its patients during the first half of the Class Period (*i.e.*, through December 2007) so that the Company would receive an additional payment of roughly $2,200 per patient per episode, they also had financial incentives to avoid significantly exceeding the 10-visit level.

> **D.** **Post-January 2008:  Medicare Replaces the 10-Therapy Visit Threshold with a Revised Payment Schedule**

62.    As discussed above, under the revised 2008 PPS System effective January 1, 2008, home health care companies received significant additional payments upon providing their patients with 6, 14 or 20 therapy visits per episode (with smaller additional payments being triggered upon reaching 7, 10, 11, 16 and 18 visits).  Under the 2008 PPS system, Medicare's revised payment "grid" now has effectively 153 HHRG payment "boxes" – comprised of a grid of boxes for determining amounts payable for "early episode" treatments and a parallel grid of boxes for determining amounts payable for "late episode" treatments.  The revised 2008 payment grid – under which a patient's "S score" is no longer directly relevant to determining home health agency reimbursement amounts – is reprinted at Appendix B.

63.    As noted at ¶49 above, under the 2008 PPS system, a patient's first and second episodes are referred to as "early episodes," whereas a patient's third and subsequent episodes are referred to as "late episodes."  In general, once a patient enters into a "late episode," under the revised PPS system Medicare pays home health care companies approximately 9% more on average for the same treatment package compared to what it would pay for the same package for the same patient during that patient's "early" episodes.  *See* Appendix B.

---

require a very large number of visits and incur unusually large costs.  The outlier payments are made for episodes whose imputed cost exceeds a threshold amount for each HHRG score.

64.     For a patient to transition from one completed 60-day episode to a subsequent 60-day episode, a physician must approve the continuation of home health services and must *recertify* (by signing a certificate of medical necessity) that the patient is (a) confined to the home, (b) requires the care specified in the updated plan of care, and (c) is under the care of the physician.  However, as with initial treatment plans, a nurse (or therapist) employed by the home health agency typically prepares the revised treatment plans for each 60-day treatment episode and, as confirmed by CWs 9, 13, 15, 22, 26, 41 and 50, among others, in practice physicians typically rely on the nurse's or therapist's recommendations for further care.

65.     The revised PPS payment system also included certain other changes.  Under the new system, a patient's clinical ("C") score and functional ("F") score remain key determinants of reimbursement amounts (with higher "C" and "F" patient scores being associated with higher payment levels).  However, beginning on January 1, 2008, new Medicare guidelines allowed certain patients with clinically complex conditions – such as those with a "primary diagnosis" of diabetes, congestive heart failure ("CHF") or chronic obstructive pulmonary disease to be given higher "C" scores.

### E.     The Financial Incentives to Avoid "LUPAs"

66.     In addition, throughout the Class Period, Medicare's PPS system has provided for what is known as a low-utilization payment adjustment ("LUPA") for patients who receive four or fewer total visits (regardless of whether they are comprised of therapy visits, nursing visits, or a combination of therapy and non-therapy visits) in an episode.  For example, if a patient refuses to accept more than four visits, or is re-hospitalized or dies before receiving a fifth therapy and/or non-therapy visit, or is determined to require fewer than five total visits (and is therefore "discharged" from treatment after fewer than five visits), that patient will be treated as a "LUPA."  LUPAs are financially expensive and undesirable from the perspective of home health

care companies, because they are paid only a very low service-specific per-visit amount (multiplied by the number of visits actually provided) for an episode that involves a LUPA – and can often result in the home health care company having to pay back to Medicare a substantial amount based on the difference between (a) the amount originally advanced to the company under Medicare's PPS system based on the patient's original OASIS form and plan of care, and (b) the small amounts payable under the per-visit payment formula applicable to "LUPAs."

## VI.    AMEDISYS'S HIGHLY-CENTRALIZED COMPUTER SYSTEM AND DATA-MONITORING CAPABILITIES

67.    During the Class Period, Amedisys utilized a highly-sophisticated and centralized computer system to collect and record patient information.  As defendant Borne told *American Executive* magazine in 2004, "With the exception of our clinical protocols and best practices, technology is the single most important factor in our success. . . ***Through technology, we can manage and oversee all of the 8,000-plus active patients we have at any given time***."  As a practical matter, Amedisys's exceptional computer capabilities allowed the Company's senior management to instantly create and analyze extensive reports detailing the statistics for each Amedisys branch, including the number of patients enrolled in treatment, their recertification or discharge status, the number of visits each patient had received, and the number of any remaining visits each patient was scheduled to receive before the end of their current 60-day episode.  Amedisys' sophisticated data gathering and monitoring technology allowed Defendants to create, in essence, a feedback loop by which Amedisys management could (and did) use to apply constant pressure on Amedisys clinicians in the field and their local supervisors in the branches to hit (or modestly exceed) the relevant Medicare visit thresholds needed to trigger lucrative additional Medicare payments (and  avoid LUPAs), irrespective of whether such visits were medically necessary.  The system also allowed Amedisys management to set up a system

that, with the assistance of remotely based monitors, was remarkably effective at applying real-time pressure on Amedisys nurses and other branch personnel to alter and manipulate its patients' OASIS coding, and to thereby further inflate the Company's Medicare reimbursements. The result was a system that was uniquely well-designed to allow remotely based corporate management, with the assistance of their teams of remotely based data monitors, to create a "big brother" environment in which the independent assessments of nurses and therapists in the field (who were actually seeing the patients) could be over-ridden and manipulated on a massive scale.

68.    As discussed above, Amedisys clinicians collect patient data through OASIS forms.  According to Amedisys, as of December 31, 2006, the Company had rolled out what it referred to as its "Point of Care" system in approximately 100 of its branches and, as of the February 27, 2008 filing of its 2007 Form 10-K, had "completed the implementation" of that system in all its branches.  As part of its computerized Point of Care system, Amedisys provided its nurses and therapists with laptop computers that allowed them to document the relevant clinical information for the OASIS form and electronically submit that information to the corporate billing database (known as AMS2).  Prior to the adoption of the Point of Care system, the Company used document recognition software to scan OASIS information into the Company's computer system and, although the system was therefore somewhat less well automated, it also allowed the corporate management to remotely monitor both OASIS coding and the provision of home health care visits to Amedisys patients.

69.    Moreover, during the Class Period, the Point of Care system did not simply collect information.  Instead, its software was designed to provide feedback to Amedisys clinicians in the field as they input patient information into an electronic OASIS form -- and to

do so in ways that were at least partly designed to further inflate the number of patient visits from the very beginning of the process. For example, the system would automatically switch the patient's "primary diagnosis" for a lower-listed (but higher paying) diagnosis referenced on the OASIS or direct that the patient be designated to receive therapy – even if the new diagnosis was not in fact the primary diagnosis or the patient was not indicated for therapy visits in the professional judgment of the clinician who was actually assessing the patient. As various CWs confirmed (such as CW-1, an RN/Case Manager based out of an Amedisys office in Kentucky during 2005-2010), in such circumstances the Point of Care system would often not let the clinician submit the OASIS until it was submitted in the form required by the computer system. *See also* §VII.D below.

70.     Once the OASIS data was collected from patients (either through the Point of Care system or under the predecessor system by scanning a hard copy form), the OASIS information became available to both clinicians in the field (including their immediate supervisors in their branch office) *and* to corporate management at Amedisys headquarters through what Amedisys refers to as its "dashboard." The dashboard is a pop-up screen in the Amedisys computer system that provides an overview of patients in the system, including their OASIS. The system also has a tracking ability, which date-stamps changes and shows who went in to make the change and at what time. Remotely-based individuals in the corporate hierarchy who had the ability to access or edit such information – and to pressure Amedisys personnel in the field to alter or otherwise change OASIS information to obtain higher reimbursement from Medicare – included the corporate officers responsible for the Company's various regions, as well as the "Episode Managers" and Quality Care Coordinators ("QCCs") who routinely reported "uncooperative" field personnel to their superiors in corporate headquarters.

71.    As numerous CWs have confirmed, Amedisys's computer system allowed the Company's management to generate scores of reports.  Indeed, as CW-2, a former Area VP of Operations who worked at Amedisys during almost the entire Class Period stated, the Company's computer system could generate virtually any kind of statistical report concerning patient visits, all corporate managers had access to it, and the Company constantly monitored reports on the number of visits its patients had received, therapy countdown reports (which listed the patients who were coming due for possible recertification) and LUPA reports (listing patients who were on track to receive fewer than 5 total visits).  Similarly, as CW-3, a former Director of Operations at an Amedisys branch in California noted, "corporate" generated daily reports on who was going out to see whom, how long patients were being seen, and how much money they were making on each patient – and that there was basically ***"not one report that was not generated; [corporate] knew everything."***  An array of tracking reports were also routinely circulated to personnel on the sales side of the business:  for example, according to CW-4, a former Account Manager who worked at Amedisys in Florida (2005-2007), weekly reports tracking the number of visits of all patients were generated by Amedisys's computer system and distributed not only within the branch, but also to the regional corporate executives, the Vice President of Sales and "all the other "higher-ups."  *See also* §VII below (discussing use of centrally generated reports within Amedisys as a tool for generating medically unnecessary visits and otherwise manipulating and/or improperly altering patient information and assessments to inflate Amedisys' reimbursements from Medicare).

## VII.   DEFENDANTS' FRAUDULENT CONDUCT

72.    Throughout the Class Period, Defendants consistently reported strong and increasing revenues, income and earnings per share, and effectively assured investors that Amedisys was in material compliance with all applicable laws relating to the provision of home health care services under Medicare.  Unbeknonst to investors, however, immediately prior to and throughout the Class Period, Defendants knew (or recklessly disregarded) that Amedisys was engaged in a multi-year scheme to fraudulently increase its reported revenues from Medicare.  Defendants' Medicare schemes, which had the effect of artificially inflating Amedisys's reported Class Period revenue and earnings and of exposing the Company to massive civil and criminal liability, had at least three basic components.

73.    *First*, Defendants knowingly or recklessly caused Amedisys to fraudulently overcharge Medicare by causing it to provide medically unnecessary therapy visits on a massive scale.  This aspect of Defendants' fraud, in turn, had three significant subparts, namely:

(a)   **Unnecessary Therapy Visits to Hit Key Reimbursement Thresholds.** Defendants knowingly or recklessly caused Amedisys to provide medically unnecessary therapy visits to enable the Company to "hit" (or modestly exceed) the key therapy visit threshold levels (10 visits per episode under the 2000-2007 System and 6, 14 and 20 visits per episode under the 2008 System) which would trigger *significantly* increased payments from Medicare;

(b)   **Unnecessary Visits to Avoid LUPAs.**  Defendants knowingly or recklessly caused Amedisys to further defraud Medicare by providing unnecessary therapy and/or nursing visits in order to minimize the number of its patients who received fewer than 5 total visits (of any kind) per episode, which in turn allowed the Company to fraudulently minimize LUPAs and the repayment obligations to Medicare that LUPAs trigger;

(c)   **Improper Patient Certifications and Recertifications.**  Defendants also knowingly or recklessly caused Amedisys to overcharge Medicare by fraudulently certifying or recertifying patients for medically unnecessary 60-day treatment episodes, including (but by no means limited to) improperly certifying patients to participate in its "Balanced for Life" program, and enrolling patients who were no longer homebound.

35

74.    **_Second_**, in addition to "gaming" the Medicare system by providing medically unnecessary visits, and as Defendants knew or recklessly disregarded, Amedisys engaged in rampant upcoding, *i.e.,* the practice of entering codes (notably on a patient's OASIS form) that reflect a more severe illness or condition than the patient actually has, or that attributes a patient's "primary diagnosis" to a medical condition other than the one giving rise to the need for therapy, in order to take advantage of higher billing rates associated with the "upcoded" data.

75.    **_Third_**, Amedisys paid improper and illegal remuneration to doctors in order to solicit profitable Medicare patients and facilitate improper patient recertifications.

76.    Defendants' improper practices artificially inflated Amedisys's reported financial performance during the Class Period by fraudulently increasing Amedisys's revenue from Medicare.  As a result, not only were taxpayers effectively ripped-off on a massive scale by Defendants' schemes, but Class members who invested in Amedisys securities during the Class Period were materially misled as to the truth concerning Amedisys's compliance with relevant laws governing Medicare payments, Amedisys's massive liability exposure for Medicare fraud, and the extent to which Amedisys's previously reported revenue and earnings were the product of illegal and improper activity.

77.    Numerous CWs contacted by Lead Counsel testified to multiple aspects of Defendants' wrongful conduct, including the pressures placed by Amedisys's senior corporate management on lower level employees to defraud and manipulate the Medicare payment system and the creation of a work environment that effectively forced honest health care workers and their managers in the field to choose between giving into pressures from "corporate" (and risking their professional licenses) or resigning (assuming they were not terminated for "un-cooperativeness" first).  For example,

(a)   CW-5, a former Director of Operations at an Amedisys branch in Indiana, described how s/he was repeatedly asked to do things at Amedisys that were illegal, and that when s/he refused "I knew I was not going to last long at the company."  For example, CW-5 described how directives would come down to Amedisys's branches from the National Director of Operations (who reported to defendant Borne) during regular conference calls to get 10 therapy visits in, how off-site personnel at corporate headquarters oversaw patient coding, and how Amedisys's National Director of Operations repeatedly admonished CW-5 for having nurses who refused to code patients' conditions "at a higher level" to trigger increased Medicare payments, and how (before ultimately resigning) CW-5 was written up for "insubordination" for refusing to follow the National Director of Operation's directives to change patient assessments;

(b)   CW-6, a former Director of Operations of an Amedisys branch in Illinois who also supervised four other Illinois branches as Administrator also described the Company's practices with respect to pressuring branch Directors to hit the 10 therapy visit threshold and to "upcode" patient assessments in order to obtain higher reimbursements, and how CW-6's refusals to go along with the Regional Director's repeated demands to over-ride the professional judgments of therapists and nurses in the field are the reason CW-6 is no longer employed at Amedisys; and

(c)   CW-30, a former Director of Operations at different Amedisys branches in Ohio and Kentucky (2007-2010), described how remotely based "Quality Control Coordinators" would constantly pressure field personnel to change patients' OASIS coding to increase Amedisys's Medicare reimbursements, how reports would be generated on clinicians who were "not cooperating" with re-coding demands, and if the branch director failed to adequately "address" such issues the Area Vice President would come to the branch to go over those reports and discuss how the branch could "become more compliant with QCC recommendations" (although the Area Vice President would confide that the pressure on the regional executives was "coming from above").  Similarly, CW-30 described how s/he was directed to "work the reports" to ensure that patients were being recertified and getting sufficient additional therapy visits to qualify for enhanced Medicare reimbursements – even if they did not need further treatment.  CW-30 also stated that s/he was instructed by her Area Vice President in early 2010 to "shred" copies of the reports that CW-30 had "worked," along with all of the notes that CW-30 had saved on those reports;

(d)   CW-3, former director of nursing at an Amedisys branch in California (2008-2009) described the pressures to hit therapy visit thresholds through unnecessary visits, to recertify patients who had no need for treatment, and to enroll "everybody" in the Balance for Life therapy program.  Corporate management monitored reports that tracked "everything," and CW-3 never experience such pressure to take improper steps.  When CW-3 tried to stand up to these practices, his/her regional supervisor informed CW-3 that s/he was "not supporting the Company and not a team player."  CW-3 resigned rather than remain in such an

"awful" environment; and

(e)   CW-7, former Director of Operations at an Amedisys branch in Texas (2006-2007) described how the rule was therapists had to get in 10 visits, and nurses had to get in 5 visits to avoid LUPAs, and if you didn't "you got in trouble." Similarly, CW-7 would be reprimanded for discharging patients who no longer needed home health services.  These instructions would come down from the Area Vice President and the Area Vice President's boss during regular conference calls that included multiple branch directors in Texas.  Similarly, CW-7 recalled a conference in Florida attended by defendants Borne and Jeter "and all the top management," and how all of them spoke about having to get 10 therapy visits and 5 nursing visits; it was just a given.

78.    For the convenience of the Court, this Complaint organizes the relevant portions of each separate CW witness statement by topic, as set forth in §§ VII.A to VII.E below.

**A.    Amedisys's Provision of Medically Unnecessary Visits to "Hit" (or Modestly Exceed) Medicare's Enhanced Payment Thresholds**

   **1.    Witness Statements Relating to Defendants' Abuse of Medicare's 10-Therapy Visit Threshold During the First Half of the Class Period (2005-2007)**

79.    In an article published on April 26, 2010, the *WSJ* quoted Tracy Trusler, a former nurse who worked at an Amedisys branch in Tennessee for two years prior to the end of 2007, as confirming Amedisys's practice of requiring its employees to provide additional, unnecessary therapy visits in order to obtain the additional Medicare reimbursement payment that was payable upon reaching the 10 visit threshold under the 2000-2007 PPS System.  According to the article, Ms. Trusler stated "I was told 'we have to have ten visits to get paid.'"  Ms. Trusler also told the *WSJ* that her supervisors asked her to identify patients "who were just shy of the 10-visits mark and call their assigned therapists to remind them to make the extra appointment" – and that "[t]he tenth visit was not always medically necessary."

80.    Since the publication of that article, Lead Counsel have identified and contacted literally dozens of additional former Amedisys employees who have confirmed – and significantly expanded upon – Ms. Trusler's statements concerning the steps that Amedisys

38

management took to maximize the number of Amedisys patients who hit (or just slightly exceeded) the 10 therapy visit threshold.  For example:

(a) As noted above, CW-5 was the Director of Operations at an Amedisys branch agency located in Indiana for roughly a year between 2005 and 2006 (and had previously served as Director of Nursing for a different health care company prior to joining Amedisys).  CW-5 had significant contact with both the Regional Director and Amedisys's National Director of Operations, Cheryl Lacey[10], including through weekly conference calls.  CW-5 stated that directives came down from both of these individuals – including the directive that "you will have 10 PT [physical therapy] visits."  Similarly, as reported to CW-5 by a friend who was an inspector with the Indiana Health Department, Indiana inspectors had identified various patients in Indiana who had complained about Amedisys clinicians making unnecessary visits.  Although CW-5 left before the Indiana inspectors' report was delivered, CW-5 "knew that it was a pretty bad survey."  CW-5, after being repeatedly admonished by the Regional Director and National Director for refusing to do things that were illegal (such as authorizing unnecessary visits), finally resigned from Amedisys after a year.  "It was a terrible, hostile environment" and, being an honest person, "I knew I was not going to last long at the Company."

(b) CW-7 was the Director of Operations at an Amedisys branch agency in Texas for roughly a year between 2006 and 2007.  According to CW-7, the "rule" at Amedisys was that therapists had to get in 10 visits, or they would be in serious trouble.  They were told to stretch it out to 10 visits, and then discharge the patient.  When visiting offices and sitting in on case conferences in other regions, CW-7 would hear other employees being instructed to get 10 visits of PT in, and observed that the same pressures existed in other offices in CW-7's region.  For example, if a patient was going out-of-town and it appeared that it would be difficult to complete the 10th therapy visit before the end of the episode, the physical therapist would be told to go on visits every day, even though PT is normally done only three times a week.  These instructions came down in regular conference calls with other branch directors of operations that were led by CW-7's Regional Director (Maggie Suggs, still with the Company), and Suggs' boss "Cheryl" (presumably Amedisys National Director of Operations, Cheryl Lacey).  CW-7 also recalled a week-long Amedisys conference in Florida for Amedisys sales and branch directors of operations, which likely took place in 2006, where defendants Borne and Jeter and other members of senior management all talked to

---

[10]    Lacey reported to defendant Borne, and remains with the Company in a senior executive capacity responsible for home health care operations.  Although CW-5 described the Regional Manager ("Cecilia") as bad, National Director of Operations Lacey was "the worst," and CW-5 believes that Cecilia was just following orders from Lacey.  Cecilia apparently left the Company just a few months after CW-5 resigned.

them about having to get 10 therapy visits (or at least 5 total visits to avoid a LUPA). Indeed, "[e]veryone who was giving direction at this conference said this …. It was a given."

(c)    CW-8 was the Director of Operations at an Amedisys branch office in Illinois from 2006 to 2008, and had more than 20 years' prior experience as a registered nurse. CW-8 also confirmed that Amedisys management applied pressure to hit the 10 therapy visit threshold. Indeed, CW-8 described how all of the physical therapists in CW-8's branch were private contractors, and how Amedisys's corporate headquarters in Baton Rouge would arrange to bill Medicare for a full cycle of 10 therapy visits even if they had not done them. That way, the Company would not have to pay these private contractors for the full ten visits. In other words, even though Amedisys would bill Medicare for 10 visits, "it wanted PT out of there before that" to save money. Moreover, an acquaintance at the Company, who was assigned to train the business office managers at home health care companies that Amedisys acquired during the Class Period, told CW-8 that all new business office managers at newly acquired companies – regardless of where they were located – would be trained by Amedisys to bill Medicare for 10 visits, and to "play the system" to get higher reimbursement. CW-8 described Amedisys as "crooked without a doubt.".

(d)    CW-9, who had worked in home health care since 2002, served as a clinical manager and/or branch Director of Operations in several different Amedisys offices in Florida between 2005 and 2007. In these capacities, CW-9 also witnessed the pressure exerted by Amedisys to hit – without significantly exceeding – the 10 therapy visit level. CW-9 would constantly hear "if you can do 9 therapy visits, why can't you do 10?" Conversely, with respect to patients who had already reached the 10 therapy visit threshold, CW-9 would constantly hear criticism in the opposite direction along the lines of "why do you need to do 15 therapy visits, can't you just do 10?" Similar pressures were applied with respect to hitting (but not exceeding) 5 nursing visits. As CW-9 stated, these pressures to meet – but not significantly exceed – key Medicare reimbursement thresholds came down the chain of command in the regular conference calls which included other branch directors of operations (DOOs) in the region, and which were led by the "regional VPs" (such as Pam Huffman and Joe White) and other corporate management. CW-9 stressed the amount of pressure placed on employees to hit these target levels. Reports would be distributed from corporate every week to determine where the office was in terms of hitting therapy and nursing thresholds, and the way corporate management talked employees were made to feel "without a doubt" that their jobs could be on the line if they did not meet the triggers. Management would say "this is what we do and this is why we are here." Because of these pressures, CW-9 left Amedisys and never wants to go back into the industry.

(e)    CW-10 was Director of Operations at an Amedisys branch in Maryland for roughly two years between 2005 and 2007. CW-10 also recalled that there was always a big focus on doing 10 visits to get the maximum payment on physical

therapy. Therapists were to make certain they did 10 visits: "That was like drilled in your head; there was unbelievable pressure with that." CW-10 also recalled attending regional meetings where Amedisys's Regional Vice President (Theresa Ledgerwood, who was "something else") would pressure the branches to hit 10 visits. Pressure came down from the top through the branch directors; if a physical therapist was not hitting 10 visits, they would get a talking to by the director as to what was going on and why 10 visits were not occurring. CW-10 added that "corporate" monitored the number of patients visits via Amedisys's computer system. CW-10 explained that the regional manager and Amedisys corporate would review daily, weekly and monthly productivity numbers. The pressures placed on branches to hit their numbers was "unbelievable," and led CW-10 to eventually resign.

(f)    CW-11 worked at Amedisys in Texas from 2003 to 2008, first as an account executive and Director of Business Development, and later as Area Vice President of Business Development. Even while working on the sales side of Amedisys, CW-11 said she witnessed numerous practices on the operations side of Amedisys that she said raised "red flags" to her – including efforts calculated to maximize its reimbursement. For example, when Medicare had a reimbursement threshold of 10 visits, *Amedisys employees were to reach the goal of 10 visits every time – whether the patient needed them or not.* CW-11 reported being in attendance at meetings where this practice was discussed, and also reported having discussions with Maggie Suggs, the Area VP of Operations (who reported to National Director of Operations Cheryl Lacey) about having case conferences with physical therapists in her region about how they needed to keep their patients on longer**.** According to CW-11, Suggs said that she would visit Amedisys branches that were having "operational issues" – *and that not doing 10 visits was an operational issue.*

(g)    CW-12 worked as a Clinical Manager at an Amedisys office in Tennessee from 2006 to 2008, and reported to branch's Director of Operations. CW-12 also confirmed that Amedisys pushed physical therapy visits, and they would never provide only nine visits: "there was a push to hit 10 every time, if not more." CW-12 recalled that Amedisys purchased Anodyne (infrared light therapy) machines in order to have employees integrate pain management within therapy and, as a result, increase the number of therapy visits. CW-12 also believes that branch director that s/he reported to was terminated shortly after the Senate investigation into Amedisys became public, but added that the pressure was coming from above the branch director: "it was corporate driven … they set the rules and guidelines." CW-12 added that everything the branches did was in the central Amedisys computer system, everything was viewed by corporate ("they could see everything we did").

(h)    CW-13 was a registered nurse who worked at an Amedisys branch in Indiana from 2005 to 2008, and reported to the director of operations in charge of that office. CW-13 confirmed ("oh yeah") that Amedisys applied pressure to increase visits to hit Medicare reimbursement both before and after the 2008 changes in

the PPS payment grid.  For example, CW-13 was told in case conferences that they needed 10 plus visits for patients receiving therapy (which changed to 14 in 2008), and the Director in charge of the office (and her assistant) would closely monitor the numbers of visits and which patients were coming up close to the triggers.  As CW-13 stated, the majority of the time these 10 visits (later 14) were not medically necessary, but that there was constant pressure to hit the reimbursement triggers in order to generate more money.

(i)   According to CW-4, the former RN, Account Executive and Account Manager who worked at more than one Amedisys branch in Florida from 2005 to 2007, Amedisys pushed to have every patient receive 10 therapy visits because the tenth visit brought an additional reimbursement from Medicare.  The additional visits were often medically unnecessary, as when a congestive heart failure (CHF) patient who did not even need a cane to walk would be scheduled for 10 therapy visits.  With certain medical conditions, such as CHF and chronic pulmonary obstructive disease, patients generally did not require much in the way of therapy visits, although they generally needed a higher number of nursing visits.  In such circumstances CW-4 would "bump heads" with his/her supervisors "all the time" over scheduling unnecessary or inappropriate therapy visits, but was told that patients needed to have 10 therapy visits and "that was the way it was," given that nursing visits didn't pay as much money.  Similarly, although therapists also complained about providing unnecessary visits, they knew that whenever a therapist discharged a patient prior to hitting the 10 visit threshold they would get "a talking to" from the head of the office.  CW-4 also described how Amedisys generated weekly reports from its computer system that tracked how many visits each patient had and how many more they were currently scheduled to receive, which were discussed at weekly meetings with the branch office staff, the regional manager and the Vice President of Sales; in addition, all the other "higher-ups" also had access to these reports.  CW-4 recalled instances where the branch heads CW-4 worked for would agree that a patient did not need more therapy visits, but would say in effect that CW-4 knew that they needed to get 10 therapy visits in.  CW-4 did not, however, place primary blame on the branch heads; instead, they were just "trying to keep their jobs" and were put under constant pressure from their bosses in corporate management to hit 10 visits.

(j)   CW-14, a former Business Office Manager at an Amedisys branch in Florida from 2004 to 2006, recalled that clinicians in CW-14's office were often pushed to keep patients past what they thought was medically necessary.  Although CW-14 was initially supposed to be the person who discharged patients from the computer, the branch director of operations told CW-14 not to discharge any patients before she had been able to discuss it ("that's the game there"), and the Regional Director, Susan Hoffman, would join in patient case conferences as well.  CW-14 also recalled one specific incident in which a therapist refused demands to give a patient with 8 therapy visits two additional visits in order to hit the 10 visit level; the therapist felt his license was at stake, and resigned from the Company in response to demands to provide 10 visits.

(k)    CW-15 was an account executive who worked out of an Amedisys branch in Oklahoma from 2006 to 2010.  CW-15 noted that, as a general rule, the branch Director of Operations would send out separate physical therapy and occupational therapy clinicians (and frequently a psych nursing and/or social work clinician as well) to visit a patient, even though Amedisys lacked physician orders for those disciplines and only had an order for basic skilled nursing.  This was "absolutely" happening a lot.  If these specialized clinicians came back and said further treatment in their discipline was not needed, Amedisys would still get paid for the initial visits.

(l)    CW-16 was Director of Operations for an Amedisys branch located in Louisiana from 2007 to the latter half of 2008.  When asked whether Amedisys applied pressure to hit specified therapy visit levels to trigger higher Medicare reimbursements, CW-16 replied "Can I plead the Fifth?" CW-16 then stated that s/he was uncomfortable speaking on that subject, and declined to provide any further information.

(m)    CW-17 was an experienced RN and case manager based at an Amedisys office in Florida from roughly 2006 to 2008 after CW-17's former employer was acquired, and was responsible for conducting initial assessments of patients, filling out admission OASIS forms and recommending the type(s) of therapy needed by a patient.  CW-17 remembered Amedisys pushing for more therapy visits, and that this was a constant subject of discussion.  CW-17 left Amedisys in 2008 because s/he was "tired of the sh-t," meaning "Medicare fraud," and was unwilling to lose his/her license for Amedisys.

(n)    CW-18 was an account executive at Amedisys offices in Georgia and Florida between 2003 and 2008.  CW-18 agreed that there was pressure at Amedisys to hit 10 therapy visits, and recalled case conference meetings at which clinicians stated that they were pressured to provide extra and unnecessary visits.  CW-18 also started that, these clinicians indicated that the pressure for extra visits came down from "corporate."

(o)    CW-19 was the Director of Operations for an Amedisys office in Louisiana from 2003 to 2009.  CW-19 described how Amedisys had "reports for everything," including monthly operational reports for which branch directors had to justify why patients did not meet threshold visit levels.  The branch directors had to work these reports to ensure they were making their numbers; all the branch directors would meet in person monthly with the regional managers, and they were either praised or "chopped up."

(p)    CW-20 was Director of Operations at an Amedisys office in Virginia from 2003 to 2009.  CW-20 said that s/he had to go over a report every day to ensure that therapy visit numbers were being met – and if not, CW-20 had to explain why not to the Regional Vice President of Operations.  As CW-20 stated, Amedisys kept the pressure on at all times to achieve 10 therapy visits during the period that 10 visits was the "magic number."  Amedisys therapists would be pressured to

43

provide additional visits, and although CW-20 said s/he told therapists to discharge patients who did not require more treatment, employees "definitely" felt the pressure to hit the "magic number."

(q)    CW-21, a claims integrity specialist at Amedisys's corporate headquarters in Baton Rouge, LA from 2005 to 2006, handled the clean-up of Amedisys claims that were rejected by Medicare on behalf of roughly 40 Amedisys branches. CW-21 said s/he knew that employees at Amedisys were pressured to increase therapy visits. CW-21 added that Amedisys's business office managers (BOMs) were always very uptight about their therapy visits not being high enough, that s/he was friends with a number of BOM's, and that s/he would have been hearing about these concerns only if they were under a lot of pressure from corporate management to hit quotas.

(r)    CW-22 was an Amedisys sales representative and account executive at Amedisys offices in South Carolina from 2005 to 2009. CW-22 also confirmed that, prior to the 2008 change in the Medicare triggers, Amedisys would pressure employees to provide a 10th visit; for example, if clinicians didn't hit 10 visits they had to give an extensive defense of why they hadn't.

(s)    CW-23 served as an RN field nurse at an Amedisys branch in Georgia from 2005 to 2006. CW-23 stated that nurses would initially determine medical necessity and the number of needed visits, but that there were weekly meetings to discuss all patients, and the clinical manager and director had the final word on the number of visits. In particular, CW-23 stated that, after initially filling out the OASIS truthfully, management would require changes that CW-23 knew to be unjustified. During CW-23 time at Amedisys, OASIS was still initially written up on paper, hence CW-23's statement that: "We would get our OASIS back all the time with big red marks on them." CW-23 clarified that the "red marks" were the changes made to the nurses' specifications. The changed OASIS was then used as the source of information entered into the computer system. CW-23 understood that the forms would be "corrected" in this way so that the patients would qualify for the number of visits that Amedisys wanted to give them.

(t)    CW-24 was an registered nurse and case manager at an Amedisys branch in Tennessee from 2006 to 2007. CW-24 recalled the emphasis on achieving 10 visits, which CW-24 believed were scheduled from the outset upon admission. According to CW-24, the practice was to frequently drag out seeing a patient with unnecessary visits by repetitively focusing on educating patients on their medications. In sum, CW-24 stated that Amedisys was "most definitely" keeping on patients longer than necessary (and this was also the view of most of CW-24's co-workers) – which is one of the primary reasons CW-24 left the Company.

(u)    CW-25 was a business office manager at Amedisys in Florida for roughly a year starting in the first half of 2007, whose duties included scheduling appointments with patients. CW-25 stated that as a scheduler, s/he was "always, always told" to schedule 10 visits until the triggers changed in 2008, and also stated that s/he had

to schedule patients for visits even when it was his/her understanding that the patients did not really need them (s/he would hear clinicians complaining that patients did not need additional visits but how they had been told to "find something" and do the visits). CW-25 added that Amedisys provided the most horrible work experience s/he had ever had, and s/he doesn't trust the Company.

(v)   CW-26 was a nurse and former Director of Operations of an Amedisys branch in Mississippi from 2006 to 2010.  CW-26 said that Amedisys pushed employees to conduct therapy visits that were not medically necessary.  For example, the Area Vice President would tell CW-26 that s/he was not making required revenue per episode targets, and would show CW-26 how s/he could meet the branch's numbers by increasing therapy visits – indeed, there was no other way to hit the revenue numbers. CW-26 also recalled receiving numerous reports, including a report called an "operational accounting report" that displayed what percentage of patients in CW-26's branch had met Medicare therapy visit thresholds.  Corporate management expected the majority of the patient visits to fall in the bracket that made the most money for Amedisys, although CW-26 also recalled getting instructions from one of the Area Vice Presidents that there should always be a certain amount below or above that bracket to avoid throwing up a "red flag" that might trigger an audit.

(w)   CW-27 was an account executive at an Amedisys branch in Florida from 2006 to 2009.   As CW-27 stated, Amedisys focused on maximizing reimbursement, which, in the pre-2008 period, basically involved hitting 10 therapy visits.  As CW-27 noted, Amedisys had a real-time ability through its computer systems to look at individual cases and to take a systematic approach to knowing where the money is and how to maximize it.

(x)   CW-28, a former business director at an Amedisys branch in Virginia  from 2007 to 2008 (and who had previously worked in the home health care business for over a half dozen years), described the culture at Amedisys as so "horrendous" that s/he ultimately resigned.   More specifically, CW-28 also confirmed that Amedisys would keep sending physical therapists to visit patients just to meet the 10-visit threshold for reimbursement.  Moreover, whenever CW-28 spoke up to complain about this, s/he was told to "shut up" and to do what the Company said.  CW-28 said that she was witness to case conferences in which therapists would say that a patient did not need any more visits, but were told to do 10 visits.  As a result, "a lot" of the patients were hitting the 10 visit threshold at CW-28's office.  CW-28 also confirmed that the branch directors were put under a lot of pressure by their superiors in corporate management.  The Regional Vice President in CW-28's area was Teresa Ledgerwood; CW-28 had actually once requested that s/he investigate the practices in CW-28's branch, but Ledgerwood basically ignored the request.

(y)   CW-29 was a physical therapist at an Amedisys branch in North Carolina between 2005 and 2006 after the Company acquired CW-29's former employer.  CW-29 stated that there was absolutely pressure, which was blunt, to change OASIS

answers and to get 10 or more therapy visits after Amedisys took over. "We were really very pressured to change our answers," and Amedisys wanted every patient to get 10 therapy visits. CW-29 resigned from Amedisys because of the unethical practices there.

      **2.**      **Witness Statements Relating to Defendants' Abuse of the Revised Therapy Visit Thresholds under the 2008 PPS System During the Second Half of the Class Period (2008-2010)**

      81.    As discussed above, in January 2008 Medicare restructured its PPS system so that instead of paying home health care companies a single additional $2,200 lump sum upon hitting the 10 therapy visit threshold, such companies would now receive additional payments upon hitting the 6, 14 and 20 therapy visit threshold within a given 60-day episode. As the CWs discussed below reported, Amedisys's fraudulent practices with respect to prescribing unnecessary home therapy visits to hit Medicare's reimbursement thresholds continued, although after 2007 they were modified to reflect the new "trigger" levels. For example:

(a)    CW-30 was Director of Operations at an Amedisys branch in Ohio and then at a branch in Kentucky for more than two years beginning in 2008 (when Amedisys acquired CW-30's former employer), and reported to the Area Vice President of Operations.

      i.    CW-30 recalled that all branch Directors of Operations had to review a report that was generated weekly by "corporate" that listed all of the branch's patients that were currently scheduled for (a) fewer than 6 therapy visits, (b) just short of 14 therapy visits (*i.e.,* who had 12 or 13 visits), or (c) just short of 20 therapy visits (*i.e.,* who had 18 or 19 visits). For example, if any patient's initial OASIS assessment form was coded so that total therapy visits worked out to 13, as a branch Director of Operations CW-30 would receive a report of such patients from "clinical services" at corporate headquarters. CW-30 was then expected by CW-30's superiors to ***"work the report"*** – a euphemism for speaking to the therapist to get them to agree that more therapy visits were necessary. If the therapist said that no more visits were indicated, that would have to be reported to "corporate." There was considerable pressure to approve additional therapy visits. For example, as the "Balanced for Life" program began to be implemented, Amedisys branches that had hired therapists to serve as Rehabilitation Specialty Directors to oversee that program (as was the case at CW-30's branch) would assume responsibility for "working the report." In that case, if the therapist in the field would not approve additional therapy visits, the RSD would have to go out into the field with that therapist to supervise a

46

"re-evaluation" of the patient – or the RSD would simply assign a new therapist to the patient who would agree that the patient required enough therapy visits to "hit the trigger."

ii.    CW-30 also recalled how Amedisys's corporate headquarters provided the branch directors of operations with a large volume of information and written materials on Medicare's revised therapy visit thresholds that came into effect in 2008, and how much money was associated with them. The branch directors of operations were directed to thoroughly train their staff on this material. ***Around January 2010, however, there was an "absolute panic" about having distributed these materials, and the Company's directors of operations were all directed to return them***. Indeed, Amedisys's corporate management was so concerned about retrieving these materials that an Amedisys Assistant Vice President was dispatched to go to CW-30's office in person to say that the Company needed to get all the information back. Although the AVP made a pretense of reciting how clinicians should make treatment decisions based on what was clinically indicated rather than on the revenue considerations detailed in the written materials, it was clear to CW-30 that headquarters had dispatched the AVP to the branches only to get the written materials back -- and that management had no intention of changing the Company's practices with respect to "working the reports" of patients whose scheduled therapy visits were falling short of the key 6, 14 or 20 visit thresholds. ***Indeed, during this same visit, the AVP instructed CW-30 to continue "working" the weekly reports (which continued to be distributed) of patients who were scheduled to fall short of the 6, 14 or 20 thresholds, but that going forward CW-30 was to shred the reports after CW-30's branch had finished "working them."*** In addition*, the AVP also instructed CW-30 to <u>shred</u> all of the therapy visit reports and related "alerts" from 2009 (and CW-30's related notes thereon) that CW-30 had carefully kept in binders*. As CW-30 stated, this instruction was the "polar opposite" of CW-30's prior instructions -- which had been to keep the very same documents so that CW-30 could show his/her superiors that CW-30 had diligently "worked them" – and CW-30 and other branch directors actually "all laughed" about management's about-face. A few months later, in the spring of 2010, CW-30 saw the April *WSJ* article and read about government investigations.

