# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| ROBERT F. BACH, ET AL.<br><br>　　　　　　　　Plaintiff,<br><br>　v.<br><br>AMEDISYS, INC., ET AL.<br><br>　　　　　　　　Defendants. | **Civil Action No.  10-395-BAJ-CN**<br>Consolidated with:<br>　No. 10-441-BAJ-CN<br>　No. 10-464-BAJ-CN<br>　No. 10-468-BAJ-CN<br>　No. 10-470-BAJ-CN<br>　No. 10-480-BAJ-CN<br>　No. 10-497-BAJ-CN<br>　No. 10-505-BAJ-CN<br>　No. 10-642-BAJ-CN<br>　No. 10-732-BAJ-CN |

## CONSOLIDATED ERISA CLASS ACTION COMPLAINT

Plaintiffs Wanda Corbin, Pia Galimba and Linda Trammell ("Plaintiffs"), participants in the Amedisys Inc. 401(k) Plan (the "Plan") during the Class Period (defined below), bring this action individually and on behalf of the Plan, as well as on behalf of all other similarly situated participants and beneficiaries of the Plan, and allege the following based upon the investigation of Plaintiffs' counsel, which included reviewing public documents filed by Amedisys, Inc. ("Amedisys" or the "Company") with the U.S. Securities and Exchange Comission ("SEC") and the U.S. Department of Labor ("DOL"), public announcements made by Amedisys and Defendants, press releases published by and regarding the Company, Plan-related documents including Summary Plan Descriptions distributed by Defendants for the Plan, and other publicly available information.

## I. NATURE OF THE ACTION

1.     Plaintiffs bring this class action pursuant to §§ 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§1132(a)(2) and (a)(3), on behalf of the Plan and all Plan participants against the Plan's fiduciaries for violations of ERISA.

2.     The Plan is a retirement plan sponsored by Amedisys and administered by the Amedisys, Inc. 401(k) Plan Administrative Committee (the "Administrative Committee" or "Committee").

3.     Plaintiffs' claims arise from the failure of Defendants, who are fiduciaries of the Plan, to act solely in the interest of the participants and beneficiaries of the Plan, and to exercise the required skill, care, prudence and diligence in administering the Plan and the Plan's assets during the period January 1, 2008 to the present (the "Class Period").

4.     Plaintiffs allege that Defendants breached their fiduciary duties under ERISA by allowing the imprudent investment of the Plan's assets in Amedisys common stock ("Amedisys stock") throughout the Class Period even though they knew or should have known that such

2

investment was unduly risky and imprudent due to the Company's serious mismanagement and improper business practices, including the Company's improper billing practices to Medicare, which was the source for approximately ninety (90) percent of the Company's revenue.

5.    Amedisys's stock was trading as high as $66 per share during the Class Period. Since disclosure of the Company's inflationary Medicare reimbursement practices and the resulting investigations, Amedisys's stock price has dropped precipitously to a low of approximately $27 per share as of the date of commencement of this action, taking with it the retirement savings of Plaintiffs and the other Plan participants.

6.    In Count I, Plaintiffs allege that the Defendants who were responsible for the investment of the Plan's assets breached their fiduciary duties to the Plan's participants in violation of ERISA by failing to prudently manage the Plan's investment in Amedisys stock.

7.    In Count II, Plaintiffs allege that the Defendants who were responsible for the selection, monitoring and removal of the Plan's other fiduciaries failed to properly monitor the performance of their fiduciary appointees and remove and replace those whose performance was inadequate, and failed to provide them with the necessary information to fulfill their fiduciary duties.

8.    In Count III, Plaintiffs allege that the Director Defendants and the Committee Defendants (defined below) breached their duty to avoid conflicts of interest and placed their own pecuniary interests above the interests of the Plan's participants.

9.    As more fully explained below, during the Class Period, Defendants imprudently permitted the Plan to hold and acquire tens of millions of dollars in Amedisys stock, representing the largest single holding of the Plan. As a result of Defendants' breaches, the Plan suffered enormous losses, wiping out substantial retirement savings of participants in the Plan.

10.    The Plan may incur additional losses from continued investment in Amedisys stock as the investigations regarding the Company's Medicare billing practices are concluded. As discussed below, Amedisys faces the ongoing threat of severe fines and penalties and even potential exclusion from Medicare and Medicaid programs.  Because 90% of the Company's revenues comes from Medicare, such exclusion could ruin Amedisys, causing its stock to become effectively worthless -- which would eviscerate the retirement savings of thousands of Plan participants.

11.    Plaintiffs, on behalf of the Plan, seek to recover losses for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2).  In addition, Plaintiffs seek other equitable relief from Defendants, including injunctive relief and, as available under applicable law, constructive trust, restitution, equitable tracing and other monetary relief.

12.    ERISA §§ 409(a) and 502(a)(2) authorize participants such as Plaintiffs to sue in a representative capacity for losses suffered by the Plan as a result of breaches of fiduciary duty. Pursuant to that authority, Plaintiffs bring this action as a class action under Fed. R. Civ. P. 23 on behalf of all participants and beneficiaries of the Plan whose Plan accounts were invested in Amedisys stock during the Class Period.

13.    Because the information and documents on which Plaintiffs' claims rest are, for the most part, solely in Defendants' possession, certain of Plaintiffs' allegations are by necessity based on information and belief.[1]  At such time as Plaintiffs have had an opportunity to conduct

---

[1] In response to requests from Plaintiffs' counsel, Amedisys has produced certain documents pursuant to ERISA § 104(b), 29 U.S.C. 1024(b), but those documents have not allowed Plaintiffs to ascertain the precise contours of each Defendant's fiduciary responsibilities.  Plaintiffs may seek leave to amend their Complaint to further allege Defendants' fiduciary transgressions once they obtain formal discovery from Defendants.

discovery, Plaintiffs will amend this Complaint, to the extent necessary and appropriate, to add such other additional facts (and, if necessary, defendants) as are discovered.

## II. JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and ERISA §502(e)(1), 29 U.S.C. §1132(e)(1).

15.    ERISA provides for nation-wide service of process.  ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All of the Defendants are either residents of the United States or subject to service in the United States, and this Court has personal jurisdiction over them.

16.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and ERISA § 502(e)(2), 29 U.S.C. §1132(e)(2), because the Plan was administered in this District, some or all of the fiduciary breaches for which relief is sought occurred in this District, and/or some Defendants reside or maintain their primary place of business in this District.

## III. PARTIES

**Plaintiffs**

17.    **Plaintiff Wanda Corbin** is a former Amedisys employee and a participant in the Plan pursuant to § 3(7) of ERISA, 29 U.S.C. §1002(7).  During the Class Period, Plaintiff Corbin held shares of Amedisys common stock in her retirement account in the Plan.

18.    **Plaintiff Pia Galimba** is a former Amedisys employee and a participant in the Plan pursuant to § 3(7) of ERISA, 29 U.S.C. §1002(7).  During the Class Period, Plaintiff Galimba held shares of Amedisys common stock in her retirement account in the Plan.

19.    **Plaintiff Linda Trammell** is a former Amedisys employee and a participant in the Plan pursuant to § 3(7) of ERISA, 29 U.S.C. §1002(7).  During the Class Period, Plaintiff Trammell held shares of Amedisys common stock in her retirement account in the Plan.

**Defendants**

A.    **Company Defendant**

20.    **Defendant Amedisys** is a provider of home health services to the chronic, comorbid and aging American population.  The Company operates in two segments; home health and hospice segments.

21.    Amedisys is a Delaware corporation with its principal executive offices located at 5959 South Sherwood Forest Boulevard, Baton Rouge, Louisiana. Amedisys currently has agencies in more than 600 locations across the United States. The Company serves 45 states, as well as the District of Columbia and Puerto Rico.

22.    Amedisys stock is actively traded on the NASDAQ under the ticker symbol "AMED."

23.    Amedisys is named as the Plan's sponsor in the Plan's Form 5500 filed for the Plan year ended December 31, 2008.

24.    According to the Plan, Amedisys is a named fiduciary of the Plan.  *See* Plan § 9.11. Further, according to the Plan's Summary Plan Description, the Company is the Plan's Administrator.

25.    Upon information and belief, the Company fulfills its fiduciary obligations under the Plan through its Board of Directors.  Through its Board of Directors, Amedisys can appoint any person, including employees of the Company, to perform the duties of administrator as a member of the Administrative Committee.

B.    **Director Defendants**

26.    **Defendant William F. Borne ("Borne")** founded the Company in 1982 and has been its Chief Executive Officer ("CEO") and Chairman of the Board of Directors since then.

As a member of the Company's Board of Directors, Defendant Borne was a fiduciary of the Plan during the Class Period to the extent that the Company performed its fiduciary responsibilities through the Board.

27.     During the Class Period, but before the improper practices at Amedisys came to light, Defendant Borne reaped nearly $8.5 million in proceeds from sales of his personal stake in Amedisys stock while continuing to encourage Plan participants to hold and acquire investments in Amedisys stock.