(b)    CW-6, the former Dyna Care employee who continued on with Amedisys for roughly ten months as Administrator in charge of a group of five Illinois branches (including Chicago) from 2007 to 2008, left Amedisys soon after the reimbursement triggers changed in January 2008. However, CW-6 took part in training that was mandatory for all Amedisys Directors of Operations (some of which was done by on-line conference), and during the training the directors were told what the new Medicare reimbursement triggers were and were instructed to obtain the maximum reimbursements available under the new system no matter what. Although CW-6 cannot recall the specifics, Directors were basically told "get the highest reimbursement." As noted in the previous section above, remote

47

corporate monitors in Baton Rouge would track visits, and would then complain to CW-6 about her therapists' refusals to do unnecessary visits, which in turn would lead to CW-6 receiving telephone calls directly from the Regional Director of Operations about CW-6's failure to get his/her therapists to go along with providing additional (and unnecessary) visits, and which in turn finally led to CW-6's departure from the Company in early 2008.

(c)     CW-31 was clinical manager at an Amedisys branch in Georgia from 2009 to 2010, having had more than ten years' experience as a nurse and doing quality assurance in the home health care field.  CW-31 recalled that during CW-31's tenure at Amedisys, there was always pressure to hit – or just slightly exceed – a particular trigger threshold.  ***CW-31 also recalled that therapists who had hit the trigger number exactly were*** sometimes ***told they had to do one or two more visits because there were "too many" patients coming in exactly at the trigger level.***  CW-31 recalled that a woman named Renee was the area therapy supervisor for branches in the region, and that she would have monthly meetings with therapists in CW-31's branch.  The field therapists would come out of those monthly meetings saying ***"we got it again,"*** namely, the instruction from the regional manager to not just hit the trigger, but to do one or two more visits beyond the trigger.  (At the same time, as noted below at §B, CW-31 noted that nurses were also pressured to do as few nursing visits as possible, as long as they did just enough to avoid a LUPA).

(d)     CW-32 was Director of Operations at an Amedisys branch in Oklahoma during 2008-2009.  CW-32 confirmed that there were weekly regional team calls, led by the Area Clinical Manager for Oklahoma (Stephanie Six) and a female executive one or two levels above Ms. Six who was responsible for the entire region (which included Oklahoma, Louisiana, Mississippi, Alabama and Georgia).  During these regular conference calls, the branch directors of operations would be "encouraged" to maximize the number of visits – and 14 therapy visits was a highly emphasized number.  ***CW-32 confirmed that the area manager and the "higher ups" were definitely looking at everyone's number of visits; "they watched [visit] numbers very closely," and had access to computer reports that showed the number of visits, by type, as well as date information showing when patients were getting close to the end of a 60-day episode.***  The pressure was especially strong for more therapy visits because therapy involved the highest reimbursement, and regional management would call CW-32 to ask for more visits on patients when they were approaching a trigger level.  Although CW-32 denied allowing CW-32's office to make unnecessary visits, there were "rumors" that other branches – and later in the interview CW-32 confirmed that unnecessary visits were "an issue" at the Oklahoma City branch (which was the largest Amedisys branch in Oklahoma).  CW-32 ultimately ended up leaving Amedisys after less than a year because of how Amedisys was billing Medicare, and how its upper management did business.

(e)   As noted above, CW-13, the registered nurse who worked at an Amedisys branch in Indiana from 2005 to 2008, also confirmed that -- just as Amedisys pressured its employees to hit the 10 visit threshold and monitored their efforts to reach that number before 2008 – the same pressures and monitoring continued after 2007, except that now management wanted 14 therapy visits. If they did not have 14 therapy visits, they would have to somehow find a way to make them, regardless of whether they believed they were medically necessary.

(f)   CW-33 was an Amedisys manager from 2005 to 2008, serving initially as Regional Administrator overseeing Amedisys sales and operations staff located (at various times) in parts of Mississippi, Louisiana, Tennessee, Arkansas and/or Missouri. As CW-33's mix of territories gradually expanded, CW-33's title became a vice president of operations, reporting to Cheryl Lacey. CW-33 described "struggling" when CW-33 started reporting to Lacey because there were "things that went against my grain" as an ethical person. One major and troubling issue was Amedisys's launch into new therapy programs, such as Balanced for Life, immediately after it became known that Medicare was going to implement the revised therapy visit payment "buckets" in 2008. CW-33 believed that if patients really needed so much additional care going forward, then such patients would have needed that care before the revised therapy buckets were put in place. CW-33 also recalled attending a quarterly regional meeting in Chattanooga, TN in the spring of 2007, at which Amedisys Senior Vice President Jill Cannon stated that Amedisys was implementing new therapy programs *to meet the new visit thresholds for reimbursement*. Although CW-33 claimed that s/he always told therapists to do what was best for each individual patient and to not make unnecessary visits, CW-33 "heard rumblings in other regions" about therapists being pressured. CW-33 also recalled that, in CW-33's region, Amedisys would send therapists to do wound care visits – even though this was a task that only nurses were qualified to perform -- in order to increase the number of therapy visits.

(g)   According to CW-3, the registered nurse and Director of Operations at an Amedisys branch California during 2008 to 2009, stated that Amedisys's corporate policy was "just push, push, push" for more therapy visits, and described the Company "all about numbers and money." CW-3 noted that Amedisys had developed a new specialty program, Balanced for Life, that was basically designed to generate more therapy visits in response to the revised 2008 PPS System payment triggers – and also confirmed that Amedisys pushed to put virtually every patient into that program regardless of whether it was appropriate for the patient. CW-3 also described how the pressure to provide additional therapy visits came from the regional supervisor to maximize visits. "Everything" was monitored by corporate; "there was not one report that was not generated; they knew everything;" and corporate had reports on who was going out to see whom, and how many visits patients were getting. As CW-3 stated, "I've never been under such scrutiny and have never been pressured that way." ***"It was awful."***

49

(h)    CW-34, a former Director of Operations at an Amedisys office in Georgia from 2008 to 2010, described how Amedisys had a system of "buckets," based on a patient's diagnosis, that were used to establish the minimum number of visits the patient should receive – and how both generally and in the Company's specialty programs (such as Balanced for Life and Rehab at Home) the number of programmed visits trended towards the post-2008 Medicare therapy reimbursement triggers of 6, 14, and 20 visits.   CW-34 also described how Amedisys employed Rehab Service Directors (RSDs), whose main job was to ensure that every patient who came in for therapy received a certain number of visits.  In retrospect, CW-34 conceded that at least some of the patients enrolled in BFL were probably solely so Amedisys could get additional reimbursement.  The number of visits patients received was recorded through the AMS2 computer system, and the off-site "Quality Management Department" would send the branch directors weekly reports regarding the status of every patient that was not on track to get the desired number of visits – and refusals to provide additional visits had to be supported by the branch directors.

(i)    CW-15, the account executive who worked out of an Amedisys branch in Oklahoma (2006-2010), described how the biggest "push" to send out therapy evaluations without proper doctor authorizations began with the introduction of the "Balanced for Life" program.  For example, CW-15 confirmed how, on every referral, the Company started to automatically put down "evaluate for Balance for Life."

(j)    CW-35 was a nurse based primarily in an Amedisys office in New Mexico for roughly two years during 2007 to 2009, and who had over 10 years of prior home health care experience.  CW-35 also confirmed that there was pressure to increase visits, and especially in the physical therapy area.  CW-35 described how there were various changes to the PPS System in 2008, and how the Company was definitely training its staff to watch for any indicators in a patient's background that might allow them to increase the number of patient therapy visits.    In particular, CW-35 recalled that "all of a sudden" physical therapists were being made to do wound care, which had previously always been in the nursing area.  Having therapists do wound care increased revenue because therapy visits were charged at a higher rate, and therapists providing wound care would immediately "qualify the patient" for more therapy visits.

(k)    CW-36 was the Business Office Manager for an Amedisys branch in Florida from late 2007 through the second half of 2010.   CW-36 described how Amedisys typically put patients on a "therapy track" at admission – such as of a "Balanced for Life" therapy "track" -- which called for a pre-specified number of X visits.  Corporate would then tell the therapists that the patients would have to do X number of visits.   There were several therapists in the branch, however, who strongly objected to having to complete the pre-specified number of therapy visits because doing so was not medically necessary.  For example, CW-36 heard a number of therapists complain that just because Amedisys said they needed to do five more visits did not mean that a patient needed the visits – but CW-36 could

see the pressure that was placed on therapists to do unnecessary visits.  For example, CW-36 recalled the names of two "damn good" therapists who simply refused to do such visits and eventually resigned from the Company rather than continue to work in such an oppressive environment.  "Therapy drives revenue" was "drilled into everyone's brains," therapists had to get in a certain number of visits per patient, and the pressure on therapists came down from the "corporate office" through reports and emails to the branch directors of operations.

(l)  CW-37 was a nurse at an Amedisys branch in Kentucky from late 2008 to late 2009.  CW-37 stated that Amedisys was committing "out and out Medicare fraud" by providing unnecessary visits, and therefore quit the Company because CW-37 valued her nursing license too much to stay.  Several other nurses also left the same office within a few months of each other, after one of them had flown to Baton Rouge to complain in person to one of the Company's lawyers, who thereafter did nothing to help them.  The head therapist in CW-37's branch also left rather than put up with the games that Amedisys played in terms of providing unnecessary visits to some patients while denying services to others who needed additional care.  Although CW-37 (a nurse) was not familiar with how the therapy triggers worked, CW-37 knows that "a lot" of therapists quit, including a friend who quit due to the excessive pressure, and who had described to CW-37 (1) how the office would "count the visits" and (2) how visit information was transmitted daily through the computer system so the main corporate office could access and review it.  Based on conversations with another friend who is still there, CW-37 believes that the wrongful practices at Amedisys are still continuing.

(m)  CW-38 served as a registered nurse for an Amedisys branch in Tennessee from 2009 to 2010.  According to CW-38, the branch held staff meetings every Wednesday, at which the major emphasis was to ensure that enough visits were being conducted to hit reimbursement levels, regardless of whether the patient needed the visits.  For example. CW-38 recalled several occasions when therapists would say that they did not know why they were continuing to see a particular patient, and would state that they did not know what more could be done for the patient.  Nonetheless, management "encouraged" continued visits to get reimbursement payments.

(n)  CW-1, as noted above, was a case manager and registered nurse at an Amedisys branch in Kentucky from 2005 to 2010.  CW-1 described how there was always a push to get more visits, and recalled how Amedisys introduced "clinical tracks" in 2008 that related to both nursing and therapy visits.  Under these tracks, Amedisys nurses were *required* to complete a certain number of visits, even if they determined that a patient needed fewer visits.  CW-1 also confirmed that therapists had similar concerns about having to make unnecessary visits.  Further, CW-1 stated that Amedisys made a strong push to put "everyone" on the Balanced For Life program (and most patients at CW-1's branch were enrolled in it), but so many patients were enrolled that it seemed to be used as a means to increase Medicare reimbursements.

(o)   CW-22 was a former Amedisys sales representative and account executive based out of South Carolina from 2005 to 2009.  CW-22 confirmed that when the Medicare triggers changed in January 2008, Amedisys changed its past focus on hitting 10 visits to reflect the new Medicare triggers.  For example, CW-22 recalled staff meetings at which the branch managers expressly told their clinicians that they had to do what was necessary for the branch's profitability goals to be met, although CW-22 knew from conversations with his/her own boss (the Area Vice President of Business Development) that the pressure on the branch managers was coming down from the Area Vice President of Operations. The pressures that CW-22 saw Amedisys management apply were extreme:  for example, the company would "bully" branch directors who did not want to follow corporate's plans to force physical therapists to enroll all of their patients in Balance for Life, and also fired field clinicians for refusing to do additional visits that the clinicians believed were not medically necessary but which were needed to trigger additional Medicare payments.  In that regard, CW-22 noted how Amedisys's sophisticated AMS2 computer system kept track of patients' number of visits and monitored which patients were nearing Medicare reimbursement triggers.   CW-22 stated physical therapists were particularly irate about the "Balanced for Life" program, because Amedisys pushed to put every single physical therapy patient in the BFL program regardless of whether it was medically necessary.  CW-22 recalled at least four therapists who were forced out or resigned for refusing to enroll all of their patients in the BFL program, and how in one case a therapist had been fired shortly after calling the Company's "hotline" to complain about being forced to enroll his patients in the BFL program.   In addition, on numerous conference calls and in training sessions Amedisys (through the area Director of Nursing and the Area Vice President of Operations) told employees that if they were not "on board" with the Balanced for Life program, then they should find another job.

(p)   CW-39 served as a Vice President of Business Development based out of Louisiana during 2008 to 2009.  CW-39 "absolutely questioned" Amedisys's business practices, stating that "it was all about numbers," and that corporate headquarters placed tremendous pressure on field personnel to increase the number of "profitable" therapy patients (such as those that could be enrolled in the Balanced for Life program).  CW-39 stated that if plaintiffs could get at Amedisys's internal emails they would be "as good as gold," as they evidenced the pressure to make numbers and increase profitability; for example, branches were told to concentrate on BFL patients to "get their numbers up."  These emails came out 3-4 times a month, and were sent primarily by Ric Pitchard, a Senior Vice President whom CW-39 described as the chief of the "data police" at Amedisys's corporate headquarters.

(q)   CW-40 was a Business Office Specialist (BOS) in South Carolina from 2009 to 2010, and was responsible for scheduling clinician visits to patients' homes.  CW-40 stated that it seemed like the branch pushed to have a lot of therapy visits.  For example, one of CW-40's job functions was to use the Amedisys computer system to track patient visits, and therapists would call in and ask CW-40 how

many visits they had done and if they needed to discharge a patient or get authorization for additional visits to meet key visit numbers. The branch's business manager would push for therapists to get the "necessary" number of visits.

(r)    CW-25, the business office manager at an Amedisys branch in Florida (2007-2008), recalled that after the Medicare reimbursement triggers changed in 2008, the prior rule of having to schedule 10 visits (see above) changed to a rule of having to schedule 15 therapy visits – even if the patient did not need them. As CW-25 recalled, nurses complained about having to try to find some reason to provide additional visits, even though they had concluded that no additional visits were necessary.

(s)    According to CW-26, the former Director of Operations of an Amedisys branch in Mississippi, that branch started the Balanced for Life program in early 2008 following the changes to the Medicare reimbursement "triggers" – and how the BFL program tracked remarkably closely the new 2008 PPS visit thresholds Amedisys's branch directors of operations and clinical managers were told to put *every* patient on the BFL program so that Amedisys could make the associated therapy visits. As CW-26 stated, it appeared that it did not matter whether the patient needed BFL therapy or not: "it was ridiculous" (referring both to the number of therapy visits BFL patients received and how "everybody" would receive therapy (even if the patients didn't want it). In addition, as noted in the previous section, CW-26 also recalled receiving numerous reports, including a report called an "operational accounting report" that displayed what percentage of patients in CW-26's branch had met various Medicare therapy visit thresholds. Corporate management expected the majority of the patient visits to fall in the bracket that made the most money for Amedisys, although CW-26 also recalled getting instructions from one of Area Vice Presidents there should always be a certain amount above the most desired bracket to avoid throwing up a "red flag" that might trigger an audit.

(t)    CW-27, the former Amedisys account executive from Florida, noted how Amedisys began to push the Balnced for Life program after the key therapy visit thresholds changed to 6, 14 and 20 visits in 2008. CW-27 also noted that virtually everyone who was given therapy was also placed on a Balanced for Life treatment track, which struck CW-27 as questionable.

(u)    CW-29, the physical therapist based in North Carolina (2006 to 2010), who described the "blunt" pressure to hit 10 therapy visits (*see* §VII.A.1 above), similarly recalled that the pressure later changed to hit new therapy visit targets that would qualify for additional reimbursement payments from Medicare.

### 3. Statistical Analysis Confirms Defendants' Massive Abuse of Medicare's PPS System During the Class Period

82.     Amedisys's systematic efforts to fraudulently manipulate the number of patient therapy visits during the Class Period are confirmed by statistical analysis of Amedisys patient visit data for the years 2005-2008.  This data is collected by the government's Centers for Medicare & Medicaid Services ("CMS"), and is made available by CMS (subject to certain conditions) only to qualified researchers, including Lead Plaintiffs' experts.   Lead Plaintiffs' Amedisys-specific statistical analysis (which is similar to certain analyses that were partially disclosed in the April 26, 2010 *WSJ* article) shows that Amedisys's distribution of therapy visits clustered at (or just slightly above) the relevant thresholds for increased Medicare reimbursement payments in both 2007 and 2008 – even though the relevant reimbursement thresholds had changed significantly in 2008 compared to 2007.

### (a) Comparison of 2007 Data to 2008 Data

83.     Table A below sets forth the distribution of therapy visits per episode (excluding LUPAs) for Amedisys patients who received 5 to 16 therapy visits (expressed as a percentage of all Amedisys patients receiving any therapy visits), for 2007 and 2008.  For example, in 2007, the percentage of Amedisys's patients who received exactly seven (7) therapy visits per episode was 3.2%, the percentage of Amedisys patients who received eight (8) therapy visits per episode was 2.9%, and the percentage of patients who received nine (9) therapy visits was also 2.9%.  *In other words, the percentage of Amedisys patients who fell just one to three visits short of what was then the key "10 visit" threshold was only **9.1%**.*  However, in 2007 the percentage of Amedisys patients who received exactly ten (10) therapy visits per episode was 9.5%, the percentage of Amedisys patients who received eleven (11) therapy visits was 9.1%, and the percentage of patients who received twelve (12) visits was 9.9%.

*In other words, the percentage of Amedisys patients who met or just slightly exceeded the 10 visit level in 2007 was __28.5%__ -- or more than three times the percentage of patients (9.1%) who fell only slightly short of ten visits.*

## TABLE A

*(Shaded data reflect clusters at or just slightly above key Medicare trigger levels each year)*

| | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Percentage of Therapy Episodes with 5 through 16 Therapy Visits (LUPAs excluded)** | | | | | | | | | | | | |
| **2007** | 4.6% | 4.5% | 3.2% | 2.9% | 2.9% | 9.5% | 9.1% | 9.9% | 6.4% | 4.9% | 4.4% | 4.3% |
| **2008** | 3.6% | 4.9% | 4.4% | 5.0% | 4.3% | 4.7% | 4.5% | 4.9% | 4.8% | 6.6% | 6.0% | 5.9% |

84.    The proportion of Amedisys's patients who received more than 10 to 12 therapy visits in 2007 tapered off sharply as the number of visits moved further away from concentration of visits at (or just slightly above) the 10 visit level.  For example, as shown in Table A above, in 2007 only 6.4% of Amedisys's patients received 13 therapy visits, only 4.9% received 14 therapy visits, only 4.4% received 15 therapy visits, etc.

85.    In 2008, the Medicare reimbursement system changed to the "bucket" or tiered system described earlier.  Statistical analysis of the 2008 data shows how the distribution of Amedisys's therapy visits changed dramatically *in just one year,* to cluster around the entirely new and different visit threshold levels that resulted in increased Medicare reimbursements.  For example, as shown in Table A above, from 2007 to 2008, (a) the number of Amedisys patients receiving 6 to 8 therapy visits per episode (*i.e.*, those patients whose visits met or slightly exceeded the new 6 visit "trigger" level) increased from 10.6% to 14.3% *-- or nearly 35%;* and (b) the number of Amedisys patients receiving 14 to 16 visits (*i.e.*, those patients whose number of visits met or slightly exceeded the new 14 visit "trigger" level) increased from 13.6% to 18.5%, *or roughly 36%*.

86.    **Similarly**, as shown in Table B below, the number of Amedisys patients receiving 20 or more therapy visits (*i.e.* those patients whose number of visits met or exceeded the new 20 visit "trigger" level) increased from 8.6% to 14.6%, **or roughly 69.8%.** Table B sets forth the distribution of therapy visits per episode (excluding LUPAs) for Amedisys patients who received 17 to 20+ therapy visits (expressed as a percentage of all Amedisys patients receiving any therapy visits), for 2007 and 2008.

**TABLE B**

*(Shaded area reflects key Medicare trigger level and above; LUPAs excluded)*

| Percentage of Therapy Episodes with 17 through 20+ Therapy Visits | | | | |
|---|---|---|---|---|
| | 17 | 18 | 19 | 20+ |
| 2007 | 3.8% | 2.8% | 1.8% | 8.6% |
| 2008 | 4.6% | 3.2% | 2.1% | 14.6% |

87.    **Moreover**, as the number of Amedisys patients receiving visits equal to (or just slightly above) the new 6, 14 and 20 visit trigger levels increased by roughly 37.8% in 2008 (from 27.8% in 2007 to 38.3% in 2008), there was -- remarkably enough -- a largely offsetting 49% drop in the number of Amedisys patients who received 10 to 12 therapy visits in 2008 (14.1%) compared to 2007 (28.5%).

88.    The extraordinary swings in Amedisys's distribution of therapy visits per patient were sufficiently large, unusual and statistically significant, and occurred within such a short time period, that a strong presumption arises that those shifts in the distribution of therapy visits were the result of deliberate manipulation of patient treatment plans on a massive and well-orchestrated scale to wrongfully inflate Medicare revenues.

89.    Indeed, the volatility in the swings within specific "buckets" with respect to Amedisys patients who received between 6 to 22 visits (which collectively accounted for 74.0% of all of Amedisys's therapy patients in 2007, and 71.4% of all such patients in 2008) is even more remarkable when it is contrasted with the *stability* between 2007 and 2008 in the number of Amedisys therapy patients receiving exactly 1, 2, 3 or 4 therapy visits (which did not qualify for any enhanced payment levels under either the pre- or post 1/1/2008 Medicare fee structures). Table C sets forth the distribution of therapy visits per episode (excluding LUPAs) for Amedisys patients who received 1 to 5 therapy visits (expressed as a percentage of all Amedisys patients receiving any therapy visits), for 2007 and 2008:

**TABLE C**

| Percentage of Therapy Episodes with 1 through 5 Therapy Visits (LUPAs excluded) | | | | | |
|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 |
| **2007** | 7.0% | 3.4% | 2.8% | 3.3% | 4.6% |
| **2008** | 7.0% | 3.3% | 2.8% | 3.0% | 3.6% |

Indeed, the data in Table C above shows that there was virtually *no* deviation between 2007 and 2008 with respect to the number of Amedisys patients receiving exactly 1, 2, 3 or 4 therapy visits. And although the data does show a more than 20% decline (4.6% to 3.6%) from 2007 to 2008 in the number of Amedisys patients receiving exactly 5 therapy visits, this decline is unsurprising (given that after 2007 Amedisys was strongly motivated to reduce the number of patients it had who received only 5 therapy visits by giving them an extra visit or two sufficient to reach the 6 visit threshold level).

90.    A line graph that plots the number of therapy visits against the percent of total Amedisys visits in 2007 and 2008 is reproduced below, which demonstrates the significant swings in patient visits between 2007 and 2008:



**(b)    Comparison of 2005-2007 Data to 2008 Data**

91.    Additional analysis of Amedisys-specific data from 2005 and 2006 performed by Lead Plaintiffs' experts provides only further and compelling evidence of the Defendants' wholesale abuse of the Medicare payment system.

92.    First, analysis of the additional data from 2005 and 2006 clearly shows that the suspect clustering of Amedisys patient visits at (or just slight above) the 10-visit level in 2007 was ***not*** a "one-off" aberration, but was part of a consistent pattern of pre-2008 fraudulent conduct that spanned several years.    Indeed, if anything, the "clustering" phenomenon of Amedisys patients receiving 10, 11 or 12 therapy visits was even worse in 2005 and 2006 (*i.e.*, during the first 18 months of the Class Period) than it was in 2007.    More specifically, as shown in table D below, the percentage of total Amedisys patients that received 10 to 12 therapy visits was ***33.4%*** in 2005 (*i.e.*, 12.3% + 10.4% + 10.7%), ***32.4%*** in 2006 (*i.e.*, 11.0% + 10.0% + 11.4%), and (as previously discussed) ***28.4%*** in 2007 (*i.e.*, 9.5% + 9.1% + 9.9%).

## TABLE D

*(shaded data reflect clusters at or just slightly above key*
*Medicare trigger levels each year; LUPAs excluded;)*

| Percentage of Therapy Episodes with 5 through 15 Therapy Visits | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **5** | **6** | **7** | **8** | **9** | **10** | **11** | **12** | **13** | **14** | **15** |
| **2005** | 5.0% | 4.7% | 2.7% | 2.3% | 2.5% | 12.3% | 10.4% | 10.7% | 6.1% | 4.4% | 4.0% |
| **2006** | 4.5% | 4.0% | 2.8% | 2.3% | 2.5% | 11.0% | 10.0% | 11.4% | 6.5% | 5.0% | 4.2% |
| **2007** | 4.5% | 4.5% | 3.2% | 2.9% | 2.9% | 9.5% | 9.1% | 9.9% | 6.4% | 4.9% | 4.4% |

93.    A line graph that plots the number of therapy visits against the percent of total Amedisys therapy visits from 2005 through 2007 is reproduced below, which demonstrates the consistency in the number of Amedisys therapy visits at certain thresholds (including at the 10, 11 and 12 therapy visit thresholds) between 2005 and 2007:



94.    Second, review of this additional data makes the contrast between Amedisys's pre-December 31, 2007 patient data and its 2008 patient data all the more striking, and confirms that the changes in Amedisys's patient visit distribution data in 2008 was highly suspicious not merely in terms of its "tracking" of Medicare's new 2008 payment grid, but also in terms of representing a sharp break from *three years* (and not just one year) of prior data.  A line graph that plots the number of therapy visits against the average percentage of the total number of

Amedisys therapy visits from 2005 through 2007 against the percentage of the total number of Amedisys therapy visits in 2008 is reproduced below:



95.    Raw Medicare data for 2009 similar to that analyzed above only became available to authorized researchers in December 2010, and Lead Plaintiffs have not had sufficient time to undertake an analysis of that data as of the date of the filing of this Complaint.  On information and belief, Lead Plaintiffs submit that the 2009 data will, given adequate time to review and analyze, provide yet further support for the allegations of fraudulent conduct set forth herein.

96.    In sum, the combination of CW accounts and statistical data alleged herein supports a strong – and indeed compelling – inference that Defendants' fraudulently manipulated

the number of therapy visits it provided to its patients throughout the Class Period on a truly

massive scale, and did so with scienter.

**B.     Amedisys's Fraudulent Provision of Medically Unnecessary Visits to Avoid LUPAs**

97.     Defendants also knowingly, or with reckless disregard for the truth, caused

Amedisys to further defraud Medicare by providing medically unnecessary therapy and/or

nursing visits for the sole purpose of minimizing the number of its patients who received fewer

than 5 total vists (of any kind) per episode, which in turn allowed the Company to fraudulently

minimize the number of LUPAs that would otherwise have required it to refund substantial sums

to Medicare.  For example:

(a)     CW-41 served as a registered nurse in the field based out of an Amedisys branch
in Massachusetts from 2006 to 2008, and had previously worked at another home
health care company that was acquired by Amedisys in 2006.  CW-41 stated that
there were "many times" when the clinical nurse manager in CW-41's branch
would forbid CW-41 from discharging a patient who no longer needed treatment.
In addition, Amedisys also practiced "up-loading," which was the practice of
front-loading three or four visits in a patient's first week of treatment, *and then
sharply curtailing visits in subsequent weeks.*  Such heavily lopsided front-loading
was unusual in the home health care industry, in part because newly-enrolled
home care patients cannot easily absorb home treatment information if it is
packed into such a tight initial period.  CW-41, however, viewed this practice as
being intended to help Amedisys avoid LUPAs where the patient had the potential
to go back into the hospital – and that in such situations the goal at Amedisys was
not to make the patient better but to keep him or her out of the hospital (which
would require the patient to be discharged from home health care) until the patient
received enough visits to avoid a LUPA.  While engaging in "up-loading" to help
ensure that the Company avoided LUPAs, at the same time CW-41 also reported
that Amedisys imposed "strict guidelines" about how many times a patient could
be seen by a nurse after hitting five visits; for example, a patient with a total knee
replacement could not be seen by a nurse more than 6 times.

(b)     As noted above, CW-15, the account executive who worked out of an Amedisys
branch in Oklahoma (2006-2010), similarly described how, as a general rule, the
branch Director of Operations would send out separate physical therapy and
occupational therapy clinicians (and frequently a psych nursing and/or social
work clinician as well) to visit a patient, even though Amedisys lacked physician
orders for those disciplines and only had an order for basic skilled nursing.  These
were "absolutely" happening a lot.  If these specialized clinicians came back and

said further treatment in their discipline was not needed, Amedisys would still get paid for the initial visits. CW-15 described this practice as a form of "front-loading" the patient visits – and was aware that the goal was to avoid having patients with fewer than five visits because then it would be a LUPA "and they would have to write off the whole thing."

(c)     CW-36, the Business Office Manager for an Amedisys branch in Florida from late 2007 through the second half of 2010, also confirmed that Amedisys clinicians were told to engage in the practice of "front-loading" clinical visits to avoid LUPAs. In other words, because they needed to get in five visits of any type to be reimbursed, they would front-load the visits in the event that "something happened" to the patient – such as being admitted to the hospital or dying – that would cause a LUPA. "All of the nurses would walk around worrying about LUPAs."

(d)     CW-31, the former clinical manager at an Amedisys branch in Georgia (2009-2010), also confirmed that Amedisys nurses were pressured to do as few nursing visits as possible without getting a LUPA. To that end, they were also told to engage in "front-loading," where they were told to do 2-3 visits the first week, then change to once a week, and then change to once every two weeks – or to do just a phone call with the patient (rather than a visit).

(e)     As CW-37, the nurse at an Amedisys branch in Kentucky from late 2008 to late 2009 stated, you had to have five visits to avoid a LUPA, which required the Company to give back money to Medicare. As CW-37 further stated, if you had a LUPA at Amedisys "you were in trouble." "You'd better not have a LUPA, and that was it." CW-37 recalled specific instances of being instructed to provide additional, and plainly unnecessary, nursing visits to avoid having a LUPA. CW-37 also reported how Amedisys encouraged its nurses not to send patients back to the hospital (which might result in a LUPA), and that "if we send anybody, it better be because they were blue." CW-37 characterized Amedisys as a "horrible company," and is surprised how it can still be in business.

(f)     Among the many improper practices that CW-6, the former Administrator in charge of five Illinois branches (including Chicago) from 2007-2008, observed during her time at Amedisys was pressure to provide additional visits to avoid LUPAs. CW-6 noted that Amedisys's sophisticated computer system allowed corporate headquarters to track potential LUPAs (i.e., patients with fewer than five visits), and that the Regional Director (Peggy Taylor) would also pressure her to keep patients on longer to avoid LUPAs.

(g)     CW-42, an RN with 20 years experience and a former nurse at an Amedisys branch in New Mexico during 2009 and 2010, noted that "LUPA" was a very familiar term that was used a lot at Amedisys, and would be discussed at weekly staff meetings. As CW-42 put it, the managers "all knew very well how to gently persuade you to make sure we're getting the 'right' amount of visits because if you don't have the 'right' amount of visits then its called [a] LUPA, and it

[reduces] the reimbursement."

(h)   CW-38, a former RN at an Amedisys office in Tennessee from 2009 to 2010, also stated that nurses had to conduct 5 visits before a patient could be discharged. Although there were definitely patients that should have been discharged earlier, CW-38 stated that nurses could not discharge patients without obtaining permission from the branch managers – and the managers would insist that patients not be discharged even if there was no reason to keep seeing them. CW-38 said Amedisys often kept seeing patients who should have been discharged, but Amedisys was intensely focused on avoiding LUPAs. CW-38 had several patients whom s/he felt should not receive additional visits, and s/he brought this issue up "all the time" with the branch director. However, it was "all about the LUPA" and s/he was instructed by the branch manager to do whatever was necessary to get in 5 visits. CW-38 added that s/he decided to leave Amedisys out of a concern for keeping his/her nursing license.

(i)   CW-11, the former Director and later Area Vice President of Business Development in Texas (2003-2008) said that Amedisys drove its nurses very hard, and were pressured to keep patients on for at least 5 visits to avoid LUPAs. CW-11 was aware of nurses who discharged patients before they received their 5th visit, only to be informed that corporate was upset that "we have another LUPA," and had also seen nurses who wanted to discharge patients being told to find a way to get in a few more visits to avoid a LUPA. Indeed, early discharges and LUPAs were among the topics discussed every Wednesday at every branch office in the region during conference calls with the branch staff and, frequently, the Area Vice President of Operations, Maggie Suggs. Although CW-11 was not in every meeting, s/he stated that it was well known how "corporate" expected them to conduct operations (e.g., avoid LUPAs), and that Suggs' boss, Cheryl Lacey, was also aware of what the branches were being told.

(j)   CW-43, an RN who worked out of an Amedisys office in Pennsylvania between 2007 and 2009, stated that Amedisys "abused the system something fierce," which included never discharging anyone until the end of the certification period and ensuring that all admitted patients definitely received at least five visits to avoid LUPAs.

(k)   CW-10, an Amedisys Director of Operations at more than one branch office in Maryland from 2005 to 2007, stated that s/he left the Company because of unreasonable pressures that corporate management placed on branch directors for things that were objectively out of their control. In this regard, CW-10 specifically cited LUPAs (referring to any patient that had less than 5 nursing visits) as something that she viewed as being out of the branch directors' control, but corporate still insisted that s/he keep LUPAs low.

(l)   CW-19, a Director of Operations for an Amedisys office in Louisiana from 2003 to 2009, noted that "corporate" generated monthly operational reports, which were used to require branch directors to justify why patients were LUPAs or

failed to meet their therapy visit thresholds. According to CW-19, branch directors at Amedisys would receive weekly emails from corporate indicating, for example, that there were a certain number of weeks left in a patient's certification period, and warning whether the patient would become a LUPA without receiving additional nursing visits. CW-19 added that the branch directors then had to "work" these and other reports to ensure that they were meeting their "numbers" (and at monthly regional meetings the branch directors would be either praised or "chopped up" based upon their "numbers.".

(m)  CW-44, an RN/Clinical Manager at an Amedisys branch in New Mexico from 2008 to 2009, stated that everyone in the office knew that at least 5 visits were required in order to avoid a LUPA -- and it was understood that you had to get a minimum of 5 visits in.

(n)  CW-26, the former clinical manager and Director of Operations in Mississippi, noted that every week s/he would receive reports (referred to as "bursts") from corporate, which would indicate whether a patient was going to be a LUPA. CW-26 would be pressured to conduct additional visits to avoid LUPAs, although CW-26 said s/he refused to order them if they were not necessary.

### C.  Amedisys's Fraudulent Practices With Respect to Patient Recertifications

98.  Defendants knowingly (or with reckless disregard for the truth) also caused Amedisys to fraudulently overcharge Medicare for unnecessary services by fraudulently certifying or recertifying patients for medically unnecessary 60-day treatment episodes, including (but by no means limited to) certifying or recertifying patients to participate in its "Balanced for Life" program, and certifying or recertifying patients who were no longer homebound. For example:

(a)  CW-41, the registered nurse who worked out of an Amedisys branch in Massachusetts from 2006 to 2008, confirmed that it was "absolutely true" that Amedisys imposed a system designed to strip RNs and case managers of their autonomy in regards to admitting, discharging and recertifying patients. For example, there were "many times" when the clinical nurse manager in CW-41's branch would force CW-41 to recertify patients who no longer needed treatment (including in cases where patients, who no longer needed treatment, were asking to be discharged and threatening to refuse further treatment if they were recertified). CW-41 would receive "nasty" phone calls from corporate headquarters and be written-up in her personnel file for refusing to discharge patients when requested to by remote, Louisiana-based monitors, and was given punitive "on call" duties and ultimately terminated as a "problem nurse" as a result of her refusal to discharge patients on command.

(b)   As CW-3, the former director of nursing at an Amedisys branch in California (2008-2009), stated, as part of Amedisys's "push, push, push" for more money the Company did not tell many patients that they were ready to go to outpatient therapy – instead "they really wanted to keep them in home health." At Amedisys, CW-3 stated that there were many patients that s/he believed were unnecessarily recertified, but recertifications were a "big thing" that were used to "keep the numbers up." ***Indeed, in 30 years of nursing, CW-3 stated that she had never worked at a company where recertifications were as high as they were at Amedisys.*** Nurses, including CW-3, were pressured to both improperly admit and improperly recertify patients. The pressure came from the Regional Director of Operations (a woman named "Debbie") and from even higher levels. For example, after expressing the view that a certain patient should not be admitted, "Debbie" informed CW-3 that s/he "was not supporting the company, and [the company] would not stand for that." As noted previously CW-3 stated that s/he had "never been pressured in that way" and that "corporate knew everything" and had reports on "everything." As a result of the constant and improper pressures imposed by corporate management, CW-3 eventually resigned.