28.     Additionally, Defendant Borne was personally benefiting from breaching his fiduciary duties because the improper practices allowed him to reap additional compensation based upon the Company's purported financial performance.  In 2009 alone, Defendant Borne benefited from a salary of $750,000, stock awards of $2,437,531, Non-Equity Incentive Plan Compensation of $1,072,500 and other compensation of $58,423.00 as a result of the Company's improper practices.

29.     **Defendant Ronald A. LaBorde ("LaBorde")** has been a member of the Board of Directors since 1997.  As a member of the Company's Board of Directors, Defendant LaBorde was a fiduciary of the Plan during the Class Period to the extent that the Company performed its fiduciary responsibilities through the Board.

30.     **Defendant Jake L. Netterville ("Netterville")** has been a member of the Board of Directors since 1997.  As a member of the Company's Board of Directors, Defendant Netterville was a fiduciary of the Plan during the Class Period to the extent that the Company performed its fiduciary responsibilities through the Board.

31.     **Defendant David R. Pitts ("Pitts")** has been a member of the Board of Directors since 1997.  As a member of the Company's Board of Directors, Defendant Pitts was a fiduciary

of the Plan during the Class Period to the extent that the Company performed its fiduciary responsibilities through the Board.

32.     **Defendant Peter F. Ricchiuti ("Ricchiuti")** has been a member of the Board of Directors since 1997.  As a member of the Company's Board of Directors, Defendant Ricchiuti was a fiduciary of the Plan during the Class Period to the extent that the Company performed its fiduciary responsibilities through the Board.

33.     **Defendant Donald A. Washburn ("Washburn")** has been a member of the Board of Directors since 2004.  As a member of the Company's Board of Directors, Defendant Washburn was a fiduciary of the Plan during the Class Periodto the extent that the Company performed its fiduciary responsibilities through the Board.

34.     **Defendant Larry R. Graham ("Graham")** joined the Board of Directors in January 2009, having joined the Company in April 1996.  Defendant Graham became the Chief Operating Officer ("COO") of Amedisys in January 1999 and was appointed President in 2004.  On September 3, 2009, Defendant Graham resigned as President, but continued to serve on the Board of Directors.  As a member of the Company's Board of Directors, Defendant Graham was a fiduciary of the Plan during the Class Period to the extent that the Company performed its fiduciary responsibilities through the Board.

35.     During the Class Period, but before the improper practices at Amedisys came to light, Defendant Graham reaped nearly $1.2 million in proceeds from sales of his personal stake in Amedisys stock while continuing to encourage Plan participants to hold and acquire investments in Amedisys stock.

36.     Additionally, on July 30, 2009, Defendant Graham sold 23,180 shares of stock at $41.21 through his Plan account, netting $955,247 in proceeds, and 12,583 shares of stock at

$41.21 through his spouse's Plan account, netting $518,419 in proceeds.  On July 31, 2009, Graham's spouse sold another 718 shares at $46.405, netting $33,319, for a total of $1,506,987 in additional proceeds.

37.    Graham was personally benefiting from breaching his fiduciary duties because the improper practices allowed him to reap additional compensation based upon the Company's purported financial performance.  In 2008 alone, Defendant Graham benefited from a salary of $529,808, stock awards of $1,571,826, Non-Equity Incentive Plan Compensation of $618,750 and other compensation of $14,454 as a result of the Company's improper practices.  In addition, as a result of Graham's resignation in September 2009, Defendant Graham received a severance package in the amount of $2,600,000.

38.    Defendants Borne, LaBorde, Netterville, Pitts, Ricchiuti, Washburn, and Graham are hereafter collectively referred to as the "Director Defendants."

### C.    Committee Defendants

39.    According to the Amedisys Inc. 401(k) Plan Investment Policy Statement ("Policy Statement"),[2] the Administrative Committee is "charged with the responsibility for the investment of the assets of the Plan."  Policy Statement, p. 2.  The Policy Statement identifies the Committee as "the named fiduciary for management of Plan assets."  Policy Statement, p. 2. The Committee is required to employ a logical and diligent process to select a menu of investment options that will provide Plan participants with the range of choices necessary to assist them in meeting their retirement needs and protection against excessive investment risk.

---

[2] All references in this Complaint are to the Policy Statement dated March 2010.  Discovery may reveal other investment policy statements that were in effect during the Class Period, and Plaintiffs will seeks to amend their Complaint based on information and policies that vary from those in the March 2010 Policy Statement.

40.    Upon information and belief, the members of the Committee had knowledge of the business practices and financial condition of the Company by virtue of the positions they held as high-level Company employees.

41.    The Committee is required to discharge its duties solely in the interest of the Plan, with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character with like aims.

42.    The specific responsibilities of the Committee relating to the investment management of Plan assets include:

(a) Adhering to the guidelines defined by ERISA and all other applicable regulations;

(b) Prudently and diligently selecting qualified investment professionals, including the Plan provider, investment consultant, and custodian;

(c) Preparing and maintaining an Investment Policy Statement for the Plan;

(d) Determining the investment objectives and selecting specific investment options to be offered to the Plan's participants geared towards achieving stated investment objectives;

(e) Avoiding prohibited transactions and conflicts of interest;

(f) Providing sufficient asset classes with different and distinct risk/return profiles available under the Plan so that each Plan participant has the opportunity to prudently diversify his/her account given his/her investment circumstances;

(g) Developing and enacting proper control procedures, i.e., replacing investment managers due to fundamental change in investment management process or overall performance;

(h) Providing periodic investment education and communications to Plan participants; and

(i) Selecting, monitoring and, if necessary, recommending the replacement of the Plan provider, investment consultant, custodian or other service provider.

*See* Policy Statement, p. 2-3.

43.    According to the minutes of a "Special Meeting of 401(k) committee meeting-June 21, 2010," the members of the Committee were: Dale E. Redman ("Redman"), Chief Financial Officer ("CFO"); Cindy L. Phillips ("Phillips"), Senior Vice President of Human Resources; T.A. "Tim" Barfield, Jr. ("Barfield"), Chief Development Officer ("CDO"); and Michael Snow ("Snow"), Chief Operating Officer ("COO").[3]

44.    In addition, other members of the Committee during the Class Period included: Defendant Borne; Defendant Graham; Gregory H. Browne ("Browne"); Melissa A. Geci ("Geci"); John F. Giblin ("Giblin"); Donald Loverich, Jr. ("Loverich"); and Alice Ann Schwartz ("Schwartz").

45.    **Defendant Redman** is the CFO for Amedisys. According to the Company's website, Defendant Redman has "more than 34 years of senior level financial experience…" For at least a portion of the Class Period, Defendant Redman served on the Committee and was therefore a fiduciary of the Plan.

---

[3] The June 21, 2010 minutes of the Plan Committee meeting approve minutes of meetings held on April 1, 2010 and May 21, 2010. In attendance at those meeting were additional individuals identified only by first name. Discovery in this matter may reveal the identity and function of the individuals mentioned in the June 21, 2010 minutes, and Plaintiffs reverse their right to name additional defendants based on that discovery.

11

46.    **Defendant Phillips** is the Company's Senior Vice President of Governance, Diversity, and Compliance.   Defendant Phillips joined Amedisys in 1993 as a benefits coordinator in the Human Resources department.   During at least a part of the Class Period, Defendant Phillips held the position of Senior Vice President – Human Resources.   Defendant Phillips served on the Committee during the Class Period and was therefore a fiduciary of the Plan.

47.    Indicative of her fiduciary responsibilities, during the Class Period, Defendant Phillips signed the Plan's Form 5500s filed with the DOL and, in these documents, identified herself as the Plan Administrator.

48.    **Defendant Barfield** is the CDO for Amedisys.   For at least a portion of the Class Period, Defendant Barfield served on the Committee and was therefore a fiduciary of the Plan.

49.    **Defendant Snow** became the COO for Amedisys in 2004.   According to the Company's website, Defendant Snow is "[a]n accomplished executive with 30 years' experience in health care business operations."   For at least a portion of the Class Period, Defendant Snow served on the Committee and was therefore a fiduciary of the Plan.

50.    **Defendant Borne,** as set forth above, founded the Company in 1982 and has been Chief Executive Officer and Chairman of the Board of Directors since then.   For at least a portion of the Class Period, Defendant Borne served on the Committee and was therefore a fiduciary of the Plan.

51.    **Defendant Browne** served on the Committee and was therefore a fiduciary of the Plan for at least a portion of the Class Period.

52.    **Defendant Geci** served on the Committee and was therefore a fiduciary of the Plan for at least a portion of the Class Period.

53.     **Defendant Giblin** served on the Committee and was therefore a fiduciary of the Plan for at least a portion of the Class Period.

54.     **Defendant Graham**, as set forth above, became the Chief Operating Officer of Amedisys in January 1999 and was appointed President in 2004.    On September 3, 2009, Defendant Graham resigned as President, but continued to serve on the Board of Directors.    For at least a portion of the Class Period, Defendant Graham served on the Committee and was therefore a fiduciary of the Plan.

55.     **Defendant Loverich** served on the Committee and was therefore a fiduciary of the Plan for at least a portion of the Class Period.

56.     **Defendant Schwartz** served on the Committee and was therefore a fiduciary of the Plan for at least a portion of the Class Period.