(c)   According to CW-45, a registered nurse and case manager at an Amedisys branch in Texas from 2008 to 2010, the Home Health side of Amedisys was concerned primarily with numbers and not patient needs, and would admit patients whether they needed services or not. The same applied to recertifications. For example, CW-45 recalled going out on a recertification visit and recommending that the patient be discharged because they no longer needed treatment; however, the branch director instructed CW-45 to "make up" a need to recertify the patient. As a result, the patient remained in care. CW-45 also described how the branch would find patients who had been discharged from other home health companies in the city, and would fabricate a need to treat them so they could be recertified as Amedisys patients.

(d)   CW-4, the former account manager from Florida (2005-2007) also felt that Amedisys was improperly recertifying patients, often as a means to recoup costs from a previous episode with a greater number of the more costly nursing visits. CW-4 noted that s/he would hear a lot of "Can we find a reason to recertify?"

(e)   CW-14, the former business manager at an Amedisys office in Florida (2004-2006), stated that patients who were no longer homebound and who were fit to be discharged were kept on in order to keep the branch's census – the total number of patients receiving treatment – higher. According to CW-14, the pressure to maintain a higher census came from the "bigwigs" whose bonuses were increased by higher numbers.

(f)   CW-30, the former Director of Operations at Amedisys branches in Ohio and Kentucky from 2008 through 2010, also described the involvement of QCC's in the certification and recertification process. For example, many Amedisys patients had chronic conditions, such as Parkinson's disease. Under Amedisys guidelines, clinicians could essentially never discharge such a patient because of

66

the continuing risk that the patient might fall. However, such patients ultimately plateau with therapy and when it gets to the point where the therapist is just reinforcing what they have previously done Medicare does not authorize additional treatment. Similarly, QCCs would press to certify patients for marginal reasons under the Company's "guidelines," e.g., simply because the patient had had a medicine change within the last 14 days. Although some therapists would appropriately seek to discharge such patients and refuse to recertify them, "corporate" gave unwritten instructions – in the form of director training sessions in Florida and instructions from the Area Vice President – that in such situations branch directors were to find a new therapist to visit the patient who "may find something to recertify the patient for."

(g)  CW-11, the former Director and later Area Vice President of Business Development in Texas (2003-2008), stated that Amedisys drove its nurses very hard and in particular exerted a lot of pressure on nurses to not only find a reason to admit patients but to then keep the patients. CW-11 added that s/he believed that the branches in Ft. Worth, Dallas and Denton in particular had issues with admitting patients who did not require treatment. According to CW-11, nurses would constantly complain that they did not want to lose their licenses for admitting patients who were not appropriate, and that they were pressured to admit patients who did not need home health care services. CW-11 noted that nurses would often complain to CW-11 because s/he was not their boss.

(h)  CW-15, the former account executive who worked out of an Amedisys branch in Oklahoma (2006-2010), further emphasized how much pressure there was to get referrals. All of the directors and account executives in the region had regular conference calls with the Area VP of Development, as well as the Area VP of Operations (Stephanie Six). Reports on referrals were entered in the centralized computer system, and the Area VP would review each AE's numbers every day on the call. Anyone failing to have a referral would have to email the VP of Development to explain why (even if the same AE had brought in 5 referrals the prior day).

(i)  CW-46 worked as an account manager (a position filled by nurses that was primarily responsible for selling Amedisys services and pre-evaluating patient files before a field nurse would make an in-person patient visit and assessment), and was based in north Texas during 2005-2008. CW-46 repeatedly described the push for new business in north Texas, and for the "Balance for Life" program in particular, as "over the top" and "very, very extreme." For example, if a new patient referral came in and the clinician came back from the full assessment and said the patient did not qualify for services, Amedisys was "just dug into the ground to re-evaluate them and get them on board." Nurses were also pushed "really, really above and beyond" on recertifications. For both referrals and recertifications, when a nurse "dug in their heals" and refused to admit or recertify patients because they did not qualify, the case would be kicked up to Maggie Suggs (Regional Vice President for Operations) and the Vice President of Business Development (or even to Suggs' boss, Cheryl Lacey) for review – which

often resulted in a different clinician being sent out to evaluate the patient (or prospective patient).  According to CW-46, these executives were sending out a different clinician to get a "different answer" on the patient, and reiterated that the push for admissions and recertifications was "extreme."  Sales persons were placed on demanding quotas to bring in new patients; if they fell short in a given month they would be put on a "performance improvement plan" (or "PIP"); if they then failed to meet their quota for the next quarter they would be terminated. "It was very money driven;" and "at the end of the quarter, it was all about financial growth and not servicing the public."  CW-46 added that the VPs could also be fired if their sales people were not hitting their quotas – and the pressure rolled down from the top.

(j)    CW-31, the former clinical manager at an Amedisys branch in Georgia (2009-2010), also confirmed that Amedisys applied pressure to admit and recertify patients to keep the Company's numbers up.  For example, the Company was not at all strict about not enforcing Medicare's requirements that patients be homebound to qualify for home health care.  In addition, all discharges had to be approved by CW-31's branch director.  CW-31 would tell the branch director of operations "we don't need to see this patient anymore," but after you hear the branch director say "Yes, we do" a couple of times, "you don't question it anymore."  CW-31 felt that she was not really being allowed to act as a clinical manager with respect to patient decisions.

(k)    As CW-37, the nurse at an Amedisys branch in Kentucky from late 2008 to late 2009 who characterized Amedisys as committing "out and out fraud," also stated, CW-37 objected to the recertification of patients who CW-37 would "swear on a stack of bibles" had received all the visits they needed.  "Corporate," however, "has set it up so that they are going to do whatever they can to get their patients."

(l)    CW-47, a former TLC employee, stayed on as scheduling coordinator in an Amedisys branch in Georgia after Amedisys acquired TLC in early 2008.  CW-47 noted that Amedisys stressed the issue of recertification, and its employees were to "find something" to recertify Medicare patients.  In contrast, CW-47 noted that TLC had only recertified patients when care was needed.  CW-47 also noticed that there were decidedly more therapy visits after Amedisys took over the branch, even though she would hear the therapists say that patients did not need the visits that they were being told to make.  From her conversation in the office CW-47 believes that the pressure to recertify patients and increase therapy visits came from corporate headquarters; it "came from the top."

(m)   Among the many improper practices that CW-6, the former Administrator in charge of five Illinois branches (including Chicago) from 2007-2008, observed during her time at Amedisys was pressure to improperly admit and recertify patients.  Admissions and recertifications (and refusals to admit or recertify) were monitored by corporate, and CW-6 recalled, for example, the Regional Director of Operations (Taylor) personally calling CW-6 to pressure him/her to get nurses to admit patients that were not homebound.  CW-6 was also aware that Taylor

pressured other branch directors of operations to recertify patients who no longer needed care, and Amedisys had a very sophisticated computer system that allowed the "corporate office" to track discharges and admissions. CW-6 termed it "disgusting" how the Amedisys system would not support the field staff who were actually doing visits and assessments. CW-6 tried to resist these pressures, but had too many administrative responsibilities to get involved with every case. CW-6 was particularly concerned, for example, that the Director of Operations in the Algonquin, IL office was taking everyone and anyone that walked in the door, and saw this as a "big issue" right about the time CW-6 left Amedisys in March 2008. The Director of the Algonquin branch, however, is still there.

(n)    CW-42, the highly experienced RN based at an Amedisys branch in New Mexico (2009-2010), also described how Amedisys had a checklist that had to be completed when a patient was up for discharge or recertification. As CW-42 stated, having a checklist was not a bad idea in and of itself, but the reason for the checklist was to find a reason to recertify patients – even if it was on the slimmest of pretexts. For example, Amedisys would look to see if there had been even a modest change in the dosing of a patient's medication. CW-42 noted that the majority of patients were either reasonably intelligent or had capable family members, and that it was unprofessional – if not illegal – to recertify a patient for multiple weeks of additional home health care just because their dosing had been modified. CW-42 would have conversations with other nurses to the effect of "What are we seeing this patient for?"

(o)    In addition, CW-38, a former Amedisys nurse in Tennessee (2009-2010), also stated that Amedisys was improperly recertifying patients over the objections of nurses in the field, which were voiced at the branch's regular Wednesday meetings. CW-38 expressed concerns about this to his/her supervisors, who took no corrective actions. CW-38 added that s/he left Amedisys due to concerns about keeping his/her license if s/he did not leave the Company.

(p)    CW-12, the former Clinical Manager of an Amedisys office in Tennessee from 2006 to 2008, stated that the branch Director of Operations gave explicit orders that no patient was to be discharged without the branch director's approval (and the branch director said he was getting this instruction "from above"). CW-12 also recalled weekly case conferences at which the branch director would interrogate and argue with nurses about recertifying patients, and nurses would then be forced to recertify them. CW-12 recalled that Amedisys "had a tendency to recert people" for months, involving two or three re-certifications – which was more than any other company CW-12 was aware of. CW-12 added that s/he was certain that the pressure came down from above the branch director's level: "it was all corporate driven, they set the rules and guidelines," everything was in the AMS2 computer system and was being monitored by corporate.

(q)    CW-17, an RN and former case manager at an Amedisys office in Florida (2006-2008) also stated that Amedisys would often recertify patients who should have been discharged. CW-17 also stated that Amedisys directed employees to "find a

reason" and recertify patients. CW-17, however, quit because s/he was unwilling to do this and risk his/her license.

(r)     CW-43, an RN who worked out of an Amedisys office in Pennsylvania between 2007 and 2009, and who described Amedisys as having abused the system "something fierce," also stated that the Company definitely kept patients on who no longer needed home health care. For example, CW-43 recalled a patient who was getting home health care for peripheral vascular disease, but was regularly going out to play golf, etc.; nonetheless, Amedisys kept recertifying that patient. CW43 raised this with her supervisors, but explained that nurses at Amedisys had to do what they were told and were instructed to "go with the flow." Basically, it was standard practice at CW-43's branch to improperly recertify patients, and the branch manager attributed the pressure to enage in dubious practices to "corporate," saying she was just passing down what she was told to do.

(s)     CW-10, an Amedisys Director of Operations in Maryland from 2005 to 2007, stated that a certain percentage of patients (which was provided by the regional manager, Laura Hughes) had to be recertified, and that branch directors who failed to make their numbers would not receive a bonus.

(t)     CW-48 worked as an RN out of an Amedisys office in Illinois from 2006 to 2008, and described how the "higher-up" area managers would get angry if nurses in CW-48's office refused to admit a patient because they did not need home health care. The area managers monitored which patients were up for recertification (as well as how many visits they received). CW-48 also recalled that when s/he refused to admit a patient, Amedisys would assign that patient to a different nurse, and nurses who refused to admit patients would be punished by having patients taken away from them. CW-48 stated that nurses were pressured to admit, *inter alia*, non-homebound patients. The pressure to admit and recertify patients, even if they did not need home health care, came from the area managers who supervised CW-48's office and who participated in weekly conferences where recertifications were discussed; as CW-48 stated, "if you complained, you are on their crap list."

(u)     CW-49 was Director of Operations at an Amedisys office in Florida for approximately 4 years (2006 to 2010), and reported that Amedisys corporate management was so intent on recertifying patients that s/he was required to call the Regional Vice President to give them an explanation if CW-49 was ***not*** going to recertify a patient.

(v)     CW-23, the RN field nurse in Georgia from 2005 to 2006, also stated that Amedisys admitted and recertified patients who did not need homecare.

(w)     CW-50, a field nurse and case manager for Amedisys in South Carolina (2005-2006), also stated that Amedisys employees were asked to recertify patients who no longer needed home health care. For example, when CW-50 determined that a patient receiving care was no longer homebound, as required by Medicare, but

was instead out driving around and able to visit their own physician, CW-50 would report as much to his/her superiors – but would be ignored. Indeed, when field nurses recommended that certain patients be  discharged, management would often determine that these patients should be recertified despite the nurse's recommendation.

(x)     CW-24, a former RN and case manager in Tennessee (2006 to 2007) stated that Amedisys was "most definitely" keeping patients on longer than was necessary, and that that was the consensus view among those that CW-24 worked with. Indeed, it was a "big joke" at the office that the nurses would have to start bringing their patients into the office to plead to be discharged. CW-24 noted that some of the branch's patients had been on medications for years and knew them better than s/he did, but Amedisys would still try to extend medically unnecessary treatment for such patients. According to CW-24, the ultimate decision on recertification was made by the Director of Nursing, not the treating nurse. After experiencing the culture at Amedisys, CW-24 stated that s/he never did home health care again:  "I got my belly full of it, and I like my [nursing] license too much."

(y)     CW-44, the RN/Clinical manager in New Mexico from 2008 to 2009, stated that there were constant issues regarding patients who were not homebound. CW-44 noted that "we discussed that all the time," and that in some office meetings everyone would burst into laughter because the homebound classification just seemed ridiculous when every clinician was saying how hard a time they were having trying to scheduling visits because the patient was never home.

(z)     CW-57, a case manager at an Amedisys office in Massachusetts for approximately a year between 2008 and 2009, stated that s/he was constantly being told not to discharge patients by an offsite corporate "QA" employee based at corporate headquarters, and that other case managers were also made to hold on to patients that did not have a medical necessity. In that regard, CW-57 said that every time s/he tried to discharge a patient, the QA employee (who had never seen the patient) would tell CW-57 that the patient had a "skilled need." Because of these types of issues, CW-57 stated that s/he knew s/he had to leave the Company.

(aa)    According to CW-27, a former Amedisys account executive in Florida (2006-2009), Amedisys gave its agencies recertification targets – meaning the agencies were expected to have a specific percentage of recertifications. Branch directors would regularly receive spreadsheets, which included a red column indicating whether these recertification rates were being met. If not, that director would have to justify why the recertification rate was too low to the Area VP of Operations. Directors were also expected to "drill down" to identify nurses or patients who were not recertifying patients.

(bb)    CW-28, a business director at Amedisys in Virginia (2007 to 2008) described how Amedisys would accept patients for home care that were not homebound. When

CW-28 argued that Amedisys was improperly admitting a patient on a particular diagnosis, management would instruct CW-28 to "code it as something else" so the patient could be admitted.  As noted earlier, whenever CW-28 spoke up about such issues, s/he was told to shut up and s/he and other nurses were told to do what they were told to do; CW-28 also noted that when s/he mentioned problems to the Regional Vice President (Ledgerwood), CW-28 was the one who got written up.

(cc)  CW-52, a Business Office Manager for Amedisys in Wisconsin from 2009 to 2010, also stated that Amedisys was improperly and unnecessarily recertifying patients, up to 4 to 5 times, and that this was a common practice to keep census numbers up.  According to CW-52, the Quality Care Coordinators (QCCs) would oversee the paperwork in the beginning of an episode and would tell the director of nursing, nurses, or therapists, that they should change the coding before assessments were  locked in.  Yet when the investigations began in 2009, according to CW-52, Amedisys began firing the QCCs.

## D.    Amedisys's Fraudulent "Upcoding" Practices

99.    In addition to "gaming" the Medicare system by providing medically unnecessary visits, Amedisys engaged, on a widespread basis, in a form of Medicare fraud commonly known as "upcoding."  Upcoding refers to entering codes (notably on a patient's OASIS form) that reflect a more severe illness or condition than the patient actually has, or that fraudulently attributes a patient's "primary diagnosis" to a medical condition other than the one giving rise to the need for therapy in order to take advantage of higher billing rates associated with certain diagnoses, or to another condition that reflects charges for a treatment that was more expensive than the service actually provided.  For example:

(a)  CW-41, the registered nurse who worked out of an Amedisys branch in Massachusetts from 2006 to 2008, also described how Amedisys's system was designed to manipulate patient coding information in order to fraudulently extract inflated reimbursement payments from Medicare.  As CW-41 recounted, remotely based Amedisys personnel in Louisiana would routinely review information contained in a patient's OASIS form in order to identify all the medical conditions that the patient suffered from -- and would then change the "primary diagnosis" as listed by the nurse in the field to whichever of the patient's *other* medical conditions was associated with the highest Medicare reimbursement payments, irrespective of whether it was the reason for the patient receiving treatment.  For example, if a patient with a primary diagnosis of congestive heart failure ("CHF") did not pay as much as one with a primary diagnosis of diabetes, after being

72

reviewed off-site in Louisiana "then all of a sudden" diabetes would be the new primary diagnosis. CW-41 would note that the majority of her patients had been diabetic for years, that such patients had long since learned how to monitor their blood sugar and otherwise care for their diabetes, and that to put down a patient who had just been treated for CHF as having a "primary diagnosis" of diabetes was simply a lie. Similarly, Amedisys personnel would have a physician statement telling them that a patient's new medications were for CHF, that the doctor was monitoring the patient for CHF, and that Amedisys should let the doctor know of any problems related to the patient's CHF -- and there would be no mention of diabetes in the doctor's original referral -- yet Amedisys would list diabetes as the primary diagnosis because it resulted in the biggest Medicare reimbursement payment. Although the doctor would later sign a Form 485 prepared by Amedisys reflecting (inter alia) the new primary diagnosis, CW-41 commented that "doctors have a hundred Form 485's to look at" and that in her years as an RN she has never had a doctor review a Form 485 as the doctors rely on the nurses to be honest in filling them out.

(b)   CW-13, the registered nurse who worked at an Amedisys branch in Indiana from 2005 to 2008, also confirmed that CW-13's superiors would pressure nurses to manipulate patients' OASIS scores. For example, if a nurse coded a patient's clinical condition or functionality as a "1," the branch Director of Operations would flag it on the OASIS form and request that the score be increased, because a worse score meant that Amedisys would receive higher reimbursement. Although CW-13 would tell the Director that she did not think the score should be changed, the Director would advise CW-13 that "it would make sense to change it," and CW-13 would acquiesce.

(c)   CW-45, former case manager in an Amedisys branch in Texas (2008-2009) confirmed that a corporate based Quality Care Coordinator (QCC) would review all of the nurses' charts and tell them how to word things for better reimbursement on the OASIS. CW-45 knew that the QCC's charting changes were not appropriate, but was told by the QCC that the changes were necessary for higher reimbursement payments, which CW-45 said was "ridiculous" and put CW-45's license at risk. CW-45 also stated that refusing to go along with the QCC's changes brought on "all kinds of retaliation" by the company, including negative write ups in the employee's personnel file.

(d)   CW-4, former account manager at an Amedisys branch in Florida (2005-2007), among other improprieties, also saw problems with the OASIS coding. After a nurse submitted the OASIS, the results were reviewed by remotely-based employees whose sole responsibility was to review OASIS, and to code in a manner that would maximize reimbursement. These people would ask the nurses to use higher codes and to change their charting in order to achieve the maximum reimbursement. CW-4 resisted such overtures as inconsistent with CW-4's observations during the patient visit. However, CW-4 noted that it took a strong nurse to refuse to change their assessments, and that most nurses would simply make such changes and resubmit the assessment because if "you don't have to come back the second time, you don't have to hear everything that goes with it."

(e)     CW-33, the former Amedisys Regional Administrator and Assistant Vice President of Operations – although an administrator rather than a health care professional – also admitted that s/he was "uncomfortable" with the Company's practice of having OASIS forms reviewed remotely, since CW-33 felt it was "inappropriate" for someone with knew little or nothing about the patient to make the decisions on coding for that patient.    CW-33 was particularly concerned that a new staffing plan implemented in early 2008, which involved hiring more "Quality Care Coordinators" at the regional level to review OASIS forms remotely, would further undercut the role of personnel in the field, and that she was aware that "some [branch] directors" were frustrated with the plan because the people who would be making the decisions under it did not know the patient.

(f)     CW-30, the former Director of Operations at Amedisys branches in Ohio and Kentucky (2008-10), described the involvement of QCC's in upcoding over the objections of the clinicians in the field.    For example, Amedisys nurses were instructed to list every medical diagnosis that a patient may have in his medical record, and then QCC would extract the diagnoses that would result in the most revenue and reimbursement from Medicare.    Clinicians would be pressed by QCC to change the primary diagnosis on the OASIS form.    Although the clinician in the field was meant to sign "correction" forms that QCC sent to them, CW-30 reported that there were "a lot" of times that the clinicians did not sign those forms but CW-30 observed that QCC's would edit and change the OASIS anyway using the AMS2 computer system.    Similarly, the QCC's would try to upcode the OASIS characterization of a patient's functional abilities.    QCC called with lots of requested changes; "it was a rarity" if a nurse completed an OASIS and did not get a call.    As CW-30 observed, "I think it was pretty obvious across the board that when they [the off-site QCC's] called you and requested that you make a change, it was because it was going to [increase] the reimbursement."    Nurses definitely had problems with the QCC's suggestions, but there was "absolutely pressure" to agree to the QCC's changes.    For example, CW-30 would receive monthly reports from "corporate" on clinicians in the field who were not cooperating with the QCC's, and as branch Director of Operations CW-30 was expected to "address" such issues.    If the branch Director's initial responses were not satisfactory, the Area Vice President would come to the branch, go over these monthly reports, and reiterated in person that the branch needed to "become more compliant with QCC recommendations."    CW-30's Area VP would also confide that "It's coming from above; I'm getting pressured; we've got to address this."

(g)     CW-15, the account executive who worked out of an Amedisys branch in Oklahoma (2006-2010), also recalled upcoding issues in CW-15's branch.    Although not involved in patient coding, CW-15 noted that one of the nurses in the branch had a run-in with the branch's clinical manager over the manager's changing the diagnosis code to one that paid more.

(h)     CW-31, the former clinical manager at an Amedisys branch in Georgia (2009-2010), observed that although she oversaw the branches nurses and therapists, she "was never allowed to … see the actual coding and billing of the OASIS."    This structure

"made the hair stand up on the back of my neck," since nothing was on paper and everything was on the computer system; CW-31 could not even access the part of the system that kept track of the number of visits and the OASIS coding. CW-31 became immediately suspicious, and felt "pretty certain" that that there was a lot of "upcoding" and "changing the OASIS" going on. When the branch director went on vacation, CW-31 took calls from coders located in a centralized off-site location, which quickly confirmed her suspicions: "it became absolutely clear [from my exchanges with the coders] that they were playing fast and loose." Upon the branch director's return, CW-31 confronted him, demanding to become involved in the coding process because CW-31 had the most direct contact with the nurses and actually knew what was going on with the patients, and pushed to have the branch director teach her the computer system. These suggestions "did not go over well," the branch director was upset that CW-31 had spoken to the coders, and CW-31 was terminated soon after.

(i)     CW-53, who is a registered nurse with prior experience in the home health care industry, was an account executive at an Amedisys branch in Indiana during most of 2006; CW-53 also covered unofficially for the clinical supervisor and branch Director of Operations at times. CW-53 reported that during his/her tenure (even though s/he was on the sales side) s/he participated in several meetings and calls about having nurses "correct" the OASIS forms, arising out of Amedisys's practice of asking nurses to backdate and change OASIS information in order to "capture reimbursement." CW-53 could not recall the name of the Regional Director, but the Regional Director would call the branch's Director of Operations and instruct them to have the nurses change OASIS forms. CW-53 noted that "it did not take a rocket scientist" to figure out that the changes being sought by corporate management were to increase reimbursement. CW-53 and the branch Director of Operations tried to push back against management. However, both CW-53 and the branch director left the Company later that year because they were worried that they were going to lose their license if they ended up staying in such an environment, as instructions from the Regional Director to change documentation went against everything they knew.

(j)     CW-6, the former Administrator in charge of five Illinois branches (including Chicago) from 2007-2008, also confirmed that the remotely based "episode managers," in addition to applying pressure to make unnecessary visits, also monitored the contents of OASIS forms – and used that information to try to get Amedisys's personnel in the branches to practice "upcoding." CW-6 explained how this process typically worked in his/her experience. First, s/he would get a call from "Episode Management" (the remotely based corporate monitors that personnel in the branch never saw) questioning the coding information. CW-6 would then reply that the nurse or clinician filled it out that way based on their in person evaluation of the patient. The "episode managers" would then try to get CW-6, as branch Director, to agree to change the OASIS form. CW-6 would confirm the lack of any error with the nurse and refuse to order any changes. The next thing that would happen would be a phone call to CW-6 from Regional Director of Operations, Peggy Taylor, who would instruct him/her to take a "long, hard look" at the coding. CW-6 would reply that s/he had reviewed the coding, that s/he trusted his/her field staff (who had actually visited

the patients) to accurately describe the patient's condition, and would again refuse to change the coding. CW-6's refusals to change patient coding (and refusals to order medically unnecessary visits), as CW-6 observed, are the reason s/he is no longer at Amedisys. CW-6 also noted that these practices did not occur at Dyna Care, which ran the same branches before Amedisys acquired them in 2007.

(k)    CW-42, the highly experienced RN based at an Amedisys branch in New Mexico (2009-2010), also described the pressures applied by Amedisys's remotely based "QCC's," and the Company's attitude that the QCC's instructions should be obeyed. For example, CW-42 recalled multiple occasions when QCC personnel would call CW-42 to say that what had been listed as a patient's third diagnosis should instead be listed as the primary diagnosis. CW-42 would explain that the lower-listed diagnosis was not the main reason why the patient needed home health care treatment, and CW-42 is certain that the only reason that such changes in diagnosis were requested (and made) was to increase the reimbursement from Medicare. In other words, the patient assessments were "manipulated." If something on the OASIS form was not written up the way the QCCs wanted it to be, the nurse would be called "again and again;" the nurses would ultimately succumb and finally agree. As CW-42 further stated, it was made very clear to the nurses that they were to do the assessment work – but that the QCC "knows how it should be written up" and the nurses were to follow the QCC's directions and "not ask questions." As CW-42 added, being under this kind of pressure was "not a nice feeling."

(l)    According to CW-38, a nurse based out of an Amedisys branch in Tennessee during 2010, Amedisys had a so-called "quality control" department ("QC Department") located at corporate headquarters that contacted the nurses all the time to change documentation in order to increase reimbursement. CW-38 stated that often these calls had to do with the "ordering" of patients' diagnoses. For example, patients might have 4 or 5 conditions, such as hypertension, diabetes, etc. – and the QC Department would want to move up certain diagnoses (or say that certain certain conditions were uncontrolled) to justify the patient's treatment. Because nurses were generally busy, they learned to just go along with these changes. For example, a patient might only need lab work, which should normally be done in a doctor's office, but the QC group would make you come up with a way to justify home treatment. As CW-38 stated, at Amedisys it was "always about money."

(m)    CW-11, former account executive and Area VP of Marketing in Texas (2003-2008) also confirmed that Amedisys was asking its field personnel to manipulate OASIS forms. CW-11, recalled how s/he attended monthly meetings where the Area VP of Operations (Suggs) would visit the branches and "educate" the field staff in how to fill out OASIS forms, and added "they were manipulating the OASIS, absolutely" to increase Medicare reimbursements.

(n)    CW-54, was Director of Operations at an Amedisys branch in Illinois from 2005 to 2010. CW-54 described how Amedisys's "Point of Care" computer system used software that prompts the nurses filling out an OASIS form to answer certain questions in only a certain way so that a certain minimum number of therapy visits

76

(such as 10) would result.  (As CW-54 explained, answers to various questions on the OASIS form determined how many visits a patient would be scheduled to receive).  Indeed, if the person entering patient data that did not answer certain questions the way that Amedisys's software "wanted" (or was designed to accept), the system would report an "error" and would force the person to go back again and again until the answers were acceptable to the system; in fact the system would not close down until the questions were answered in the desired way (e.g., until they justified at least Amedisys's 10 physical therapy visits).  The system also always demanded that one list every patient diagnosis, even if that diagnosis was not the reason that Amedisys was seeing the patient.  In sum, it was a bad computer system, but you could not tell that to anyone in corporate in charge of the system – they were "always right."  CW-54 would try to override the system to get accurate (but less remunerative) answers input over the objections of the computer, but would constantly get in trouble for trying to do so.  "We were always on the hot seat" and under pressure from the boss of the QCC department (who would then call CW-54's Regional manager to complain) – but CW-54 was unwilling to "commit fraud."

(o)   CW-12, Clinical Manager at an Amedisys office in Tennessee from 2006 to 2008, stated that someone from corporate would review everything that employees coded, and that s/he would receive emails from corporate personnel informing CW-12 which specific diagnosis should be used as a lead diagnosis for patients.  According to CW-12, corporate would invariably instruct CW-12 to change a particular primary diagnosis because it had a higher Medicare reimbursement.  As a result, OASIS forms were effectively altered to say something different from what the clinicians in the field had actually diagnosed.  For example, patients with chronic diabetes would be diagnosed by Amedisys as diabetics, even though the patients were being treated for another illness entirely and had been on diabetes medication for years (therefore requiring little or no therapy for diabetes).  CW-12 said s/he felt that s/he had to go along with such manipulations because s/he was at the mercy of Amedisys, and his/her corporate bosses monitored "everything."  The coding manipulations (and related pressures) were one of the reasons s/he eventually left.

(p)   CW-17, a former Amedisys RN and Case Manager in Florida (2006-2008), said s/he felt certain that Medicare fraud was going on at Amedisys.  CW-17 recalled being specifically instructed by a superior (who now holds a regional supervisory position at Amedisys) that s/he needed to code patient admissions to bring in the most possible money to Amedisys.  CW-17 said that, after s/he had completed his/her assessment and OASIS form concerning a patient, a clinical manager would review it and then *change the coding in a way that would allow Amedisys to obtain the most money* – for example, by changing the order of the patient diagnoses that CW-17 had listed.  Coding changes were done without CW-17's approval.  CW-17 said s/he left Amedisys because s/he was "tired" of the Medicare fraud happening at Amedisys, and was unwilling to lose his/her license for Amedisys.

(q)   CW-43, an RN who worked out of an Amedisys office in Pennsylvania between 2007 and 2009, also confirmed that nurses at Amedisys were pressured to change their OASIS coding in a manner intended to increase Amedisys's Medicare

reimbursements. CW-43 described how an offsite nurse ("Kelly" from "down South") would regularly call about changing OASIS forms, and how, for example, "Kelly" would say that the Company could get more reimbursement by listing "something else" on the OASIS. The nurses would go along with what Kelly said, because although they were frustrated by it they knew to do what they were told if they wanted to have a job at the Company.

(r)    CW-10, an Amedisys Director of Operations in Maryland from 2005 to 2007, also described how "corporate" had a group of remotely based OASIS reviewers who reviewed every single OASIS form – and how the group invariably sought changes to OASIS forms that would increase the reimbursement for Amedisys. Rather than cause trouble, CW-10 acknowledged that most nurses would just go along with such proposed changes.

(s)    CW-19, a Director of Operations for an Amedisys Louisiana office from 2003 to 2009, also described the activities of remotely based QCCs in overseeing and reviewing all OASIS forms. According to CW-19, remotely based personnel should not be asking clinicians in the field to change their patient evaluations. Although some field clinicians would not change their assessments, others "would cave under pressure." When asked if s/he noticed whether QCC's requested changes would increase reimbursements, CW-19 stated that as a result of the changes "a lot of patients were meeting their [therapy visit] thresholds."

(t)    CW-51, a case manager at an Amedisys office in Massachusetts from approximately 2008 to 2009, also described pressures to change OASIS scores. CW-51 described being "harassed" by calls from Amedisys QCCs that sought to pressure CW-51 into changing CW-51's assessments and OASIS scores in ways that did not correspond to the medical needs of the patient. If CW-51 refused to make the requested changes, even if they did not comport with a patient's medical needs, s/he would get in trouble with his/her supervisors – who in turn would tell CW-51 that they were being pressured in emails by their corporate superiors to deal with CW-51's outstanding OASIS "corrections" and attitude in giving the QA department a hard time. CW-51, however, refused to engage in what s/he considered illegal conduct and would refuse to change her scores; s/he was then written up for refusing to so. CW-51 said that, at one time, s/he had a whole list of situations and specific cases in which Amedisys wanted to improperly change assessments, and had contemplated going to a district attorney about it, but decided not to because CW-51's supervisors were very powerful in the area, and s/he feared retaliation.

(u)    According to CW-26, former Clinical Manager and Director of Operations in Mississippi (2005-2010), Amedisys put the "QCCs" in place for specialty coding to get the most out of the new reimbursement triggers, even though they never saw the patients (which really upset the field staff). According to CW-26, the QCCs exerted very considerable pressure on nurses to change their coding: They would "batter them down so bad" that the nurses would say "just put what you want; fine, put what you want." In that regard, CW-26 said that some of the QCCs were pressuring the nurses so badly that s/he raised the issue with the regional Assistant Vice President

78

(although to CW-26's knowledge nothing was ever done).

(v)  CW-28, the business office director at an Amedisys branch in Virginia from 2007 to 2008, also stated that Amedisys would "stack" OASIS codes in order to maximize reimbursement. As CW-28 stated, there was a remote group devoted to reviewing OASIS forms, which made considerable changes to OASIS forms after the nurses had completed them, including changing the way diagnoses were coded. Employees learned to "play the game" and how to code to maximize the functional HHRG score assessment to maximize reimbursement, even if it was not legitimate. CW-28 added that all of these improper practices were directed from "up above," meaning the branch directors and their bosses. When asked how many changes requested by the off-site coders would be made, CW-28 stated "Oh gosh yeah, just about every one of them."

(w)  CW-52, the Wisconsin Business Office Manager from 2009 to 2010, also described how the QCCs frequently called about OASIS scores, often to request changes going against what the very knowledgeable clinicians in the field had recommended. As a result, many of the treating nurses felt their expertise was not being valued, but they would do what they were told and would approve the changes. Such calls were frequently about newly admitted patients.

(x)  CW-29, a physical therapist in North Carolina from 2006 to 2010, also described coding issues with Amedisys's fully computerized OASIS data entry system. Although it was supposed to flag inconsistencies in OASIS answers, it would do so even when the supposed "inconsistency" accurately reflected what the patient could and could not do. In such circumstances, CW-29 would get a phone call from the QCC, wherein CW-29 was asked leading questions and pressured into accepting changes to the answers. For example, if CW-29 answered that a patient could walk independently with a walker, but needed help with some dressing, the QCC would insist that could not really walk alone. The QCC would therefore want CW-29 to change the answer to "assisted ambulation" so that the patient would be bumped up to a different reimbursement level. CW-29 knew, however, that the patient needed help dressing because the patient only had a shoulder issue that did not affect ambulatory function -- but Amedisys's computer program would not accept such an assessment when inputting the OASIS. CW-29 noted that there was "no way" that these practices were limited to isolated branches..

## E.    Amedisys's Payments of Illegal Remuneration to Physicians

100.    In addition, Amedisys paid improper and illegal remuneration to doctors in order to solicit profitable Medicare patients and facilitate improper patient recertifications. As explained by CWs, outside doctors were retained on Amedisys's staff as directors or consultants because it is a violation of Medicare regulations to give outside physicians any compensation for

referring patients.  However, these same referring doctors were paid as directors or consultants

although their only or primary function was to refer patients to Amedisys.  For example:

(a)  According to CW-4, outside physicians were placed on Amedisys's staff as medical directors and were paid a certain fee every month in exchange for sending a majority of their patients to Amedisys.  CW-4 stated that Amedisys knew that doctors sending 100% of their patients to Amedisys would constitute a red flag to Medicare (since doctors are required to offer patients a choice in home health care agencies). Therefore, according to CW-4, Amedisys would receive 85-90% of these referrals, with a small amount going to other agencies.  Amedisys only wanted to target those medical directors that were willing to send them the bulk of their patients.  Further, according to CW-4, Amedisys's goal was to have an outside doctor-medical director for every program they offered (e.g., orthopedist for orthopedic program, cardiologist for heart program, etc.), with each Amedisys office having multiple medical directors willing to refer the bulk of the patients to Amedisys.

(b)  CW-53, the account executive at an Amedisys branch in Indiana during most of 2006, was told by his/her superiors that if s/he could bring on physicians in that area, Amedisys would pay them as consultants.  CW-53 understood this to be a kind of kickback.  Consultants were paid on a monthly basis and were meant to show up for quarterly meetings, but Amedisys "blatantly said" that consultants were brought on because they were good referral sources.  CW-53 was also told that they could bring on more than one medical director per branch, which did not make sense to CW-53.

(c)  CW-32, the former Director of Operations at an Amedisys branch in Oklahoma from 2008-2009, also expressed concerns about the extent of the incentives and remuneration that Amedisys paid to doctors.  CW-32 believes that Amedisys went over and above the guidelines for parties, dinners and trips in "quite a few" cases, and saw issues with Amedisys's practices at both the branch and corporate level.  CW-32 knew that the Director of the Oklahoma branch was not comfortable with a number of these events, and reported them to Stephanie Six, the area director, but the concerns "never seemed to be addressed."   As noted above, CW-53 left Amedisys because of ethical concerns about the Company's practices.

(d)  CW-11 said it was beneficial to physicians to keep patients in Amedisys home care longer.  According to CW-11, when a physician who was an Amedisys medical director or advisor referred a patient to Amedisys, the physician could bill for monitoring and supervising the care of the patient.  Thus, the longer the patient stayed in care, the more the physician could bill Medicare for services.

(e)  CW-22, a former sales representative and account executive at Amedisys South Carolina offices from 2007 to 2009, explained that physicians receive reimbursement from Medicare in one of three ways:  1) for making a referral; 2) for managing a patient; and 3) for medical supervision, which was the highest reimbursement payment.  To qualify for a medical supervisory payment, a physician would review what a therapist had done with a patient over a 30-day period (spending as little as 30

minutes a month doing so). If the physician supervised the patient for another 30 days, an additional reimbursement payment would be paid. Accordingly, physicians benefitted from patients staying in a program (such as Balanced for Life) for longer periods. CW-22 said that Amedisys had a medical director on staff as a consultant, and also had numerous other physicians that served as consultants. According to CW-22, if a patient was discharged from the hospital and did not have a physician, Amedisys's staff medical director would take over as the supervisory physician. CW-22 estimated that about 50% of Amedisys's patients had their own physician, and the other 50% used Amedisys's medical director as their physician. This allowed Amedisys to capture more patients as Amedisys's staff medical director gave Amedisys a lot of referrals. According to CW-22, the other doctors who were signed up as consultants at Amedisys also gave the Company a lot of referrals, as there was an unwritten rule that doctors who were paid consulting fees were to refer any home health patients to Amedisys first.

(f)    CW-26, former Amedisys clinical manager and Director of Operations in Mississippi, also confirmed that Amedisys had compliance issues relating to employees purchasing improper gifts for physicians, which were swept under the rug. For example, Amedisys's business development people were providing excessive entertainment to doctors, such as taking physicians out to eat at the country club and adding golf games to their lunches, and giving physicians Christmas gifts of cases of wine.