57.     Defendants Redman, Phillips, Barfield, Snow, Borne, Browne, Geci, Giblin, Graham, Loverich and Schwartz are hereafter collectively referred to as the "Committee Defendants."

58.     **Defendants John Does 1-10** are additional Amedisys officers, directors, employees and members of any committees - including additional members of the Administrative Committee (if applicable) - who were fiduciaries of the Plan during the Class Period and whose identities are presently unknown to Plaintiffs.    Once their identities are ascertained, Plaintiffs will seek leave to join them under their true names.    Unless otherwise specified, the term "Defendants" as used herein includes all Defendants collectively and each allegation pertains to each Defendant named in this complaint.

### D.    Defendants' Fiduciary Status

59.    During the Class Period, Defendants had discretionary authority with respect to the management of the Plan and the management and disposition of the Plan's assets.

60.    During the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

61.    Plaintiffs do not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration. Rather, as set forth below, Defendants were fiduciaries to the extent of the fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

62.    As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan and its investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

63.    Amedisys has a duty to ensure that the Plan is operated for the "exclusive benefit of the Participants and their Beneficiaries" and may appoint counsel and advisers as it deems necessary or desirable "in connection with the exercise of its fiduciary duties under this Plan." *See* Plan § 2.1(a). Instead of delegating all fiduciary responsibility for the Plan to external service providers, Amedisys chose to retain certain fiduciary responsibilities and assign others to individuals within Amedisys. These persons and entities in turn selected Amedisys employees, officers and agents to perform most of the relevant fiduciary functions. Although the Plan had

14

an institutional trustee unrelated to Amedisys, the trust agreement required the Trustee to take directions from Amedisys personnel.

64.    While ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), insider fiduciaries must still act solely in the interest of participants and beneficiaries, not in the interest of the Plan's sponsor. Moreover, all fiduciaries of the Plan were obliged to act independently of Amedisys when performing fiduciary functions with respect to the Plan, the Plan's investments, and the disclosure of information between and among fiduciaries or from fiduciaries to the Plan's participants.

65.    According to the Plan, the named fiduciaries of the Plan are: (1) the Company, (2) the Administrator, (3) the Trustee, and (4) any investment manager appointed to manage certain portions of the Plan's assets. *See* Plan § 9.11.

66.    Amedisys is identified as the Administrator of the Plan in both the Plan document (*see* Plan § 2.2) and the Plan's Summary Plan Description ("SPD") provided to Plan participants. As Administrator, the Company's primary responsibility is to "administer the Plan for the exclusive benefit of the Participants and their Beneficiaries. . . ." *See* Plan § 2.4.

67.    Amedisys, as the Plan Administrator, has the power to appoint individual employees of the Company to perform the duties of the Plan Administrator. It also has the power to remove and appoint successor individuals to be the Plan Administrator. *See* Plan § 2.2.

68.    One of the powers and responsibilities of the Company as named fiduciary of the Plan was to "periodically review the performance of any Fiduciary or other person to whom duties have been delegated or allocated by it under the provisions of this Plan…" *See* Plan § 2.1.

69.     By necessity, the Company could only perform its fiduciary responsibilities to the Plan through the Company's Board of Directors.  Accordingly, each member of the Board of Directors was a fiduciary of the Plan to the extent they performed the fiduciary responsibilities of the Company.

70.     The Administrative Committee is "charged with the responsibility for the investment of the assets of the Plan."  Policy Statement, p. 2.  Indeed, the Policy Statement identifies the Committee as "the named fiduciary for management of Plan assets."  Policy Statement, p. 2.

71.     Some of the additional responsibilities of the Committee include "selecting the trustee(s); hiring the Plan Provider and Custodian; selecting the investment option(s) and the Investment Manager(s); hiring the Investment Consultant(s); and appointing the members of the Committee."  Policy Statement, p. 2.

72.     Additionally, as part of its responsibility regarding the management of Plan assets, the Committee is also responsible for determining the investment objective and selecting specific investment options to be offered to participants; developing and enacting proper control procedures; providing "periodic investment education and communications to" Plan participants; and selecting, monitoring and if necessary recommending replacement of the Plan provider, investment consultant, custodian or other service provider.  Policy Statement, p. 3.

73.     Further, as noted above, the Committee was required to periodically review, monitor, and if necessary remove investment options available under the Plan.  Policy Statement, p. 5.  As part of that review, the Committee reviews a fund's performance, putting it on a "watch list" if the fund fails to meet specific criteria.   In addition, "[i]f the fund experiences

extraordinary circumstances, which may render it inappropriate to maintain, it may be considered for removal." Policy Statement, p. 6, 7.

74.    In light of the foregoing duties, responsibilities and actions, the Company, the Board of Directors, Committee, and Committee Defendants were each named fiduciaries of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

## IV.  DIRECT ACTION ON BEHALF OF THE PLAN

75.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), Plaintiffs, as participants in the Plan, bring this action directly on behalf of the Plan, seeking all relief to which the Plan is entitled for the breaches of fiduciary duty set forth herein. ERISA § 502(a)(2) expressly authorizes any plan participant to bring an action against a fiduciary who has violated ERISA § 409.

## V.  CLASS ACTION ALLEGATIONS

76.    In the alternative to bringing this action directly on behalf of the Plan, Plaintiffs bring this action under Rule 23 of the Federal Rules of Civil Procedure, as individual representatives of the class of the Plan's participants and beneficiaries seeking all relief to which the Plan and the Plan's participants and beneficiaries are entitled to for the breaches of fiduciary duty set forth herein.

77.    Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of themselves and the following class of persons similarly situated:

> All persons who were participants in or beneficiaries of the Plan and who held Amedisys stock in their retirement savings account in said Plan (the "Class") at any time between January 1, 2008 and the present (the "Class Period"). The Class specifically excludes Defendants, members of the Defendants' immediate families, any officer, director, or partner of any Defendant, any entity in which a Defendant has a controlling interest, and the heirs, successors or assigns of the foregoing.

78.    The members of the Class are so numerous that joinder of all members is impracticable. The exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery. However, based on the Plan's Form 5500 for the year ending December 31, 2008, there were more than 15,100 individuals who participated in the Plan at the beginning of that Plan year.

79.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the Defendants each owed a fiduciary duty to the Plan, Plaintiffs and members of the Class;

(b)    whether the Defendants breached their fiduciary duties to the Plan, Plaintiffs and the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries;

(c)    whether the Defendants breached their fiduciary duties to the Plan and participants by causing materially misleading information to be delivered to participants and failing to correct that information when Amedisys's true financial condition became known to Defendants;

(d)    whether the Defendants breached their fiduciary duties to the Plan and participants by failing to disclose pertinent information regarding Amedisys to the Plan and the Plan's participants and beneficiaries;

(e)    whether the Defendants violated ERISA; and

(f)    whether the Plan and members of the Class have sustained harm and, if so, what is the proper measure of such harm.

80.    Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs, the Plan and the other members of the Class each sustained losses arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

81.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, complex and ERISA litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Plan or the Class.

82.    Class action status is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of multiple adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

83.    Class action status is also warranted under the other subsections of Rule 23(b) because (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole;

and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VI.  THE PLAN

84.     The Plan is an "employee pension benefit plan" as defined by §3(2)(A) of ERISA, 29 U.S.C. §1002(2)(A).   Specifically, the Plan is a "defined contribution plan" within the meaning of ERISA §3(34).

85.     The Plan is a legal entity that can sue or be sued.  ERISA §502(d)(1), 29 U.S.C. §1132(d)(1).  In a breach of fiduciary duty action such as this, however, the Plan is neither a plaintiff nor a defendant.  Rather, pursuant to ERISA §409, 29 U.S.C. §1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan.  Stated differently, in this action, Plaintiffs seek relief on a "plan-wide" basis.

86.     The Plan was established as a profit sharing plan effective July 1, 1993.  It was subsequently amended in its entirety, restated and adopted on December 31, 2008.

87.     According to the Plan's Policy Statement, the Plan is "intended to provide eligible employees with a source of retirement income through a combination of accumulated employee and potentially employer contributions and investment returns." Policy Statement, p. 1.

88.     Any employee over the age of 18, who does not reside in Puerto Rico, and is not subject to a collective bargaining agreement, is eligible to participate in the Plan.  *See* Plan § 1.27.  Employees are eligible to participate on the first day of the month following their date of employment with the Company.  *See* Plan §§ 3.1-3.2.

89.     Each Plan participant may elect to defer up to 90% of their compensation to Plan, subject to limitations imposed by the IRS.  Beginning in January 1, 2007, any employee who does not make a salary election deferral, or elects to defer less than 3% of their compensation

(per payroll period) to the Plan, shall be automatically deemed to have elected to contribute a pre-tax deferral of 3% of their compensation to the Plan. *See* Plan §4.2.

90.    Plan participants are always considered fully vested in that portion of their Plan account comprised of their deferral amount. *See* Plan §4.2.

91.    The Company makes a discretionary matching contribution equal to a uniform percentage of each employee's salary deferrals. Each year, the Company determines the amount of the discretionary percentage; however, only salary reductions of up to 6% of compensation are considered for matching contribution. *See* Plan §4.1.