## VIII.   THE TRUTH BEGINS TO EMERGE

101.   On August 12, 2008, Citron Research published an online report, entitled "Seeking Healthy Returns in Amedisys?  Better get a Second Opinion…", which raised material questions about the legitimacy of Amedisys's accounting and Medicare billing practices. The report stated that Citron had hired a private investigator to investigate the existence of possible accounting irregularities at the Company, and that certain former employees contacted by its investigator had reported, among other things, that:

- Amedisys pressured employees to manipulate OASIS scores in order to increase billings; [and]

- Local Amedisys offices would receive calls from the Company's headquarters that applied pressure on the Company's employees in the field to change the proposed scoring on Medicare patients (to justify higher billing).

As the Citron report also noted, its analysis left "plenty of reason to wonder just how Amedisys maintains gross profit margins that run way ahead of everyone else in the industry," and raised questions about whether Amedisys was complying with the Medicare laws and accounting standards.   Citron emphasized in its report that "***it is not yet concluding that Amedisys is committing Medicare fraud***, ***but there are many indications that this inquiry needs deeper scrutiny***.   (Further documentation is anticipated.)  Due to these concerns, Amedisys's near total dependence upon Medicare for its revenues has to be factored as a business risk."

102.    On August 12, 2008, as a result of the negative and previously-undisclosed information in the Citron report, the price of Amedisys stock dropped a statistically significant 17.86%, or $11.80, to close at $54.27 on heavy trading volume of 11.2 million shares (which was more than 11 times the prior day's volume).   However, Amedisys's false reassurances to investors via statements to analysts, discussed below, artificially kept the Company's stock price from falling further than it did.

103.    Moreover, as Citron's August 12 report itself stated, the report did not conclude that Amedisys was committing fraud, but only that Citron believed that additional investigation was warranted.  The report, by its own terms was therefore only a partial disclosure, and did not fully reveal the truth concerning Amedisys's misconduct.  Amedisys senior management, in communicating with analysts at Oppenheimer, also reassured financial markets (albeit falsely) that the accusations in the Citron report were "unfounded."   As the August 12, 2008 Oppenheimer analyst report stated:

> We have reviewed a report on AMED by Citron Research.  The report primarily questions the company's accounting for receivables and its ability to generate greater internal growth than its peers.  After speaking to management and analyzing the supporting details of the report, ***we believe the report is irresponsible in its innuendos of an underlying problem at Amedisys***.  ***Furthermore, we believe the stock's reaction to the report is significantly overblown***.

*First off, we believe the source of this report is suspect*.  Citron Research is a web-based investment research service.  The legal disclaimer on the site says that the "principals of Citron Research most always hold a position in any securities profiled on the site." . . .

*We continue to have the utmost confidence in the current management team*.  In our experience, AMED has always been forthcoming and transparent with the details it provides around the business.

<u>*After speaking to management*</u> and analyzing the supporting details of the report.. . , *we believe the accusations are unfounded*.  While clearly this will present an overhang in the short term, when the dust settles we believe the stock will offer a compelling buying opportunity.

In its August 12, 2008 report, Oppenheimer rated Amedisys stock (which was then trading at $54.27) as "Outperform" and projected a 12-18 month price target of $73.00.

104.    In the wake of the August 12, 2008 Citron report, Amedisys senior management also spoke with analysts at BB&T Capital Markets to reiterate to the market the Company's confidence in its quarterly results and outlook and downplay the importance of the report.  In an analyst report issued on August 13, 2008, BB&T Capital Markets echoed Oppenheimer's sentiments wherein they described the "18% drop" in Amedisys's share price as "an overreaction," and characterized the Citron report as "negatively biased."  The BB&T report concluded:  "<u>*We had the opportunity to speak with management yesterday*</u> *and while they were deeply troubled by the reaction of their stock they reiterated confidence in their quarterly results, and their outlook for the company remains unchanged.*  In a nutshell, we believe that AMED's management has set forth appropriate operating procedures to enable more accurate coding and improve its overall Medicare reimbursement.  As a result, we side with the company."  At the time, BB&T rated Amedisys stock as "Hold."

105.    Similarly, in an August 13, 2008 analyst report, Wachovia stated that "Recently published criticisms of the company's accounting, transparency and compliance appears to be spurious at best, in our view, and in some instances inaccurate and illogical," and upgraded

Amedisys stock from Market Perform to Outperform.  Wachovia also expressed skepticism over

Citron's suggestions that "Amedisys pressured employees to manipulate OASIS scores to

increase billings."  In the words of the Wachovia report:  "Obviously we cannot evaluate the

factual accuracy of this assertion.  However, we can point out that the [Citron] note (or at least

the portion we have seen) does not explain how many former employees were interviewed, when

these employees worked for the company, [or] why these employees left the company."

106.    On September 3, 2009, Amedisys announced the abrupt resignations, effective

that same day, of its President and Chief Operating Officer, Larry R. Graham, and its Chief

Information Officer, Alice Ann Schwartz.  The Company's press release stated that these two

executives were leaving to "pursue other interests."  That day, in response to this unexpected

news, the price of Amedisys stock dropped a statistically significant 21.68%, or $9.42, to close at

$34.04, on extremely heavy trading volume of 22.6 million shares (which was more than 100

times the prior day's volume).  However, the September 3, 2009 disclosure was only partial, and

accordingly, Defendants' fraud continued.

107.    Market participants viewed the news of these unexpected departures as a highly

negative development, and one that indicated heightened risk that prior allegations of fraud

concerning the Company were in fact well-founded.  For example, in an October 14, 2009 report

entitled "Amedisys: Caught between a RAC and a Hard Place," Citron focused on the abrupt

nature of the departures of the two former executives (including Graham's highly suspicious

stock sale in the several weeks immediately preceding his departure), and described the

departures as a "red flag" indicating the existence of fraud at the Company:

> In the month of July we see the President of the company, Larry Graham, who has
> worked there for over 10 years, sold most of his stock holdings in a single day –
> July 31 – a transaction that exceeded all of his prior stock sales combined.  And
> just five weeks later, on September 3, he resigns – effective immediately, without

any stated reason (beyond the ubiquitous "personal reasons") and without a succession plan in effect.

This leaves a question both obvious and troubling:  are those stock sales improper?  Wasn't he the ultimate insider, with advance knowledge that he was planning to resign soon, with likely negative effect on the stock?  Shouldn't he have resigned first, and sold later?

The stock plunged sharply on the news, but recovered the loss within days as analysts (who spoke only with remaining management) reassured investors that Graham had resigned over a disagreement with the board regarding his ambition to be CEO.

Compounding the mystery, on the same day, CIO Alice Schwartz, an employee of over eleven years standing, also abruptly resigns, also effectively immediately, and similarly absent an explanation or succession plan.

Larry and Alice were the same people who were justifying Amedisys's higher than industry margins on a conference all in Q3 2008, explaining that they just treat "a sicker population" than their competitors. . . .

Conversations and correspondence with a plethora of former employees from a variety of different offices has given Citron a deeper view into the underbelly of Amedisys's business. *As a result, it is our opinion that the abrupt executive departures aren't random circumstances, and are more likely a warning indicator of a more dangerous problem*.  Citron challenges readers to cite a single other example where the resignation of top officers without notice or succession plan was not the harbinger of bad news.

108.    The October 2009 Citron report also specifically focused on the departure of CIO Schwartz as a "red flag."  As the report stated "Why is the departure of a Chief Information Officer relevant to Amedisys shareholders?  For most companies, the CIO isn't even on investors' radar, so what's the deal here?"  As Citron report further stated:

*Former employees have consistently reported to Citron that the laptop-based Point Of Care program, in which every healthcare staffer records every patient visit, is specifically designed to prompt workers to skew their Oasis scoring for higher reimbursement*.  It is Citron's opinion that this explains why Amedisys's margins are the highest in the industry, not that their patients are "sicker" than their competitors'.

*Numerous employees have told Citron that they feel pressured by the continuous automatic computer prompts in Amedisys's POC system to change their scores on the Oasis reports they submit*.

It is going to be interesting once auditors realize it is the POC system's rule-base which exerts influence on thousands of health-care practitioners, who are bound by onerous employee contracts and subject to being fired if they "cause trouble".

So who knows the design and architecture of the rule-base better than anyone? Who oversaw its system specifications, development, implementation, training, scalability and all the "enhancements" over the last eleven years? That would be the Chief Information Officer, who resigned as described above. Considering the intensified fraud audits the company is now subjected to, investors should wonder: Is it just getting too hot in the kitchen? It should be noted that Alice Schwartz did not leave for a new job and her compensation at Amedisys was not of a scale to put her on the fast track to retirement.

109.    Another "red flag" identified by the Citron report was the participation of Amedisys Quality Care Coordinators in modifying OASIS scoring for Amedisys patients. As Citron also reported on October 14, 2009:

> [P]atient records and billing data are . . . routed to Amedisys's Quality Care Coordinators (QCC). These 200 employees mainly work from home and review every Oasis record, ostensibly to verify that it is recorded correctly.

> Citron believes that each case that doesn't meet the optimum billing and reimbursement profile as defined by the POC system is kicked out for "special attention" by the QCC's. It is common practice for QCC's to send an OASIS correction form to the clinical manager, which requires the clinician to sign off on the revised re-coding. For fear of being labeled a "troublemaker" and losing their jobs, nurses routinely just sign off on these without even reading them.

110.    On October 15, 2009, in response to the additional allegations in the October 2009 Citron report concerning the role of QCCs in modifying OASIS scores, the price of Amedisys stock dropped a statistically significant 6.94%, or $3.11, to close at $41.73 on heavy trading volume of 4.6 million shares (which was almost seven times the prior day's volume). However, the disclosures of October 14, 2009 were only partial, and accordingly the fraud continued.

111.    Indeed, other analysts dismissed the latest concerns set forth in the October 14, 2009 Citron report as unfounded. For example, in response to the October 14 Citron report, analysts at Baird commented as follows in their own October 15 report:

***We would buy AMED on today's sell-off***.  Not too surprising, Citron is attacking AMED, presumably with the impetus being recent management departures.  It's only been a year since their last short report.  ***We see little substance behind today's report, view it more of the same and a buying opportunity*** with AMED selling for 9x our 2011 EPS estimate, which assumed a 10% cut to Medicare over the next two years.

112.   Similarly, in an October 15, 2009 report entitled "Absolute Citron Gives AMED Investors An Unnecessary Hangover," analysts at Jeffries & Company also voiced skepticism over the claims made in the Citron report:

We are buyers especially on weakness today.  ***We believe Citron's claims are unsubstantiated***, Q309 results will be better-than-expected, healthcare reform will be less onerous to home nursing than many anticipate, and that AMED's valuation at less than 10x FY10 EPS is compelling particularly vs. its peers. . . .

***As we wrote in our AMED report dated 9/4/09, we believe the resignation of the former COO and CIO was due to a failed internal power struggle, not fear of an impending investigation as Citron alleges***. . . .

***We remain skeptical that former nurses are reaching out to Citron to discuss personal AMED work experiences.  We believe that any nurse with a legitimate concern would have already approached the Department of Justice where the opportunity for financial gain exists as part of a qui tam lawsuit.***

113.   On April 26, 2010, the WSJ published an article questioning whether Amedisys was "taking advantage of the Medicare reimbursement system," particularly in light of the *WSJ*'s specially commissioned analysis by a Yale University professor that showed that "the number of [Amedisys's] in-home therapy visits tracks Medicare financial incentives."  As the *WSJ* article reported:

[A]n analysis by *The Wall Street Journal* of Medicare payments to home health-care companies in recent years raises questions about whether some companies—including the sector's largest, Amedisys Inc.—are taking advantage of the Medicare reimbursement system.  The results show that the number of in-home therapy visits tracks Medicare financial incentives.

Medicare reimbursements are determined in part by the number of at-home therapy visits each patient receives, with an extra fee kicking in as soon as a patient hits a certain number of visits. Between 2000 and 2007, Medicare paid

companies a flat fee of about $2,200 for up to nine home therapy visits. It paid an additional reimbursement of roughly $2,200 if the therapy surpassed nine visits. . .

Amedisys provided many of its patients just enough therapy visits to trigger the extra $2,200 payment.  In 2005, 2006 and 2007, very few Amedisys patients received nine therapy visits while a much higher percentage got 10 visits or more.  In 2007, for instance, only 2.88% of patients got nine visits, while 9.53% of patients got 10 visits.

The article also quoted a former Amedisys nurse as stating "I was told 'we have ten visits to get paid," and the article also reported that the nurse's supervisors asked her to (a) review patients who were just short of the ten-patient visit threshold, and (b) call the patients' therapists to remind them to make the extra appointment.  The former nurse was also quoted as stating that "[t]he tenth visit was not always medically necessary."

114.    In addition, the *WSJ* article reported that after the reimbursement rules were modified in 2008, "the percentage of Amedisys patients getting 10 visits dropped by 50%, while the percentage that got six visits increased 8%.  The percentage of patients getting 14 visits rose 33% and the percentage getting 20 visits increased 41%."

115.    The April 26, 2010 *WSJ* article, however, was only a partial disclosure of Defendants' misconduct, and the fraud continued.  Indeed, the article also quoted a Company representative as reassuring investors that Amedisys had done nothing wrong:

*[Amedisys spokesman Kevin LeBlanc said] the company didn't take advantage of the system and that the company's home visits "are in line with the industry trends."*  [LeBlanc] said Amedisys in general focuses on sicker patients than the industry average, and therefore patients that require more care.  "Amedisys's clinical patterns are representative of the patient population we focus on, namely those patients suffering from complex, chronic and co-morbid medical issues," he said. . . .

The Amedisys spokesman said *any suggestion the company may have increased its number of therapy visits to receive higher reimbursements is "both incendiary and inaccurate."* . . .

Mr. LeBlanc said many factors contributed to Amedisys's rapid growth, including "our significant investment in the best and most innovative technologies, our

strategic acquisitions of compatible companies, our expansion into other therapies and by providing the best quality care for our patients at a lower cost." He emphasized that the number of home therapy visits is driven not by the company but by doctors' orders.

116.    The next day, April 27, 2010, in response to the negative news in the *WSJ* article, Amedisys's stock price dropped a statistically significant 6.58%, or $3.98, to close at $56.52 on heavy trading volume of 2,865,100 shares (which was five times the prior day's volume). Amedisys's false reassurances to investors in the April 26, 2010 *WSJ* article, however, artificially kept the Company's stock price from falling further than it did.

117.    Late in the evening on May 12, 2010, the *WSJ* reported that the Senate Finance Committee had launched an investigation into Amedisys to determine whether it "deliberately boosted the number of home therapy visits to trigger higher Medicare reimbursements." The *WSJ* quoted portions of Senator Max Baucus's public statement announcing the investigation, wherein he stated that companies "working with Medicare should not be allowed to target seniors or manipulate care simply to get higher reimbursement rates." The article also quoted Senator Charles Grassley's statements in the same release, wherein Senator Grassley said, "It appears that either the home health care reimbursement policy is flawed, some companies are gaming the system, or both. We're working to figure out what's going on."

118.    As part of their investigation, on May 12, 2010, Senators Baucus and Grassley sent a letter to Amedisys, in which they wrote that the home therapy numbers cited in the April 26, 2010 *WSJ* article "suggest home health agencies intentionally increased utilization for the purpose of triggering higher reimbursements." The May 12, 2010 letter also asked Amedisys's CEO, defendant Borne, to provide information concerning Amedisys's therapy visits from 2006 through 2009 and its financial relationships with referring physicians. The Senators also asked Amedisys to provide information on its Balanced for Life falls-prevention program, and noted

that "the referral form [for the Balanced for Life program] raises concerns that the program may be taking advantage of Medicare payments in order to improve company profits." As the *WSJ* reported, as of early 2010, more than 330 Amedisys locations offered Balanced for Life, which was up significantly from 33 locations in 2008.

119.    The May 12, 2010 Senate letter to Amedisys also requested the following documents, information and/or data from the Company:

1) For each calendar year from 2006 through 2009, data showing the distribution, in one day intervals from 1 to 30, of therapy visits for therapy episodes by both number and percentage.

2) For each year from 2006 through 2009, data showing the average score at admission for Medicare patients that received therapy visits for various activities of daily living as reported in the OASIS form (including walking/ambulation, hygiene, continence, dressing, eating, toileting and transferring).

3) For each calendar year from 2006 through 2009, data concerning:

   a. The total number of Medicare home health patients that received therapy visits from Amedisys for that year;

   b. The total amount of Medicare reimbursement Amedisys received for home health episodes that qualified for additional payments because of therapy visits provided; and

   c. The total amount of Medicare reimbursement Amedisys received.

4) All internal documents, records, and communications relating to the 2008 Medicare payment revisions for home health therapy visits from January 1, 2007 to the present, including audit reports and all communications regarding changes to the Amedisys Medical Software applications as a result of the 2008 Medicare payment revisions.

5) All internal policies and guidelines regarding the number of therapy visits provided per home health episode, including any prior policies and guidelines from January 1, 2007 to the present and any modifications to those policies.

6) For each state in which Amedisys provides home health services, a list of the 10 physicians from whom it received the highest number of referrals for home health services in each of 2006, 2007, 2008, and 2009, including the physician's specialty, location, and the number of referrals.

7) For each physician identified in the response to the prior question, all payments or transfers of value from Amedisys, or any entity acting at its direction, to that physician for 2006, 2007, 2008, and 2009, including:

    a. The recipient's name, business address, and specialty;
    b. A description of the form of payment or transfer of value (cash, stock, travel, meals, etcetera);
    c. A description of the nature of payment or transfer of value (royalty, consulting, speaking fee, gift, etcetera); and
    d. The date of payment.

8) All marketing materials produced for patients and physicians for calendar years 2006, 2007, 2008, and 2009.

9) All copies of guidance or instructions to marketing staff on appropriate physician and patient marketing practices (including payments and transfers of value to physicians) for calendar years 2006, 2007, 2008 and 2009.

10) A statement of whether Amedisys had a compliance program, and if so:

    a. whether it provides a toll free number for purposes of reporting inappropriate marketing activities;
    b. the number of times in each of the calendar years 2006, 2007, 2008 and 2009 complaints were received regarding marketing activities as well as the nature and resolution of each complaint;
    c. documentation on the compliance program including previous policies from 2006 to the present.

11) Copies of all physician attestation forms with an explanation of the process for physician attestations for calendar years 2006, 2007, 2008, and 2009.

12) An explanation of the clinical criteria Amedisys used in drafting each patient question on the Balanced for Life/Fall Risk Assessment physician attestation form.

13) Whether Amedisys had medical directors serve in its home health agencies, and if so:

    a. Identify the duties and responsibilities of the medical directors;
    b. The average number as well as range of physicians in such agencies;
    c. The five most common specialties that represented by medical directors across all such agencies;
    d. The average number of physicians in each of the specialties identified in question 12.b. that serve as medical directors in such agencies;
    e. The percentage of medical directors that are Amedisys employees and the percentage of medical directors that serve under contractual

arrangement; and

f.  For medical directors that serve under contractual arrangement, the method of compensation as well as average number and range of hours worked per week.

120.    However, the May 12, 2010 disclosure was only partial, and accordingly, Defendants' fraud continued.  Indeed, the next day, on May 13, 2010, Amedisys issued a public statement attempting to downplay the importance of the Senate Finance Committee investigation, to discredit the earlier April 26, 2010 *WSJ* article as "incomplete," and to otherwise reassure investors.  That statement read, in part:

> Amedisys, Inc. (NASDAQ: AMED), one of America's leading home health and hospice companies, issued the following statement in response to a letter of inquiry received on May 12, 2010, from the Senate Committee on Finance.
>
> "We will cooperate with the Committee's inquiry. We also look forward to discussing with the Senators the many benefits and advantages home health care provides for the millions of Americans our industry serves," said William F. Borne, Amedisys chief executive officer.
>
> ***The letter of inquiry received from Senators Grassley and Baucus references an article published recently in <u>The Wall Street Journal</u>.  The article told an incomplete story about the value of home health to patients, their families, and the overall healthcare system***.
>
> Home healthcare is an important part of the solution to ensuring that patients who have chronic, complex medical needs and their families receive a high level of care and support.
>
> Amedisys provides home care to more than 35,000 elderly patients every day. ***We are proud to be an organization that leads by putting our patients first and are proud of the work we do on their behalf***.

121.    On May 13, 2010, in response to the negative news that the Senate Finance Committee was investigating Amedisys, the Company's stock price dropped a statistically significant 7.97%, or $4.48, to close at $51.73 on heavy trading volume of 3,142,900 shares (which was more than eight times the prior day's volume).  Amedisys's false reassurances to

investors in its May 13, 2010 public statement, however, artificially kept the Company's stock price from falling further than it did.

122.    On June 30, 2010, Amedisys issued a press release, published by the *Business Wire* at 10:08 p.m. ET that day, announcing that it had received a notice of formal investigation from the SEC; and a subpoena for production of documents from the SEC relating to the same or similar matters as were under review by the Senate Finance Committee.  However, the June 30, 2010 disclosure was only partial, and Defendants' fraud continued.

123.    The next day, July 1, 2010, Amedisys filed with the SEC a Form 8-K attaching its June 30, 2010 press release and providing details concerning the ongoing Senate Finance Committee investigation, as follows:

> As previously disclosed, the Company received a letter of inquiry on May 12, 2010 from the United States Senate Committee on Finance requesting documents and information relating to the Company's policies and practices regarding home therapy visits and therapy utilization trends.  The Company submitted its initial response to the Committee on June 4, 2010, and the Company made an additional submission to the Committee on June 25, 2010.  The Company anticipates making additional submissions of information to the Committee.  Each of the responses contained documentation and information as requested by the Committee.  The Company intends to cooperate with the Committee with respect to its inquiry.
> No assurances can be given as to the timing of this inquiry or as to the outcome of this inquiry.

This disclosure made clear that the Senate Finance Committee investigation had not yet reached a resolution and was ongoing.

124.    On July 1, 2010, in response to the negative news that the SEC had launched a formal investigation of Amedisys (in addition to the already ongoing Senate Finance committee investigation), Amedisys's stock price dropped a statistically significant 10.55%, or $4.64, to close at $39.34 on heavy trading volume of 4,534,200 shares (which was more than eight times

the prior day's volume).  Amedisys's false reassurances to investors during this time period, however, artificially kept the Company's stock price from falling further than it did.

125.    Less than two weeks later, on July 12, 2010, Amedisys issued a press release announcing an earnings call for the next day.  That release stated:

> We currently believe that our second quarter net income will be approximately $1.12 per share.  These results include nonrecurring costs of 17 cents per share primarily associated with realignment of operations, and the Senate Finance Committee and SEC investigations; $3.5 million or 7 cents per share we received from CMS under their pay for performance demonstration program and a reversal of the first quarter corporate bonus accrual which amounted to 7 cents per share. ***The net effect of these items on reported earnings per share was a reduction of approximately 3 cents per share***.

As Amedisys executives discussed on the next day's earnings call, those results were "very disappointing" and a "bit of a wake up call."

126.    In his introductory comments on the July 13, 2010 earnings call, Defendant Borne stated, in relevant part:

> First, let me begin with an overview of our operating performance in the quarter.  As Dale and Mike will explain in more detail, ***the decline in our volume of recertifications more than offset our growth in admissions for this quarter***. ***This resulted in revenues much lower than we expected***. . . . ***We are very disappointed with these results***.

127.    Amedisys's CFO, Defendant Dale Redman, continued:

> Volume in the second quarter came in significantly lower than we expected, both from a recert and an admit perspective, and our operating costs also affected the quarter. . . .

> Revenue for the quarter we estimate to be approximately $422 million.  In comparison to the first quarter this number was a product of ***substantially lower volume of admits and recerts*** offset by higher completed episodes and higher revenue per episode. . . .

> ***Based on our second-quarter performance we are today suspending our previous annual guidance***.

128.    Amedisys COO Michael Snow added that:

> As you have heard, our operating performance in the second quarter was very disappointing driven primarily by earnings declines in the home care division. . . . [T]he results of this quarter are a bit of a wake-up call. . . .

129.    Amedisys's second quarter operating results were substantially below expectations because, in the wake of the April 26 *WSJ* article and the Senate Finance Committee and SEC investigations, the Company was now under regulatory scrutiny and was forced to adopt much more conversative (and less lucrative) business practices.

130.    On July 13, 2010, as a result of the negative news the previous day regarding the Company's drop in revenue and profit, Amedisys's stock price dropped a statistically significant 24.13%, or $8.45, to close at $26.57 on heavy trading volume of approximately 10.3 million shares (which was more than 15.7 times the prior day's volume).  However, the July 12, 2010 disclosures were only partial, and accordingly Defendants' fraud continued.

131.    During a 10:00 a.m. Amedisys conference call held on August 9, 2010 to discuss second quarter earnings, Chief Operating Officer Michael Snow admitted that one of the factors in the decline in the recertification rates was related to "external factors" relating to the investigations that had been announced during the second quarter of 2010.  Starting with this conference call, Amedisys began using the euphemism of "external factors" and "behavioral" to describe the phenomena of the Amedisys clinicians and employees adopting more conservative (and less lucrative) business practices:

> And third, finally, we can't ignore the impact of **external factors**.  These **distractions** contributed to our volume weakness, particularly in the utilization of therapy.  And of course, if therapy utilization declines, our revenue per episode will be negatively impacted and it's unclear whether these factors will abate in the near-term.

132.    Later in the same call, Defendant Borne responded to a question from analyst Sheryl Skolnick from CRT Capital Group asking for more detail on why there was such a steep decline in the recertification rate during the second quarter:

Skolnick:  I guess *I'm worried about whether it's the behavior of the clinicians not seeking recerts*, whether there was something in the compliance training you mentioned that might have scared them into doing something differently than they had done before and what, if anything, you're doing to address and determine those issues as opposed to just putting it in the basket of changes in behavior and outside influence and therefore not something the company can do anything about.

Borne:  Yeah, Sheryl.  You got it.  You nailed it.  We have cut this result nine ways to Sunday and in the absence of other factual patterns, *we have to put it under behavioral*.  And as much as we have gone out to provide assurances to our clinicians that we got to take care of patients because this outcome is unexplainable.  And so we've gone out, as I said, do the right things for the patients every time, and so – but I cannot explain why we had the precipitous drop in June…

133.    On September 28, 2010, Amedisys issued a press release disclosing that it had received a civil investigative demand ("CID") from the U.S. Attorney's Office for the Northern District of Alabama "pursuant to the federal False Claims Act."  The CID asked for a wide range of documents and information related to the Company's "clinical and business operations, including reimbursement and billing claims submitted to Medicare."  As the *WSJ* noted when it reported on the announcement, if a company is found to have submitted a false claim to a federal agency, like Medicare, it could be liable for damages, plus $5,500 to $11,000 for each of the claims, and also lose its ability to do business with Medicare.

134.    On September 28, 2010, as a result of the negative news regarding the Department of Justice's investigation of the Company, Amedisys's stock price dropped a statistically significant 15.51%, or $4.41, to close at $24.02 on heavy trading volume of 3.36 million shares (which was more than 5.7 times the prior day's volume).

135.    During the JPM Securities Healthcare Conference held on September 28, 2010, Defendant Borne addressed the decline in recertification rates that Amedisys had experienced in the second quarter, noting "we saw a lot of things that we couldn't explain except with

***Behavioral*** and some of that has to be the noise from Senate Finance Committee and SEC and *Wall Street Journal* articles and things like that."

## IX.    POST-CLASS PERIOD DISCLOSURES FURTHER ILLUSTRATE THE SIGNIFICANT NEGATIVE IMPACT OF AMEDISYS'S FRAUD

136.    The extent to which Amedisys's adoption of more conservative business practices – in lieu of its past manipulative practices with respect to the Medicare system – adversely affected its reported revenue and earnings was further evidenced on October 26, 2010, when Amedisys released its operating results for the quarter ending September 30, 2010.  That quarter was the first full quarter after publication of the April 26, 2010 *WSJ* article and the commencement of the Senate and SEC investigations.  Not surprisingly, given the increased public scrutiny and Amedisys's inability to continue to manipulate the Medicare payment system, Amedisys reported a ***39.8% (or $14.3 million) reduction in net income*** for the third quarter of 2010 (compared to the third quarter of the prior year) to $21.6 million, and a ***41% reduction in quarterly earnings per share*** from $1.29 to $0.76.

137.    Moreover, the following graph of the Company's reported earnings per share for each quarter of the Class Period, Amedisys reported record profits, until various partial disclosures concerning Amedisys's business operations began to enter the market in 2010:





138.    On October 26, 2010 at 10:00 a.m., Amedisys hosted a conference call to discuss third quarter 2010 earnings.  During the call, COO Michael Snow replied to a question from Whit Mayo with Robert Baird asking for additional insight into the recertification trends, noting that much of the change was "behavioral":

> Here is the long and short of it is as we went back and I think as we described in our calls earlier in the year, we tried to do analytics to try to get to the fundamentals of the change in research, and *frankly where we kind of landed is primarily behavioral*.  So whether it's from external factors or a combination of some of the internal education we did, that just kind of laid in the lap of *behavioral change*.

139.    Amedisys's use of the term "behavioral" as a euphemism for the behavior of the clinicians and their employees to no longer violate Medicare reimbursement regulations was not lost on the analysts.  For example, later in the October 26, 2010 conference call, Sheryl Skolnick questioned why Amedisys employees would feel the need to change their behavior:

> But I am very concerned here.  The number of visits per episode is up, okay.  The acuity is down, and you're facing a significant price compression next year, which one of my colleagues I think adeptly pointed out gives you fewer arrows in the quiver to offset this.  There is a behavioral change that's been undertaken by your clinicians, which – okay, that's an explanation, *but why they felt the need to change their behavior is still a question*.  And where I am going with this is why should I not be worried that all of these changes in pattern, the drop in acuity, the drop in research, the change in behavior, the compression of price, *why doesn't that add up to something that would make the DOJ ask questions?*

140.    In addition, on November 3, 2010, during the Oppenheimer Healthcare Conference, Defendant Borne again addressed the decline in recertification rates that Amedisys experienced, noting "But as we had this drop off which *we think is behavioral*, we hired an outside firm, OCS, to take a look at some of the dynamics around the drop off we saw at the end of the second quarter in recertifications, and *[the] only thing we can attribute it to is actual behavioral response from some of the noise we had, from some of the investigations or inquiries that were open*."

141.    Because presumably Amedisys continued providing patients with medically appropriate care during 2010, the only plausible explanation for the Company's drop-off in earnings is that Amedisys ceased providing patients with medically *unnecessary* care.

X.    **DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
MADE DURING THE CLASS PERIOD** [11]

142.    During the Class Period, Defendants made a series of materially false and

misleading statements that concealed Defendants' improper practices and artificially inflated the

value of Amedisys's publicly-traded securities.    Among other things, Defendants made

statements concerning Amedisys's financial results, including *inter alia* the Company's income,

revenue, retained earnings and earnings per share, which were materially false and misleading

due to Defendants' scheme to improperly manipulate the Medicare reimbursement system, as

alleged herein.    These misstatements were particularly material to investors given that the

Company's revenue is tied almost exclusively to Medicare reimbursements – indeed, according

to Amedisys's public filings, Medicare payments represented approximately 93%, 93%, 89%,

87% and 88% of the Company's revenue in 2005, 2006, 2007, 2008 and 2009, respectively.

Amedisys would swiftly cease to operate if the Company were unable to receive Medicare

reimbursements.    Defendants also made statements during the Class Period concerning the

Company's compliance with federal, state and local laws and regulations, which were materially

false and misleading due to Defendants' scheme to improperly manipulate the Medicare

reimbursement system.    Defendants' materially false and misleading statements are discussed in

greater detail below.

A.    **Defendants' Materially False and Misleading Statements
Concerning the Company's Second Quarter 2005 Financial Results**

143.    On August 2, 2005 (the first day of the Class Period), at 7:00 a.m., Amedisys

issued a press release announcing record earnings and revenue for the second quarter of 2005. [12]

Defendants stated in the press release:

---

[11]    Unless otherwise noted, all emphasis included in the misstatements set out herein has
been added.

For the quarter ended June 30, 2005, the Company reported net income of $7.9 million, or $0.50 per diluted share, on record net service revenue of $80.1 million. Net service revenue increased by 41% when compared with the $56.9 million reported for the comparable period in the prior year.

For the six months ended June 30, 2005 the Company reported net income of $15.0 million, or $0.95 per diluted share, on record net service revenue of $150.5 million.  Net service revenue increased by 44% when compared with the $104.2 million reported for the comparable period in the prior year.

In this press release, Defendant Borne also touted Amedisys's record financial results:

> *"Our continued commitment to both organic growth and selective acquisitions has resulted in the achievement of record quarterly revenue and earnings per share, as well as a significant increase in net income,"* noted William F. Borne, Chief Executive Officer of Amedisys. "Clearly, we are extremely pleased with the results, and *we remain confident that Amedisys can continue to deliver strong revenue and earnings growth for our shareholders*."

144.    Also on August 2, 2005, Amedisys held a conference call discussing its earnings for the second quarter of 2005.  During the conference call, Defendant Graham repeated the above information concerning Amedisys's second quarter 2005 financial results.

145.    On August 9, 2005, Amedisys issued its Form 10-Q for the second quarter of 2005 (the "2Q05 10-Q"), which repeated the above information concerning Amedisys's second quarter 2005 financial results.  Amedisys's 2Q05 10-Q also reported the Company's retained earnings of $31,491,000.

146.    Further, the 2Q05 10-Q included certifications from Defendants Borne and Browne who both certified, among other things, that:

- [the 2Q05 10-Q] does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report.

---

[12]    Quarterly financial results are announced retrospectively – so a company's second quarter financial results are announced in the third quarter, third quarter results are announced in the fourth quarter and so on.

- the financial statements, and other financial information included in [the 2Q05 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

Defendants Borne and Browne also certified that they had disclosed to the Company's auditors and its audit committee, "[a]ll significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting…" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in [Amedisys's] internal control over financial reporting." Further, Defendants Borne and Browne certified that the 2Q05 10-Q complied with the Exchange Act and that "[t]he information contained in the [2Q05 10-Q] fairly presents, in all material respects, the financial condition and result of operations of the Company.

147.    The above statements were materially false and misleading when made because, among other things:

(a) the statements concerning Amedisys's financial results, including revenue, income, earnings per share and retained earnings, and the purported reasons behind those increases, failed to disclose that they were materially and artificially inflated as a result of Defendants' improper manipulations of the Medicare reimbursement system, as described herein; and

(b) when signing the above-described certifications, Defendants Borne and Browne knew about or recklessly disregarded, and failed to disclose, Defendants' fraudulent scheme to improperly manipulate the Medicare reimbursement system, as described herein.

B.      **Defendants' Materially False and Misleading Statements**
        **Concerning the Company's Third Quarter 2005 Financial Results**

148.    At 8:01 a.m. on November 1, 2005, Amedisys issued a press release reporting its financial results for the third quarter of 2005. In this press release, the Company emphasized its "record quarterly revenue," stating:

> For the quarter ended September 30, 2005, the Company reported net income of $7.8 million, or $0.48 per diluted share, on record net service revenue of $112.2 million. Net service revenue increased by 92 percent when compared with the $58.5 million reported for the comparable period in the prior year. […]

> For the nine months ended September 30, 2005, the Company reported net income of $22.8 million, or $1.44 per diluted share, on net service revenue of $262.7 million. The diluted weighted average number of shares outstanding approximated 15.9 million in the nine months ended September 30, 2005 and 12.8 million in the comparable period of 2004.

The press release also quoted Defendant Borne as touting the Company's "strong Balance Sheet."

149.    Also on November 1, 2005, beginning at or about 10:00 a.m., Amedisys held a conference call discussing its earnings for the third quarter of 2005. During the conference call, Defendant Browne repeated the above information concerning Amedisys's third quarter 2005 financial results.

150.    On November 7, 2005, Amedisys filed a Form-8K with the SEC to which was attached an investor presentation touting Amedisys's "increasing revenue," "expanded margins," "strong cash flow," "EPS growth," and "solid balance sheet." Further, the investor presentation, among other things, repeated Amedysis's 2005 third quarter financial results, as described above.

151.    On November 9, 2005, Amedisys filed its Form 10-Q for the third quarter ended September 30, 2005 (the "3Q05 10-Q"), which again repeated the above information concerning Amedisys's third quarter 2005 financial results. Amedisys's 3Q05 10-Q also reported the Company's retained earnings of $39,251,000. Further, Defendants Borne and Browne provided

certifications that were substantially the same as the certifications described above which, among other things, attested to the accuracy and completeness of the information contained in Amedisys's 3Q05 10-Q.

152.    On February 13, 2006, Amedisys filed a Form-8K with the SEC to which was attached an investor presentation touting Amedisys's "increasing revenue," "expanded margins," "strong cash flow," "EPS growth," and "solid balance sheet."  Further, the investor presentation, among other things, repeated Amedysis's 2005 third quarter financial results, as described above.

153.    The above statements were materially false and misleading when made because, among other things:

(a) the statements concerning Amedisys's financial results, including revenue, income, earnings per share and retained earnings, and the purported reasons behind those increases, including Amedisys's strong internal growth, failed to disclose that they were materially and artificially inflated as a result of Defendants' improper manipulations of the Medicare reimbursement system, as described herein; and

(b) when signing the above-described certifications, Defendants Borne and Browne knew about or recklessly disregarded, and failed to disclose, Defendants' fraudulent scheme to improperly manipulate the Medicare reimbursement system, as described herein.

C.    **Defendants' Materially False and Misleading Statements Concerning the Company's Fourth Quarter and Year End 2005 Financial Results**

154.    At 6:00 p.m. on February 22, 2006, Amedisys reported its fourth quarter 2005 and 2005 year-end financial results.  In the earnings release, Amedisys announced:

For the year ended December 31, 2005, the Company reported net income of $30.1 million, or $1.88 per diluted share, on net service revenue of $381.6 million. […]  For the quarter ended December 31, 2005, the Company reported net income of $7.3 million, or $0.45 per diluted share, on record net service

revenue of $118.9 million. Net service revenue increased 85 percent when compared with the $64.4 million reported for the comparable period in the prior year.