92.    The total matching contributions in any Plan year, however, cannot exceed 4.5% of the total employee compensation. *See* Plan §4.1. For purposes of determining this formula, after January 2002, compensation in excess of $200,000.00 is disregarded. *See* Plan §1.17.

93.    According to the Plan, Company matching contributions vest pursuant to the following schedule:

| Periods of Service | Percentage Vested |
|--------------------|-------------------|
| 0-2 | 0% |
| 2 | 25% |
| 3 | 50% |
| 4 | 75% |
| 5 | 100% |

*See* Plan § 6.4.

94.    The Administrator establishes the permissible investment options, determines how often changes between investments can be made and may, in its discretion, include or exclude any instructions, guidelines or policies as it deems necessary. Plan, § 4.13.

95.    The Policy Statement states that Amedisys common stock "may be offered as an investment option" under the Plan "as determined by the Committee." Policy Statement, p.6. Notably,

the Committee members recognized that the "long-term return of this option will be tied to the operating results of the Company." Policy Statement, p. 6.

96.    On a quarterly basis, the Committee was required to monitor the available investment funds.  If a fund failed to meet certain standards, it was to be placed on a "watch list," and if it faced "extraordinary circumstances, which [would] render it inappropriate to maintain, it may be considered for removal." Policy Statement, p. 6.

97.    Beginning in April 2007, Plan participants were no longer able to direct the investment of their Plan account into Company stock.  However, their Plan accounts continued to hold Amedisys stock and Company matching contributions continued to be made in Company stock.  Policy Statement, p. 6.

98.    As of January 1, 2008, the Plan had 9,547 participants and the Plan held 1,298,543 shares of Amedisys securities valued at $63,005,348.  The Plan's holdings in Company stock at the beginning of 2008 represented 46% of the Plan's total investments.

99.    As of December 31, 2008, the Plan had 15,150 participants and the Plan held 1,430,831 shares of Amedisys securities valued at $59,150,560.  The Plan's holdings in Company stock in 2008 represented 39.96% of the Plan's total investments.

100.    According to the Plan's Form 5500 for 2008, and attached Schedules, Merrill Lynch Bank & Trust Co., FSB serves as the Plan's trustee and record keeper.

## VII.  SUBSTANTIVE ALLEGATIONS

### A.    Facts Bearing On Fiduciary Breach

### History of Amedisys And Its Inappropriate Billing Practices

101.    During the Class Period, Amedisys stock became an imprudent investment for participants' retirement savings because of, *inter alia,* (a) the Company's reliance on a single customer (Medicare) for its profits; (b) improper billing practices which put the Company's

continued relationship with Medicare in jeopardy; and (c) increasing federal investigations into the medical field in general, and Amedisys in particular, regarding billing practices to Medicare.

102.     Between 2000 and 2010, Amedisys experienced tremendous growth.  For example, in 2000, the Company's stock traded at less than $1 and the Company had revenue of approximately $88 million per year.  By April 2010, the stock was trading at over $60 per share, and the Company had revenue of $1.5 billion in 2009.

103.     As was later disclosed through an investigation began by *The Wall Street Journal*, this tremendous growth was fueled by improper Medicare billing practices which put the Company's future in jeopardy.

**Amedisys Depends Heavily On Medicare Payments**

104.     Defendant Amedisys is a provider of home health services and depends heavily on Medicare payments.  Nearly 90% of the Company's revenue comes from providing services that are paid by Medicare.  The Company's fees are set by the Centers for Medicare and Medicaid Services ("CMMS") through its home health prospective payment program ("PPS").

105.     Under Medicare's PPS system, home health care companies such as Amedisys received a flat fee from Medicare of approximately $2,200 for providing a patient with up to nine home therapy visits from occupational, physical or speech therapists.   Under PPS, Medicare reimburses home health care companies in advance for a substantial portion of the total payment to which they are entitled for a given patient, with payment based on (1) a predetermined rate schedule established by Medicare, and (2) a pre-treatment assessment of the given patient's condition (performed by nurses and therapists on what is termed an "OASIS" form) and proposed plan of care during a standardized 60-day time period.

106.     Between 2000 and 2007, Medicare also paid an *additional* reimbursement amount of approximately $2,200 (on a per patient basis) when a home health care company provided at

least ten (10) therapy visits to the same patient during a 60-day treatment episode. Doctors were required to sign off on the number of visits in order for the company to be reimbursed.

107. Beginning in January 2008, the CMMS changed its PPS policy to eliminate the $2,200 tenth-visit payment, and instead provided additional payments of $2,200 and replaced it with a revised system that provided for significant increased payments at six (6), fourteen (14) and twenty (20) therapy visits.

108. In lockstep with this change, Amedisys instantaneously began changing the way it treated its patients, with dramatically fewer patients needing 10 visits and more patients needing six, fourteen, or twenty visits.

109. As discussed further below, in contravention of applicable laws, Amedisys routinely encouraged its health provider employees to maximize the number of their home therapy visits when the visits were not medically necessary. Amedisys promoted these extra visits to trigger the additional Medicare payments, for the principal purpose of inflating the Company's home health revenue payments from Medicare.

**Amedisys's Prior Violations Of The False Claims Act And Corporate Integrity Agreements**

110. Home health care companies are forbidden by federal law from seeking reimbursement for services that are not medically necessary, and a health care company that increases patient visits to meet Medicare triggers (absent medical necessity) commits Medicare fraud. The penalties for violating these requirements include civil liability under the False Claims Act, 31 U.S.C. §§ 3729–3733 ("FCA") (which prohibits the making of false statements to government agencies in connection with government contracts), criminal prosecution, and exclusion from the Medicare system for entities convicted of Medicare fraud.

111. Under the False Claims Act, knowingly presenting or causing to be presented to the United States any false or fraudulent claim for payment violates federal law. For violating

the FCA the United States may recover three times the amount of the damage the government sustained and a civil monetary penalty.   In addition, violating of the FCA can subject the perpetrator to exclusion from participation in federal health care programs.

112.   In 2003, the Company entered into a Corporate Integrity Agreement (the "2003 CIA") with the Office of the Inspector General of the Department of Health and Human Services regarding Amedysis violating the FCA from 1994 through 1999.  During that time, the Company had allegedly billed Medicare for services that were not actually rendered and submitted invalid cost report deductions.   The Company's employees had allegedly altered records, falsified physician and patient signatures, and falsified nurses' notes.

113.   The 2003 CIA mandated that the Company create a position for a Corporate Compliance Officer and a compliance committee.  The Corporate Compliance Officer would be responsible for developing and implementing policies and procedures designed to ensure compliance with federal healthcare program requirements.  The 2003 CIA also required that the Company maintain written standards of conduct.  Also in connection with these violations, Amedisys agreed to pay the United States Department of Justice a penalty of $1.156 million.

114.   On October 1, 2008, the Company acquired Home Health Corporation of America ("HHCA"), another company with previous violations of federal law.  In 2005, HHCA had entered into a Corporate Integrity Agreement ("2005 CIA") following its alleged involvement in an illegal kickback scheme in 1997 and 1998.

115.   In connection with Amedisys's acquisition of HHCA, the provisions of the 2005 CIA were binding on Amedisys.  The 2005 CIA required the Company's Compliance Officer to make periodic reports regarding compliance matters directly to the Board of Directors, and authorized the Compliance Officer to report any noncompliance to the Board at any time.  The

2005 CIA also included a stipulation to penalties for non-compliance, which included possible exclusion from participation in Medicare programs.

116.    Such exclusion would result in catastrophic damages to the Company and the Plan participants because the Company would lose its Medicare patients, which are the source of almost 90% of its revenues.

117.    At all times during the Class Period, Defendants were well aware of the consequences of violating Medicare billing practices and corporate integrity agreements with the government.    Defendants knew or should have known that if the Company improperly encouraged unnecessary visits for the purpose of triggering additional Medicare payments, the Company's business would be at risk of future exclusion from the Medicare program.

**Amedisys Stock Was An Imprudent Investment**

118.    Throughout the Class Period, the Company had its employees schedule extra home therapy appointments solely to trigger the extra Medicare payments, despite the fact that such visits were not medically necessary and therefore violated applicable laws.  By increasing the number of home therapy visits, Amedisys inflated its home health Medicare revenue.

119.    During the Class Period the Company regularly held weekly meetings called "care conferences" where Defendants emphasized that Medicare is a major part of Amedisys's business proceeds and encouraged Amedisys employees to maximize patient visits and sales of the Company's other services for purposes of increasing Medicare reimbursements.  As incentive to provide and bill for unnecessary Medicare services, Defendants offered employees special bonus payments if they exceeded preset sales goals.  In short, Defendants offered employees a financial incentive to maximize the amount billed to Medicare.