In this earnings release, Defendant Borne stated that "fiscal 2005 represented the strongest net income and service revenue in Amedisys' history" and further touted Amedisys's performance by stating:

> Our results, both for the quarter and the full year, are indicative of Amedisys' continued solid top-line growth, which has been a critical driver in the Company's ability to deliver strong earnings growth over the last three years […] Amedisys reported an increase for the year ended December 31, 2005 in net service revenue of 68 percent, and in net income of approximately 47 percent, when compared with the prior year. Our results are due, in part, to the continued strong internal growth of Medicare admissions. This growth rate was approximately 16 percent for the fourth quarter, and 18 percent for the year, and reflects the significant efforts made by all of our field staff towards further enhancing the clinical reputation of the Company."

155.    At 10:00 a.m., on February 23, 2006, Amedisys held a conference call to discuss the Company's fourth quarter and year end 2005 earnings. During this conference call, Defendant Borne stated that the Company's "…revenue growth was 68 percent for the past year, our net income grew by 50 percent, and our earnings per share grew by 25 percent." Also on the conference call, Defendant Browne repeated the above information concerning Amedisys's fourth quarter and year end 2005 earnings and elaborated on those financial results, stating:

> Our revenues of 183.9 million represent an increase of 85% on 2004, and reflect continued strong internal growth… […] For the year, our revenues of 380 [i.e., million] …, the 1.6 million, represents an increase of 154.4 million or 68 percent on the previous year. […] Our net income for the quarter of 7.3 million or 45 cents per diluted share compares with 6.1 million or 39 cents per share in the fourth quarter of 2004. And for the 12 months ended December, our net income was 30.1 million, an increase of 47 percent when compared with the 20.5 million recorded in 2004.

156.    On March 1, 2006, Amedisys filed a Form 8-K with the SEC to which was attached an investor presentation touting Amedisys's "increasing revenue," "expanded margins," "strong cash flow," "EPS growth," and "solid balance sheet." Further, the investor presentation,

among other things, repeated Amedysis's fourth quarter and year-end 2005 financial results, as described above.

157.    On March 16, 2006, Amedisys filed its Form 10-K for the year ended December 31, 2005 (the "2005 10-K"), which repeated the above information concerning Amedisys's fourth quarter and year-end 2005 financial results and also reported retained earnings of $46,552,000.  Amedisys's 2005 10-K also incorporated the investor presentation slides filed with Amedisys's Form 8-Ks filed on March 1, 2006, February 13, 2006 and November 7, 2005 (described above).

158.    In addition, Amedisys's 2005 10-K discussed the regulation of the Company's business by federal, state and local authorities, laws and regulations which impose criminal and civil penalties for the submission of "false of fraudulent claims for Medicare, Medicaid or other health care reimbursements."  The Company stated "[w]e believe that we bill for our services under all state and federal health care programs accurately" and also stated "[w]e believe that we are in compliance with all state and federal fraud and abuse provisions and all other applicable government laws and regulations."  In addition, Defendants Borne and Browne provided certifications that were substantially the same as the certifications described above which, among other things, attested to the accuracy and completeness of the information contained in Amedisys's 2005 10-K.

159.    The above statements were materially false and misleading when made because, among other things:

(a) the statements concerning Amedisys's financial results, including revenue, income, earnings per share and retained earnings, and the purported reasons behind those increases, including Amedisys's strong internal growth, failed to disclose that they were

materially and artificially inflated as a result of Defendants' improper manipulations of the Medicare reimbursement system, as described herein;

(b) when making the material misstatements concerning Amedisys's compliance with relevant laws and regulations and the Company's accurate billing practices, Defendants knew or recklessly disregarded at the time, and failed to disclose, that they were engaged in a fraudulent scheme to improperly manipulate the Medicare reimbursement system, as described herein; and

(c) when signing the above-described certifications, Defendants Borne and Browne knew about or recklessly disregarded, and failed to disclose, Defendants' fraudulent scheme to improperly manipulate the Medicare reimbursement system, as described herein.

**D.     Defendants' Materially False and Misleading Statements Concerning the Company's First Quarter 2006 Financial Results**

160.    On May 2, 2006, at 8:01 a.m., Amedisys issued a press release announcing record earnings for the first quarter of 2006. The Company's press release stated:

> For the quarter ended March 31, 2006, the Company reported quarterly net income of $7.3 million, or $0.45 per diluted share, on record quarterly net service revenue of $127.2 million. Net service revenue increased by 81 percent when compared with the $70.4 million reported for the comparable period in the prior year.

In the press release, Defendant Borne also touted the Company's "record quarterly revenue" as being "indicative of … the continued significant demand for our services." Further Defendant Borne stated "[i]n particular, we have continued to deliver strong internal growth in Medicare admissions."

161.    Also on May 2, 2006, beginning at 10:00 a.m., Amedisys held a conference call discussing the Company's first quarter 2006 earnings. During this conference call, Defendant Borne touted the Company's "top line revenue growth" and "strong compliance program." In

addition, on the call, Defendant Browne repeated the above information concerning Amedysis's first quarter 2006 financial results. Further, Defendant Browne stated that Amedisys "recorded revenue per episode of $2,649 in the first quarter, an increase of approximately 2.3 percent over the first quarter of 2005 of $2,587."

162.    Also on May 2, 2006, Amedisys filed its Form 10-Q for the first quarter ended March 31, 2006 (the "1Q06 10-Q"), which repeated the above information concerning Amedisys's first quarter 2006 financial results. Amedisys's 1Q06 10-Q also reported retained earnings of $53,836,000. Further, Defendants Borne and Browne provided certifications that were substantially the same as the certifications described above which, among other things, attested to the accuracy and completeness of the information contained in Amedisys's 1Q06 10-Q.

163.    The above statements were materially false and misleading when made because, among other things:

(a) the statements concerning Amedisys's financial results, including revenue, income, earnings per share and retained earnings, and the purported reasons behind those increases, including "significant demand for our services" and a "strong compliance program," , failed to disclose that they were materially and artificially inflated as a result of Defendants' improper manipulations of the Medicare reimbursement system, as described herein; and

(b) when signing the above-described certifications, Defendants Borne and Browne knew about or recklessly disregarded, but failed to disclose, Defendants' fraudulent scheme to improperly manipulate the Medicare reimbursement system, as described herein.

**E.    Defendants' Materially False and Misleading Statements
Concerning the Company's Second Quarter 2006 Financial Results**

164.    On August 1, 2006 at 8:01 a.m., Amedisys issued its earnings release for the second quarter of 2006.  In this press release, the Company emphasized its "record quarterly net income," stating:

> For the quarter ended June 30, 2006, the Company reported record quarterly net income of $9.1 million, or $0.55 per diluted share, on record quarterly net service revenue of $132.9 million. Net service revenue increased by 66 percent when compared with the $80.1 million reported for the comparable period in the prior year.
>
> For the six-month period ended June 30, 2006, the Company reported year-to-date net income of $16.3 million, or $1.00 per diluted share, on year-to-date net service revenue of $260.1 million. Net service revenue increased by 73 percent when compared with the $150.5 million reported for the comparable period in the prior year.

In this press release, Defendant Borne also touted the Company's "strong revenue growth."

165.    Also on August 1, 2006, starting at around 10:00 a.m., Amedisys hosted a conference call concerning its "record second quarter results."   During the conference call, Amedisys's Principal Accounting Officer and Treasurer repeated the above financial information concerning Amedisys's second quarter 2006 financial results.

166.    Also on August 1, 2006, Amedisys issued its Form 10-Q for the second quarter of 2006 (the "2Q06 10-Q"), which again repeated above financial information concerning Amedisys's second quarter 2006 financial results.  Amedisys's 2Q06 10-Q also reported the Company's retained earnings of $62,889,000.  Further, Defendant Borne and Amedisys's Principal Accounting Officer and Treasurer provided certifications that were substantially the same as the certifications described above which, among other things, attested to the accuracy and completeness of the information contained in Amedisys's 2Q06 10-Q.

167.    The above statements were materially false and misleading when made because, among other things:

(a) the statements concerning Amedisys's financial results, including revenue, income, earnings per share and retained earnings, and the purported reasons behind those increases, including strong internal growth, failed to disclose that they were materially and artificially inflated as a result of Defendants' improper manipulations of the Medicare reimbursement system, as described herein; and

(b) when signing the above-described certifications, Defendant Borne knew about or recklessly disregarded, and failed to disclose, Defendants' fraudulent scheme to improperly manipulate the Medicare reimbursement system, as described herein.

**F.    Defendants' Materially False and Misleading Statements
Concerning the Company's Third Quarter 2006 Financial Results**

168.    On October 25, 2006, at 8:00 a.m., Amedisys issued its earnings release for the third quarter of 2006.  In this press release, the Company again broadcast its "record quarterly net income," stating:

> For the quarter ended September 30, 2006, the Company reported record quarterly net income of $10.6 million, or $0.64 per diluted share, a 33 percent increase in earnings per share over the same quarter last year.  These earnings were achieved on record quarterly net service revenue of $137.0 million.  Net service revenue increased by 22 percent when compared with the $112.2 million reported for the comparable period in the prior year.  […]

> For the nine-month period ended September 30, 2006, the Company reported year-to-date net income of $26.9 million, or $1.65 per diluted share, on year-to-date net service revenue of $397.1 million.  Net service revenue increased by 51 percent when compared with the $262.7 million reported for the comparable period in the prior year.

In the press release Defendant Borne touted the Company's "improved operating results" and "continuing strong internal growth" among other things to "drive earnings and enhance shareholder returns."

169.    Also on October 25, 2006, starting at 10:00 a.m., Amedisys hosted a conference call discussing its earnings for the third quarter of 2006.  During the conference call, Amedisys's Principal Accounting Officer and Treasurer repeated the above information concerning Amedisys's third quarter 2006 financial results.  Further, during the call Defendant Borne discussed the Company's new "Point of Care" system noting that it would "enhance [the Company's] compliance efforts by mandating and standardizing documentation while validating clinical necessity for all care provided."

170.    Also on October 25, 2006, Amedisys filed its Form 10-Q for the third quarter of 2006 (the "3Q06 10-Q"), which again repeated the above information concerning Amedisys's third quarter 2006 financial results.  Amedisys's 3Q06 10-Q also reported the Company's retained earnings of $73,448,000.  Further, Defendant Borne and Amedisys's Principal Accounting Officer and Treasurer provided certifications that were substantially the same as the certifications described above which, among other things, attested to the accuracy and completeness of the information contained in Amedisys's 3Q06 10-Q.

171.    The above statements were materially false and misleading when made because, among other things:

(a) the statements concerning Amedisys's financial results, including revenue, income, earnings per share and retained earnings, and the purported reasons behind those increases, including "continuing strong internal growth," failed to disclose that they were

materially and artificially inflated as a result of Defendants' improper manipulations of the Medicare reimbursement system, as described herein;

(b) when making the material misstatements concerning enhancement of the Company's compliance efforts and validating clinical necessity for Amedisys's provision of care, Defendant Borne knew or recklessly disregarded at the time, and failed to disclose, that Defendants were engaged in a fraudulent scheme to improperly manipulate the Medicare reimbursement system, as described herein; and

(c) when signing the above-described certifications, Defendant Borne knew about or recklessly disregarded, and failed to disclose, Defendants' fraudulent scheme to improperly manipulate the Medicare reimbursement system, as described herein.

### G. Defendants' Materially False and Misleading Statements Concerning the Company's Fourth Quarter and Year-End 2006 Financial Results

172. On February 20, 2007, at 7:00 a.m., Amedisys issued its earnings release for the fourth quarter and year end 2006.  The press release stated:

> For the year ended December 31, 2006, the Company reported record net income of $38.3 million, or $1.72 per diluted share, on record net service revenue of $541.1 million.  […]

> For the quarter ended December 31, 2006, the Company reported record quarterly net income of $11.4 million, or $0.48 per diluted share, on record quarterly net service revenue of $144.0 million.

In this press release, Defendant Borne touted "yet another year of record revenues and record net income."  Defendant Borne also highlighted to investors that the Company's "earnings per share have grown over 20 percent in each of the past four years."  In this press release, the Company also announced the resignation of Defendant Giblin after only four short months of working at

the Company. The press release quotes Defendant Giblin as stating that he "…believe[d] the Company is poised to continue its impressive trend of growth and profitability."

173.   Also on February 20, 2007, starting at 10:00 a.m., Amedisys hosted a conference call to discuss the Company's financial results for the fourth quarter and year end of 2006. In commenting on the record results for the year Defendant Borne touted the Company's accomplishments, stating:

> This has been an exciting year for us. We posted record revenues and record earnings per share for 2006… Our revenues doubled in the past 24 months as a result of both internal growth and acquisitions, and our net income has nearly doubled over the same period.

Defendant Giblin repeated the above information concerning Amedisys's financial results for the fourth quarter and year end of 2006 and offered the following statements elaborating on that financial information:

> Our fourth quarter revenues grew nearly 21% over the 2005 fourth quarter to a quarterly record $144 million on a 29% increase in completed episodes of Care. […]
>
> Revenue per episode totaled [$]2,612 in the current quarter, up 1.7% from $2,569 in last year's fourth quarter. […]
>
> Net income totaled $11.4 million this quarter or $0.48 per diluted share, a new quarterly record, increasing 56% from the 7.3 million or $0.34 per diluted share reported for last year's fourth quarter. […]  For the full-year 2006, we grew our net service revenue by 42% over the 2005 period to a record $541.1 million on a 43% increase in complete episodes of Care…   Revenue per episode totaled $2,634 in 2006, up 2.6% from 2,567 in 2005.

174.   Also on February 20, 2007, Amedisys filed its Form 10-K for the year ended December 31, 2006 (the "2006 10-K"), which again reiterated the above information concerning Amedisys's financial results for the fourth quarter and year end of 2006. Amedisys's 2006 10-K also reported the Company's retained earnings of $84,807,000. Further, the 2006 10-K touted

extensively Amedisys's compliance program and practices and, in particular, its billing-related

compliance training practices:

### Compliance and Quality Improvement

We are a health care services business and the quality and reputation of our personnel and operations are critical to our success. ***We develop, implement and maintain comprehensive compliance and quality improvement programs as a component of the centralized corporate services provided to our home health and hospice agencies.*** Our compliance program includes a code of ethical conduct for our employees and affiliates and a process for reporting regulatory or ethical concerns to our Chief Compliance Officer, including a toll-free telephone hotline. We have a Compliance Committee, which is chaired by the Chief Compliance Officer and is comprised of our Chief Executive Officer, Chief Operating Officer, the Senior Vice President of Clinical Operations and the Senior Vice President of Human Resources. This Corporate Compliance Committee reviews and recommends appropriate courses of action for handling compliance issues.

The effectiveness of our compliance program is directly related to the legal and ethical training that we provide to our employees. […] In particular, all employees in our corporate offices and in the field that are involved in the billing process are required to participate in an ***annual billing compliance seminar*** that is led by the Chief Compliance Officer and is conducted at various, regional sites each year. ***Additionally, billing staff are also required to complete an annual Billing Compliance Training and Certification course***… […] In addition, all of our employees are required to receive continuing compliance education and training each year. ***We conduct periodic compliance surveys of all of our agencies, which include audits of patient charts and documentation to ensure compliance with Medicare regulations***. Audit findings and corresponding action plans are routed to both the Chief Compliance Officer and the Senior Vice President of Operations.

***Our compliance and quality improvement programs are intended to ensure that our employees are well trained and capable of delivering high-quality service***. We incorporate compliance staffing and oversight into our growth plans and believe our consistent focus on compliance and quality improvement provides us with a competitive advantage in the market.

Further, Defendants Borne and Giblin provided certifications that were substantially the same as

the certifications described above which, among other things, attested to the accuracy and

completeness of the information contained in Amedisys's 2006 10-K.

175.    The above statements were materially false and misleading when made because, among other things:

(a) the statements concerning Amedisys's financial results, including revenue, income, earnings per share and retained earnings, and the purported reasons behind those increases, including "comprehensive compliance and quality improvement programs," failed to disclose that they were materially and artificially inflated as a result of Defendants' improper manipulations of the Medicare reimbursement system, as described herein;

(b) when making the material misstatements concerning Amedisys's compliance practices, Defendants knew or recklessly disregarded at the time, and failed to disclose, that they were engaged in a fraudulent scheme to improperly manipulate the Medicare reimbursement system, as described herein; and

(c) when signing the above-described certifications, Defendants Borne and Giblin knew about or recklessly disregarded, and failed to disclose, Defendants' fraudulent scheme to improperly manipulate the Medicare reimbursement system, as described herein.

**H.    Defendants' Materially False and Misleading Statements Concerning the Company's First Quarter 2007 Financial Results**

176.    On May 1, 2007, at 7:00 a.m., Amedisys issued its earnings release for the first quarter of 2007 and announced yet another quarter of "record first quarter revenues and earnings."  According to the Company's press release:

- Net service revenues were $153.6 million, up 21% compared to $127.2 million reported for the first quarter of 2006.

- Net income was $13.3 million, or $0.51 per diluted share, compared to $7.3 million, or $0.34 per diluted share, for the first quarter of 2006.

In the press release, Defendant Borne touted the Company's "position as the nation's leading market provider in the home health services industry" and its "record quarterly revenues and

record net income." Defendant Borne also stated that Amedisys's "diluted earnings per share increased 50% from the first quarter of 2006 to the first quarter of 2007." In addition, the Company disclosed that its revenue per episode for the first quarter of 2007 was $2,644.

177. Also on May 1, 2007, starting at 10:00 a.m., Amedisys held a conference call discussing its first quarter 2007 financial results. During the call, Defendant Borne touted the Company's "record revenues" and repeated the above information concerning Amedisys's first quarter 2007 earnings. Defendant Redman also touted Amedisys's "outstanding quarter," noting that the Company "set a number of records" and repeated the above information concerning Amedisys's first quarter 2007 earnings.

178. Also on May 1, 2007, Amedisys issued its Form 10-Q for the first quarter of 2007 (the "1Q07 10-Q"), which again repeated the above information concerning Amedisys's first quarter 2007 earnings. Amedisys's 1Q07 10-Q also reported the Company's retained earnings of $97,722,000. Further, Defendants Borne and Redman provided certifications that were substantially the same as the certifications described above which, among other things, attested to the accuracy and completeness of the information contained in Amedisys's 1Q07 10-Q.

179. The above statements were materially false and misleading when made because, among other things:

(a) the statements concerning Amedisys's financial results, including revenue, income, earnings per share and retained earnings, and the purported reasons behind those increases, including strong internal growth, failed to disclose that they were materially and artificially inflated as a result of Defendants' improper manipulations of the Medicare reimbursement system, as described herein;

116

(b) when signing the above-described certifications, Defendants Borne and Redman knew about or recklessly disregarded, and failed to disclose, Defendants' fraudulent scheme to improperly manipulate the Medicare reimbursement system, as described herein.

**I.    Defendants' Materially False and Misleading Statements Concerning the Company's Second Quarter 2007 Financial Results**

180.    On July 31, 2007, at 7:00 a.m., Amedisys issued its earnings release for the second quarter of 2007, announcing yet another quarter of record revenues and income.  The Company's press release stated:

Three-Month Periods Ended June 30, 2007 and 2006

- Net service revenue was $169.5 million, up 27.5% compared to $132.9 million reported for the second quarter of 2006.

- Net income was $14.9 million, up 64.8% compared to $9.1 million for the second quarter of 2006, with diluted earnings per share of $0.57 for the second quarter of 2007, up 35.7% from $0.42 per diluted share for the second quarter of 2006.

- Earnings before interest, taxes, depreciation and amortization ("EBITDA") was $26.3 million, up 44.6% compared to $18.2 million during the second quarter of 2006.

Six-Month Periods Ended June 30, 2007 and 2006

- Net service revenue was $323.0 million, up 24.2% compared to $260.1 million reported for 2006.

- Net income was $28.2 million, up 72.5% compared to $16.3 million for 2006, with diluted earnings per share of $1.08 for the six-month period ended June 30, 2007, up 44.0% from $0.75 per diluted share for 2006.

- EBITDA was $49.9 million, up 49.4% compared to $33.4 million during 2006.

In this press release, Defendant Borne touted "another exceptional quarter for us, with record revenues and record earnings."  Further, the Company disclosed its revenue per episode of $2,671 and $2,658 for the three-month and six-month periods ended June 30, 2007, respectively.

181.    Also on July 31, 2007, starting at 10:00 a.m., Amedisys hosted a conference call concerning its earnings release for the second quarter of 2007.  On the call, Defendant Borne touted Amedisys's "record revenues of $169 million and record earnings of $0.57 per share." Defendant Redman also spoke on the conference call and repeated the above information concerning Amedisys's second quarter 2007 financial results.

182.    Also on July 31, 2007, Amedisys issued its Form 10-Q for the second quarter of 2007 (the "2Q07 10-Q"), which again repeated the above information concerning Amedisys's second quarter 2007 financial results.  Amedisys's 2Q07 10-Q also reported the Company's retained earnings of $112,639,000.  Further, Defendants Borne and Redman provided certifications that were substantially the same as the certifications described above which, among other things, attested to the accuracy and completeness of the information contained in Amedisys's 2Q07 10-Q.

183.    The above statements were materially false and misleading when made because, among other things:

(a) the statements concerning Amedisys's financial results, including revenue, income, earnings per share and retained earnings, and the purported reasons behind those increases, including strong internal growth, failed to disclose that they were materially and artificially inflated as a result of Defendants' improper manipulations of the Medicare reimbursement system, as described herein; and

(b) when signing the above-described certifications, Defendants Borne and Redman knew about or recklessly disregarded, and failed to disclose, Defendants' fraudulent scheme to improperly manipulate the Medicare reimbursement system, as described herein.

**J.**    **Defendants' Materially False and Misleading Statements Concerning the Company's Third Quarter 2007 Financial Results**

184.    On October 30, 2007, at 7:00 a.m., Amedisys issued an earnings release announcing that the Company had set yet another record with its earnings for the third quarter of 2007. Amedisys's press release stated:

Three-Month Periods Ended September 30, 2007 and 2006

- Net service revenue was $180.9 million, up 32.0% compared to $137.0 million reported for the third quarter of 2006.

- Net income was $20.2 million or $0.77 per diluted share, inclusive of $4.2 million related to Alliance or $0.16 per diluted share. Excluding the Alliance gain, net income was $16.0 million, up 51.6% compared to $10.6 million for the third quarter of 2006, with diluted earnings per share of $0.61 for the third quarter of 2007, up 27.1% from $0.48 per diluted share for the third quarter of 2006.

- Earnings before interest, taxes, depreciation and amortization ("EBITDA"), excluding Alliance was $29.5 million, up 44.5% compared to $20.4 million during the third quarter of 2006.

Six-Month Periods Ended September 30, 2007 and 2006

- Net service revenue was $503.9 million, up 26.9% compared to $397.1 million reported for 2006.

- Net income was $48.4 million or $1.85 per diluted share, inclusive of $4.2 million related to Alliance or $0.16 per diluted share. Excluding the Alliance gain, net income was $44.2 million, up 64.3% compared to $26.9 million for 2006, with diluted earnings per share of $1.69 for the nine-month period ended September 30, 2007, up 37.4% from $1.23 per diluted share for 2006.

- EBITDA, excluding Alliance was $79.3 million, up 47.6% compared to $53.8 million during 2006.

In this press release, Defendant Borne touted the Company's "record revenues and earnings." Further, the Company disclosed its revenue per episode of $2,679 and $2,666 for the three-month and six-month periods ended September 30, 2007, respectively.

185.    Also on October 30, 2007, starting at 10:00 a.m., Amedisys hosted a conference call to discuss its third quarter 2007 earnings. On the call, Defendant Borne touted Amedisys's

"record revenues of $181 million and record earnings of $0.61 per diluted share excluding the Alliance matter." Defendant Redman also spoke on the conference call and repeated the above information concerning Amedisys's third quarter 2007 financial results. Defendant Graham spoke about the impact that the new point of care system would have on the Company's compliance:

> It is very important to us as we continue to grow that we stay focused on three very important areas, our care coordination abilities, our clinical outcomes *and most importantly, our compliance controls*. The design of our point-of-care system was very purposeful in order to further enhance these areas. [...] *We will continue to stay committed to enhancing our care coordination abilities and our compliance controls each year.*

186. Further, during the question and answer portion of the October 30, 2007, conference call, Defendant Redman emphasized the Company's point of care system as a means of enhancing the Company's compliance with the CMS regulations:

> We have benefited from the system-wide roll-out of our point-of-care system, which has enabled our clinical assessment data to become more consistent when compared with a paper-based environment. [...] *So, these care consistency reminders that Larry referred to earlier, they enhance our care coordination, they enhance our documentation, ultimately, our comp compliance. . .*

187. Also on October 30, 2007, Amedisys issued its Form 10-Q for the third quarter of 2007 (the "3Q07 10-Q"), which again repeated the above information concerning Amedisys's third quarter 2007 financial results. Amedisys's 3Q07 10-Q also reported the Company's retained earnings of $132,855,000. Further, Defendants Borne and Redman provided certifications that were substantially the same as the certifications described above which, among other things, attested to the accuracy and completeness of the information contained in Amedisys's 3Q07 10-Q.

188. The above statements were materially false and misleading when made because, among other things:

(a) the statements concerning Amedisys's financial results, including revenue, income, earnings per share and retained earnings, and the purported reasons behind those increases, including its "compliance controls," failed to disclose that they were materially and artificially inflated as a result of Defendants' improper manipulations of the Medicare reimbursement system, as described herein;

(b) when making the material misstatements concerning the enhancement of the Company's compliance efforts, Defendants Graham and Redman knew or recklessly disregarded at the time, and failed to disclose, that Defendants were engaged in a fraudulent scheme to improperly manipulate the Medicare reimbursement system, as described herein; and

(c) when signing the above-described certifications, Defendants Borne and Redman knew about or recklessly disregarded, and failed to disclose, Defendants' fraudulent scheme to improperly manipulate the Medicare reimbursement system, as described herein.

**K.      Defendants' Materially False and Misleading Statements Concerning the Company's Fourth Quarter and Year End 2007 Financial Results**

189.    On February 27, 2008, at 7:00 a.m., Amedisys issued its earnings release for the fourth quarter and year ended December 31, 2007.  Amedisys's press release stated:

Three-Month Periods Ended December 31, 2007 and 2006

- Net service revenue for the fourth quarter of 2007 increased 34.7% to $194.0 million compared to $144.0 million in the fourth quarter of 2006.

- Net income increased 47.2% to $16.7 million compared to $11.4 million in the fourth quarter of 2006.

- Diluted earnings per share increased 31.3% to $0.63 compared to $0.48 per diluted share in the fourth quarter of 2006.

- Earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 38.8% to $30.4 million compared to $21.9 million in the fourth quarter of 2006.

Years Ended December 31, 2007 and 2006

- Net service revenue for the full-year period in 2007 increased 29.0% to $697.9 million compared to $541.1 million in 2006.

- Net income increased to $65.1 million, or $2.48 per diluted share (inclusive of a $4.2 million gain related to Alliance* or $0.16 per diluted share). Excluding the gain on release of Alliance's net liabilities, net income increased 59.2% to $60.9 million compared to $38.3 million in 2006.

- Diluted earnings per share (excluding Alliance) increased 34.9% to $2.32 compared to $1.72 per diluted share in 2006.

- EBITDA (excluding Alliance) increased 45.0% to $109.8 million compared to $75.7 million in 2006.

In this press release, Defendant Borne touted the Company's "record revenues and net income results" and highlighted that "[i]n addition to achieving strong double-digit growth in net service revenue and net income, this was the fifth consecutive year that earnings per share growth has exceeded 20 percent." Further, the Company disclosed its revenue per episode of $2,666 and $2,666 for the three-month and twelve-month periods ended Decmber 30, 2007, respectively.

190.    Also on February 27, 2008, starting at 10:00 a.m., Amedisys hosted a conference call to discuss the Company's earnings for the fourth quarter and year ended December 31, 2007. On the call, Defendant Borne touted Amedisys's financial results stating "[f]or the fourth quarter, we recorded net revenue of $194 million and earnings per share of $0.63, growth of 35 and 31% respectively of over the fourth quarter of 2006." Further, Defendant Borne stated "[f]or the full year we recorded net revenue of $698 million and earnings per share of $2.32, growth of 29 and 35% respectively." Defendant Redman also spoke on the conference call and repeated the above information concerning Amedisys's financial results for the fourth quarter and year ended December 31, 2007.

191.    Also on February 27, 2008, Amedisys issued its Form 10-K for the year ended December 31, 2007 (the "2007 10-K"), which again repeated the above information concerning

Amedisys's financial results for the fourth quarter and year ended December 31, 2007. Amedisys's 2007 10-K also reported the Company's retained earnings of $149,570,000.  The 2007 10-K also repeated the Company's statements contained in the 2006 10-K, described above, touting Amedisys's compliance program and practices and, in particular, its billing-related compliance training practices.   Further, Defendants Borne and Redman provided certifications that were substantially the same as the certifications described above which, among other things, attested to the accuracy and completeness of the information contained in Amedisys's 2007 10-K.

192.    The above statements were materially false and misleading when made because, among other things:

(a) the statements concerning Amedisys's financial results, including revenue, income, earnings per share and retained earnings, and the purported reasons behind those increases, including its compliance program and practices, failed to disclose that they were materially and artificially inflated as a result of Defendants' improper manipulations of the Medicare reimbursement system, as described herein;

(b) when making the material misstatements concerning Amedisys's compliance practices, Defendants knew or recklessly disregarded at the time, and failed to disclose, that they were engaged in a fraudulent scheme to improperly manipulate the Medicare reimbursement system, as described herein; and

(c) when signing the above-described certifications, Defendants Borne and Giblin knew about or recklessly disregarded, and failed to disclose, Defendants' fraudulent scheme to improperly manipulate the Medicare reimbursement system, as described herein.

L.    **Defendants' Materially False and Misleading Statements
Concerning the Company's First Quarter 2008 Financial Results**

193.    On April 30, 2008, at 6:00 a.m., Amedisys issued its earnings release for the first

quarter of 2008.  Amedisys's press release stated:

Three-Month Periods Ended March 31, 2008 and 2007

- Net service revenue for the first quarter of 2008 increased 38.7% to $213.1
  million compared to $153.6 million in 2007.

- Net income increased 24.1% to $16.5 million compared to $13.3 million in
  2007.

- Diluted earnings per share increased 21.6% to $0.62 compared to $0.51 per
  diluted share in 2007.

- Earnings before interest, taxes, depreciation and amortization ("EBITDA")
  increased 37.0% to $32.3 million compared to $23.6 million in 2007.

In this press release, Defendant Borne touted the Company's "record revenue and strong EPS."

Further, the Company disclosed its revenue per episode of $2,680 for the three-month period

ended March 31, 2008.

194.    Also on April 30, 2008, starting at 10:00 a.m., Amedisys hosted a conference call

to discuss the Company's earnings for the first quarter of 2008.  On the call, Defendant Borne

touted Amedisys's financial results stating "[w]e had excellent results for the first quarter,

recording net revenue of $213 million and earnings per share of $0.62 … [t]his represents growth

of 39% and 22%, respectively, over the first quarter of '07."  Defendant Redman also spoke on

the conference call and repeated the above information concerning Amedisys's financial results

for the first quarter of 2008.

195.    Also on April 30, 2008, Amedisys issued its Form 10-Q for the quarter ended

March 31, 2008 (the "1Q08 10-Q"), which again repeated the above information concerning

Amedisys's financial results for the first quarter 2008.  Amedisys's 1Q08 10-Q also reported the

Company's retained earnings of $166,034,000. Further, Defendants Borne and Redman provided certifications that were substantially the same as the certifications described above which, among other things, attested to the accuracy and completeness of the information contained in Amedisys's 1Q08 10-Q.

196.    The above statements were materially false and misleading when made because, among other things:

(a) the statements concerning Amedisys's financial results, including revenue, income, earnings per share and retained earnings, and the purported reasons behind those increases, including strong internal growth, failed to disclose that they were materially and artificially inflated as a result of Defendants' improper manipulations of the Medicare reimbursement system, as described herein; and

(b) when signing the above-described certifications, Defendants Borne and Redman knew about or recklessly disregarded, and failed to disclose, Defendants' fraudulent scheme to improperly manipulate the Medicare reimbursement system, as described herein.

**M.    Defendants' Materially False and Misleading Statements Concerning the Company's Second Quarter 2008 Financial Results**

197.    On the morning of July 29, 2008, at 6:00 a.m., Amedisys issued its earnings release for the second quarter of 2008. Amedisys's press release stated:

Three-Month Periods Ended June 30, 2008 and 2007

- Net service revenue increased 84.5% to $312.7 million compared to $169.5 million in 2007.

- Net income increased 36.6% to $20.4 million compared to $14.9 million in 2007.

- Diluted earnings per share increased 33.3% to $0.76 compared to $0.57 per diluted share in 2007.

- Earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 68.7% to $44.3 million compared to $26.3 million in 2007.

Six-Month Periods Ended June 30, 2008 and 2007

- Net service revenue increased 62.8% to $525.8 million compared to $323.0 million in 2007

- Net income increased 30.8% to $36.8 million compared to $28.2 million in 2007.

- Diluted earnings per share increased 27.8% to $1.38 compared to $1.08 per diluted share in 2007.

- EBITDA increased 53.7% to $76.6 million compared to $49.9 million in 2007.

Further, the Company disclosed its average revenue per episode of $2,852 and $2,782 for the three-month and six-month periods ended June 30, 2008, respectively.

198.    Also on July 29, 2008, starting at 10:00 a.m., Amedisys hosted a conference call to discuss the Company's earnings for the second quarter of 2008.  On the call, Defendant Borne touted Amedisys's financial results stating "[w]e had outstanding result [sic] for the second quarter, recording net revenue of [$]313 million and earnings per share of $0.82 after adjusting for certain TLC integration costs … [t]his represents growth of 85% and 44%, respectively, over the second quarter of '07."  Defendant Redman also spoke on the conference call and repeated the above information concerning Amedisys's financial results for the second quarter of 2008.

199.    Also on July 29, 2008, Amedisys issued its Form 10-Q for the quarter ended June 30, 2008 (the "2Q08 10-Q"), which again repeated the above information concerning Amedisys's financial results for the second quarter 2008.  Amedisys's 2Q08 10-Q also reported the Company's retained earnings of $186,418,000.  Further, Defendants Borne and Redman provided certifications that were substantially the same as the certifications described above

which, among other things, attested to the accuracy and completeness of the information contained in Amedisys's 2Q08 10-Q.

200.    The above statements were materially false and misleading when made because, among other things:

(a) the statements concerning Amedisys's financial results, including revenue, income, earnings per share and retained earnings, and the purported reasons behind those increases, including strong internal growth, failed to disclose that they were materially and artificially inflated as a result of Defendants' improper manipulations of the Medicare reimbursement system, as described herein; and

(b) when signing the above-described certifications, Defendants Borne and Redman knew about or recklessly disregarded, and failed to disclose, Defendants' fraudulent scheme to improperly manipulate the Medicare reimbursement system, as described herein.

### N.    Defendants' Materially False and Misleading Statements Concerning the Company's Third Quarter 2008 Financial Results

201.    On October 28, 2008, at 6:00 a.m., Amedisys issued its earnings release for the third quarter of 2008.  Amedisys's press release stated:

Three-Month Periods Ended September 30, 2008 and 2007

- Net service revenue increased 77.7% to $321.6 million compared to $180.9 million in 2007.

- Net income increased 16.2% to $23.5 million compared to $20.2 million in 2007.

- Diluted earnings per share increased 13.0% to $0.87 compared to $0.77 per diluted share in 2007.

- Earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 46.4% to $49.4 million compared to $33.7 million in 2007.

Nine-Month Periods Ended September 30, 2008 and 2007

- Net service revenue increased 68.1% to $847.3 million compared to $503.9 million in 2007.

- Net income increased 24.7% to $60.3 million compared to $48.4 million in 2007.

- Diluted earnings per share increased 21.6% to $2.25 compared to $1.85 per diluted share in 2007.

- EBITDA increased 50.8% to $126.0 million compared to $83.6 million in 2007.

Further, the Company disclosed its average episode-based revenue per completed episode of $2,868 and $2,808 for the three-month and six-month periods ended September 30, 2008, respectively.

202.    Also on October 28, 2008, starting at 10:00 a.m., Amedisys hosted a conference call to discuss its 2008 third quarter earnings.  In his opening remarks, Defendant Borne repeated certain information concerning the Company's third quarter earnings outlined above, including the Company's "net revenue of $322 million and adjusted earnings per share of $0.89…[representing] growth of 78% and 46%, respectively over the third quarter of 2007." Defendant Borne also touted the Company's results for the nine-month period ended September 30, 2008, as described above.  Defendant Borne also emphasized the importance of high quality care and compliance to Amedisys:

> High clinical care in a top -- is a top priority, and **compliance is central to everything we do as a company**.  We would like investors to fully understand our commitment to both of these components of being a healthcare provider, and we believe today's call is a great forum to provide that information.
>
> **Amedisys is a leader in disclosing detailed information**.  **In our effort to be even more transparent, we have changed the format of today's call to provide a comprehensive, detailed review of our process and controls as it relates to our clinical population and compliance program**.

203.    Also during this conference call Defendant Redman repeated the above information concerning Amedisys's financial results for the third quarter of 2008.

204.    Further, during the October 28, 2008 conference call, Larry Graham noted an

increase in recertifications over the prior year:

> For the quarter, our internal growth rate over last year in episodic-based
> admissions was 14%.  Our internal recertification growth over prior year was
> 23%.  The increase in our recertifications are the result of our admission growth,
> our startup initiative, and our agencies acquired over the past two years that have
> transitioned into our base agencies. As an agency opens, we first develop our
> census by obtaining patient admissions. However, as time progresses, these
> patients may require an additional episode of care and thus cause our
> recertification rate to increase. […]
>
> To summarize this, our internal episodic-based revenue growth rate in dollars
> grew 28%, which consists of volume growth of 19%. As a reminder, volume
> growth is total episodic growth, which is admit plus recert growth.