120.    Before 2008, Amedisys provided many of its patients just enough home therapy visits to trigger the extra $2,200 payment then in place under the PPS. In 2005, 2006 and 2007, very few Amedisys patients received nine therapy visits while a much higher percentage got 10 visits or more. For example, in 2007, 9.53% of patients got 10 visits (which triggered the extra $2,200 Medicare payment), while only 2.88% of patients received nine visits (for which no additional Medicare payment was received). Indeed, in 2007 alone, over 28% of Amedisys's patients received 10 to 12 visits – ensuring that the Company maximized its Medicare billing.

121.    In January 2008, when CMS changed its reimbursement rules, Amedisys also changed its home therapy procedures in order to trigger the extra Medicare payments at six, fourteen and twenty visits. In 2008, the percentage of Amedisys patients getting 10 visits dropped by 50%, while the percentage that received six, fourteen and twenty visits (which triggered additional Medicare revenue) increased by 8%, 33% and 41%, respectively.

122.    Amedisys employed a Point of Care ("POC") system to inflate its home therapy visits. The POC, implemented on December 31, 2006 to, is a computerized system that allows Amedisys's nurses and therapists to electronically document and submit relevant clinical information to the Company's billing database. The POC program often inflated the number of patient visits by, for example, automatically directing that a patient be designated to receive therapy when the patient was not indicated for therapy visits in the professional judgment of the clinician who was actually assessing the patient.

123.    Remotely-based individuals in the corporate hierarchy – including Defendants – had the ability to access or edit such information and to pressure Amedisys personnel in the field to alter clinical information to obtain higher reimbursement from Medicare.

124.    In addition, Amedisys paid improper and illegal remuneration to doctors in order to solicit profitable Medicare patients and facilitate improper patient re-certifications.

125.    These actions taken by the Company to increase the number of visits to meet Medicare benchmarks were expressly or implicitly approved by the Defendants, many of whom held key management positions within Amedisys, as well as the Company itself.  The improper Medicare reimbursement practices at the Company were widespread, prevalent, and continued throughout the Class Period.  Because of their positions within the Company, Defendants knew or should have known that these practices would have a devastating effect on the Company's financial performance and future business prospects.

**Defendants' Misconduct Begins To Come To Light**

126.    On August 12, 2008, Citron Research released a report on Amedisys questioning the Company's Medicare billing practices and challenging the Company's premise that its success resulted from its Point of Care system.

127.    Citron cautioned that Amedisys had been growing faster than one would expect for a Company dependent on Medicare reimbursements:

> Amedisys has been growing fast - rolling up competitors, growing revenues rapidly through acquisitions.  All the while it's been growing margins, too. Amedisys claims its computer systems for submitting and tracking claims gives it a huge competitive advantage in its business.   Considering nearly 90% of their business is Medicare reimbursement, it is really hard to "out-Medicare" your competition - its kinda like selling to Wal-Mart.

128.    Commenting on the Company's then recently filed Form 10-Q for the second quarter 2008, Citron stated the results "left many unanswered questions for those trying to assess the long term viability of [Amedisys's] business model."  Citron speculated that Amedisys was staying ahead of its competitors by increasing revenue per admission:   "In this case, in the

second quarter, for example, AMED had about the same growth in admissions, slightly better growth in revenue per episode but TWICE the growth in total internal revenue as everyone else. We believe that is because their revenue per admission soared. . . ."

129.    Citron engaged a private investigator to interview former employees. According to Citron, those former employees presented consistent concerns: the Company pressured employees to manipulate scores in order to increase billings; and local offices would receive calls from headquarters to influence the score on Medicare patients to justify higher billing.

130.    Although Citron cautioned that it had not reached a conclusion that Amedisys was committing Medicare fraud, Citron advised that "Amedisys's near total dependence upon Medicare for its revenue has to be factored as a business risk." Citron also questioned whether the Company's POC program could account for the Company's margins as opposed to, for instance, "increasing management pressure to push the envelope harder and harder to game the Medicare billing system."

131.    On August 12, 2008, as a result of the negative information in the Citron report, the price of Amedisys stock dropped significantly, falling 17.86% or $11.80 to close at $54.27 on heavy trading volume of 11.2 million shares (more than 11 times the prior day's volume).

132.    In the wake of the August 2008 Citron report, Amedisys senior management spoke with analysts at BB&T Capital Markets to assure the public of the Company's confidence in its quarterly results and outlook, and to downplay the significance of the report. In an analyst report issued on August 13, 2008, BB&T Capital Markets concluded: "We had the opportunity to speak with management yesterday and while they were deeply troubled by the reaction of their stock they reiterated confidence in their quarterly results, and their outlook for the company remains unchanged. In a nutshell, we believe that [Amedisys's] management has set forth

appropriate operating procedures to enable more accurate coding and improve its overall Medicare reimbursement. As a result, we side with the company."

133. In an article dated September 12, 2008 that appeared at www.fool.com, The Motley Fool pointed to the Citron Research report questioning accounting at the Company and its ability to grow margins that surpass industry peers, again stirring questions of regarding the propriety of Amedisys's Medicare billing practices.

134. On October 28, 2008, during a conference call to discuss Amedisys's 2008 third quarter earnings, Defendants assured Plaintiffs and the Plan's participants that the Company was committed to transparency and to compliance with the law for Medicare billing practices.

135. In Amedisys's filings throughout the Class Period, Defendants consistently assured Plaintiffs and the Plan's participants that the Company maintained comprehensive controls over its billing practices to ensure accurate and complete billing under the law.

136. Despite their knowledge that Amedisys was engaged in improper accounting practices that artificially inflated the Company's stock price, the Defendants continued to permit the Plan, and concomitantly the Plan's participants, to acquire and hold Amedisys common stock.

137. On October 15, 2009, Citron released a second report claiming that it had never before received as much correspondence from former employees as it did after its first report on Amedisys. After witnessing the abrupt resignation of two key employees, Citron attempted to "shed some light on the 'story behind the story,'" pointing to several ominous red flags.

138. First, Citron revealed that Amedisys received numerous additional document requests from Medicare. Second, Citron pointed to the abrupt resignations of Defendants Graham and Defendant Schwartz.

139.    Graham served as Amedisys's President and worked for the Company for more than 10 years.  On July 31, 2009, Graham sold most of his stock holdings in the Company, more than 57,000 shares, reaping $2,371,412 in proceeds.  Two months later, on September 3, 2009, Graham resigned without a successor in place.

140.    Also on September 3, 2009, Defendant Schwartz, the Company's Chief Information Officer, resigned with no explanation or succession plan.  According to Citron, "[f]ormer employees have consistently reported to Citron that the laptop-based Point of Care [POC] program . . . is specifically designed to prompt workers to skew their Oasis scoring for higher reimbursement.  It is Citron's opinion that this explains why Amedisys's margins are the highest in the industry, not that their patients are 'sicker' than their competitors."  As Chief Information Officer, Defendant Schwartz would have been at the helm of the Company's POC information system that tracked patient visits and Medicare reimbursements.

141.    Thus, Citron opined that "the abrupt executive departures aren't random circumstances, and are more likely a warning indicator of a more dangerous problem."

142.    On October 15, 2009, in response to the additional allegations in the October 2009 Citron report, the price of Amedisys stock dropped a significant 6.95%, or $3.11, to close at $41.73 on heavy trading volume of 4.6 million shares (almost seven times the prior day's volume).

143.    In spite of the Citron report and the subsequent drop in Amedisys's stock price, Defendants continued to offer and hold Amedisys stock as a retirement investment in the Plan.

144.    On April 26, 2010, *The Wall Street Journal* reported that Amedisys had been taking advantage of the Medicare reimbursement system by increasing the number of home therapy visits in order to trigger additional reimbursements.

145.    One former nurse employee, Tracy Trusler, told *The Wall Street Journal* that her supervisors advised her that she must "have ten visits to get paid."  She also disclosed how her supervisors asked her to look through her patients' files to find those who were just shy of the 10-visit mark.  She was then asked to call those patients' assigned therapists to remind them to make the extra appointment.

146.    *The Wall Street Journal* article, entitled "Home Care Yields Medicare Bounty," also revealed the following, in relevant part:

> The number of visits eligible for the extra reimbursement has a significant impact on home-health providers' receipts from Medicare and thus on overall revenue. While Amedisys doesn't break out the amount of revenue from the extra Medicare payment, the company says between 55% and 60% of its patients receive home therapy. In 2007, according to The Journal's analysis, 28.5% of the patients who received therapy got 10 to 12 visits, thereby triggering the extra $2,200 Medicare payment. Such cases are highly profitable because they cost the company less than $80 per visit.

> Medicare reimbursements for the entire home health-care industry are coming under increased scrutiny. The federal agency that advises Congress on Medicare payment issues, the Medicare Payment Advisory Commission, or MedPAC, warned last month that home health "overpayments contribute to the insolvency" of the Medicare trust fund as well as premium increases that beneficiaries must pay.

> Medicare changed its reimbursement rules in January 2008 in an attempt to blunt the incentive for home health-care visits it created. It eliminated the $2,200 bonus payment at 10 visits and now pays an extra fee of a couple of hundred dollars at six, 14 and 20 therapy visits. "What we felt we could do is try to create some better incentives in the system for providing the level of service that beneficiaries actually needed," says Mr. Wilson from Medicare.