205.    Defendant Graham also touted Amedisys's ability to service sicker, higher-risk

patients:

> Before I turn the call over to Alice Ann, I went to highlight some key points related to the
> chronicity of our patient population.  […]
>
> Amedisys is a clear example of a home-health provider with a higher distribution of
> patients on the high end of the risk scale.  More than one half of all patients admitted by
> Amedisys agencies are predicted to be of high or very high risk of hospitalization
> compared to just one third of patients nationwide.  Conversely, only 10% of the
> Amedisys patients are assessed as low or very low risk compared to 23% of patients
> nationally.
>
> Another indicator of overall patient severity is length of stay, with higher-severity
> patients requiring more days of service, as a general rule.  As patient length of stay
> increases, hospitalization rates also increase, and many measures of patient outcomes
> typically decrease.  The higher severity of Amedisys patients is also shown by longer
> length of stay than the national benchmarks, based on 2008 data.
>
> The average Medicare patient requires approximately 1.55 episodes of care. The average
> Amedisys Medicare patient receives about 1.85 episodes of care.  The logical result of a
> high-risk patient population is overall lower quality outcome scores.  Yet despite caring
> for a population that is considerably higher risk and requires a longer length of stay than
> the national norm, ***Amedisys has shown consistently higher overall quality of care***, as
> measured by the OCS Standardized Outcome Index, referred to as SOI, a proprietary
> measure that offers a single number representative of overall quality.
>
> ***In conclusion, Amedisys excels in a complicated care-management environment, as***

*evidenced by a patient population with higher than national risk characteristics requiring a longer length of care and yet producing quality patient outcomes*.

206.    During the October 28, 2008 earnings call, Defendant Alice Ann Schwartz, Chief Information Officer and Senior Vice President of Clinical Operations, reinforced and elaborated upon Defendant Graham's statements regarding the quality of care delivered by Amedisys – despite the higher chronicity and clinical acuity of Amedisys patients.

> Clinical acuity, meaning how sick or debilitated a patient is, is expressed in home care by what is known as a case-mix weight. […] … *Amedisys' case-mix weight is higher than both national and regional norms.* […] *We service a sicker population requiring greater resource needs.*
>
> *With a trend of sicker patients receiving services each year, our approach has been to develop our care management systems and evidence based clinical programs, with a focus on better servicing our senior population that has a multiple of clinical needs.*

Defendant Schwartz continued on to tout Amedisys's specialty programs such as Balanced For Life.

207.    Defendant Schwartz also highlighted the merits of Amedisys's compliance practices:

> We have 461 home care locations that are all connected via a wide area network. All of our full time and consistent PRN employees in home care have laptops and are using those to input clinical visit information in the patient's home. We had *three goals* when developing this system. *Enhanced standardization with consistency and compliance control*, the ability to have most all of our notes in digital format and the ability to provide more intensive care management services to our populations.
>
> You will continue to see the company further integrate evidence-based clinical management standards in its technology, and expand it's system capability. Details on our businesses system infrastructure will be posted on the website, including our organizational coding control, clinical auditing controls, billing controls, *compliance controls,* patient recertification controls, and clinical auditing state survey trends…

208.    Defendant Jeffrey Jeter, Chief Compliance Officer/Corporate Counsel, also spoke during the October 28, 2008 conference call, touting the compliance functions in place at Amedisys, including concerning its billing-related compliance programs:

Our compliance program features a multi-layer and recurrent approach designed to ensure the propriety of both our services and our billings. At the outset, it must be noted that the Amedisys compliance program is based on the OIG's model Compliance Guidance for Home Health and Hospice. As Chief Compliance Officer, I am the person responsible for oversight of the compliance functions of Amedisys.

*        *        *

…And Amedisys has implemented a targeted and tiered training strategy to train all of our staff about the seminal importance of compliance in our day-to-day jobs. Every employee in the company is required to complete general compliance training upon hire, and then annually thereafter.

In addition, any staff involved in billing and coding functions, both from a corporate level as well as a local agency level, must participate in a separate billing-compliance training. We also require that all of our billing personnel complete annual competency testing and training. Similarly, our sales force is required to receive special compliance training concerning how they market, and the constraints and legal limitations placed on their marketing activities by the federal anti-kickback law and the Stark law.

209.    Defendant Jeter also discussed centrality of the point of care system to the Company's compliance practices:

Additionally, ***our point-of-care system represents a fundamental compliance control*** and is the sort of technology that helps us improve not only what we do in terms of clinical care ***but how we do it in terms of our adherence to Medicare rules and regulations.***

***One simply cannot overemphasize the importance of this technology as a means for strengthening our compliance with the law.***

*        *        *

***Amedisys' point-of-care system elevates the quality of our documentation, which goes hand-in-hand with better compliance.*** […]

210.    Defendant Jeter further touted the quality of Amedisys's compliance practices, including reassuring investors of the Company's compliance practices with specific reference to certain of the fraudulent practices at issue here:

Let me briefly describe for you the compliance oversight audits that Amedisys conducts each quarter.

Beginning in early 2005, we identified three key areas to which any home healthcare agency maybe susceptible because of the inherent revenue impacts of each. ***These are***

131

*first, excessive therapy, where a high number of therapy visits are conducted, which results in increased reimbursement and may be potentially suggestive of fabricated or unnecessary visits just to increase reimbursement.*

*Second, LUPA exaggeration, which is where an agency has an exceptionally low number of Low Utilization Payment Adjustments, otherwise known as LUPAs, which may be suggestive of potentially fabricated or unnecessary visits so as to avoid having reimbursement automatically reduced by the government*.

*And third, up-coded case mixes, where an agency has a higher than average case mix weight that may be suggestive of possible manipulation of coding occasioned by scoring patients as sicker than they actually are.* These are big bang for the buck kinds of risk areas for fraud.

Since 2005, one of the primary functions that my compliance auditors have performed is the proactive review of agencies that perform well in each of these areas. *We have focused on those Amedisys agencies performing very well with respect to having a higher percentage of high profitability therapy episodes and having a lower incident of low reimbursement LUPAs and in having overall higher reimbursement case mix scores*.

Now, it should be noted that just because an agency has a high percentage of high profitability therapy or a lower occurrence of LUPAs or a higher case mix does not necessarily mean that there is something improper or untoward occurring. In each instance, there may well be wholly appropriate justifications for each risk category. *However, because of the revenue implications of each, there exists a potential for improprieties, which we feel warrants a compliance review*.

*Since 2005, my staff has audited those agencies that stand out based on these high revenue audit focus areas.* […]

*We are also continuously refining our audit processes and risk controls.*

211.    Defendant Jeter also emphasized the Amedisys confidential hotline as a means of

enhancing the Company's compliance practices:

[M]y compliance auditors are responsible for conducting audits related to complaints that are made on our company hotlines, as well the issues identified in exit interviews. They also conduct special audits at my direction, which have included reviews of high-risk clinical events, such as Coumadin administration as well as other compliance risks, such as outliers and high recertification patients. […]
*We use a confidential compliance hotline that is available 24 hours a day, seven days a week, and permits employees to report problems directly to me, and allows them to even remain anonymous if they so choose. This hotline also*

132

*serves as our SOX Whistleblower Hotline.  All calls that come into our hotlines are reported to the company's Board of Directors on a quarterly basis.*

212.    Defendant Jeter further highlighted Amedisys's deterrents to fraud, stating: "Amedisys has long had stiff enforcement policies for compliance violations" and the "compliance plan articulates a zero tolerance police for healthcare fraud and abuse."

213.    Also on October 28, 2008, Amedisys issued its Form 10-Q for the third quarter of 2008 (the "3Q08 10-Q"), which again repeated the above information concerning Amedisys's financial results for the third quarter of 2008.  Amedisys's 3Q08 10-Q also reported the Company's retained earnings of $209,911,000.  Further, Defendants Borne and Redman provided certifications that were substantially the same as the certifications described above which, among other things, attested to the accuracy and completeness of the information contained in Amedisys's 3Q08 10-Q.

214.    The above statements were materially false and misleading when made because, among other things:

(a) the statements concerning Amedisys's financial results, including revenue, income, earnings per share and retained earnings, and the purported reasons behind those increases, including its strong compliance program, failed to disclose that they were materially and artificially inflated as a result of Defendants' improper manipulations of the Medicare reimbursement system, as described herein;

(b) when making the material misstatements concerning Amedisys's extensive compliance practices, Defendants knew or recklessly disregarded at the time, and failed to disclose, that they were engaged in a fraudulent scheme to improperly manipulate the Medicare reimbursement system, as described herein;

(c) when making the material misstatements concerning Amedisys's rate of recertification, Defendants knew or recklessly disregarded at the time, and failed to disclose, that they were engaged in a fraudulent scheme to improperly manipulate the Medicare reimbursement system, including through improper recertification of patients, as described herein;

(d) when making the material misstatements concerning the regarding the quality of care delivered by Amedisys, despite the higher chronicity and clinical acuity of Amedisys's patients, Defendants knew or recklessly disregarded, and failed to disclose, at the time that they were engaged in a fraudulent scheme to improperly manipulate the Medicare reimbursement system, which among other things, included the provision of additional, unnecessary therapy visits, "upcoding" patient diagnoses, and improper recertification, as described herein; and

(e) when signing the above-described certifications, Defendants Borne and Redman knew about or recklessly disregarded, and failed to disclose, Defendants' fraudulent scheme to improperly manipulate the Medicare reimbursement system, as described herein.

**O.    Defendants' Materially False and Misleading Statements Concerning the Company's Fourth Quarter and Year End 2008 Financial Results**

215.    On February 17, 2009, at 7:00 a.m., Amedisys issued its earnings release for the fourth quarter and year-ended December 31, 200.  Amedisys's press release stated:

Three-Month Periods Ended December 31, 2008 and 2007

- Net service revenue increased 75.3% to $340.1 million compared to $194.0 million in 2007

- Net income increased 57.6% to $26.3 million compared to $16.7 million in 2007.

- Diluted earnings per share increased 54.0% to $0.97 compared to $0.63 per diluted share in 2007.

- Earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 68.8% to $51.4 million compared to $30.4 million in 2007.

Years Ended December 31, 2008 and 2007

- Net service revenue increased 70.1% to $1,187.4 million compared to $697.9 million in 2007.

- Net income increased 33.1% to $86.7 million compared to $65.1 million in 2007.

- Diluted earnings per share increased 29.8% to $3.22 compared to $2.48 per diluted share in 2007.

- EBITDA increased 55.6% to $177.4 million compared to $114.0 million in 2007.

In this press release, Defendant Borne touted the Company's "record revenues and earnings for both the fourth quarter and full year." Defendant Borne highlighted that "[t]his marks the sixth consecutive year that earnings per share growth has exceeded 20%." Further, the Company disclosed its average episodic-based revenue per completed episode of $2,972 and $2,854 for the three-month and twelve-month periods ended December 31, 2007, respectively.

216.    Also on February 17, 2009, starting at 10:00 a.m., Amedisys hosted a conference call to discuss the Company's earnings for the fourth quarter and year-end of 2008. In his opening remarks, Defendant Borne repeated certain information concerning the Company's fourth quarter 2008 earnings outlined above, including the Company's "net revenue of $340 million and adjusted earnings per share of $0.98...[representing] growth of 75[%] and 56%, respectively over the fourth quarter of 2007." Defendant Borne also touted the Company's year-end 2008 results, as described above. Defendant Redman also highlighted the Company's "tremendous year," repeating the above information concerning Amedisys's financial results for the fourth quarter and year-end of 2008.

217.    In addition, during this conference call, Larry Graham discussed episodic based revenue and recertifications, stating:

For the quarter, our internal episodic-based revenue growth rate was 30% with

16% related to volume and 14% related to rate. For the full year, our internal episodic-based revenue growth rate was 28% with 19% related to volume and 9% related to rate. The volume increase during the quarter and full year related to increases in the total number of admissions and re-certifications with internal-based episodic admissions growing 11% for both periods and internal episodic-based re-certifications growing 20% in the quarter four, and 25% for the full year.

218.    Also on February 17, 2009, Amedisys issued its Form 10-K for the fourth quarter and year end of 2008 (the "2008 10-K"), which again repeated the above information concerning Amedisys's financial results for the fourth quarter and year end of 2008. Amedisys's 2008 10-K also reported the Company's retained earnings of $236,252,000.

219.    Amedisys's 2008 10-K also discussed Amedisys's controls to ensure compliance with federal, state and local laws regarding Medicare reimbursements:

> We maintain comprehensive controls over our billing processes to help ***ensure accurate and complete billing.*** We have company-wide annual billing compliance testing; use formalized billing attestations; limit access to billing systems; use risk forecasting methodologies; perform direct line supervisor audits; hold weekly operational meetings; use automated daily billing operational indicators; deploy operational "turnaround teams" when problems are identified; and terminate employees who knowingly fail to follow our billing policies and procedures in accordance with a well publicized "Zero Tolerance Policy".

220.    The 2008 Form 10-K also highlighted the controls the Company had in place in order to ensure proper recertification of patients:

> Before any employee recommends recertification to a physician, we conduct an agency level, multidisciplinary care conference. ***We also use centralized automated compliance recertification indicators to identify and monitor agencies that have relatively high recertification levels.***

221.    Further, Amedisys's 2008 10-K included certifications from Defendants Borne and Redman that were substantially the same as the certifications described above which, among other things, attested to the accuracy and completeness of the information contained in Amedisys's 2008 10-K.

222.    The above statements were materially false and misleading when made because, among other things:

(a) the statements concerning Amedisys's financial results, including revenue, income, earnings per share and retained earnings, and the purported reasons behind those increases, including strong internal growth, failed to disclose that they were materially and artificially inflated as a result of Defendants' improper manipulations of the Medicare reimbursement system, as described herein;

(b) when making the material misstatements concerning Amedisys's compliance practices, including its billing practices and policies, Defendants knew or recklessly disregarded at the time, and failed to disclose, that they were engaged in a fraudulent scheme to improperly manipulate the Medicare reimbursement system, as described herein;

(c) when making the material misstatements concerning Amedisys's rate of recertification, Defendants knew or recklessly disregarded at the time, and failed to disclose, that they were engaged in a fraudulent scheme to improperly manipulate the Medicare reimbursement system, including through improper recertification of patients, as described herein; and

(d) when signing the above-described certifications, Defendants Borne and Redman knew about or recklessly disregarded, and failed to disclose, Defendants' fraudulent scheme to improperly manipulate the Medicare reimbursement system, as described herein.

**P.    Defendants' Materially False zand Misleading Statements**
**Concerning the Company's First Quarter 2009 Financial Results**

223.    On April 28, 2009, at 6:00 a.m., Amedisys issued its earnings release for the first quarter of 2009.  Amedisys's press release stated:

Three-Month Periods Ended March 31, 2009 and 2008

- Net service revenue increased $128.7 million or 60.4% to $341.8 million compared to $213.1 million in 2008…

- Net income attributable to Amedisys, Inc. increased $10.5 million or 64.1% to $27.0 million compared to $16.5 million in 2008

- Diluted earnings per share increased 59.7% to $0.99 compared to $0.62 per diluted share in 2008.

- Earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 67.0% to $54.0 million compared to $32.3 million in 2008.

In this press release, Defendant Borne touted the Company's "impressive results" and "record revenue and earnings." Further, the Company disclosed its revenue per episode of $3,033 for the three-month period ended March 31, 2009.

224.    Also on April 28, 2009, starting at 10:00 a.m., Amedisys hosted a conference call to discuss the Company's 2009 first quarter earnings. In his opening remarks, Defendant Borne repeated certain information concerning the Company's first quarter 2009 earnings outlined above, including the Company's "net revenue of $341 million and earnings per share of $0.99…[representing] growth of 60% and 59%, respectively over the first quarter of 2008." Defendant Redman also highlighted the Company's "outstanding quarter," repeating the above information concerning Amedisys's financial results for the first quarter of 2009.

225.    Defendant Graham commented on the growth in episodic revenue during the April 28, 2009, conference call pointing out that recertifications had increased by 15% during the first quarter:

> For the quarter, our internal episodic-based revenue growth rate was 23%, with 10% related to volume and 13% related to rate. The volume increase during the quarter related to increases in the total number of admissions and re-certifications with internal episodic-based admissions growing 8% and internal episodic-based re-certifications growing 15% in the first quarter. The rate increase was primarily due to our continued deployment of our specialty programs to more of our home health agencies.

226.    Also on April 28, 2009, Amedisys issued its Form 10-Q for the quarter ended March 31, 2009 (the "1Q09 10-Q"), which again repeated the above information concerning Amedisys's financial results for the first quarter 2009.  Amedisys's 1Q09 10-Q also reported the Company's retained earnings of $263,274,000.  Further, Defendants Borne and Redman provided certifications that were substantially the same as the certifications described above which, among other things, attested to the accuracy and completeness of the information contained in Amedisys's 1Q09 10-Q.

227.    The above statements were materially false and misleading when made because, among other things:

(a) the statements concerning Amedisys's financial results, including revenue, income, earnings per share and retained earnings, and the purported reasons behind those increases, including strong internal growth and the deployment of "specialty programs," failed to disclose that they were materially and artificially inflated as a result of Defendants' improper manipulations of the Medicare reimbursement system, as described herein;

(b) when making the material misstatements concerning Amedisys's rate of recertification, Defendants knew or recklessly disregarded at the time, and failed to disclose, that they were engaged in a fraudulent scheme to improperly manipulate the Medicare reimbursement system, including through improper recertification of patients, as described herein; and

(c) when signing the above-described certifications, Defendants Borne and Redman knew about or recklessly disregarded, and failed to disclose, Defendants' fraudulent scheme to improperly manipulate the Medicare reimbursement system, as described herein.

**Q.    Defendants' Materially False and Misleading Statements
Concerning the Company's Second Quarter 2009 Financial Results**

228.    On July 28, 2009, at 7:00 a.m., Amedisys issued its earnings release for the second quarter 2009.  Amedisys's press release stated:

Three-Month Periods Ended June 30, 2009 and 2008

- Net service revenue increased $65.2 million or 20.9% to $377.9 million compared to $312.7 million in 2008…

- Net income attributable to Amedisys, Inc. increased $14.7 million or 72.1% to $35.1 million compared to $20.4 million in 2008.

- Diluted earnings per share increased 67.1% to $1.27 compared to $0.76 per diluted share in 2008.

- Earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 52.0% to $67.4 million compared to $44.3 million in 2008.

Six-Month Periods Ended June 30, 2009 and 2008

- Net service revenue increased $194.0 million or 36.9% to $719.7 million compared to $525.8 million in 2008…

- Net income attributable to Amedisys, Inc. increased $25.3 million or 68.5% to $62.1 million compared to $36.8 million in 2008.

- Diluted earnings per share increased 63.8% to $2.26 compared to $1.38 per diluted share in 2008.

- EBITDA increased 58.3% to $121.3 million compared to $76.6 million in 2008.

In this press release, Defendant Borne touted the Company's "three-prong business strategy of providing superior clinical services, growing our business aggressively and becoming as operationally efficient" and "high-quality outcome driven care to the…chronically ill Medicare patient population for the lowest cost."  Further, the Company disclosed its average episodic-based revenue per completed episode of $3,166 and $3,102 for the three-month and six-month periods ended June 30, 2009.

140

229.    Also on July 28, 2009, starting at 10:00 a.m., Amedisys hosted a conference call to discuss the Company's 2009 second quarter earnings.  In his opening remarks, Defendant Borne repeated certain information concerning the Company's second quarter 2009 earnings outlined above, including the Company's "net revenue of [$]378 million and earnings per share of $1.27…[representing] growth of 21[%] and 67%, respectively over the second quarter of '08." Defendant Redman also highlighted the Company's "excellent quarter," repeating the above information concerning Amedisys's financial results for the second quarter of 2009.

230.    During the call, Defendant Borne highlighted Amedisys's "care management expertise and information technology infrastructure" as a means to "facilitate and improve physician-directed care coordination resulting in improved outcomes and decreased healthcare costs for elderly Americans."

231.    Also during the Larry Graham addressed the internal episodic growth rate for the second quarter of 2009:

> For the quarter, our internal episodic-based revenue growth rate was 19%. With 7% related to volume and 12% related to rate.  For the six months, our internal episodic-based revenue growth rate was 21%.  The volume increased during the second quarter related to increases in the total number of admissions and re-certifications, with these internal episodic-based admissions growing 4% and internal episodic-based re-certifications growing 10% in the second quarter.  ***The rate increase was primarily due to our continued deployment of our specialty programs to more of our home health agencies, which resulted in an increase in our average revenue – episodic-based revenue per episode of $325***.

232.    Also on July 28, 2009, Amedisys also issued its Form 10-Q for the second quarter of 2009 (the "2Q09 10-Q"), which again repeated the above information concerning Amedisys's financial results for the second quarter of 2009.  Amedisys's 2Q09 10-Q also reported the Company's retained earnings of $298,357,000.  Further, Defendants Borne and Redman provided certifications that were substantially the same as the certifications described above

which, among other things, attested to the accuracy and completeness of the information contained in Amedisys's 2Q09 10-Q.

233.    The above statements were materially false and misleading when made because, among other things:

(a) the statements concerning Amedisys's financial results, including revenue, income, earnings per share and retained earnings, and the purported reasons behind those increases, including its "care management expertise" and the "continued employment of our specialty programs," failed to disclose that they were materially and artificially inflated as a result of Defendants' improper manipulations of the Medicare reimbursement system, as described herein;

(b) when making the material misstatements concerning Amedisys's quality of care and rate of recertification, Defendants knew or recklessly disregarded at the time, and failed to disclose, that they were engaged in a fraudulent scheme to improperly manipulate the Medicare reimbursement system, including through improper recertification of patients, as described herein; and

(c) when signing the above-described certifications, Defendants Borne and Redman knew about or recklessly disregarded, and failed to disclose, Defendants' fraudulent scheme to improperly manipulate the Medicare reimbursement system, as described herein.

R.    **Defendants' Materially False and Misleading Statements**
      **Concerning the Company's Third Quarter 2009 Financial Results**

234.    On October 27, 2009, at 7:00 a.m., Amedisys issued its earnings release for the

third quarter 2009.  Amedisys's press release stated:

<u>Three-Month Periods Ended September, 2009 and 2008</u>

- Net service revenue increased $66.7 million or 20.7% to $388.3 million
  compared to $321.6 million in 2008…

- Net income attributable to Amedisys, Inc. increased $12.4 million or 53.0% to
  $35.9 million compared to $23.5 million in 2008.

- Diluted earnings per share increased 48.3% to $1.29 compared to $0.87 per
  diluted share in 2008.

- Earnings before interest, taxes, depreciation and amortization ("EBITDA")
  increased 40.0% to $69.1 million compared to $49.4 million in 2008.

<u>Nine-Month Periods Ended September 30, 2009 and 2008</u>

- Net service revenue increased $260.7 million or 30.8% to $1.1 billion
  compared to $847.3 million in 2008…

- Net income attributable to Amedisys, Inc. increased $37.7 million or 62.5% to
  $98.0 million compared to $60.3 million in 2008.

- Diluted earnings per share increased 57.8% to $3.55 compared to $2.25 per
  diluted share in 2008.

- EBITDA increased 51.1% to $190.4 million compared to $126.0 million in
  2008.

In this press release, Defendant Borne touted "another strong quarter" for Amedisys.  Further,

the Company disclosed its average episodic-based revenue per completed episode of $3,189 and

$3,132 for the three-month and nine-month periods ended September 30, 2009.

235.    Also on October 27, 2009, starting at 10:00 a.m., Amedisys hosted a conference

call to discuss the Company's third quarter 2009 financial results.  During the conference call,

Defendant Borne repeated the above information concerning the Company's third quarter 2009

earnings, including the Company's "net revenue of [$]388 million and earnings per diluted share

of $1.29…[representing] growth of 21[%] and 48%, respectively over the third quarter of '08." Defendant Redman also repeated the above information concerning Amedisys's financial results for the third quarter of 2009.

236.    Also during the conference call, Defendant Borne touted the Company's "quality management and compliant processes."  Further, Defendant Borne  pointed out that there was an increase of 8% in the volume of recertifications during the third quarter:

> For the quarter, our internal episodic-based revenue growth was 18%, with 6% related to volume and 12% related to rate. The volume increase during the quarter was comprised of 12% in internal episodic-based admissions of four and 8% recertifications. For the year-to-date period, our internal episodic-based revenue growth was 20%, with 8% related to volume and 12% related to rate. The volume increase during the quarter was comprised of growth in internal episodic-based admissions of 5% and recertifications of 10%.

237.    Also on October 27, 2009, Amedisys also issued its Form 10-Q for the third quarter of 2009 (the "309 10-Q"), which again repeated the above information concerning Amedisys's financial results for the third quarter of 2009.  Amedisys's 3Q09 10-Q also reported the Company's retained earnings of $334,296,000.  Further, Defendants Borne and Redman provided certifications that were substantially the same as the certifications described above which, among other things, attested to the accuracy and completeness of the information contained in Amedisys's 3Q09 10-Q.

238.    The above statements were materially false and misleading when made because, among other things:

(a) the material misstatements concerning Amedisys's financial results, including revenue, income, earnings per share and retained earnings, and the purported reasons behind those increases, including its internal growth rate, failed to disclose that they were materially and

artificially inflated as a result of Defendants' improper manipulations of the Medicare reimbursement system, as described herein;

(b) when making the material misstatements concerning Amedisys's quality of care and rate of recertification, Defendants knew or recklessly disregarded at the time, and failed to disclose, that they were engaged in a fraudulent scheme to improperly manipulate the Medicare reimbursement system, including through improper recertification of patients, as described herein; and

(c) when signing the above-described certifications, Defendants Borne and Redman knew about or recklessly disregarded, and failed to disclose, Defendants' fraudulent scheme to improperly manipulate the Medicare reimbursement system, as described herein.

**S.      Defendants' Materially False and Misleading Statements Concerning the Company's Fourth Quarter and Year End 2009 Financial Results**

239.    On February 23, 2010, at 7:00 a.m., Amedisys issued its earnings release for the fourth quarter and year-ended December 31, 2009.  Amedisys's press release stated:

Three-Month Periods Ended December 31, 2009 and 2008

- Net service revenue increased $65.4 million or 19.2% to $405.5 million compared to $340.1 million in 2008…

- Net income attributable to Amedisys, Inc. increased $11.5 million or 43.5% to $37.8 million compared to $26.3 million in 2008.

- Diluted earnings per share increased 39.2% to $1.35 compared to $0.97 per diluted share in 2008.

- Earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 38.8% to $71.3 million compared to $51.4 million in 2008.

Years Ended December 31, 2009 and 2008

- Net service revenue increased $326.1 million or 27.5% to $1.5 billion compared to $1.2 billion in 2008…

- Net income attributable to Amedisys, Inc. increased $49.1 million or 56.7% to $135.8 million compared to $86.7 million in 2008.

- Diluted earnings per share increased 51.9% to $4.89 compared to $3.22 per diluted share in 2008.

- EBITDA increased 47.5% to $261.8 million compared to $177.4 million in 2008.

In this press release, Defendant Borne touted the Company's "outstanding results for the fourth quarter and full year ending 2009." Defendant Borne highlighted that "[t]his marks the seventh consecutive year in which we have increased our earnings per share in excess of 20%." Further, the Company disclosed its average episodic-based revenue per completed episode of $3,260 and $3,166 for the three-month and twelve-month periods ended December 31, 2009, respectively

240.    Also on February 17, 2009, starting at 10:00 a.m., Amedisys hosted a conference call to discuss the Company's financial results for fourth quarter and year end 2009.  In his opening remarks, Defendant Borne repeated certain information concerning the Company's fourth quarter 2009 earnings outlined above, including the Company's "net revenue of $405 million and earnings per share of $1.35…[representing] growth of 19[%] and 39%, respectively over the fourth quarter of 2008." Defendant Borne also touted the Company's year-end 2008 results, as described above.  Defendant Redman also repeated the above information concerning Amedisys's financial results for the fourth quarter and year-end of 2009.

241.    In discussing the internal growth rate for the fourth quarter of 2008, Defendant Borne disclosed:

> For the quarter, our internal-based revenue growth was 15%, with 5% related to volumes and 10% related to rates. The volume increase during the quarter was comprised of growth and internal episodic-based admissions of 7% and recertifications of 2%. […] For the year-to-date period, our internal episodic-based revenue growth was 18%, with 7% related to volume and 11% related to rates. The volume increase during the year was comprised of growth in internal episodic-based admissions of 6% and recertifications of 8%.

The increase in our rate, both the quarter and the year-to-date, is driven by our focus on higher acuity patients, many of whom are benefiting from our state-of-the-art disease management programs such as our Balance for Life program. At quarter-end, we had launched our BFL program in 332 locations, representing 64% of our total home health locations. We intend to continue rolling out our Balance for Life to select agencies in 2010.

242.     Amedisys also issued its Form 10-K for the year ended December 31, 2009 on February 23, 2010, confirming the results announced in the earnings release.  The 2009 Form 10-K was certified as complying with the Exchange Act by Defendants William Borne and Dale Redman.

243.     Also on February 23, 2010, Amedisys issued its Form 10-K for the fourth quarter and year end of 2009 (the "2009 10-K"), which again repeated the above information concerning Amedisys's financial results for the fourth quarter and year end of 2009.  Amedisys's 2009 10-K also reported the Company's retained earnings of $372,089,000.

244.     Amedisys's 2009 10-K also discussed Amedisys's controls in place to ensure compliance with federal, state and local laws regarding billing for Medicare reimbursements:

> We maintain comprehensive controls over our billing processes to help ***ensure accurate and complete billing.*** We have company-wide annual billing compliance testing; use formalized billing attestations; limit access to billing systems; use risk forecasting methodologies; perform direct line supervisor audits; hold weekly operational meetings; use automated daily billing operational indicators; deploy operational "turnaround teams" when problems are identified; and terminate employees who knowingly fail to follow our billing policies and procedures in accordance with a well publicized "Zero Tolerance Policy".

245.     The 2008 Form 10-K also discussed the controls the Company had in place in order to ensure proper recertification of patients:

> In order to be recertified for an additional episode of care, a patient must be diagnosed with a continuing medical need. This could take the form of a continuing skilled clinical need or could be caused by changes to the patient's medical regimen or by modified care protocols within the episode of care. As with the initial episode of care, a recertification requires approval of the patient's

physician. Before any employee recommends recertification to a physician, we conduct an agency level, multidisciplinary care conference. We also use centralized automated compliance recertification indicators to identify and monitor agencies that have relatively high recertification levels. (Emphasis added.)

246.   Further, Amedisys's 2008 10-K included certifications from Defendants Borne and Redman that were substantially the same as the certifications described above which, among other things, attested to the accuracy and completeness of the information contained in Amedisys's 2009 10-K.

247.   The above statements were materially false and misleading when made because, among other things:

(a) the statements concerning Amedisys's financial results, including revenue, income, earnings per share and retained earnings, and the purported reasons behind those increases, failed to disclose that they were materially and artificially inflated as a result of Defendants' improper manipulations of the Medicare reimbursement system, as described herein;

(b) when making the material misstatements concerning Amedisys's extensive compliance practices, Defendants knew or recklessly disregarded at the time, and failed to disclose, that they were engaged in a fraudulent scheme to improperly manipulate the Medicare reimbursement system, as described herein;

(c) when making the material misstatements concerning Amedisys's rate of recertification, Defendants knew or recklessly disregarded at the time, and failed to disclose, that they were engaged in a fraudulent scheme to improperly manipulate the Medicare reimbursement system, including through improper recertification of patients, as described herein; and

(d) when signing the above-described certifications, Defendants Borne and Redman knew about or recklessly disregarded, and failed to disclose, Defendants' fraudulent scheme to improperly manipulate the Medicare reimbursement system, as described herein..

> **T.  Defendants' Materially False And Misleading Statements Concerning The Company's First Quarter 2010 Financial Results, The WJS Article And The Senate Finance Committee Investigation**

248.    As previously discussed, on April 26, 2010, the *WSJ* article was published.  As quoted in the *WSJ* article, Amedisys was already seeking to falsely reassure investors that Amedisys had done nothing wrong:

> [Amedisys spokesman Kevin LeBlanc said] the company didn't take advantage of the system and that the company's home visits "are in line with the industry trends." [LeBlanc] said Amedisys in general focuses on sicker patients than the industry average, and therefore patients that require more care.  "Amedisys' clinical patterns are representative of the patient population we focus on, namely those patients suffering from complex, chronic and co-morbid medical issues," he said.

> The Amedisys spokesman said ***any suggestion the company may have increased its number of therapy visits to receive higher reimbursements is "both incendiary and inaccurate."*** . . .

> Mr. LeBlanc said many factors contributed to Amedisys's rapid growth, including "our significant investment in the best and most innovative technologies, our strategic acquisitions of compatible companies, our expansion into other therapies and by providing the best quality care for our patients at a lower cost."  He emphasized that ***the number of home therapy visits is driven not by the company but by doctors orders. "The final decision as to how much care the patient needs ultimately is authorized by the physician, not the home health-care provider,"*** he said in an email.

249.    On April 27, 2010, at 7:00 a.m., Amedisys issued its earnings release for the first quarter 2010.  Amedisys's press release stated:

> Three-Month Periods Ended March 31, 2010 and 2009

- Net service revenue increased $71.2 million or 20.8% to $413.0 million compared to $341.8 million in 2009…

- Net income attributable to Amedisys, Inc. increased $9.6 million or 35.6% to $36.6 million compared to $27.0 million in 2009

- Diluted earnings per share increased 30.3% to $1.29 compared to $0.99 per diluted share in 2009.
- Earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 31.0% to $70.7 million compared to $54.0 million in 2009.

In this press release, Defendant Borne said that he was "pleased with the results from the past quarter." Further, the Company disclosed its average episodic-based revenue per completed episode of $3,282 for the three-month period ended March 31, 2010.

250.    Also on April 27, 2010, starting at 10:00 a.m., Amedisys hosted a conference call confirming the Company's first quarter 2009 earnings. During the conference call, Defendant Redman and Amedisys's Chief Operating Officer repeated the above information concerning Amedisys's financial results for the first quarter of 2010.

251.    Also during the call, Defendant Borne stated:

[T]he Journal fully recognizes the growing value and professional role of home health care as part of the comprehensive solution to chronic health care delivery. The article clearly states that treating sick patients in their homes rather than paying for costly hospitalizations can help save billions of dollars. In the era of a growing elderly population, **this is exactly the role Amedisys serves in the healthcare industry.**

\*   \*   \*

[CMS] has designed Medicare reimbursement to incentivize the transformation of healthcare from expensive facility-based care to more innovative, less expensive and more effective homecare. And **Amedisys is accomplishing this transformation.**

252.    Later in the conference call, Amedisys's Director of Investor Relations sought to discredit the *WSJ* article:

**Basically in reference to the [WSJ] article, there was not a whole lot of new news that we haven't discussed in volumes in different reports.** If I had to pick anything out of the loop troubling one of – we had over 17,000 employees in Amedisys, who are active and very engaged. One of our [ex-employees] who happened to be an LPN that wasn't in a clinical role was actually in a scheduling role made a comment about calling therapists to make sure they got a [tenth] visit. Well, you know the reality is when a therapist or a nurse goes out and assesses the patient, we look at what is called frequency which is the level and the amount of business that we will provide each week and the frequency of that. That is embedded in the care plan and the care protocol that the physician has to

150

review and sign off on.  If there is indeed a change, even a one visit change in their protocol we have to go back to the physician and address the reason why we make that change.  ***So it is probably not unusual for some of those schedulers from time to time to call and chat with the therapists or nurses and making sure that they are online with the care curriculum that we set for the patient at the initiation of calls.***

 When we did discover, you know, that sound bite during our communications with the Wall Street Journal reporter, again as I mentioned, it was a good reporter.  ***You know, we reached out to that agency.  Our compliance did an audit.  We talked to the active PT, physical therapist, as well as the physical therapy assistant.  Asked them if they've ever done a visit that they felt that they were inappropriate or that they were ever pressured to do a visit that was unnecessary.  And there was a resounding no.  They were very comfortable with the care they were providing to the patient.***  So I think that balanced side of it maybe could have been mentioned.  But besides that, as far as the trends and changes in trends and the information that came out, and I did like the piece that the reporter did recognize -- that home care is really the solution for a complex situation.  And some of the trends that you've seen is really a trend as a result of reimbursement change to the hospitals and DRGs, the 75% rule with inpatient rehab facilities.  Those patients had to naturally migrate somewhere.  And our belief is that CMS prepared and positioned for it and created an environment to let the Home Health industry care for those patients.  So, overall, I was pretty pleased with the results of the article.

253.    During the same earnings call, analyst Sheryl Skolnick of PRC Capital Group

asked:

… [T]here's a question mark here at to just how Amedisys can be so efficient at picking patients at billing so correctly so many times at generating such high degree of consistency about optimizing Medicare reimbursements under a specific rule.  And then I guess what is new news here in the article that I found a bit disquieting is that the data showing that once the rules change, you were able to do that again with the new system.

. . . I think that that is the issue that is troubling people and making it not go away.  That the data shows this very significant pattern for LHC, for yourselves, for [Gentiva] to perhaps – and maybe [AFAM], to perhaps a greater extent than it does for others in the industry.  So that is why it is not going away and I guess what my question here is, first, to make that point; second to say, just how are you doing it so well and, third, to ask a question what happens when physicians who I believe may even be medical directors in some of your units are quoted in the Wall Street Journal as saying "Well, I let the therapists do their thing."  How are you ensuring that the doctors actually, being the gatekeeper especially under the new reimbursement rule that will require face-to-face visits with doctors and patients?

Defendant Borne responded:

In reference to how we focus on that, we are very specific with care algorithms and I'll use clinical tracks as a better term and the evidence base, and we have a prescription of care for specific patient conditions. They are about 70 of those clinical tracks that we have. And although *the [therapists] always and the nurses always have discretion in what to do*, we help to prescribe what we feel in a defined protocol, the care that is delivered to achieve the best results that are out there. And that is – those are called frequency to visits.

So with the fact that we have technology and we can track and monitor. *And we can use our point of care system to help direct what we feel is a more comprehensive assessment.* Because with any assessment too which is an OASIS assessment. It is about 40 pages. *We actually have particular systems inside that were pop-ups that if a nurse answers some particular questions in the OASIS that we feel more explanation is needed, it helps the nurses, the therapists, whomever is doing the assessment to be more comprehensive and consistent.*

So what we are trying to do as an organization is to be consistent in the assessment and the delivery of care through care tracks and the outcomes that we achieve. And that is why we are so effective and consistent asset because that is where our strategy is.