> It wasn't until the change was made that MedPAC noticed the questionable home visit patterns. In its March report, the agency said that the industry-wide percentage of therapy visits in the 10-to-13 range dropped by about a third after the policy change in 2008.

> The pattern of clustered visits around reimbursement targets is continuing: MedPAC found the number of therapy visits numbering six, 14 and 20 increased after the policy was changed in 2008.
>
> During a MedPAC meeting in December, Arnold Milstein, a MedPAC commissioner, questioned whether all the home visits were appropriate. "Looking at the great speed with which the volume of services adapts to payment changes, which are breathtaking, it does suggest that there may be a problem with certifying the appropriateness of these services," Mr. Milstein said, according to a transcript of the meeting.
>
> Based on the report, MedPAC suggested for the first time last month that the Secretary of Health and Human Services "review home health agencies that exhibit unusual patterns of claims for payment."
>
> The Journal analysis found a similar pattern: In 2008, the percentage of Amedisys patients getting 10 visits dropped by 50%, while the percentage that got six visits increased 8%. The percentage of patients getting 14 visits rose 33% and the percentage getting 20 visits increased 41%.
>
> \*      \*      \*
>
> The generous Medicare reimbursements are one reason the home healthcare industry has grown so swiftly, according to MedPAC. There are now more than 10,400 home-health agencies in the U.S., up nearly 50% since 2002.

147.   The article also noted that Amedisys has benefited dramatically from the Medicare payment system, which allowed the Company to grow dramatically to a market value of $1.7 billion.

148.   In response to the article, Amedisys common stock fell $3.98 or 6.5% the day *The Wall Street Journal* article was published.

149.   On May 12, 2010, following *The Wall Street Journal* article, the U.S. Senate Finance Committee ("Finance Committee") began investigating the Company's billing and operating practices, as well as Amedisys's Medicare reimbursement practices.

150.    In a letter to Amedisys dated May 12, 2010, the Finance Committee cited the article and questioned whether Amedisys "intentionally increased utilization for the purpose of triggering higher reimbursements." The letter stated that the findings reported in the article suggested that Amedisys is "basing the number of therapy visits [it] provide[s] on how much Medicare will pay [it] instead of what is in the best interests of patients." The Finance Committee's letter noted that when Medicare changed its payment rules in 2008 to provide additional reimbursement to patients when they had six, fourteen and twenty therapy visits, Amedisys "apparently changed [its] utilization patterns as a result of these payment policy changes." In addition, the Finance Committee noted that the physician referral form associated with Amedisys's Balanced for Life program "raises concerns that the program may be taking advantage of Medicare payments in order to improve company profits."

151.    The Finance Committee also questioned whether Amedisys's marketing materials that targeted seniors "to take advantage of Medicare payments to improve profits." Accordingly, the Finance Committee requested that Amedisys produce various documents in connection with the investigation.

152.    On May 13, 2010, *The Wall Street Journal* reported that the Finance Committee had launched an investigation into the practices of Amedisys and whether the Company has "deliberately boosted the number of home therapy visits to trigger higher Medicare reimbursements."

153.    On May 13, 2010, in response to the negative news that the Senate Finance Committee was investigating Amedisys, the Company's stock price dropped 7.97% to close at $51.73 on heavy trading volume of 3,142,900 shares (more than eight times the prior day's volume). Amedisys's false reassurances to investors in its May 13, 2010 public statement that *The Wall Street Journal* article told an "incomplete story," however, artificially inflated the Company's stock price.

154.    On June 30, 2010, the Company announced that the SEC had launched a formal investigation into the Company.  In addition, the Company disclosed that the SEC had issued a subpoena for documents relating its Medicare reimbursement practices.

155.    On July 2, 2010, *The Wall Street Journal* reported that the SEC was investigating whether Amedisys "pushed patients into extra, sometimes unnecessary, home-health care visits in order to hit a threshold level that secured them thousands more in reimbursements to the government's health-care program."

156.    Following this news, Amedisys stock was instantly downgraded to "neutral" or "hold" ratings from earlier "buy" ratings by analysts including the Branch Banking and Trust Company and Jefferies & Company.

157.    On July 13, 2010, Amedisys announced that its second quarter earnings would drop substantially due, in part, to nonrecurring costs related to the federal investigations into the Company.  As a result, the price of Amedisys stock fell another 24% that day to close at $26.57.

158.    In an earnings call with investors on July 13, 2010, Defendant Borne stated that "the decline in our volume of re-certifications more than offset our growth in admissions for this quarter. This resulted in revenues much lower than we expected. . . .  We are very disappointed with these results."

159.    The Company's second quarter operating results were substantially below expectations because, in the wake of the April 26, 2010 article in *The Wall Street Journal* and the Senate Finance Committee and SEC investigations, the Company was now under regulatory scrutiny and was forced to adopt much more conservative (and less lucrative) business practices.

160.    On July 15, 2010, Amedisys issued a 20-page "Open Letter to Shareholders" addressing the allegations raised by *The Wall Street Journal* reports and the investigations by the Finance Committee and the SEC. In the letter, Defendant Borne reported that the Company was cooperating with the investigations but "believe[s] that the [*Wall Street Journal*] article is based upon an inaccurate understanding of a very complex industry… and that it overlooked some very important facts."  The letter also stated that Amedisys was "disappointed that [the *Wall Street Journal* reporter] presented what we believe is an unbalanced story" and the Company cited data and other information that it had produced to the Finance Committee and SEC to support its position.  In short, Defendant Borne tried to downplay the negative public information and attempted to reassure the public in general, and the Plan's participants in particular, that Amedisys stock was a sound equity holding.

161.    Upon information and belief, Defendant Borne visited the Company's regional offices following the announcement of the SEC investigation to assure Plan participants that the Company (i) did not engage in any wrongdoing, (ii) was in a strong financial position, and (iii) Amedisys stock was a sound retirement investment.

162.    On September 28, 2010, Amedisys issued a press release disclosing that it received a civil investigative demand ("CID") from the U.S. Attorney's Office for the Northern District of Alabama "pursuant to the federal False Claims Act."  The CID sought a wide range of documents and information related to the Company's "clinical and business operations, including reimbursement and billing claims submitted to Medicare."

163.    On September 28, 2010, as a result of this negative news, Amedisys's stock price dropped 15.51%, or $4.41, to close at $24.02 on heavy trading volume of 3.36 million shares (more than 5 times the prior day's volume).

164.    On September 29, 2010, *The Wall Street Journal* reported that the Department of Justice had launched an investigation into Amedisys -- making the DOJ the third government agency to announce an investigation in the Company since May.  The article noted that if Amedisys is found to have submitted false claims to Medicare, the Company could be (i) liable for damages, (ii) banned from future participation with Medicare, and (iii) face penalties of $5,500 to $11,000 for each false claim submitted.  Since Amedisys submits hundreds of thousands of claims a year, the penalties alone threaten to cripple the Company.

165.    As the misconduct at Amedisys has come to light, the Company's stock price has plummeted.  Due to the Plan's heavy concentration in Amedisys stock, the Plan and its participants lost tens of millions of dollars in retirement savings.

166.    Over the course of the Class Period, the market price of Amedisys stock has dropped approximately 60%, from a high of $66 per share in August 2008, to $27 per share as of the date of filing of the original complaint in this action in September 2010, and currently trades at approximately $36 per share.

167.    Failing to act with an eye single to the interests of the Plan's participants, Defendants nonetheless continued to protect their own interests.  As an example, during the Class Period, several Defendants, including at least Defendants Borne and Graham, protected their own interests by selling off significant portions of their holdings in Amedisys stock before the stock price collapsed and while they were causing the Plan to offer and hold that same stock as a retirement investment.

168.    In addition to the damage already caused, the liability the Company faces is substantial.  For instance, violations of the FCA can lead to the exclusion of the Company from Medicare and Medicaid programs.  Because 90% of the Company's revenues come from

Medicare, such exclusion could ruin Amedisys, causing its stock to become effectively worthless – which would eviscerate the retirement savings of thousands of Plan participants.

169.    Despite these facts, Defendants failed to take any action to protect the interests of the Plan's participants and instead continued to provide matching contributions in Amedisys stock and continued to allow the Plan to maintain investments in Amedisys stock.

**B.    Defendants Breached Their Fiduciary Duties**

**1.    Defendants Knew or Should Have Known that Amedisys Stock was an Imprudent Investment**

170.    Since the beginning of the Class Period, Amedisys stock has been an imprudent investment as a result of the Company's inappropriate practices regarding Medicare payments.

171.    At all relevant times, Defendants knew or should have known that Amedisys stock was an imprudent investment for the Plan due to the inappropriate practices described above.

172.    Throughout the Class Period, Defendants consistently reported strong and increasing revenues, income and earnings per share, and effectively assured investors that Amedisys was in material compliance with all applicable laws relating to the provision of home health care services under Medicare.  Defendants knew or should have known that Amedisys was engaged in a multi-year scheme to increase its reported revenues from Medicare. Defendants' Medicare scheme had the effect of artificially inflating Amedisys's reported revenue and earnings and exposing the Company to massive financial risks as well as civil and criminal liability.