254.    Also on April 27, 2010, Amedisys issued its Form 10-Q for the first quarter of 2010 (the "1Q10 10-Q"), which again repeated the above information concerning Amedisys's financial results for the first quarter 2010. Amedisys's 1Q10 10-Q also reported the Company's retained earnings of $408,735,000. Further, Defendants Borne and Redman provided certifications that were substantially the same as the certifications described above which, among other things, attested to the accuracy and completeness of the information contained in Amedisys's 1Q10 10-Q.

255.    On May 12, 2010, the Senate Finance Committee Investigation was announced. On May 13, 2010, Amedisys issued a public statement attempting to downplay the importance of the Senate Finance Committee investigation, and further discredit the earlier April 26, 2010 WSJ article as "incomplete." Amedysis's statement read, in part:

Amedisys, Inc. (NASDAQ: AMED), one of America's leading home health and

hospice companies, issued the following statement in response to a letter of inquiry received on May 12, 2010, from the Senate Committee on Finance.

"We will cooperate with the Committee's inquiry. We also look forward to discussing with the Senators the many benefits and advantages home health care provides for the millions of Americans our industry serves," said William F. Borne, Amedisys chief executive officer.

***The letter of inquiry received from Senators Grassley and Baucus references an article published recently in <u>The Wall Street Journal</u>. The article told an incomplete story about the value of home health to patients, their families, and the overall healthcare system.***

256.    The above statements were materially false and misleading when made because, among other things:

(a) the statements concerning Amedisys's financial results, including revenue, income, earnings per share and retained earnings, and the purported reasons behind those increases, failed to disclose that they were materially and artificially inflated as a result of Defendants' improper manipulations of the Medicare reimbursement system, as described herein;

(b) when making the material misstatements concerning the *WSJ* rticle and the Senate Finance Committee Investigation, Defendants knew or recklessly disregarded at the time, and failed to disclose, that they were engaged in a fraudulent scheme to improperly manipulate the Medicare reimbursement system, as described herein; and

(c) when signing the above-described certifications, Defendants Borne and Redman knew about or recklessly disregarded, and failed to disclose, Defendants' fraudulent scheme to improperly manipulate the Medicare reimbursement system, as described herein.

U.     **Defendants' Materially False and Misleading Statements Concerning
       the Company's Second Quarter 2010 Financial Results, the April 26, 2010
       *WSJ* Article and the Senate Finance Committee Investigation**

257.     On July 1, 2010, Amedisys issued a press release indicating that it had received

"notice of a formal investigation from the Securities and Exchange Commission (SEC)

pertaining to the company, and received a subpoena for documents relating to the matters under

review by the Senate Finance Committee."  Amedisys sought to downplay the impact of the SEC

investigation and allay investors concerns by indicating that the Company intended "to cooperate

with the SEC with respect to this investigation."  Amedisys also stated that it understood that

"the SEC is also investigating others in the home health industry regarding matters being

examined by the Senate Finance Committee."

258.     On July 12, 2010, Amedisys issued a press release announcing an investor

conference call for the next day.  That release stated:

> We currently believe that our second quarter net income will be approximately
> $1.12 per share.  These results include nonrecurring costs of 17 cents per share
> primarily associated with realignment of operations, and the Senate Finance
> Committee and SEC investigations; $3.5 million or 7 cents per share we received
> from CMS under their pay for performance demonstration program and a reversal
> of the first quarter corporate bonus accrual which amounted to 7 cents per share.
> *The net effect of these items on reported earnings per share was a reduction of*
> *approximately 3 cents per share.*

259.     On July 13, 2010, starting at 9:00 a.m., Amedisys hosted a conference call.

During the conference call, Defendant Borne sought to discredit the WSJ article, stating, in part:

> The article in the Wall Street Journal published in late April is cited in the Senate
> Finance Committee's inquiry and the shareholder suits, and it seems to have
> received the attention of the SEC as well.  *We believe this article has shown a*
> *lack of understanding about our industry and overlooked some important facts.*
> We shared quite a bit of information with the Wall Street Journal reporter
> explaining how the home health industry works, highlighting our business model,
> innovations, clinical outcomes, and our focus on quality.
>
> In fact, we provided the reporter with an opportunity to meet with our patients,

visit our offices, and speak with our staff.  After countless hours of correspondence with this reporter we were disappointed that she presented what we believe to be an unbalanced story, excluding much of the data that we shared with her in the spirit of full cooperation.

260.    On July 15, 2010, Amedisys published an "Open Letter To Shareholders," signed by Defendant Borne (the "Open Letter").  In the Open Letter, Amedisys sought to alleviate investor concerns about the Company arising from the WSJ article, the Senate Finance Committee Investigation and the SEC Investigation by providing purported innocent explanations for the fraudulent conduct alleged herein, touting the Company's compliance policies and practices, expressing the Company's intent to cooperate with the SEC and Senate Finance Committee investigations and seeking to again discredit the WSJ article.

261.    On August 9, 2010, at 7:01 a.m., Amedisys issued its earnings release for the second quarter of 2010.  The press release stated:

Three-Month Periods Ended June 30, 2010 and 2009

- Net service revenue increased $44.4 million or 11.8% to $422.3 million compared to $377.9 million in 2009…

- Net income attributable to Amedisys, Inc. decreased $2.9 million or 8.2% to $32.2 million compared to $35.1 million in 2009.

- Diluted earnings per share decreased 11.0% to $1.13 compared to $1.27 per diluted share in 2009.

- Earnings before interest, taxes, depreciation and amortization ("EBITDA") decreased 5.9% to $63.4 million compared to $67.4 million in 2009.

Six-Month Periods Ended June 30, 2010 and 2009

- Net service revenue increased $115.6 million or 16.1% to $835.3 million compared to $719.7 million in 2009…

- Net income attributable to Amedisys, Inc. increased $6.7 million or 10.9% to $68.8 million compared to $62.1 million in 2009.

- Diluted earnings per share increased 7.1% to $2.42 compared to $2.26 per diluted share in 2009.

- EBITDA increased 10.5% to $134.1 million compared to $121.3 million in 2009.

262.    Also on August 9, 2010, at 10:00 a.m., Amedisys hosted a conference call concerning the Company's second quarter 2010 earnings results set out above.   During the conference call Defendant Borne repeated certain information concerning the Company's second quarter 2010 earnings outlined above, including the Company's delivery of "revenue growth of 13%, recording net revenue of $422 million, net income of $32 million, which represents a decline of 8% over the second quarter of 2009."   Defendant Redman also repeated the above information concerning Amedisys's financial results for the second quarter of 2010.

263.    During the earnings call, Michael Snow, COO, sought to reassure investors as to the decline in recertification rates that the Company experienced in the second quarter of 2010:

As I mentioned in our July call, the primary drag on volume growth in the second quarter was the deterioration of recertifications, particularly late in the quarter. From what we've seen of others in the industry, this is not unique to Amedisys, but *the recert rate in June was so pronounced that it significantly reduced our active census leading into third quarter, which will require a number of months to rebuild.*

As we dug deeper into the clinical data, we discovered three primary influences for the drop in recerts. The first area was, as I described in July, we had a material change in patient mix in the clinical diagnoses of our patients, primarily an uptick in orthopedics. This is a continuation of the trend we outlined in our open letter to shareholders explaining why therapy utilization had changed from prior years.

The second thing we found was a high correlation between multidisciplinary treatment plans, including therapy and lower recerts. So our initial review of the clinical data suggests that as therapy and other multidisciplinary care plans have penetrated our portfolio, we're actually driving fewer episodes with better patient outcomes. This is a factor that we will continue to evaluate and we have engaged external resources to help us confirm.

*And third, finally, we can't ignore the impact of external factors. These distractions contributed to our volume weakness, particularly in the utilization of therapy.* And of course, if therapy utilization declines, our revenue per episode will be negatively impacted and it's unclear whether these factors will abate in the near-term.

264.    During the question and answer portion of the call, analyst Sheryl Skolnick of CRT Capital asked for more detail on why there was such a steep decline in the recertification rate during the second quarter.  In response, Defendant Borne sought to marginalize the decline, reassuringly suggesting that it was due to physicians' reactions and merely bringing Amedisys's in line with the industry average.

<Q - Sheryl Skolnick>: Good morning and thank you very much for letting me ask a question on this call. I want to focus on the recertification pattern because to me this is really a key not only to what's happening here in the near term but also over the much longer term. And that is you said on the last conference call that recerts declined much more steeply in the last half of June. So really don't want to put words in your mouth, but giving us a sense of falling off the cliff in the last half of June. And I guess I'm at a loss to understand how a slow progression of recert decline like attributable to the orthopedic growth, as well which presumably is also your Balance for Life program would also be attributed to a compression of case mix. And I get all of that part, so that part's all negative, but it just still doesn't make sense that all of a sudden you should have such a steep decline. I mean if you were to have had that same decline over the whole period for the company as a whole, you would have had a 50% decline in recerts in the quarter.

So this is non-trivial, and I guess I'm worried about *whether it's the behavior of the clinicians not seeking recerts*, whether there was something in the compliance training you mentioned that might have scared them into doing something differently than they had done before and what, if anything, you're doing to address and determine those issues as opposed to just putting it in the basket of changes in behavior and outside influence  and therefore not something the company can do anything about.

<A - William F. Borne, Chief Executive Officer and Chairman>: Yeah, Sheryl. You got it. You nailed it. We have cut this result nine ways to Sunday and *in the absence of other factual patterns, we have to put it under behavioral.* And as much as we have gone out to provide assurances to our clinicians that we got to take care of patients because this outcome is unexplainable. And so we've gone out, as I said, do the right things for the patients every time, and so – but I cannot explain why we had the precipitous drop in June.

But I will tell you is that when you kind of sit back and take a moment and say, okay, well, where are we in terms of kind of episodes per patient, we're coming much closer into line with what is purported to be the industry average.  […]  I don't know where there's an industry average out there, but let's assume it's in the 1.5 range.  We're coming a lot closer to that …

265.    Amedisys also filed its Form 10-Q for the second quarter of 2010 on August 9, 2010 (the "2Q10 10-Q"), which again repeated the above information concerning Amedisys's financial results for the second quarter of 2010.  Amedisys's 2Q10 10-Q also reported the Company's retained earnings of $ 440,937,000.  Further, Defendants Borne and Redman provided certifications that were substantially the same as the certifications described above which, among other things, attested to the accuracy and completeness of the information contained in Amedisys's 2Q10 10-Q.

266.    In the 2Q10 10-Q, Amedisys also disclosed that it had experienced a decrease in its recertification rate during the second quarter of 2010: "Our internal episodic-based recertification growth has decreased from 10% in the second quarter of 2009 to a negative 9% for the second quarter of 2010."

267.    The above statements were materially false and misleading when made because, among other things:

(a) the statements concerning Amedisys's financial results, including revenue, income, earnings per share and retained earnings, and the purported reasons behind those increases, failed to disclose that they were materially and artificially inflated as a result of Defendants' improper manipulations of the Medicare reimbursement system, as described herein;

(b) when making the material misstatements concerning the *WSJ* Article and the Senate Finance Committee Investigation, Defendants knew or recklessly disregarded at the time, and failed to disclose, that they were engaged in a fraudulent scheme to improperly manipulate the Medicare reimbursement system, as described herein;

(c) when making the material misstatements concerning Amedisys's extensive compliance practices, Defendants knew or recklessly disregarded at the time, and failed to disclose, that they were engaged in a fraudulent scheme to improperly manipulate the Medicare reimbursement system, as described herein;

(d)    when making the material misstatements concerning Amedisys's rate of recertification, Defendants knew or recklessly disregarded at the time, and failed to disclose that they were engaged in a fraudulent scheme to improperly manipulate the Medicare reimbursement system, including through improper recertification of patients, as described herein; and

(e) when signing the above-described certifications, Defendants Borne and Redman knew about or recklessly disregarded, and failed to disclose, Defendants' fraudulent scheme to improperly manipulate the Medicare reimbursement system, as described herein.

## XI.    ADDITIONAL ALLEGATIONS OF SCIENTER

268.    As alleged herein, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.   The additional allegations below strongly support a finding that Amedisys and the Individual Defendants acted with scienter.

### A.    Home Health Care Reimbursed by Medicare Is Amedisys's "Core" Business

269.    That home health care was both the core business and critically important to Amedisys supports a strong inference of scienter.  When a senior officer of a company makes a public statement regarding *core* operations of the company, and that statement turns out to be

false, this supports a strong inference that the officer knew the statement was false when made. Medicare-reimbursed home health care services's tremendous importance to Amedisys is indisputable.  As Amedisys acknowledges in its public filings, at all material times the Company has been (and remains) critically dependent on Medicare reimbursement payments as its primary source of revenue.  Medicare payments consistently represented roughly ***90%*** of the Company's net service revenue during the 2005-2009 time period.   Given the critical importance of Medicare-reimbursed home health care to Amedisys, it is simply not plausible that Amedisys's most senior management, including those directly responsible for overseeing, managing and reporting on its financial state, were not privy to the internally known adverse facts about it.  For example, the Defendants named herein were the officers primarily responsible for speaking on behalf of Amedisys to the investing public (and in certain instances also signatories of the Company's annual and quarterly SEC filings during the Class Period).  In short, Defendants had ultimate control over Amedisys's public statements, and personally made numerous materially false and misleading statements concerning Amedisys's home health care operations during the Class Period.  Each of the Individual Defendants held key positions and responsibilities within the Company such that they would have been knowledgeable about Amedisys's core business.

270.    According to the employment agreement between Amedisys and Defendant Borne dated January 1, 1999, Borne was ultimately responsible for, and exercised control over, the Company:

> BORNE shall perform such duties as are usually performed by a Chairman/Chief Executive Officer of a business similar in size and scope as the Company and such other reasonable additional duties as may be prescribed from time to time by the Company's board of directors which are reasonable and consistent with the Company's operations, taking into account BORNE's expertise and job responsibilities…

As was the case with Borne, the Chief Executive Officer is typically the highest-ranking member of the executive team and is responsible for managing the company's operations and resources. Defendant Borne was the Founder, CEO and Chairman of Amedisys since its inception in 1982 and can be presumed to be knowledgeable concerning its core business practices.  He was the officer primarily responsible for speaking on behalf of Amedisys to the investing public, and did in fact make many statements to the investing public during the Class Period as evidenced by the multiple false and misleading statements cited herein.  This included certifying pursuant to the Sarbanes-Oxley Act that the information in Company reports "fairly presents, in all material respects, the financial condition and result of operations of the Company."  In short, Borne had ultimate control over Amedisys's business and public statements.

271.    Defendant Graham was the Chief Operations Officer for Amedisys from January 1999 through September 3, 2009.  According to the employment agreement between Amedisys and Graham dated February 1, 2000, he was responsible for and had control over the Company's operations:

> GRAHAM shall perform such duties as are usually performed by the Chief Operations Officer of health care companies of a business similar in size and scope as the Company and such other reasonable additional duties as may be prescribed from time to time by the Company's Chief Executive Officer which are reasonable and consistent with the expectations of the Company and the Company's operations, taking into account GRAHAM's expertise and job responsibilities, ***including but not limited to, adherence to internal compliance and governmental and regulatory rules, regulations and applicable laws.*** GRAHAM shall report directly to the Chief Executive Officer of the Company or his designee.

Defendant Graham had control over the operational activities of Amedisys and was primarily responsible for speaking on behalf of Amedisys to the investing public providing information on matters relating to Amedisys's operational status, and in fact did make multiple statements

during the Class Period to the public as evidenced herein.  Graham directly reported to Borne

and shared control over Amedisys's business and public statements.

272.    As discussed above, Amedisys had three different CFOs during the Class Period,

Defendants Browne, Giblin and Redman.  According to the employment agreements between

Amedisys and each of those executives, they were each responsible for and had control over the

Company's financial matters, including public reporting and compliance with applicable

policies, regulations and laws.  The relevant passage of Browne's employment agreement, which

is substantially identical to those of Giblin and Redman, is found below:

> BROWNE shall perform such duties as are usually performed by the Chief
> Financial Officer of health care companies of a business similar in size and scope
> as the Company and such other reasonable additional duties as may be prescribed
> from time to time by the Company's Chief Executive Officer which are
> reasonable and consistent with the expectations of the Company and the
> Company's operations, taking into account BROWNE's expertise and job
> responsibilities, ***including but not limited to, adherence to internal compliance
> and governmental and regulatory rules, regulations and applicable laws.***
> BROWNE shall report directly to the Chief Executive Officer of the Company or
> his designee.

As Amedisys CFOs, Defendants Browne, Giblin and Redman had control over the reporting of

Amedisys's financial activities and were primarily responsible (during their respective tenures)

for speaking on behalf of Amedisys to the investing public providing information on matters

relating to Amedisys's financial status, and in fact did make multiple statements during the Class

Period to the public as evidenced herein.  This included certifying pursuant to the Sarbanes-

Oxley Act that the financial information in Company reports "fairly presents, in all material

respects, the financial condition and result of operations of the Company."  These Defendants

directly reported to Borne and shared control over Amedisys's business and public statements.

273.    Defendant Schwartz was Amedisys's Chief Information Officer from September

2004 through September 3, 2009.  According to the employment agreement between Amedisys

and Defendant Schwartz dated October 26, 2006, she was responsible for and had control over

the Company's information systems, including compliance with policies, regulations and laws:

> [Schwartz] shall perform such duties as are usually performed by the chief
> information officer of a publicly-traded company similar in size and scope to the
> Company. [Schwartz] shall also perform such other reasonable additional duties
> as may be prescribed from time to time by the Company's Board of Directors (the
> "Board"), the Company's Chief Operating Officer and President or the
> Company's Chief Executive Officer, consistent with the expectation of the
> Company and the Company's operations and taking into account [Schwartz]'s
> expertise and job responsibilities, ***including but not limited to adherence to***
> ***internal compliance policies, regulatory agency rules and regulations and***
> ***applicable Federal and State laws.*** [Schwartz] shall have the title of Chief
> Information Officer and shall report directly to the Company's Chief Operating
> Officer and President (or his designee) and indirectly to the Company's Chief
> Executive Officer.

Defendant Schwartz had control over Amedisys's information systems, including but not limited

to ultimate control over AMS2 and the Point of Care computer systems, and was primarily

responsible for speaking on behalf of Amedisys to the investing public concerning matters

relating to Amedisys's information system and other matters, and in fact made at least one false

and misleading public statement during the Class Period as evidenced herein. Schwartz directly

reported to Amedisys's COO (which, during her tenure was Defendant Graham) and indirectly to

Defendant Borne, and Schwartz shared control over Amedisys's business and public statements.

274. Defendant Jeter was the Chief Compliance Officer for Amedisys beginning on

October 26, 2006 through the remainder of the Class Period. According to the employment

agreement between Amedisys and Jeter dated October 26, 2006, he was responsible for and had

control over the Company's compliance with policies, regulations and laws:

> [Jeter] shall perform such duties as are usually performed by the chief compliance
> officer of a publicly-traded company similar in size and scope to the Company.
> [Jeter] shall also perform such other reasonable additional duties as may be
> prescribed from time to time by the Company's Board of Directors (the "Board"),
> the Company's Chief Operating Officer and President or the Company's Chief
> Executive Officer, consistent with the expectation of the Company and the

Company's operations and taking into account [Jeter]'s expertise and job responsibilities, ***including but not limited to adherence to internal compliance policies, regulatory agency rules and regulations and applicable Federal and State laws.***  [Jeter] shall have the title of Chief Compliance Officer and shall report directly to the Company's Chief Operating Officer and President (or his designee) and indirectly to the Company's Chief Executive Officer.

Defendant Jeter had control over Amedisys's compliance activities and was primarily responsible for speaking on behalf of Amedisys to the investing public concerning Amedisys's compliance, and in fact did make at least one false and misleading public statement during the Class Period as evidenced herein.  Jeter reported directly to Defendant Graham for much of the Class Period and indirectly to Defendant Borne, and shared control over Amedisys's business and public statements.

> ### B.    Defendant Borne's Remarks at an Internal Amedisys Meeting Support a Strong Inference of Scienter

275.    CW-5, the Director of Operations at an Amedisys branch agency located in Indiana for roughly a year between 2005 and 2006, recalled attending an Amedisys management meeting in Orlando, Florida during the early spring of 2006, which was also attended by other Amedisys Directors of Operations and certain other managers from around the country.  At the meeting, CW-5 described how Defendant Borne went on a "tirade" about an unspecified investigation concerning Amedisys, and how he wanted all the branch managers at the meeting to know that, as managers, they were "going to be sitting right there by him at the defendants' table," and that "I am going to hold you underwater if I go down."  CW-53, an account executive who worked at the same Amedisys branch in Indiana as CW-5 in 2006, also attended the same 2006 meeting in Florida, and corroborated CW-5's recollection of that meeting.  For example, CW-53 similarly recalled Borne telling them that an unspecified government investigation of Amedisys was going on, and how "if he [Borne] was sinking in the ocean, he would step on our heads, hold our heads underwater, and take our last breath of air and come up above water."

Borne also told attendees, in substance, that they would be sitting beside him in the courtroom "if it came to that." Borne's staff immediately tried to get him away from the microphone and a break was called before the meeting continued; when Borne returned he changed subjects and said nothing further about any investigations. Defendant Borne's statements at this meeting support a strong inference of scienter and that he was personally aware of the fraudulent practices alleged herein. It also describes the intimidating and domineering role of management at Amedisys, which is described by numerous confidential witnesses herein.

### C.    The Existence of the Amedisys Compliance Committee Supports a Strong Inference of Scienter

276.    During much of the Class Period, Amedisys had a Compliance Committee, which oversaw and was responsible for compliance practices and initiatives at Amedisys, including reviewing and handling all compliance issues faced by the Company. Defendants Borne and Jeter served on the Compliance Committee at all relevant times during 2006, 2007 and 2008; and at various times from 2006 to 2008, Defendants Graham, Redman and Schwartz served on it as well. In their capacity as members of the Compliance Committee, these Defendants were responsible for and had access to all relevant information concerning Amedisys's legal and regulatory compliance, including compliance with Medicare regulations. According to the Company's 2009 Form 10-K, Amedisys's Compliance Committee was disbanded and was no longer in existence by 2009.

### D.    Defendants' Access to Information Reported on the Amedisys Fraud Hotline Supports a Strong Inference of Scienter

277.    As part of its purported compliance efforts, Amedisys claimed to maintain a fraud reporting hotline that allows employees to report problems directly to Defendant Jeter. Reports from multiple confidential witnesses confirmed that the hotline calls went to Defendant Jeter, and that employees called the confidential hotline to report compliance problems. For example,

CW-37, who worked as a nurse in Kentucky from November 2008 through December 2009, called the confidential hotline twice to report Medicare fraud, and harassment towards those employees who would not participate in the fraud at the Company.  As Amedisys's Chief Compliance Officer, Defendant Jeter was *the* senior officer responsible for receiving reports concerning regulatory or ethical concerns through the confidential hotline and other avenues. Further, according to a statement made by Defendant Jeter during the October 28, 2008 earnings call, **"All calls that come into our hotlines are reported to the company's Board of Directors on a quarterly basis."**  Because the Defendants would have received reports on the calls on a quarterly basis (including Defendants Jeter and Borne, the Board Chairman), they knew or recklessly disregarded that Amedisys was committing Medicare fraud.

> **E.     The Sudden Resignations of Multiple Key Executives During the Class Period Support a Strong Inference of Scienter**

278.    On February 22, 2006, Amedisys announced the resignation of then-CFO, Defendant Browne in order for him to "pursue other professional interests."  No immediate successor was announced.  On October 23, 2006, Amedisys issued a press release announcing the appointment of Defendant Giblin as CFO.  The press release touted Giblin's more than 27 years of financial experience, including the fact that he had spent the previous eight years at Crawford and Company, an international insurance services firm, and the preceding 10 years at an international public accounting firm.  However, Giblin's tenure at Amedisys was very short-lived.  On February 20, 2007 – barely five months after his initial appointment – Amedisys announced that Giblin was resigning as CFO for "personal reasons."  As TheStreet.com reported on August 27, 2008, by resigning so abruptly, Giblin had walked away from stock options "valued at $418,000."  After Defendant Giblin left the post, Defendant Redman was appointed as CFO, making him the third CFO at Amedisys during the Class Period.

279.    As TheStreet.com reported on August 27, 2008, however, Redman had been part of a management team at his former employer, United Companies Financial Corp. ("UCFC"), that was "accused of hiding hundreds of millions of dollars worth of losses at UCFC" and "the company's stock wound up worthless in the end."  According to TheStreet.com:

> Although UCFC flew high for years – with its stock topping $75 halfway through Redman's reign as CFO – the company came crashing down in 1999, long before the rest of the industry.  UCFC filed for bankruptcy that spring and announced that Redman would be leaving "to pursue outside interests."  With their once-valuable stock almost worthless, angry shareholders filed class-action lawsuits against UCFC and its ousted leaders for allegedly concealing the bleak condition of the company.

> Redman worked for himself in the meantime, operating an obscure consulting firm for eight years before suddenly surfacing as Amedisy' CFO early [in 2007].  His boardroom ties may have helped – notably, he served on the board at Piccadilly Cafeterias when Ronald LaBorde – Amedisys's lead independent director – ran the floundering restaurant chain.  Like UCFC, Piccadilly wound up bankrupt in the end.

280.    As discussed above, on September 3, 2009, Amedisys announced the abrupt resignations of two more key executives, Defendant Larry Graham as President and Chief Operating Officer, and Defendant Alice Ann Schwartz as Chief Information Officer.  It is notable that Amedisys's 2009 Form 10-K identified both Graham and Schwartz as key members of Amedisys's senior management team, whose loss would have a "material adverse effect" on the Company's business:

> Our success depends upon the continued employment of members of our senior management team, including our Chairman and Chief Executive Officer, William F. Borne, our President and Chief Operating Officer, Larry R. Graham, our Chief Financial Officer, Dale E. Redman, our Chief Information Officer and Senior Vice President of Clinical Operations, Alice A. Schwartz, and our Chief Compliance Officer, Jeffrey D. Jeter.  The loss or departure of any one of these executive officers could have a material adverse effect on our business and consolidated financial condition, results of operations and cash flows.

281.    As discussed above, the October 14, 2009 Citron report also discussed how these departures were highly suspicious.

167

### F.    The Manipulation of Amedisys's Computer Systems Supports a Strong Inference of Scienter

282.    Each Defendant knew or had access to non-public information that contradicted Amedisys's public statements – which further supports a strong inference of scienter.    As discussed more fully above, Amedisys has highly-sophisticated computer systems (including the AMS2 and Point of Care systems) that allow detailed reports to be generated for management to review while treatment of Amedisys's patients was ongoing.    These systems provided senior Amedisys management with the opportunity to monitor and influence the coding and number of visits for patients.

283.    Defendants Borne, Graham, Redman, Jeter and Schwartz have each displayed a close familiarity with the Point of Care system and spoken positively to investors about the system's relation to compliance efforts.    Defendant Borne stated during the October 25, 2006 Amedisys earnings call that the "[P]oint of [C]are implementation will enhance [Amedisys's] compliance efforts by mandating and standardizing documentation while validating clinical necessity for all care provided."    In a statement by Defendant Graham during the October 30, 2007 Amedisys earnings call, he claimed that one of the primary purposes of the Point of Care system was to improve the Company's compliance:    "It is very important to us as we continue to grow that we stay focused on three very important areas, our care coordination abilities, our clinical outcomes and **most importantly, our compliance controls**.    The design of our point-of-care system was very purposeful in order to further enhance these areas."    Later during that October 30, 2007 earnings call, Defendant Redman also claimed that the Point of Care system had enhanced the Company's compliance.    During the Amedisys earnings call on October 28, 2008, Defendant Jeter also claimed that the Point of Care system was fundamental to the Company's compliance with Medicare rules and regulations:

Additionally, ***our point-of-care system represents a fundamental compliance control*** and is the sort of technology that helps us improve not only what we do in terms of clinical care but how we do it in terms of our adherence to Medicare rules and regulations.

Through our point-of-care system*, we're better* able to ensure the accuracy and completeness of our documentation, and when used in concert with our clinical management dashboards, allows for real-time assessment and review of our coding and documentation. ***One simply cannot overemphasize the importance of this technology as a means for strengthening our compliance with the law.***

284.    During the same October 28, 2008 conference call, while discussing the business system controls Defendant Schwartz commented on the Point of Care system noting the three goals Amedisys had when developing the system: "[1] ***Enhanced standardization with consistency and compliance control***, [2] the ability to have most all of our notes in digital format and [3] the ability to provide more intensive care management services to our populations."   She went on to say that the "point-of-care technology rolled out in 2007 [] enhanced many clinical documentations" and "compliance controls."

285.    However, despite these statements by Defendants Borne, Graham, Redman, Schwartz and Jeter, the Point of Care system, designed purposefully by Amedisys, would actually ***manipulate*** the user to steer him or her toward additional visits or higher acuity HHRG scores as he or she completed the OASIS form on the Point of Care system.   Further, once the OASIS form was submitted by the clinician, the Point of Care system allowed management to manipulate the OASIS form for the desired outcome.

### G.    Financial Motives of Individual Defendants Support a Strong Inference of Scienter

286.    Defendants also had motive and opportunity to engage in the fraudulent practices described above.   Defendants' desire to personally benefit from the fraudulent income-generating scheme provides further evidence of Defendants' scienter.   For example, the Company's

incentive compensation plans further motivated the Individual Defendants to boost the

Company's earnings, as set forth below.

(a)    The Company's proxy statement filed on April 30, 2007 disclosed that "Our 2007 earnings per share was $2.32, []. Therefore, the value of the performance-based portion of the [restricted stock units or "RSUs"] was, in the case of Mr. Borne, increased from $720,000 to $900,000, and, in the case of Mr. Graham, increased from $330,000 to $412,500 on the date of grant. The number of RSUs granted under the performance-based portion of the award was calculated by dividing the cash value of the RSUs on the date of grant by the closing price of our common stock on the determination date ($46.57), and resulted in a grant of 19,326 RSUs to Mr. Borne and 8,858 RSUs to Mr. Graham."

(b)    The Company's proxy statement filed on April 28, 2009 disclosed that "[f]or 2008, the incentive compensation opportunity was based on overall corporate performance measure of diluted earnings per share ('EPS')." If the 2008 EPS performance levels of $2.32 threshold, $2.40 target, $2.50 maximum were met, then the inventive earned as a percentage of target were 50%, 100% or 150% respectively. The Company reported that actual 2008 EPS performance "substantially exceeded the maximum targeted EPS." As a result, Defendant Borne received a $1,125,000 cash bonus and Redman received a $281,250 cash bonus.

(c)    The Company's proxy statement filed on April 27, 2010 also disclosed that "[f]or 2009, the incentive compensation opportunity was based on the overall corporate performance measure of earnings per share ('EPS')." If the 2009 EPS performance levels of $3.90 threshold, $4.20 target or $5.00 maximum were met, then the incentive earned as a percentage of target were 50%, 100% or 150% respectively. The Company reported that actual 2009 EPS performance was $4.89 or approximately 143% of the 2009 target EPS level. As a result, Borne received a $1,072,500 cash bonus and Redman received a $455,813 cash bonus.

**H.    Defendants' Insider Sales Support a Strong Inference of Scienter**

287.    During the Class Period, Defendants Borne, Browne, Graham, Jeter and Schwartz

(the "Insider Trading Defendants") sold substantial amounts of Amedisys common stock from

their personal holdings. The Insider Trading Defendants' insider sales often immediately

followed the exercise of options to purchase Amedisys common stock. Stock options provide

the grantee with the right to purchase a company's stock at the exercise price and then sell those

shares in the open market at the then-prevailing market price.  Thus, option holders benefit most from exercising options and selling their shares when they believe the market value of the stock (*i.e.,* the price they will receive when selling the stock in the open market) is at a high point, or when they believe that subsequent events or disclosures will lower the value of their shares.

288.    These Defendants' stock sales were suspicious because of the (i) large number of shares sold; (ii) significant dollar amounts of the transactions, (iii) large percentages of their holdings sold, which far exceeded prior trading patterns, and (iv) exercise of options significantly in advance of their expiration date.  Moreover, none of these Defendants accumulated any significant amounts of stock during the Class Period, and certain of these Defendants had significantly smaller holdings at the end of the Class Period in comparison to their holdings at the beginning of the Class Period.  For example: Defendant Borne reported holdings of 256,431 shares on August 11, 2005, but holdings of only 145,550 on February 23, 2010, *a decrease of 43.25%*.  Similarly, Defendant Graham reported holdings of 8,693 shares on February 27, 2006 but holdings of 4,877 on July 31, 2009, *a decrease of 43.90%*.[13]

289.    Most of these individuals also made no open market purchases of stock during the Class Period, which stands in stark contrast to the vast shareholdings they sold.  For example, Borne only acquired stock on the open market once during the Class Period, purchasing 3,710 shares at $31.52 per share on February 27, 2006.  Borne's holdings in fact resulted primarily from option grants.  Moreover, Defendants Browne, Graham, Jeter and Schwartz acquired no Amedisys stock on the open market during the Class Period and only acquired Amedisys shares through the exercise of stock options received from the Company.

---

[13]    These dates are the closest Form 4 filing dates to the beginning and end of the Class Period for these individuals.

1. **Defendant Borne's Insider Stock Sales**

   a)    **2005 Stock Sales**

290.    Defendant Borne personally profited from the sale of Amedisys stock at artificially-inflated prices during the Class Period.  On August 11, 2005, Borne exercised options to purchase 10,000 shares of Amedisys common stock.  The exercise price of the options was $3.00 per share and his cost to exercise all 10,000 options was $30,000.  Defendant Borne then sold 10,000 shares in the open market for $41.01 per share, for proceeds of $410,114 and profits of $380,000.[14]  He sold an additional 24,500 shares from his holdings of 256,431 shares (resulting in a total sale that day of 12.48% of his holdings) at $41.00, for proceeds of $1,004,525.50, bringing his total proceeds for that day's sales to $1,414,638.50.

291.    Similarly, the next day, on August 12, 2005, Borne exercised 5,455 options at $4.34 per share, 30,000 options at $6.97 per share, 10,000 options at $5.40 per share, 6,555 options at $3.00 per share, and 8,000 options at $5.13 per share (*i.e.*, a total of 60,010 shares at a total cost of $347,479.70 and an average price-per-share of $5.79).  Borne then sold 30,010 shares in the open market at $40.5122 per share, 5,000 shares at $40.5122 per share, 9,089 shares at $40.7937 per share, 15,000 shares at $40.5363 per share, and another 15,000 shares at $40.5103 per share, for total sales of 74,099 shares, and total proceeds on August 12, 2005 of ***$3,004,805.06*** (and an average selling price per share of $40.551).  Borne's August 12, 2005 sales represented 25.38% of his holdings at the time, and his cumulative sales over August 11, 2005 through August 12, 2005 represented ***sales of 38.65% of his holdings***.  Defendant Borne's sales in August 2005 were unusual because the total proceeds from his sales (***$4,009,330***) are

---

[14] On August 11, 2005, Borne also sold an additional 10,000 shares held by his family at $41.19 per share, netting another $411,900.

staggering, particularly in comparison to his base salary at the beginning of 2005 ($396,153), and represented a large percentage of his holdings in Amedisys.

<p style="text-align:center"><strong>b)</strong>    <strong><u>2007 Stock Sales</u></strong></p>

292.    On November 9, 2007, Borne sold 55,000 shares at $41.13, for total proceeds of $2,262,106.00, which represented 19.48% of his holdings at that time.  That same day, his family trust and spouse also made sales.  Notably, these sales were unusual in timing because they were made just prior to the January 2008 change in the Medicare reimbursement structure.  While the change in the Medicare payment structure was publicly-known at the time of Borne's sales, the specific threat that this change posed to Amedisys (in light of Amedisys's existing practice of manipulating the Medicare payment system to hit the 10-therapy visit threshold numbers, rather than the thresholds that would be in effect after December 31, 2007) was not.  Defendant Borne's November 9, 2007 sale was unusual in scope because of the enormous sales proceeds he obtained and because it represented such a large percentage of his Amedisys holdings at the time.

c)   **Additional Class Period Stock Sales**

293.   Additional sales made by Borne after 2007 through the end of the Class Period are

listed in the table below (certain of which resulted from option exercises):

| Date | Number of Shares sold | Sales Price | Holdings After Transaction | Value ($) of Shares Sold | Percentage of Holdings Sold |
|------|------|------|------|------|------|
| 3/3/2008 | 12,500 | $42.19 | 211,082 | $527,375.00 | 5.59% |
| 5/5/2008 | 12,500 | $50.92 | 211,306 | $636,500.00 | 5.59% |
| 8/1/2008 | 10,834 | $62.26 | 214,614 | $674,524.84 | 4.81% |
| 8/1/2008 | 1,666 | $62.53 | 214,614 | $104,174.98 | 0.77% |
| 8/4/2008 | 20,000 | $62.37 | 194,614 | $1,247,400.00 | 9.32% |
| 8/5/2008 | 10,000 | $62.52 | 183,614 | $625,200.00 | 5.16% |
| 8/8/2008 | 10,000 | $64.52 | 170,614 | $645,200.00 | 5.54% |
| 2/17/2009 | 12,500 | $50.26 | 170,705 | $628,250.00 | 6.82% |
| 7/28/2009 | 12,500 | $41.28 | 170,550 | $516,000.00 | 6.83% |
| 10/27/2009 | 12,500 | $40.85 | 170,550 | $510,625.00 | 6.83% |
| 12/28/2009 | 12,500 | $50.00 | 158,050 | $625,000.00 | 7.33% |
| 2/23/2010 | 12,500 | $61.03 | 145,550 | $762,850.00 | 7.91% |
| 2/23/2010 | 6,553 | $60.46 | 145,550 | $396,182.58 | 4.31% |
| 2/23/2010 | 5,947 | $59.70 | 145,550 | $355,057.90 | 3.93% |

Many of these sales are unusual in timing because they were made near the Class Period high for

the stock of $66.25 on July 30, 2008.  For example, on August 1, 2008 Borne sold a total of

12,500 shares at the prices of $62.26 and $62.53.  Those prices represented 93.97% and 94.38%,

respectively, of the highest price of the stock during the Class Period.  Similarly, Borne made

sales on August 4, 2008, August 5, 2008, August 8, 2008, February 23, 2010 and again on

February 23, 2010, at prices representing 94.14%, 94.36%, 97.38%, 92.12% and 91.26%,

respectively, of the highest price of the stock during the Class Period.