173.    Defendants knew or should have known that Amedisys overcharged Medicare by providing medically unnecessary therapy visits on a massive scale that triggered significantly increased payments from Medicare.

174.    Defendants knew or should have known that Amedisys encouraged its clinicians, therapists and other employees to use the POC system to input clinical information for Amedisys patients that reflected a more severe illness or condition than the patient actually had or that attributed the patient's diagnosis to a medical condition other than the one giving rise to the need for therapy in order to take advantage of higher billing rates associated with the altered data.

175.    Defendants knew or should have known that Amedisys paid improper and illegal remuneration to doctors in order to solicit profitable Medicare patients and facilitate improper patient re-certifications.

176.    Accordingly, Defendants had a duty to steer the Plan's investments away from Amedisys stock.  Yet the Plan continued to acquire and hold significant quantities of Amedisys stock.

177.    As a result of the Defendants' knowledge of and, at times, implication in creating and maintaining participants' misconceptions concerning the true financial health of the Company, any generalized warnings of the risks that the Defendants made to the Plan's participants regarding the Plan's investments in Amedisys stock did not effectively inform the Plan's participants of the past, immediate and future risks of investing in the Amedisys stock.

178.    Thus, Plan participants did not have complete and accurate information necessary for them to exercise informed, independent control over the portion of the Plan's assets that were invested in Amedisys stock as a result of their investment directions, and the Defendants remained entirely responsible for losses that resulted from such investment.

179.    In addition, upon information and belief, Defendants failed to adequately review the performance of the other fiduciaries of the Plan to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.  Defendants also failed to conduct an appropriate

investigation into whether Amedisys stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan and its participants with information regarding Amedisys's risks so that the Plan and its participants -- to the extent that they were permitted -- could make informed decisions regarding whether to include Amedisys stock in their accounts.

180.   An adequate (or even cursory) investigation by the Defendants would have revealed to a reasonable fiduciary that investment in Amedisys stock was imprudent.  A prudent fiduciary action under similar circumstances would have acted to protect participants against unnecessary losses and would have made different investment decisions.

181.   Because Defendants knew or should have known that Amedisys stock was not a prudent investment for the Plan, they had an obligation to protect the Plan and its participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in Amedisys stock.

182.   Defendants had available to them several different options for satisfying their fiduciary duty, including: making appropriate disclosures to participants as necessary; discontinuing further contributions to or investment in Amedisys stock under the Plan; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; or resigning as fiduciaries of the Plan to the extent that as a result of their employment by Amedisys they could not loyally serve the Plan and its participants in connection with the Plan's holding and acquisition of Amedisys stock.

183.   Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses resulting from the Plan's investment in Amedisys stock.

2.    **Defendants Failed to Provide Plan Participants with**
      **Complete and Accurate Information About the True Risks**
      **of Investing in Amedisys Stock under the Plan**

184.    ERISA mandates that plan fiduciaries have a duty of loyalty to the plan and its participants, including the duty to speak truthfully to the plan and its participants when communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries.

185.    During the Class Period, upon information and belief, Defendants made direct and indirect communications with participants in the Plan which included statements regarding investments in Company stock.  These communications included SEC filings, annual reports, press releases and Plan documents, in which Defendants failed to disclose that Amedisys stock was not a prudent retirement investment.

186.    Indicative of the Defendants' fiduciary breaches, as the Company's misconduct regarding Medicare reimbursement practices came to light and Amedisys's stock price began to decline significantly, Defendant Borne continued to encourage Amedisys employees in general and Plan participants in particular to continue investing in Company stock. Specifically, Defendant Borne encouraged employee investment in Company stock following announcement of the SEC investigation, touting the drop in Amedisys's stock price as a good "opportunity to buy" additional shares of Amedisys stock.

187.    Further, Defendants, as the Plan's fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plan's participants, well recognized in 401(k) literature and trade press, concerning investment in company stock, including that:

(a)    Employees tend to interpret required purchases of company stock as an endorsement of the company and its stock;

41

(b)     Out of loyalty, employees tend to invest in company stock;

(c)     Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

(d)     Employees tend not to change their investment option allocations in the plan once made;

(e)     No qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid entirely investment in company stock;

(f)     Lower income employees tend to invest more heavily in company stock than more affluent workers, although they are at great risk; and

(g)     Even for risk-tolerant investors, the risks inherent in company stock are not commensurate with its rewards.

188.    Even though Defendants knew or should have known these facts, and even though Defendants knew of the high concentration of the Plan's funds in Amedisys stock during the Class Period, Defendants failed to take any meaningful ameliorative action to protect the Plan and its participants from their heavy investment in an imprudent retirement vehicle – Amedisys stock.

189.    In addition, Defendants failed to provide participants, and the market as a whole, with complete and accurate information regarding the true financial condition of the Company. As such, participants in the Plan could not appreciate the true risks presented by investments in Amedisys stock and therefore could not make informed decisions regarding their investments in Amedisys stock in the Plan.

190.    Thus, Plan participants did not have complete and accurate information necessary for them to exercise informed, independent control over the portion of the Plan's assets that were invested in Amedisys stock as a result of their investment directions, and the Defendants remained entirely responsible for losses that resulted from such investment.

C.    **Plaintiffs Are Not Obligated to Exhaust Administrative Remedies**

191.    Plaintiffs claim breach of fiduciary duty under ERISA §§ 404 and 405, 29 U.S.C. §§1104 and 1105, for which they are entitled to damages under ERISA § 409, 29 U.S.C. § 1109. ERISA claims based on statutory rights, such as the claims here, are distinguished from claims based on "benefits due" or other contractual rights under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).

192.    No provision of ERISA expressly or implicitly requires a participant to exhaust administrative remedies before that participant may bring a fiduciary breach claim in federal court for losses to the plan.

193.    Because Plaintiffs are not seeking to recover benefits due under the Plan, but rather are petitioning this Court to remedy breaches of fiduciary duty owed by Defendants to the Plan, it is neither necessary nor useful for Plaintiffs to exhaust administrative remedies in this case.

194.    Under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), Plaintiffs seek to enforce, pursuant to ERISA § 409, 29 U.S.C. § 1109, Defendants' "personal [] liabil[ity] to make good to [a] plan any losses to the plan resulting from [the breach of fiduciary duty]." Under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs can "enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or . . . obtain other appropriate equitable relief. . . ."

195.    Plaintiffs allege that Defendants' breaches of fiduciary duty have caused the Plan to lose tens of millions of dollars. Given the extent of the Defendants' liability, it is certain that the relief Plaintiffs seek will not be provided through the Plan's administrative processes. Moreover, the Plan Administrators are not going to order themselves or any of the other Defendants to pay millions of dollars to the Plan or seek a declaratory judgment to this effect, so any appeal to them would be futile.

196.    Finally, even if the Plan Administrators were to order the monetary relief sought, the individual Defendants' assets may be inadequate to satisfy such an order. Plaintiffs' attempt to obtain any such order would be futile.

## VIII. CAUSATION

197.    Because of Defendants' breaches, the Plan and Plan Participants used retirement assets to acquire and hold Amedisys stock at prices that were artificially inflated and overly risky.

198.    Because of Defendants' fiduciary breaches outlined above, the Plan and Plan Participants used their hard earned retirement assets to hold or acquire an imprudent investment option — Amedisys stock — instead of other alternative investments in the Plan, including prudent alternative Plan investments that out-performed the returns on Amedisys.

199.    When the market began to learn the truth about the misconduct at Amedisys and the investigations into the Company's Medicare reimbursement practices, the Company's stock price declined, taking with it the vested retirement benefits of the Plan.

200.    As a direct and proximate result of Defendants' breaches, the Plan suffered tens of millions of dollars in losses because substantial assets of the Plan were imprudently invested, or allowed to be invested by Defendants, in Amedisys stock during the Class Period, in breach of

Defendants' fiduciary duties. These losses were reflected in the diminished account balances of the Plan's participants.

201.    Plaintiffs and the Plan may incur additional losses from continued investment in Amedisys stock as the investigations regarding the Company's Medicare billing practices may ultimately result in fines and serious penalties for the Company such as exclusion from the Medicare, which accounts for approximately 90% of the Company's revenue, and which would cripple Amedisys.

202.    Had Defendants properly discharged their fiduciary and co-fiduciary duties, the Plan Participants would have avoided, or at least mitigated, a substantial portion of the losses that they suffered through their continued investment in Amedisys stock.

### IX. CAUSES OF ACTION

### COUNT I

**Failure to Prudently and Loyally Manage the Plan's Assets
(Breaches of Fiduciary Duties in Violation of
ERISA § 404 and § 405 by All Defendants)**

203.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

204.    At all relevant times, as alleged above, the Defendants were fiduciaries or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. §1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

205.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.

Accordingly, the Defendants were responsible for ensuring that all investments in the Company's stock in the Plan were prudent and that such investment was consistent with the purpose of the Plan. The Defendants were liable for losses incurred as a result of such investments being imprudent.

206.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA §404(a)(1)(D), 29 U.S.C. §1104(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct nor who are directed by the plan, including plan trustees, to do so.