294.    In sum, during the Class Period, Borne sold a total of **332,099 shares** of the 477,649 shares of Amedisys securities he held during that time (or 69.53% of the total number of securities), for **total proceeds of $15,594,704.36**.  By contrast, Borne's total direct sales in the **ten year period** preceding the Class Period, from August 25, 1995 through June 23, 2005, totaled only 161,500 shares with proceeds of $3,238,778.00.  In other words, in a period almost twice as long as the Class Period, Borne only sold less than half the quantity of shares before the Class Period as he did during the Class Period.  In addition, during the Class Period, Borne only acquired 3,710 shares through acquisitions that were not related to stock option exercises, meaning that his sales during the Class Period were nearly 90 times larger than his acquisitions through non-stock option exercises and grants.  All of these facts support a strong inference that Borne knew or recklessly disregarded that Defendants artificially inflated the value of Amedisys stock during the Class Period.

## 2.    Defendant Graham's Insider Stock Sales

295.    Defendant Graham personally profited from the sale of Amedisys stock at artificially-inflated prices during the Class Period.  During the Class Period, Graham exercised options to purchase 47,666 shares on May 3, 2007, May 22, 2007 and October 30, 2007.

296.    On May 3, 2007 Graham exercised the right to buy shares in three blocks, and then sold all of those same shares in the open market.  In the first block he exercised 4,444 options at $4.05 each.  In the second block he exercised 3,556 options belonging to his wife at $13.58 each, selling those same shares for $35.25 each.  In the third block, he exercised 444 options belonging to his wife at $4.05 each.  He sold all of the resulting shares of Amedisys stock in the open market for $35.25 each.  In total, Graham paid $68,086 for his exercises, netted proceeds of $297,651, and made profits of $229,565.  Moreover, the timing of these sales was unusual because they occurred ***just after Amedisys's announcement on May 1, 2007 that profits***

*for the first quarter had increased 82%.*

297.    On May 22, 2007, Graham exercised 27,444 options at $12.16 each and sold those same shares in the open market at $37.50.   Graham paid $333,719 to exercise these options, netting proceeds of $1,029,150 and profits of $695,431.  This sale was unusual because it represented 39.53% of Graham's then-current holdings, and occurred shortly after the May 1, 2007 announcement described above.

298.    Finally, on October 30, 2007, Graham exercised 2,778 options belonging to his wife in two blocks: 1,778 shares at $13.58 each, and 10,000 shares at $21.89 each.  He sold all of these shares in the open market the same day for $44.25 each.  Graham paid $243,045 to exercise these options, netted $521,176 in proceeds, and made total profits of $278,131.  Moreover, the scope and timing of these sales was unusual because ***they occurred on the same day as Amedisys reported record third quarter earnings*** and because these sales represented over 81% of Graham's wife's holdings.  Notably, these sales were also unusual in timing because they were made just a few months prior to the January 2008 change in the Medicare reimbursement structure.  While the change in the Medicare payment structure was publicly-known at the time of Graham's sales, the specific threat that this change posed to Amedisys (in light of Amedisys's existing practice of manipulating the Medicare payment system to hit the 10-therapy visit threshold numbers, rather than the thresholds that would be in effect after December 31, 2007) was not.

299.    In addition, Graham made sales during the Class Period that were unconnected to options exercises.  On May 8, 2009 Graham sold 7,179 shares into the open market at $37.74, netting $270,935, and on July 30, 2009 Graham sold 21,827 shares into the open market at

$41.12, netting $897,724.[15]  These sales were unusual in their scope and timing because the May 8, 2009 sale *occurred closely following Amedisys's announcement on April 28, 2009 that the Company had beat analysts earnings expectations by 2 cents per share*.  Similarly, *the July 30, 2009 sales occurred right after Amedisys's July 28, 2009 announcement that the Company was raising its 2009 earnings-per-share forecast.*  Moreover, the May 8, 2009 and July 30, 2009 sales represented 18.96% and 69.21% of Graham's Amedisys holdings at the time.  The July 30 sale was suspicious in timing because it occurred just five weeks prior to when Graham's resignation was announced publicly.

300.    All told, Graham spent $644,850 to exercise options for shares he sold for total proceeds of $1,847,977 and total profits of $1,203,127.  And he received another $1,168,659 in direct sales of shares and $1,507,107 in indirect proceeds, for a grand total of *$4,523,626 in proceeds* from his direct and indirect sales during the Class Period.

301.    Defendant Graham's sales were unusual because of: (i) the enormous proceeds from the sales; (ii) the $4,523,626 in proceeds he made during the Class Period is very large in comparison to his base salary ($425,000 at the beginning of 2007, and $550,000 at the beginning of 2009 (iii) the large number of shares sold by Graham cumulatively during the Class Period represented 113,153 of the 118,030 shares he had available for sale, amounting to 95.87% of his total holdings of Amedisys shares and options, and a net divestiture of Graham's holdings overall.  These facts support a strong inference that Graham knew or recklessly disregarded that Defendants artificially inflated the value of Amedisys stock during the Class Period.

---

[15]      Graham also made indirect trades during the Class Period.  On July 30, 2009 he sold 23,180 shares at $41.21 through his 401(k) plan netting $955,247 in proceeds and 12,583 shares at $41.21 through his spouse's 401(k) plan netting $518,419 in proceeds.  The next day, his spouse sold another 718 shares at $46.405 netting another $33,319, *for a total of $1,506,987 in proceeds* for these indirect transactions.

### 3.       Defendant Browne's Insider Stock Sales

302.     Defendant Browne also personally profited from the sale of Amedisys stock at artificially-inflated prices during the Class Period.  During the Class Period, Browne exercised options to purchase 23,000 shares on three occasions: 10,000 shares at $8.42 on August 12, 2005; 8,000 shares at $5.40 on August 18, 2005; and 5,000 shares at $8.43 on November 17, 2005.  On August 12, 2005 Browne sold the shares obtained at $8.42 each for $40.27, spending $84,300 to exercise the options, and selling the shares obtained the same day in the open market for proceeds of $402,764 and profits of $318,464.  Similarly, on August 18, 2005 Browne sold the shares obtained at $5.40 each for $41.575, spending $43,200 to exercise the options, and selling the shares obtained the same day in the open market for proceeds of $332,600 and profits of $289,400.  On November 17, 2005 Browne sold the shares obtained at $8.43 each for $40.01, spending $42,150 to exercise the options, and selling the shares obtained the same day in the open market for proceeds of $200,050 and profits of $157,900.  All told, Defendant Browne spent $169,650 to obtain *total proceeds of $935,414 and profits of $765,764*.

303.     Defendant Browne's sales on August 12, 2005, August 18, 2005 and November 17, 2005 were unusual because: (i) the approximately $765,764 in profits he made on these three transactions are very large in comparison to his base salary at the beginning of 2005 ($232,788); (ii) the large number of shares sold by Browne represented 81.29% of his holdings on August 12, 2005, 77.66% of his holdings on August 18, 2005 and 68.48% of his holdings on November 17, 2005.  Cumulatively, according to publicly-available SEC filings, the option exercises and sales made by Browne on these three dates represented sales of 23,000 shares of the 25,301 he had available for sale during the Class Period, or *90.91% of his available holdings*.  In contrast, the Form 4 filed on behalf of Browne on June 1, 2005, just prior to the beginning of the Class Period, showed that Browne had accumulated a significant number of shares (70,500) prior to the

start of the Class Period, including a number of shares Browne acquired in the open market. During the Class Period, Browne made *zero* open market purchases of shares. In other words, Defendant Browne significantly curtailed his stock acquisitions, and in combination with his decrease in overall holdings, these facts support a strong inference that Browne knew or recklessly disregarded that Defendants artificially inflated the value of Amedisys stock during the Class Period.

### 4.    Defendant Jeter's Insider Stock Sales

304.   Defendant Jeter personally profited from the sale of Amedisys stock at artificially-inflated prices during the Class Period. Jeter exercised options to purchase 19,001 shares in three transactions occurring on November 2, 2007. In those transactions, Jeter exercised the right to buy 13,334 shares at $21.89 each, another 2,167 shares at $13.58 each, and another 3,500 shares at $13.58 each. On the same day, Jeter sold the shares obtained in the open market, selling 13,334 shares at $43.00, 2,167 shares at $43.00, and 3,500 shares at $43.00. All told, Jeter spent $368,838 to exercise the options, sold the shares obtained through exercise for *total proceeds of $817,043 and made profits of $448,205*.

305.   These sales were unusual in timing because they were made just prior to the January 2008 change in the Medicare reimbursement structure. While the change in the Medicare payment structure was publicly-known at the time of Jeter's sales, the specific threat that this change posed to Amedisys (in light of Amedisys's existing practice of manipulating the Medicare payment system to hit the 10-therapy visit threshold numbers, rather than the thresholds that would be in effect after December 31, 2007) was not. Defendant Jeter's sales on November 2, 2007 were also unusual because: (i) the $448,205 in profits he made that day is very large in comparison to his base salary at the beginning of 2007 ($105,538); (ii) the large number of shares sold by Jeter on that day (19,001) represented 61.52% of his total holdings of

Amedisys shares and options and *left Jeter with no remaining unexercised options*; and (iii) the enormous proceeds from the sales. Moreover, Jeter had other sales during the Class Period on August 12, 2005 and August 18, 2006. When combined with his sales on November 2, 2007, Jeter's total shares sold during the Class Period were 20,631 shares of the 24,845 total shares that he had available for sale during the Class Period, resulting in sales during the Class Period of 83.04% of his total holdings. As a result of these sales, Jeter's total holdings declined significantly at the end of the Class Period. Moreover, Jeter's 20,631 shares sold during the Class Period dwarf his sales of only 2,100 shares prior to the Class Period, and his overall net accumulation of shares from 2002 through 2005.

306. Indeed, in contrast to Jeter's accumulation of shares prior to the Class Period, Jeter acquired *zero* shares during the Class Period. In other words, Jeter significantly changed his pattern of behavior from accumulation of Amedisys shares prior to the Class Period, to sales and divesting of holdings during the Class Period. These facts support a strong inference that Jeter knew or recklessly disregarded that Defendants artificially inflated the value of Amedisys stock during the Class Period.

### 5.  **Defendant Schwartz's Insider Stock Sales**

307. Defendant Schwartz personally profited from the sale of Amedisys stock at artificially-inflated prices during the Class Period. Throughout the Class Period, Schwartz exercised options to purchase 46,556 shares, selling all of the shares in the open market obtained on the same day they were acquired – *i.e.*, on November 11, 2005, November 14, 2005, January 3, 2007, February 14, 2007, November 1, 2007 and September 20, 2006. In addition, Schwartz

sold shares unconnected to options exercises on December 20, 2007.  These sales are set forth in the chart below:

| Date | Number of Shares Sold | Sales Price | Holdings After Transaction | Value ($) of Shares Sold | Percentage of Holdings Sold |
|---|---|---|---|---|---|
| 11/11/2005 | 7,166 | $40.51 | 2,028 | $290,283.19 | 77.94% |
| 11/14/2005 | 7,000 | $40.50 | 2,028 | $283,500.00 | 77.54% |
| 9/20/2006 | 1,667 | $5.40 | 0 | $9,001.80 | 100.00% |
| 1/3/2007 | 1,279 | $33.75 | 2,773 | $43,166.25 | 31.56% |
| 2/14/2007 | 7,611 | $33.75 | 2,773 | $256,871.25 | 73.30% |
| 2/14/2007 | 1,777 | $33.75 | 2,773 | $59,973.75 | 39.05% |
| 11/1/2007 | 1,779 | $41.71 | 5,363 | $74,202.09 | 24.91% |
| 11/1/2007 | 8,889 | $41.71 | 5,363 | $370,760.19 | 62.37% |
| 12/20/2007 | 3,341 | $48.00 | 2,022 | $160,368.00 | 62.30% |

308.    All told, Defendant Schwartz spent $794,223 exercising options that she sold, in each case, on the same day as they were obtained, ***receiving total proceeds of $1,387,758 and profits of $654,545***.  In addition, Schwartz's sale of common stock unconnected to options exercises on December 20, 2007 resulting in an additional $160,368 in value, bringing her cumulative proceeds for all sales made during the Class Period to ***$1,548,126.***

309.    Defendant Schwartz's sales in November and December of 2007 resulted in total proceeds to Schwartz of $605,330.  These sales were unusual in timing because they were made just prior to the January 2008 change in the Medicare reimbursement structure.  While the change in the Medicare payment structure was publicly-known at the time of Schwartz's November and December 2007 sales, the specific threat that this change posed to Amedisys (in light of Amedisys's existing undisclosed practice of manipulating the Medicare payment system to hit the 10-therapy visit threshold numbers, rather than the thresholds that would be in effect after December 31, 2007) was not.

310.    Defendant Schwartz's sales were also unusual because: (i) the $654,545 in profits she made from sales due to options exercises were very large in comparison to her base salary at the beginning of 2007 ($150,000); (ii) the large number of shares sold by Schwartz on each of the days identified in the chart above represented significant portions of her total holdings at the time, in some cases reducing her holdings to *zero*, such as on September 20, 2006; (iii) during the Class Period, Schwartz sold a total of 40,509 shares of her total holdings of 42,531 shares, amounting to ***total sales of 95.25% of all of her available holdings during the Class Period***. Indeed, as of her Form 4 filing of December 20, 2007, her total remaining holdings were only 2,022 shares.  This stands in stark contrast to her accumulation of shares prior to the Class Period.

### 6.      Expiration Dates of Options Exercised

311.    Analysis of Amedisys's annual Proxy Statements and the Individual Defendants' Form 4 filings establishes that substantially all of their exercised options expired substantially later than the dates on which Defendants exercised the options and sold the common shares.  For example, substantially all the options (other than 8,000 options) exercised by Defendant Borne in 2005 would have expired in 2008 through 12 and the options exercised by Borne in 2008 and 2009 would have expired in December 31, 2012.  (Borne did not exercise options in 2007.)  The options exercised by Defendant Browne in 2005 would have expired in 2012 through 2013, and Browne did not exercise other options during the Class Period.   The options exercised by Defendant Graham in 2007 would have expired in 2012 through 2015, and Graham did not exercise other options during the Class Period.  The options exercised by Defendant Jeter in 2007 would have expired in 2014 through 2015, and Jeter did not exercise other options during the Class Period (except for a sale in April 2010 for the purpose of obtaining proceeds to pay withholding taxes).  The options exercised by Defendant Schwartz in 2005 through 2007 would

have expired in 2012 through 2015, and Schwartz did not exercise other options during the Class

Period).  That Defendants exercised such options and sold resulting shares years before the

expiration dates of the options – rather than seek to benefit from the unexpired terms of the

options – supports a strong inference that Defendants had actual knowledge or strong reason to

believe that the Amedisys shares were trading at inflated and unsustainable prices at the time the

options were exercised.

I.    **Defendants' Fraudulent Scheme Has Triggered Numerous Government
      Investigations**

312.    As discussed more fully above, the Senate Finance Committee, the SEC and the

Department of Justice have all launched investigations into the Company to determine whether,

among other things, Amedisys "deliberately boosted the number of home therapy visits to trigger

higher Medicare reimbursements."  As part of the Senate Finance Committee's investigation, the

Committee requested documents identifying physicians who gave the highest number of referrals

for each state.  Shortly after the announcement of the Senate Finance Committee's investigation

into Amedisys's relationship with doctors, the Company's re-certifications declined

significantly.  In fact, in the Form 10-Q for the second quarter of 2010, issued on August 9,

2010, Amedisys admitted that its "internal episodic-based recertification growth has decreased

from 10% in the second quarter of 2009 to a negative 9% for the second quarter of 2010."  In the

Form 10-Q for the third quarter of 2010, Amedisys again admitted a decline in recertifications:

"We have continued to experience a decline in the number of recertifications over 2009 and

expect the trend to continue into the fourth quarter."  During the conference call held on August

9, 2010, discussing the results of the second quarter 2010, when asked "whether it's the behavior

of the clinicians not seeking recerts" that was causing the decline in recertifications, Defendant

Borne admitted that "we have to put it under behavioral."

## XII.    LOSS CAUSATION

313.    As detailed herein, Defendants engaged in a course of conduct that artificially inflated the price of Amedisys securities throughout the Class Period.  The Defendants' unlawful conduct directly caused the losses incurred by Lead Plaintiffs and the other members of the Class.  The materially false and misleading statements set forth above were widely disseminated to the securities markets, investment analysts and the investing public.  Defendants' materially false and misleading statements artificially inflated the price of Amedisys stock by causing Amedisys's stock price to increase (or not decrease as much as it otherwise would have if Defendants had not made those misstatements).  For example:

a)    In response to Defendants' materially false and misleading statements on August 2, 2005, the price of Amedisys stock rose **5.05%** from a close of $39.84 per share on August 1, 2005 to a closing price of $41.85 per share on August 2, 2005, on heavy volume of approximately 1.96 million shares.

b)    In response to Defendants' materially false and misleading statements on November 1, 2005, the price of Amedisys stock **rose 7.67%** from a closing price of $38.21 per share on October 31, 2005 to a closing price of $41.14 per share on November 1, 2005, on volume of 1.2 million shares.

c)    In response to Defendants' materially false and misleading statements on May 21, 2006, the price of Amedisys stock **rose 7.67%** from a closing price of $33.00 per share on May 1, 2006, to a closing price of $35.53 per share on May 2, 2006, on volume of over 1.5 million shares.  Shares of Amedisys also rose **6.16%** on May 3, 2006 to a closing price of $28.29 per share on volume of 1.14 million shares, a statistically significant increase of 6.16%.

d)    In response to Defendants' materially false and misleading statements on October 25, 2006, the price of Amedisys stock **rose approximately 3%** from its close on October 24, 2006, of $41.49 per share to a close of $42.77 per share on October 25, 2006, on volume of 802,759 shares.

e)    In response to Defendants' materially false and misleading statements on May 1, 2007, the price of Amedisys stock **rose 8.01%** from a closing price of $31.35 per share on April 30, 2007, to a closing price of $33.86 per share on May 1, 2007, on volume of 1.8 million shares.

f)      In response to Defendants' materially false and misleading statements on July 31, 2007, the price of Amedisys stock **rose 3.27%** from a closing price of $36.65 per share on July 30, 2007, to a closing price of $37.85 per share on July 31, 2007, on volume of 1.07 million shares.

g)      In response to Defendants' materially false and misleading statements on October 30, 2007, the price of Amedisys stock **rose 18.42%** from a closing price of $36.65 per share on October 29, 2007, to a closing price of $43.40 per share on October 30, 2007, on volume of 2.57 million shares.

h)      In response to Defendants' materially false and misleading statements on April 30, 2008, the price of Amedisys stock **rose 10%** from a closing price of $47.09 per share on April 29, 2008, to a closing price of $51.08 per share on April 30, 2008, on volume of 1.98 million shares.

i)      In response to Defendants' materially false and misleading statements on July 17, 2008, the price of Amedisys stock **rose 7.53%** from a closing price of $55.74 per share on July 16, 2008 to a closing price of $59.94 per share on July 17, 2008 on volume of 2.9 million shares

j)      In response to Defendants' materially false and misleading statements on July 29, 2008, the price of Amedisys stock **rose 7.58%** from a closing price of $60.91 per share on July 28, 2008, to a closing price of $65.53 per share on July 29, 2008, on volume of 1.5 million shares.

k)      In response to Defendants' materially false and misleading statements on October 28, 2008, the price of Amedisys stock **rose 4.30%** from a closing price of $45.54 per share on October 27, 2008, to a closing price of $47.50 per share on October 28, 2008, on volume of 1.465 million shares. On October 29, 2008, the price of Amedisys stock **rose another 9.33%** to close at $51.93.

l)      In response to Defendants' materially false and misleading statements on July 28, 2009, the price of Amedisys stock **rose 3.28%** from a closing price of $37.76 per share on July 27, 2009, to a closing price of $39.00 per share on July 28, 2009, on volume of 3.067 million shares.

m)      In response to Defendants' materially false and misleading statements on August 9, 2010, the price of Amedisys stock **rose 1.23%** from a closing price on August 6, 2010 of $26.79 per share to a closing price of $27.12 per share on Monday, August 9, 2010, on volume of 3.3 million shares.

314.    By making contemporaneous misstatements to the market in connection with the negative partial disclosures of August 12, 2008, September 3, 2009, October 14, 2009, April 26, 2010, May 12, 2010, July 1, 2010 and July 13, 2010, as alleged herein, Defendants mitigated the

impact of those corrective disclosures and prevented the full truth about Defendants' Medicare reimbursement manipulation from being revealed at once. As a result, Lead Plaintiffs and the other members of the Class purchased Amedisys securities at artificially-inflated prices and were damaged when the artificial inflation gradually dissipated as a result of partial-corrective disclosures entering the market that revealed Defendants' manipulation of the Medicare reimbursement system.

315. Lead Plaintiffs' losses occurred from the declines in Amedisys stock price in response to a series of partial disclosures concerning the true nature of Amedisys's business practices and the extent of the risks associated with such practices. For example, according to CW-54, a Director of Operations at Amedisys in an Illinois office from approximately May 2005 through June 2010, Defendant Borne sent Amedisys employees a videotaped message regarding the April 26, 2010 *WSJ* article. According to CW-54, Borne informed Amedisys employees that Amedisys stock was going to plummet because of the *WSJ* article, and, as discussed herein, it did. Borne thus internally acknowledged the material link between the corrective information and Amedisys's stock price.

316. As the truth gradually became known and/or risks that had been fraudulently concealed by Defendants gradually materialized as alleged herein (including but not limited to the commencement of government investigations into Amedisys), the price of Amedisys securities declined significantly as artificial inflation was removed from the market price of these securities, causing substantial damage to Lead Plaintiffs and members of the Class, as further detailed in the "Truth Begins to Emerge" section above. Discovery and expert analysis may reveal further partial disclosures of corrective information.

**XIII.  NO SAFE HARBOR**

317.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements set forth in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements. To the extent that the statutory safe harbor is intended to apply to any forward-looking statements set forth herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. In addition, to the extent any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and defendants failed to update those statements which later became inaccurate.

**XIV.  PRESUMPTION OF RELIANCE**

318.    Lead Plaintiffs are entitled to a presumption of reliance because the claims asserted herein against Defendants are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

319.    The market for the Company's securities was, at all times, an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the prices of the Company's securities. Throughout the Class Period:

            (a)        Amedisys stock was actively traded on the NASDAQ;

(b)     The market price of Amedisys securities reacted promptly to the dissemination of public information regarding the Company;

(c)     Securities analysts followed and published research reports regarding Amedisys that were publicly available to investors.  Those analysts included Credit Suisse; Oppenheimer & Co.; Deutsche Bank; RBC Capital Markets; SunTrust Robinson Humphrey; BB&T Capital Markets; Raymond James; EVA Dimensions; First Analysis Corp; Robert W. Baird & Co.; Stephens Inc.; FBR Capital Markets; Stifel Nicolaus; Avondale Partners LLC; CRT Capital Group; Jefferies; and Macquarie.

(d)     The average weekly trading volume for Amedisys stock during the Class Period was approximately 4.41 million shares; and

(e)     The Company's market capitalization was in excess of $735 million on July 14, 2010 and the Company had over 28.4 million shares outstanding as of July 14, 2010.

320.     Throughout the Class Period, the Company was consistently followed by the market, including securities analysts as well as the business press. The market relies upon the Company's financial results and management to accurately present the Company's financial results.  During this period, Amedisys and the Individual Defendants continued to pump materially false information into the marketplace regarding the financial condition of the Company. This information was promptly reviewed and analyzed by the ratings agencies, analysts and institutional investors and assimilated into the price of the Company's securities.

321.     As a result of the misconduct alleged herein (including defendants' misstatements and omissions), the market for Amedisys securities was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory

applies. Thus, Class members are presumed to have indirectly relied upon the misrepresentations and omissions for which defendants are each responsible.

322.    Plaintiff and other Class members justifiably relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of Amedisys securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

323.    Had Plaintiff and other members of the Class known of the material adverse information not disclosed by defendants, or been aware of the truth behind defendants' material misstatements, they would not have purchased Amedisys securities at artificially inflated prices.

## XV.    CLAIMS FOR RELIEF

### COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

324.    Lead Plaintiffs repeat and re-allege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

325.    Throughout the Class Period, Amedisys and the Individual Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the U. S. mail, engaged and participated in a continuous course of conduct to conceal adverse material information about Amedisys, including its true financial results and internal controls, as specified herein.  This plan, scheme and course of conduct was intended to and, throughout the Class Period, did:  (a) deceive the investing public, including Lead Plaintiffs and other members of the Class, as alleged herein; (b) artificially inflate the market price of Amedisys securities; and (c) cause Lead Plaintiffs and other members of the Class to purchase Amedisys securities at artificially inflated prices.

326.    In furtherance of this unlawful scheme, plan and course of conduct, the Individual Defendants, individually and jointly, took the actions set forth herein.    Indeed, while in possession of material, adverse non-public information, these Defendants:  (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of conduct which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to create and maintain artificially high market prices for Amedisys's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.    Each of the Individual Defendants was a direct and substantial participant in the common course of conduct alleged herein.

327.    The Individual Defendants knew or recklessly disregarded that the Company's reported financial results during the Class Period, as filed with the SEC and disseminated to the investing public, were materially overstated.  Further, these Defendants knew of or recklessly disregarded undisclosed existing adverse facts which undermined their representations about Amedisys's existing business, internal controls and prospects during the Class Period and which needed to be disclosed to prevent their Class Period statements from being rendered materially false and misleading.

328.    In addition to the duties of full disclosure imposed on the Individual Defendants, as a result of their responsibility for the Company's financial statements and making affirmative statements and reports to the investing public, the Individual Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.1-01, et seq.) and Regulation S-K (17 C.F.R. § 229. 10, et seq.) and other SEC regulations,

including accurate and truthful information with respect to the Company's financial condition, earnings and expenses so that the market price of the Company's securities would be based on truthful, complete and accurate information.

329.    Amedisys and the Individual Defendants, the top executive officers of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers of the Company, each of these individual Defendants was able to and did control the content of the public statements disseminated by Amedisys.  With knowledge of the falsity and/or misleading nature of the statements contained therein and in reckless disregard of the true financial results of the Company, these Defendants caused the heretofore complained of public statements to contain misstatements and omissions of material facts as alleged herein.

330.    Amedisys and the Individual Defendants acted with scienter throughout the Class Period in that they either had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with deliberate reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were among the senior management of the Company and were therefore directly responsible for the false and misleading statements and/or omissions disseminated to the public through press releases, news reports and filings with the SEC.

331.    Defendants' misrepresentations and/or omissions were intentional or reckless and done for the purpose of enriching themselves at the expense of Lead Plaintiffs and the Class and to conceal the Company's true operating condition from the investing public.  Defendants engaged in this scheme to inflate the Company's reported revenues and prospects in order to create the illusion that Amedisys was a successful, strong and growing company.

191

332.    As a result of those deceptive practices and false and misleading statements and/or omissions, the market price of Amedisys's securities was artificially inflated throughout the Class Period.    In ignorance of the false and misleading nature of the representations and/or omissions described above and the deceptive and manipulative devices employed by defendants, Lead Plaintiffs and the other members of the Class, in reliance on either the integrity of the market or directly on the statements and reports of Defendants and the statements for which they are responsible, purchased Amedisys securities at artificially inflated prices and were damaged thereby.

333.    Had Lead Plaintiffs and other members of the Class known of the material adverse information not disclosed by Defendants or been aware of the truth behind Defendants' material misstatements, they would not have purchased Amedisys securities at artificially inflated prices.

334.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

335.    Lead Plaintiffs repeat and re-allege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

336.    Each of the Individual Defendants, by virtue of their positions with Amedisys and their specific acts, were controlling persons of Amedisys within the meaning of Section 20(a) of the Exchange Act.  the Individual Defendants were the Company's Chairman and CEO (Borne), COO (Graham), CFOs (Browne, Giblin and Redman), Chief Information Officer (Schwartz) and Chief Compliance Officer (Jeter) and actively managed the Company and its reporting to

investors and Amedisys's accounting practices.  They had the power and influence and exercised same to cause Amedisys to engage in the illegal conduct and practices complained of herein.  Defendants were thereby and otherwise culpable participants in the fraud perpetrated by Defendants.

337.    By reason of the conduct of Amedisys as alleged in this Complaint, the Individual Defendants are liable for the aforesaid wrongful conduct of Amedisys and liable to Lead Plaintiffs and the Class for the substantial damages which they suffered in connection with their purchases or acquisitions of shares as a result of Amedisys's violations of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class;

B.    Awarding Lead Plaintiffs and the Class compensatory damages and/or rescission;

C.    Awarding Lead Plaintiffs and the Class pre-judgment and post-judgment interest;

D.    Awarding Lead Plaintiffs and the Class the fees and expenses incurred in this action, including expert witness fees and attorneys fees; and

E.    Awarding such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Lead Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

Dated:  January 18, 2011

Respectfully submitted by:

HYMEL DAVIS & PETERSEN
RICHARD P. IEYOUB (26287)

/s/Richard P. Ieyoub
RICHARD P. IEYOUB
10602 Coursey Boulevard
Baton Rouge, LA 70816
Telephone: (225) 298-8118
Facsimile: (225) 298-8119

*Liaison Counsel*

BERNSTEIN LITOWITZ BERGER &
      GROSSMANN LLP
G. Anthony Gelderman, III
John Alden Meade
2727 Prytania Street, Suite 14
New Orleans, LA 70130
Telephone: (504) 889-2339
Facsimile:  (504) 899-2342

*- and -*

BERNSTEIN LITOWITZ BERGER &
      GROSSMANN LLP
William C. Fredericks
Jeremy P. Robinson
Adam H. Wierzbowski
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

WOLF POPPER LLP
Marian P. Rosner
Robert C. Finkel
Elizabeth Robinson
845 Third Avenue
New York, NY 10022
Telephone: (212) 759-4600
Facsimile: (212) 486-2093

*Lead Counsel for Lead Plaintiffs*

POMERANTZ HAUDEK GROSSMAN &
   GROSS LLP
Marc I. Gross
100 Park Avenue, 26th Floor
New York, New York 10017
Telephone: (212) 661-1100
Facsimile:  (212) 661-8665

*- and -*

POMERANTZ HAUDEK GROSSMAN &
   GROSS LLP
Patrick V. Dahlstrom
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184

KAPLAN FOX & KILSHEIMER LLP
Joel B. Strauss
Jeffrey P. Campisi
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile:  (212) 661-7714

*Additional Plaintiffs' Counsel*

**Appendix A**

**Description of HH-PPS for 2000-2007, with 80 Home Health Resource Groups (HHRGs)**

| HHRG CODE C-F-S LEVELS | HHRG Num. | HHRG PAYMENT | HHRG CODE C-F-S LEVELS | HHRG Num. | HHRG PAYMENT |
|---|---|---|---|---|---|
| C0F0S0 | 1 | $1,211 | C2F0S0 | 41 | $1,832 |
| C0F0S1 | 2 | $1,397 | C2F0S1 | 42 | $2,018 |
| C0F0S2 | 3 | $3,415 | C2F0S2 | 43 | $4,036 |
| C0F0S3 | 4 | $3,994 | C2F0S3 | 44 | $4,615 |
| C0F1S0 | 5 | $1,429 | C2F1S0 | 45 | $2,050 |
| C0F1S1 | 6 | $1,615 | C2F1S1 | 46 | $2,236 |
| C0F1S2 | 7 | $3,633 | C2F1S2 | 47 | $4,254 |
| C0F1S3 | 8 | $4,212 | C2F1S3 | 48 | $4,833 |
| C0F2S0 | 9 | $1,667 | C2F2S0 | 49 | $2,288 |
| C0F2S1 | 10 | $1,853 | C2F2S1 | 50 | $2,474 |
| C0F2S2 | 11 | $3,871 | C2F2S2 | 51 | $4,492 |
| C0F2S3 | 12 | $4,450 | C2F2S3 | 52 | $5,071 |
| C0F3S0 | 13 | $1,755 | C2F3S0 | 53 | $2,376 |
| C0F3S1 | 14 | $1,941 | C2F3S1 | 54 | $2,562 |
| C0F3S2 | 15 | $3,959 | C2F3S2 | 55 | $4,580 |
| C0F3S3 | 16 | $4,537 | C2F3S3 | 56 | $5,159 |
| C0F4S0 | 17 | $2,140 | C2F4S0 | 57 | $2,761 |
| C0F4S1 | 18 | $2,326 | C2F4S1 | 58 | $2,947 |
| C0F4S2 | 19 | $4,344 | C2F4S2 | 59 | $4,965 |
| C0F4S3 | 20 | $4,923 | C2F4S3 | 60 | $5,544 |
| C1F0S0 | 21 | $1,431 | C3F0S0 | 61 | $2,754 |
| C1F0S1 | 22 | $1,617 | C3F0S1 | 62 | $2,940 |
| C1F0S2 | 23 | $3,635 | C3F0S2 | 63 | $4,958 |
| C1F0S3 | 24 | $4,214 | C3F0S3 | 64 | $5,537 |
| C1F1S0 | 25 | $1,649 | C3F1S0 | 65 | $2,972 |
| C1F1S1 | 26 | $1,835 | C3F1S1 | 66 | $3,158 |
| C1F1S2 | 27 | $3,853 | C3F1S2 | 67 | $5,176 |
| C1F1S3 | 28 | $4,432 | C3F1S3 | 68 | $5,755 |
| C1F2S0 | 29 | $1,887 | C3F2S0 | 69 | $3,210 |
| C1F2S1 | 30 | $2,073 | C3F2S1 | 70 | $3,396 |
| C1F2S2 | 31 | $4,091 | C3F2S2 | 71 | $5,414 |
| C1F2S3 | 32 | $4,670 | C3F2S3 | 72 | $5,993 |
| C1F3S0 | 33 | $1,975 | C3F3S0 | 73 | $3,298 |
| C1F3S1 | 34 | $2,161 | C3F3S1 | 74 | $3,484 |
| C1F3S2 | 35 | $4,179 | C3F3S2 | 75 | $5,502 |
| C1F3S3 | 36 | $4,757 | C3F3S3 | 76 | $6,081 |
| C1F4S0 | 37 | $2,360 | C3F4S0 | 77 | $3,683 |
| C1F4S1 | 38 | $2,546 | C3F4S1 | 78 | $3,869 |
| C1F4S2 | 39 | $4,564 | C3F4S2 | 79 | $5,887 |
| C1F4S3 | 40 | $5,143 | C3F4S3 | 80 | $6,466 |

## Appendix B

## Refined HH-PPS and Payment Rates for CY2008

|  | THER VISITS | C1F1 | C1F2 | C1F3 | C2F1 | C2F2 | C2F3 | C3F1 | C3F2 | C3F3 |
|---|---|---|---|---|---|---|---|---|---|---|
| EARLY EPIS. | TV=1-5 | $1,323 | $1,524 | $1,714 | $1,665 | $1,866 | $2,056 | $2,046 | $2,247 | $2,437 |
| EARLY EPIS. | TV=6 | $1,931 | $2,133 | $2,323 | $2,274 | $2,475 | $2,665 | $2,654 | $2,855 | $3,045 |
| EARLY EPIS. | TV=7-9 | $2,406 | $2,607 | $2,798 | $2,749 | $2,950 | $3,140 | $3,129 | $3,330 | $3,520 |
| EARLY EPIS. | TV=10 | $2,893 | $3,094 | $3,284 | $3,236 | $3,437 | $3,627 | $3,616 | $3,817 | $4,007 |
| EARLY EPIS. | TV=11-13 | $3,293 | $3,495 | $3,685 | $3,636 | $3,837 | $4,027 | $4,016 | $4,217 | $4,407 |
| EARLY EPIS. | TV=14-15 | $3,659 | $3,923 | $4,089 | $4,229 | $4,493 | $4,658 | $4,887 | $5,151 | $5,316 |
| EARLY EPIS. | TV=16-17 | $4,013 | $4,277 | $4,442 | $4,582 | $4,846 | $5,012 | $5,240 | $5,504 | $5,669 |
| EARLY EPIS. | TV=18-19 | $4,324 | $4,588 | $4,753 | $4,893 | $5,157 | $5,323 | $5,551 | $5,815 | $5,981 |
|  |  |  |  |  |  |  |  |  |  |  |
| EARLY OR LATE EPIS. | TV=20+ | $5,788 | $6,218 | $6,705 | $6,273 | $6,704 | $7,190 | $7,001 | $7,431 | $7,917 |
|  |  |  |  |  |  |  |  |  |  |  |
| LATE EPIS. | TV=1-5 | $1,485 | $1,789 | $2,078 | $1,617 | $1,921 | $2,209 | $2,134 | $2,438 | $2,726 |
| LATE EPIS. | TV=6 | $2,280 | $2,584 | $2,872 | $2,412 | $2,716 | $3,004 | $2,928 | $3,232 | $3,520 |
| LATE EPIS. | TV=7-9 | $2,739 | $3,043 | $3,331 | $2,871 | $3,175 | $3,463 | $3,388 | $3,692 | $3,980 |
| LATE EPIS. | TV=10 | $3,241 | $3,546 | $3,834 | $3,373 | $3,677 | $3,965 | $3,890 | $4,194 | $4,482 |
| LATE EPIS. | TV=11-13 | $3,638 | $3,942 | $4,230 | $3,770 | $4,074 | $4,362 | $4,286 | $4,591 | $4,879 |
| LATE EPIS. | TV=14-15 | $3,980 | $4,277 | $4,661 | $4,603 | $4,900 | $5,285 | $5,330 | $5,628 | $6,012 |
| LATE EPIS. | TV=16-17 | $4,243 | $4,540 | $4,924 | $4,866 | $5,164 | $5,548 | $5,593 | $5,891 | $6,275 |
| LATE EPIS. | TV=18-19 | $4,598 | $4,895 | $5,279 | $5,221 | $5,518 | $5,902 | $5,948 | $6,245 | $6,630 |

**CERTIFICATE OF SERVICE**

I hereby certify that on January 18, 2011, a true and correct copy of the above and foregoing Amended Complaint was electronically served on counsel of record in this matter who are registered with the Court's ECF filing system through ECF notification.


By: ___/s/  Richard P. Ieyoub_____
     Richard P. Ieyoub