207.    The Defendants' duty of loyalty and prudence also obligates them to speak truthfully to participants, not to mislead them regarding the Plan or their assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information and to refrain from providing inaccurate or misleading information or concealing material information regarding the Plan's investments and investment options such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan.

208.    Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period, these Defendants knew or should have known that, as described herein, Amedisys stock was not a suitable and appropriate investment for the Plan and its participants' retirement savings. Investment in Company stock during the Class Period clearly

did not serve the Plan's stated purposes. Yet, during the Class Period, Defendants failed to take any meaningful steps to protect the Plan's participants from the inevitable losses that they knew or should have known would ensue as the non-disclosed material problems, concerns and business slowdowns took hold and became public.

209.    Thus, Plan participants did not have complete and accurate information necessary for them to exercise informed, independent control over the portion of the Plan's assets that were invested in Amedisys stock as a result of their investment directions, and the Defendants remained entirely responsible for losses that resulted from such investment.

210.    Defendants also breached their duties of loyalty and prudence by failing to provide complete and accurate information regarding the Company's true condition concerning its Medicare billing practices and the Company's concealment of the same and, generally, by conveying inaccurate information regarding the Company's future outlook.

211.    During the Class Period, upon information and belief, the Company fostered a positive attitude toward the Company's stock, and/or allowed participants in the Plan to follow their natural bias towards investment in the equities of their employer, by not disclosing negative material information concerning investment in the Amedisys stock. As such, participants in the Plan could not appreciate the true risks presented by investment in the Amedisys stock and, therefore, could not make informed decisions regarding their investment in the Plan.

212.    Defendants also breached their co-fiduciary obligations by, among their other failures, knowingly participating in, or knowingly undertaking to conceal, the other Defendants' failure to disclose crucial information regarding the Company's operations and artificial inflation of the price of the Amedisys stock. Defendants had or should have had knowledge of such breaches by other fiduciaries of the Plan, yet made no effort to remedy them.

213.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, suffered losses in their investment in the Company.

214.    Pursuant to ERISA §502(a), 29 U.S.C. §1132(a) and ERISA §409, 29 U.S.C. §1109(a), the Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**WHEREFORE**, Plaintiffs pray for:

A.    A Declaration that this action is a proper class action pursuant to Fed. R. Civ. P. 23;

B.    An Order certifying the Class, appointing Plaintiffs as Class Representatives for the Class and Plaintiffs' counsel as Class Counsel for the Class;

C.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

F.    An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

G.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants in proportion to their losses;

H.      An Order that Defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in the Amedisys stock maintained by the Plan in proportion to the accounts' losses attributable to the decline in the stock price of Amedisys;

I.      An Order awarding costs pursuant to 29 U.S.C. §1132(g);

J.      An Order awarding attorneys' fees pursuant to 29 U.S.C. §1132(g) and the common fund doctrine; and

K.      An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

## COUNT II

**Failure to Adequately Monitor Other Fiduciaries and Provide Them with Accurate Information (Breaches of Fiduciary Duties in Violation of ERISA § 404 by Amedisys, the Director Defendants, the Committee and its Members)**

215.    Plaintiffs incorporate the allegations contained in the previous paragraphs of the Complaint as if fully set forth herein.

216.    At all relevant times, as alleged above, the Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. §1002(21)(A).

217.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of the Defendants included the responsibility to appoint, evaluate and monitor other fiduciaries, including without limitation the members of the Board of Directors and Administrative Committee, as well as any other Company officers, employees and agents to whom fiduciary responsibilities were delegated.

49

218.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.  In this case, that means that the monitoring fiduciaries, the Defendants, had the duty to:

(a)     Ensure that the monitored fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties.  They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan's participants;

(b)     Ensure that the monitored fiduciaries are provided with adequate financial resources to do their jobs;

(c)     Ensure that the monitored fiduciaries have adequate information to do their job of overseeing the Plan's investment;

(d)     Ensure that the monitored fiduciaries have ready access to outside, impartial advisors when needed;

(e)     Ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investment; and

(f)     Ensure that the monitored fiduciaries report regularly to the Company and/or the Board.  The Company and/or the Board must then review, understand and approve the conduct of the hands-on fiduciaries.

219.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a plan's assets, and must take prompt and effective action to protect a plan and its participants when they are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries

with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and its assets.

220.    The Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's exposure to losses alleged above, which made Amedisys stock an imprudent investment, and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment in Amedisys stock, an investment that was imprudent and subject to inevitable and significant depreciation. The Defendants knew or should have known that the fiduciaries they were responsible for monitoring were imprudently allowing the Plan to continue offering Amedisys stock as an investment alternative. Despite this knowledge, the Defendants failed to take adequate action to protect the Plan, and concomitantly the Plan's participants, from the consequences of these fiduciaries' failures.

221.    In addition, the Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition of Amedisys that they knew or should have known that these Defendants needed to make sufficiently informed decisions. By remaining silent and continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plan and ERISA.

222.    The Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

223.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiff and the Plan's other participants and beneficiaries suffered massive losses.

224.    Pursuant to ERISA §502(a), 29 U.S.C. §1132(a) and ERISA §409, 29 U.S.C. §1109(a), the Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**WHEREFORE**, Plaintiffs pray for:

**A.**    A Declaration that this action is a proper class action pursuant to Fed. R. Civ. P. 23;

**B.**    An Order certifying the Class, appointing Plaintiffs as Class Representatives for the Class and Plaintiffs' counsel as Class Counsel for the Class;

**C.**    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

**D.**    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

**E.**    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

**F.**    An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

G.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants in proportion to their losses;

H.    An Order that Defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in the Amedisys stock maintained by the Plan in proportion to the accounts' losses attributable to the decline in the stock price of Amedisys;

I.    An Order awarding costs pursuant to 29 U.S.C. §1132(g);

J.    An Order awarding attorneys' fees pursuant to 29 U.S.C. §1132(g) and the common fund doctrine; and

K.    An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

## COUNT III

### Failure To Avoid Conflicts Of Interest
### (Breaches Of Fiduciary Duties In Violation Of ERISA §§ 404 And 405
### By The Director Defendants and the Committee Defendants)

225.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

226.    This Count alleges breaches of the duty to avoid conflicts of interest against the Director Defendants and the Committee Defendants.

227.    At all relevant times, as alleged above, Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

228.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on plan fiduciaries a duty of loyalty; that is, a duty to discharge his duties with respect to a plan solely in the interest

of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

229.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in the Company's own securities; and by otherwise placing their own and/or the Company's interests above the interests of the participants with respect to the Plan's investment in the Company's securities.

230.    As a consequence of Defendants' breaches of fiduciary duty, the Plan suffered millions of dollars in losses. If Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan other participants and beneficiaries, lost a significant portion of their retirement investments.

231.    ERISA imposes liability on a fiduciary for a fiduciary breach by another fiduciary if, that fiduciary has knowledge of a breach by such other fiduciary, unless it makes reasonable efforts under the circumstances to remedy the breach.  Here, these Defendants knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.  Accordingly, the Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the conflicted fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

232.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants Borne and Graham are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**WHEREFORE,** Plaintiffs pray for:

A.    A Declaration that this action is a proper class action pursuant to Fed. R. Civ. P. 23;

B.    An Order certifying the Class, appointing Plaintiffs as Class Representative for the Class and Plaintiffs' counsel as Class Counsel for the Class;

C.    A Declaration that the Director Defendants and the Committee Defendants have breached their ERISA fiduciary duties to the participants;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

F.    An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

G.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants in proportion to their losses;

H.    An Order that Defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in the Amedisys stock

maintained by the Plan in proportion to the accounts' losses attributable to the decline in the stock price of Amedisys;

I.     An Order awarding costs pursuant to 29 U.S.C. §1132(g);

J.     An Order awarding attorneys' fees pursuant to 29 U.S.C. §1132(g) and the common fund doctrine; and

K.     An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

Dated: March 10, 2011

By: */s/ Scott E. Brady*
Scott E. Brady
**BOHRER LAW FIRM, L.L.C.**
8712 Jefferson Highway, Suite B
Baton Rouge, LA 70809
Telephone: (225) 925-5297
Facsimile: (225) 231-7000
Email: scott@bohrerlaw.com

*Interim Liaison Counsel for Plaintiffs*

Stephen J. Fearon, Jr.
Olga Anna Posmyk
Caitlin Duffy
**SQUITIERI & FEARON LLP**
32 E. 57th Street, 12th Floor
New York, NY 10022
Telephone: (212) 421-6492
Facsimile: (212) 421-6553
Email: stephen@sfclasslaw.com
Email: olga@sfclasslaw.com
Email: caitlin@sfclasslaw.com

Jacob A. Goldberg
Gerald D. Wells, III
Sandra G. Smith
**FARUQI & FARUQI, LLP**
101 Greenwood Avenue, Suite 600
Jenkintown, PA 19046
Telephone: (215) 277-5770
Facsimile: (215) 277-5771
Email: jgoldberg@faruqilaw.com
Email: jwells@faruqilaw.com
Email: ssmith@faruqilaw.com

*Interim Co-Lead Counsel for Plaintiffs*