## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| ROBERT F. BACH, et al., | **Consolidated Securities Class Action** |
| Plaintiffs, | **Civil Action No. 10-00395-BAJ-RB** |
| v. | **Consolidated with:  No. 10-464-BAJ-RB** |
| AMEDISYS, INC., et al., | **No. 10-470-BAJ-RB** |
| Defendants. | **No. 10-497-BAJ-RB** |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT

During the Class Period, Amedisys and its senior executives committed a pervasive and intentional fraud against Medicare. In numerous public statements and SEC filings Defendants told investors that Amedisys was achieving "record" revenue growth honestly, and that senior management had designed the Company's computer systems and other procedures to ensure a "strong compliance program." *E.g.*, ¶¶235, 265, 283, 285.[1] Indeed, Defendants told investors that compliance with Medicare was the "***most important***" area of focus for the Company, and that Amedisys's "Point of Care" computer system was a key component of the Company's "adherence to Medicare rules and regulations." ¶¶3, 334.

These and similar statements were critical to investors. As Defendants knew, the market was highly focused on Amedisys's compliance programs because Medicare was essentially the Company's only customer, providing nearly 90% of Amedisys's Class Period revenue. ¶¶1, 393(a). Unfortunately for investors, and in direct contrast to Defendants' public statements, Amedisys was engaged in a widespread scheme to defraud Medicare by providing medically unnecessary services, deliberately overcharging Medicare for certain services, and paying kickbacks to doctors in return for patient referrals. *See* ¶¶55-88 (Defendants designed and operated Point of Care and other computer systems to deliberately defraud Medicare); ¶¶89-160

---

[1] Citations to "¶__" are to the First Amended Consolidated Class Action Complaint (the "Complaint") (Dkt. No. 270). Citations to "App. A ¶__" are to Appendix A to the Complaint.  All emphasis herein is added.

(Defendants manipulated "clinical tracks" to reach a pre-set number of therapy visits designed to fraudulently increase payments from Medicare); ¶¶161-71 (Defendants engaged in rampant and pervasive "upcoding"); ¶¶172-96 (Defendants paid illegal kickbacks to doctors).

When the truth about Amedisys's scheme was finally revealed, investors suffered enormous losses. In reliance on Defendants' Class Period representations, investors purchased Amedisys stock at artificially inflated prices as high as $66.25. Following the U.S. Senate Finance Committee's ("SFC") Report concluding that Amedisys abused and likely defrauded Medicare, Amedisys's stock price fell to $11.53, an eight-year low. ¶261.

Defendants argue the Complaint fails to adequately plead that they "provided medically unnecessary care or fraudulently billed the government." D.Br. at 1. That is baseless. The Complaint is replete with detailed allegations of a scheme that has been well documented in numerous private and governmental lawsuits and investigations. In fact, after Plaintiffs' initial Complaint was dismissed in 2012, Amedisys paid the U.S. government $150 million to resolve claims that it falsely billed Medicare in violation of the False Claims Act ("FCA"), one of the largest government Medicare fraud settlements ever. *See Pub. Emps. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 325 (5th Cir. 2014) ("Amedisys has settled the civil investigation with the DOJ on November 12, 2013 for $150 million. ... This evidence was not before the district court and could not have been considered when the order of dismissal was entered.").

The U.S. Attorney for the Northern District of Alabama has stated that "Amedisys made false Medicare claims." ¶393(o). Amedisys also admitted that it violated the Stark Law, which prohibits referrals by physicians who have a financial relationship with a health services provider. ¶393(h). Over 40 former Amedisys employees cited in the Complaint, as well as relators in *qui tam* actions (to whom the government collectively paid over $26 million for their efforts to reveal

the fraud), also attest to Defendants' "out and out Medicare fraud."[2] App. A ¶28(a).

The fraud at Amedisys was astonishingly widespread and was directed from the top down. Each of the Individual Defendants actively participated in designing and overseeing the very same clinical programs and computer systems that were subsequently accused by the U.S. Senate and the DOJ of being used to defraud Medicare. Contrary to Defendants' arguments, Plaintiffs have adequately pled that Defendants made materially false and misleading statements to investors knowingly or with severe recklessness.

Indeed, while Defendants fail to mention it, Judge Trimble of the Western District of Louisiana has held that nearly identical allegations involving another health care company easily pled a claim for securities fraud. *See City of Omaha Police and Fire Ret. Sys. v. LHC Group Inc.*, 2013 WL 1100819 (W.D. La. Mar. 15, 2013) (denying motion to dismiss against LHC, which reached a smaller ($65 million) settlement with the government). For the reasons set forth below, Defendants' motion to dismiss this case should be denied.

## STATEMENT OF FACTS

### A.    Amedisys And Its Reported Class Period Growth

Medicare is Amedisys's primary customer, with Medicare reimbursements accounting for approximately 90% of the Company's net service revenue. ¶¶1, 393(a). Throughout the Class Period, Amedisys posted purportedly "record" results every quarter until the second quarter of 2010, while Defendants repeatedly represented that Amedisys grew its revenues through innovative programs and a sicker patient population requiring more care. *E.g.*, ¶¶264-391.

---

[2] Defendants' argument that they cannot be held liable for civil securities fraud absent a criminal conviction is not the law. *See Sapssov v. Health Mgmt. Assocs., Inc.*, 22 F. Supp. 3d 1210, 1226 (M.D. Fla. 2014) (no requirement "that a claim for securities fraud premised on an underlying scheme to defraud Medicare must comply with the pleading requirements for a FCA claim"). Defendants made similar arguments to this Court on the initial round of motions to dismiss, all the while knowing that they were about to pay $150 million to the government. *See* Dkt. No. 126 at 9, 24-30 (arguing to this Court for dismissal because plaintiffs alleged no "fine, judgment or penalty against the Company").

### B.     Defendants' Scheme To Defraud Medicare

### 1.     Unnecessary Medical Visits To Hit Predetermined Thresholds

Medicare reimburses home health care companies based on (1) a rate schedule and (2) a pre-treatment assessment of each patient's condition (conducted by the companies' staff on the Outcome and Assessment Information Set ("OASIS") form). ¶¶28-30. Before 2008, Medicare paid (a) $2,200 for providing between five and nine therapy visits in a given 60-day treatment "episode," and (b) an *additional* $2,200 for 10 such visits. ¶¶33-34, 210. In January 2008, Medicare changed its payment system to provide instead for significant increased payments at 6, 14, and 20 visits. ¶35.[3] Federal law permits reimbursement only for "medically necessary" services. ¶¶39-43.

Compelling statistical evidence, the SFC Report, Amedisys's $150 million settlement with the DOJ ("DOJ Settlement"), *qui tam* complaints, and statements from 47 confidential witnesses ("CWs") – a range of former Amedisys employees from across the country – demonstrate a widespread scheme to inflate Amedisys's reported revenues and growth by improperly manipulating Medicare reimbursements. The Complaint alleges in detail that Amedisys provided home therapy visits to meet pre-established Medicare reimbursement "triggers," not "medical necessity," as required by law. ¶¶6, 11, 49, 56, 64, 91(a), 106, 126-27, 142, 214-15, 252. For example, Amedisys therapy visits closely tracked the 10-visit threshold until 2008, after which they tracked the 6, 14, and 20 visit thresholds. ¶¶144-58.

The Complaint also alleges in detail that Amedisys manipulated Medicare by designing its computer architecture (including its Point of Care system) to identify episodes where patients were just shy of 10 visits. ¶¶55-84. The CWs describe how Amedisys further used its sophisticated, centralized data monitoring to systematically change patient evaluations to provide for medically

---

[3] In addition, throughout the Class Period, Medicare provided for a so-called low-utilization payment adjustment ("LUPA") for patients receiving fewer than five visits in an episode. LUPAs generate far lower revenues. ¶38.

unnecessary visits. For example, the former Director of Operations of an Ohio branch (CW30) stated that reports tracked whether patients "hit" Medicare thresholds and were used to pressure employees to hit the higher payment targets. CW30 was directed to shred those reports. ¶142(b). Moreover, in conjunction with the SFC Report, Senators Baucus and Grassley described a "top down" corporate culture focused on "gam[ing]" Medicare to inflate revenues. ¶249.[4] Further, a 2006 document instructed employees to "look for patients that have 7, 8, 9 visits and ***try to get the 10 visits to make therapy threshold***." ¶255. It also "encouraged" employees to use an "Adjusted Revenue Report" to identify patients that will require "***revenue adjustments***" to the expected payment amount and "***convert or prevent* ... *non therapy threshold patients*.**" *Id.*

When the payment thresholds changed in 2008, Amedisys's senior management instructed employees to hit the new thresholds, regardless of patient need. For example, on February 25, 2008, Amedisys's Vice President of Quality Management and Analytics sent an email to Defendant Graham and others, titled "Therapy Management in 2008," stressing differences in reimbursement in 2008 versus 2007 based on therapy visits. ¶140. The emails showed how providing 14-15 therapy visits instead of 11-13 increased revenue to Amedisys by $813.13 per episode in 2008 (but by only $34.38 in 2007). *Id.* The email also ranked individual agencies, Area Vice Presidents, and Vice Presidents by 14+ total therapy visits per episode. *Id.*; *see also* ¶141 (February 27, 2008 email pressuring employees to adjust 10-therapy threshold "mindset" to increase to "14-15" in order to "be profitable"); ¶141 (February 26, 2008 email stating that the Company's "***established guidelines***" require employees to reach 14 home visits). *See also* ¶¶81-82, 91(d), 116-18, 141-42, 161, 197, 201, 205, 256, 258, 393(g), (l), (s).

---

[4] The Complaint also describes Amedisys's improper payments to doctors (including lavish trips and parties) to solicit profitable Medicare patients and facilitate improper patient re-certifications. *See* ¶¶172-96.

### 2. Development Of Clinically Unnecessary Programs To Generate Higher Reimbursements Regardless Of Medical Necessity

The 2008 change to Medicare's reimbursement system was a serious threat to Amedisys's business, which was built on the 10-visit threshold. As a result, in June 2007, the Company also engaged in "Data Mining" to identify the "most profitable/least profitable diagnoses." ¶257(a). A June 8, 2007 document, for example, ranked diagnoses by profit and set out a strategy to (i) increase therapy visits for episodes beneath key thresholds, (ii) add therapy visits to non-therapy episodes, and (iii) substitute therapy for nursing visits. *Id*. The document stated that using therapists instead of nurses to treat patients' wounds (which are properly treated by nurses) would result in "Added Revenue." *Id*. Defendants Graham and Schwartz received that document and were involved in those discussions. *Id*., ¶¶404, 420.

Defendants then held a series of meetings, and formed an "A-Team," to continue manipulating the Medicare system. A July 2007 "Amedisys Strategic Planning, Executive Summary" stated that Borne "spearheaded" "strategic planning," and outlined his strategic plan to use the 2008 changes to the Medicare system as "an opportunity for Amedisys to *refine internal practices* in order to enhance shareholder value despite the payment changes." ¶¶93-95, 256.

In July 24, 2007 and October 25, 2007 meetings, Schwartz advised the Board of the anticipated loss of revenue from the changing Medicare rules, and stated that the "A-Team" would develop strategic clinical programs to address the changes. ¶¶93-95, 99, 256, 405-06. Borne, Redman, Graham and Jeter attended. ¶256. During the October 2007 meeting, Schwartz outlined the projected impact of the new rules on the Company's revenue, updated the Board on Amedisys's "Refinement Plan," and discussed the impact on revenue of certain "clinical tracks" (*e.g.*, "Balanced for Life" and "Therapy Wound Care"). ¶99. Unfortunately, rather than "refine internal practices" in an honest way, Borne and the other Defendants designed a new scheme to boost

revenue by cheating and manipulating Medicare. An October 2007 Excel spreadsheet, used to track tasks of the "A-Team," revealed that **Amedisys management decided** to incorporate "therapy into [the congestive heart failure] program" and institute "Aggressive [Balanced for Life] and multi-disciplinary therapy program launches in 2008." ¶¶257(e), 409. This spreadsheet was distributed by Schwartz's executive assistant to a group including Schwartz. ¶257(e).

Balanced for Life and Therapy Wound Care were frauds. Amedisys claimed Balanced for Life was a "fall-prevention program," but enrolled massive numbers of patients who did not need balance therapy.[5] ¶¶105-33. Amedisys then mandated an excessive number of therapy visits to meet reimbursement thresholds, but with no link to medical need. Amedisys's October 2007 "Rational[e] for Clinical Tracks based on Diagnosis" shows that the **very first** Balanced for Life level required **at least 16** therapy visits for "**[a]ny diagnosis** that scores at fall risk," instantly exceeding the 14-visit payment target. ¶107. The next level generated a clinical track recommendation of an astounding 22 visits for purported "High Fall Risk" patients, including patients that could trip over things such as rugs, pets, or shoes – nearly anyone. ¶108.[6] By late 2009, nearly 20,000 Balanced for Life patients had an average of 20 therapy visits – exactly the highest level of Medicare payment. ¶124. Before 2008, tellingly, Amedisys's prior balance program had recommended a **maximum** of 12 therapy visits. ¶86, 258.[7]

Schwartz directly participated in the fraud by creating Amedisys's Therapy Wound Care

---

[5] Amedisys incentivized therapists to keep patients in Balanced for Life with a $100 bonus per patient and paid employees $500 for having three accounts that referred six patients each to Balanced for Life. ¶¶119, 128.

[6] In 2007, Amedisys initiated the "Balanced for Life Data Project" to provide external validation of the Balanced for Life program. ¶112. The "Rehab Team" for this project, which included Schwartz, attempted to substantiate the claim that Balanced for Life was a qualified therapy under Medicare guidelines. ¶¶113, 411. Notably, the team **unsuccessfully** sought the assistance of academic institutions including Yale, Johns Hopkins, and Emory, who did not support that Balanced for Life clinical tracks were evidence-based medicine. *Id.*

[7] Similarly, after 2007, instead of the 3 to 12 visit range for Amedisys's rehabilitation program, the range for "Rehabilitation @ Home" became 8, 16, or 22 visits – two above each of the new therapy payment thresholds. ¶258.

clinical tracks. ¶101. Beginning in 2007, to inflate therapy visits and obtain bonus payments, Amedisys attempted to reinvent wound care as "therapy" to be performed by therapists. ¶102. A September 2007 presentation provided examples where treating a wound care patient with 14 and 20 physical therapy visits would more than double the Company's Medicare reimbursement for the episode. ¶257(c). An October 2007 Amedisys document showed that a patient with a basic, "uncomplicated wound," categorized as group "I," would automatically receive 14 therapy visits, thus meeting the new Medicare reimbursement threshold. ¶¶103-04. A patient with a "complex" wound fell into group "II" and received 20 or more therapy visits. ¶104.

### 3.     Amedisys's Fraudulent "Upcoding" Practices

Amedisys also engaged, on a widespread basis, in a form of Medicare fraud known as "upcoding." Upcoding refers to entering codes (usually on a patient's OASIS form) that reflect a more severe condition than the patient actually has, or that fraudulently attributes a patient's "primary diagnosis" to a false medical condition, in order to take advantage of higher Medicare reimbursement. ¶¶7, 51, 54, 60-84, 161. For example, CW54 stated that management used Point of Care to enforce requirements to enter data that maximized payments, or else the system would report "errors." ¶161(c). Relators CAF (which received over $18.5 million as part of the DOJ Settlement) and Brown (who received over $6.5 million) also described how Point of Care was designed with prompts and error messages to record the most severe level of illness, and made it nearly impossible to override those prompts. ¶¶63-64, 75-77, 393(q).

### C.     The Revelation Of Amedisys's Misconduct

Investors suffered damages from declines in Amedisys's stock price in response to a series of six partial disclosures gradually exposing the nature of Amedisys's business practices. *See*

¶¶197-263, *Amedisys*, 769 F.3d at 321, 326.[8] On October 3, 2011, the SFC released its Report analyzing internal documents from Amedisys and three other home health care companies (LHC, Gentiva and Almost Family), and concluded that "Amedisys ... encouraged therapists to target the most profitable number of therapy visits, even when patient need alone may not have justified such patterns." ¶251. It further found that "[t]herapy visit records for each company showed concentrated numbers of therapy visits at or just above the point at which a 'bonus' payment was triggered." ¶252. The Report stated that "[a] review of internal documents and communications ... shows that Amedisys management directed employees to adjust the number of home health therapy visits to maximize Medicare payout[s] to the company after the 2008 changes to the Medicare payment system." *Id*. The Report referred to the "A-Team" "*set up by Amedisys corporate management*" to develop "therapy programs ... to target the most profitable Medicare therapy treatment patterns, including adding therapy visits to clinical tracks that previously did not involve therapy." ¶¶256, 393(g). The SFC concluded that "the home health therapy practices identified at Amedisys ... at best represent ***abuses*** of the Medicare home health program," and "[a]t worst, they may be examples of [Amedisys] ***defrauding*** the Medicare home health program." ¶¶253, 393(g).

Numerous post-Class Period events further confirmed the fraud. In May 2012, Amedisys admitted to violating the Stark Law. ¶393(h). On September 5, 2013, the Court approved the settlement of the derivative suit arising from the same operative facts as this case, which involved significant corporate governance reforms. ¶393(i). On November 12, 2013, Amedisys announced "an accrual of $150 million related to the tentative settlement of both the DOJ investigation and

---

[8] For example, on April 26, 2010, the market received stunning news when the *Wall Street Journal* ("*WSJ*") reported on a detailed and sophisticated analysis of Medicare data performed by a Yale University professor. The analysis showed that "the number of [Amedisys's] in-home therapy visits tracks Medicare financial incentives," and the article quoted an Amedisys nurse who said that the care provided was not always "medically necessary." ¶210. Defendants falsely denied the *WSJ* story. ¶¶212, 216, 233, 371, 374-76, 378, 382-83.

the Stark Law Self-Referral matter." ¶393(j). On February 24, 2014, Borne "retired" after serving

as the Company's founder, CEO and Chairman since 1982. And on April 22, 2014, the DOJ

Settlement was finalized, including a payment of $150 million – equal to two years of the

Company's profits – and a corporate integrity agreement ("CIA") with the U.S. government. *See*

*Amedisys, Inc.*, 769 F.3d at 325 (noting that post-Class Period DOJ Settlement "was not before the

district court and could not have been considered when the order of dismissal was entered").[9]

## ARGUMENT

On a motion to dismiss, the Court must accept all well-pled factual allegations as true and

draw all reasonable inferences in plaintiffs' favor. *Lormand v. US Unwired, Inc.*, 565 F.3d 228,

232 (5th Cir. 2009). Defendants challenge only two elements of Plaintiffs' Section 10(b) claim –

falsity and scienter. To plead those elements, a complaint must allege with particularity "why each

one of defendants' representations or omissions was 'misleading,'" and "those facts giving rise to

a 'strong inference' that the defendant acted with the required state of mind [scienter]." *Spitzberg*

*v. Houston Am. Energy Corp.*, 758 F.3d 676, 683 (5th Cir. 2014).

## I.    PLAINTIFFS PLEAD ACTIONABLE MISSTATEMENTS AND OMISSIONS

Plaintiffs' Complaint clearly specifies "the statements contended to be fraudulent," "the

speaker," "when and where the statements were made," and "why the statements were fraudulent."

*Southland*, 365 F.3d at 362. *See* ¶¶256-391.

### A.    Materially False And Misleading Statements About Revenues

---

[9] The DOJ represented in the settlement agreement that it had valid claims against Amedisys for: "improperly billing and failing to refund overpayments for Medicare home health care services that Amedisys: (a) provided to non-homebound patients, (b) provided to patients lacking a need for skilled nursing and/or skilled therapy services, (c) provided to patients without regard to medical necessity, and (d) overbilled by upcoding patients' diagnoses." ¶7. The DOJ also represented that it had valid claims against Amedisys "arising from Amedisys's billings to the Medicare program, during the period from April 1, 2008 through April 30, 2012, in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and the Stark Law, 42 U.S.C. § 1395nn." ¶8. The DOJ Settlement also resolved seven *qui tam* lawsuits, with relators receiving over $26 million in whistleblower awards. ¶¶9, 44-47, 393(n), (p)-(q).

"[A] duty to speak the full truth arises when a defendant undertakes a duty to say anything."
*Rubinstein v. Collins*, 20 F.3d 160, 170 (5th Cir. 1994). Once a defendant speaks on a particular
topic, it has a "duty to disclose a 'mix of information' that is not misleading." *Lormand*, 565 F.3d
at 248-49. Here, Defendants did not simply report Amedisys's revenues – they specifically
attributed those revenues to "organic growth" (¶265), "significant demand for our services" (¶282),
"specialty programs" (¶¶348, 356) and having "sicker" patients than competitors (¶¶371, 383).
Notably, Amedisys also attributed its growth to "significant investment in the best and most
innovative technologies," "expansion into other therapies" and the "best quality care for our
patients at a lower cost." ¶¶212, 371. Those statements were false because, in reality, Amedisys
was generating much of its revenue through rampant, unsustainable Medicare fraud. ¶¶248-59
(SFC Rpt.); 61-88 (*qui tam* complaints); 5-10, 393(j) (DOJ Settlement); App. A (CW statements).[10]

There is no genuine question that the Complaint adequately pleads Amedisys's abuse of
the Medicare reimbursement system. As explained above and in the Complaint, Amedisys engaged
in a widespread practice of providing medically unnecessary therapy visits fraudulently targeted
to hit payment thresholds (¶¶55-160), designed computer systems (Point of Care) and other
procedures (Balanced for Life and Therapy Wound Care) to manipulate clinical tracks and
"upcode" treatment (¶¶161-96), and paid illegal kickbacks to doctors (¶¶172-96). *See also* ¶¶348,

---

[10] Defendants' attacks on allegations derived from the SFC Report, *qui tam* complaints, and DOJ Settlement fail.
These sources are reliable and corroborated by one another and by the CWs, and are routinely accepted by courts. *See,
e.g.*, *Hill v. State St. Corp.*, 2011 WL 3420439, at *13 (D. Mass. Aug. 3, 2011) (citing attorney general complaints,
*qui tam* actions, and CWs; "Plaintiffs' evidentiary sources strengthen one another and collectively paint a plausible
picture of a company defrauding its clients …. ***Without discovery, it is next to impossible for Plaintiffs to produce
any more***"); *SEC v. Lee*, 720 F. Supp. 2d 305, 341 (S.D.N.Y. 2010) ("acknowledgement and reliance on the SEC and
CFTC allegations does not demonstrate that [the complaint] lacks evidentiary support, but rather provides it with the
necessary evidentiary support"); *de la Fuente v. DCI Telecomms., Inc.*, 259 F. Supp. 2d 250, 260 (S.D.N.Y. 2003)
("[T]here is nothing improper about utilizing information from the SEC [complaint] as evidence to support private
claims"). Moreover, the *qui tam* complaints include actual reproductions of Amedisys documents, further supporting
reliability – along with the fact that the DOJ joined the *qui tam* actions. Defendants' reliance on *Kushner v. Beverly
Enters., Inc.*, 317 F.3d 820 (8th Cir. 2003) (D.Br. at 35) is misplaced. In *Kushner*, the court actually relied on a
settlement agreement with the government but noted that it was the company's subsidiary that had entered into it, and
it did not implicate wrongdoing on behalf of the parent. 317 F.3d at 825.

351-52, 356, 366, 376. Amedisys also paid the government $150 million to settle fraud claims and entered into a CIA to change its practices, while the U.S. Attorney for the Northern District of Alabama stated that Amedisys "unlawfully enrich[ed]" itself through Medicare fraud. ¶393(o). Amedisys's 2009 "Annual Internal Audit Risk Assessment" identified its "Top Overall Risk" as "Billing," with employees' prime concern being fraudulent billing. ¶135. Numerous CWs describe the misconduct at Amedisys as "Medicare fraud." ¶¶161(c), App. A ¶¶16(b), 28(a), 39(a).[11]

By Defendants' own admission, after government investigations into Amedisys's reimbursement practices began, Amedisys changed its fraudulent "behavior," causing a sharp decline in the number of patients admitted and resulting in "very disappointing" earnings. ¶¶224, 227-28, 236-38.[12] These facts show a compelling "nexus" between Defendants' undisclosed misconduct and the "company's financial performance." *Contra* D.Br. at 8.[13]

---

[11] Numerous CWs from multiple branches of the Company corroborated allegations of Amedisys's Medicare fraud. CW7 observed employees being reprimanded for not ensuring 10 therapy visits. ¶91(b). CW8 stated that Borne and others pressured them to hit reimbursement thresholds both before and after the 2008 Medicare reimbursement changes. App. A ¶8. CW55 discussed how Borne told top executives, including Graham, Jeter, and Schwartz, that Amedisys developed programs to obtain higher reimbursements following the 2008 changes. ¶142(a). CW30 and CW17 described how supervisors and "corporate" would monitor OASIS forms to ensure improper upcoding. ¶¶161(a), (d). CW54 stated that the Point of Care system would demand entries that led to increased therapy visits, even when not medically necessary. ¶161(c). There are many other examples. *See* ¶¶54, 91, 142, 159-61; *see also, generally*, App. A. Defendants' attempts to discredit CW allegations fail. Where, as here, CWs "from various levels and geographic locations within the Company corroborate" the allegations, they should be credited. *In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*, 694 F. Supp. 2d 1192, 1206 (W.D. Wash. 2009); *see also ABC Arbitrage Pls. Grp. v. Tchurk*, 291 F.3d 336, 353 (5th Cir. 2002) (reliance on CWs appropriate where "other facts, *i.e.*, documentary evidence, provide an adequate basis for" falsity allegations). Defendants also argue that the Complaint includes hearsay (D.Br. at 19) but "at the pleading stage" hearsay is "sufficient." *Quantlab Techs. Ltd. v. Godlevsky*, 2012 WL 1596710, at *5 (S.D. Tex. May 4, 2012); *Oinonen v. TRX, Inc.*, 2010 WL 2217870, at *2 (N.D. Tex. June 1, 2010).

[12] On August 9, 2010, Amedisys admitted that its internal recertification growth decreased from 10% in 2Q09 to **negative 9%** for 2Q10. ¶389. On October 26, 2010, Amedisys reported a **39.8% reduction in net income** for 3Q10 (compared to 3Q09), and a **41% reduction in quarterly earnings per share**. ¶234. On October 26, 2010, Borne acknowledged that the revenue decline resulted from changed employee behavior. An analyst asked: "But *I am very concerned here* .... [W]hy [clinicians] felt the need to change their behavior is still a question. … [W]hy should I not be worried that all of these changes … would make the DOJ ask questions?" ¶237.

[13] Plaintiffs' allegations are in accord with *Shushany v. Allstate, Inc.*, 992 F.2d 517, 522 (5th Cir. 1993) because they plead how the fraud affected the company's financial statements and that the omitted facts were material. *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 401 (6th Cir. 1997) (D.Br. at 8) is easily distinguishable because the plaintiffs there did not "point[] to any affirmative misstatement in the company's explanations of the numbers." Defendants' reliance on *In re Odyssey Healthcare, Inc. Securities Litigation* is misplaced because the false statements there were projections of future growth; and there was "no apparent relation between the allegedly misleading statements and omitted information" concerning compliance with Medicare, which left the court to surmise an argument "that the issue of

Numerous courts have held under similar circumstances that false statements concerning revenue sources are actionable. Defendants do not discuss *LHC*, the single decision most analogous to this case. In that case, Judge Trimble sustained securities fraud claims concerning statements that LHC's revenues were due to "organic growth" and "acquisitions" (rather than Medicare abuse), and that LHC was "in material compliance with applicable laws." 2013 WL 1100819, at *3 (W.D. La. Mar. 15, 2013). The court held that LHC's statements were false because "defendants were knowingly violating the Social Security Act by systematically providing unneeded medical care while boasting of their compliance policies and procedures." *Id*. at *4.

Likewise, in *In re Gentiva Securities Litigation*, the court rejected the same argument that Defendants make here (D.Br. at 16) – that plaintiffs failed to specify particular amounts by which Medicare abuse skewed reported financial information. *Gentiva* recognized that "[a]ny alleged Medicare fraud could have serious consequences for the company, including both civil and criminal liability." 932 F. Supp. 2d 352, 368 (E.D.N.Y. 2013). Because Gentiva "put … the cause of its financial success at issue, then it [wa]s obligated to disclose information concerning the source of its success[.]" *Id*.[14] Here, as there, the Complaint adequately pleads false statements.

Defendants' citation to *In re Almost Family, Inc. Securities Litigation*, 2012 WL 443461

---

Medicare and Medicaid compliance is so severe and so pervasive that *any* statement regarding Odyssey that does not disclose that issue is misleading." 424 F. Supp. 880, 894-95 (N.D. Tex. 2005). *Compare* ¶¶222-45. In addition, contrary to Defendants' argument (D.Br. at 10), a restatement is not necessary to plead a securities fraud claim related to a company's revenues. *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (requiring a restatement "would shift to accountants the responsibility that belongs to the courts").

[14] *See also Greenfield v. Prof'l Care, Inc.*, 677 F. Supp. 110, 113 (E.D.N.Y. 1987) (falsity alleged where health care company failed to disclose that earnings were supplemented by Medicaid fraud); *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 389 (D. Del. 2010) ("A statement regarding successful financial performance, even when accurate, is still misleading under the securities laws if the speaker attributes the performance to the wrong source"); *In re Unumprovident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 886 (E.D. Tenn. 2005) (plaintiff "adequately alleged Defendants knowingly failed to account for the potential repercussions of [hidden misconduct] in its statements regarding the company's finances"); *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 824 (E.D. Pa. 2001) ("Assuming the truth of the plaintiffs' allegations [that illegal practices and not company's 'customer-focused approach' drove revenues], it is plain that the SAC alleges misstatement of the cause of Providian's success.").

(W.D. Ky. Feb. 10, 2012), is unhelpful. *Almost Family* involved the only company cited in the April 2010 *WSJ* article against whom the government has ***not*** filed claims. As the Fifth Circuit recognized, "of the four publicly traded home health companies under investigation by the SFC, ***Almost Family alone was effectively exonerated*** by the [SFC] Report .... Therefore, *Almost Family* is distinguishable from this case." *Amedisys*, 769 F.3d at 324 n.4. Further, the *Almost Family* complaint failed to "point to any affirmative misstatement in the company's ***explanations***" of its earnings. *Almost Family*, 2012 WL 443461, at *3. That is not so here.

### B.  Materially False And Misleading Statements About Regulatory Compliance

Defendants also made materially false statements concerning Amedisys's Medicare compliance, including how the Company's computer systems were designed to improve "compliance controls." ¶309. Jeter – Amedisys's Chief Compliance Officer – claimed that Amedisys's Point of Care system was "a fundamental compliance control" that improved "adherence to Medicare rules and regulations," and "***one simply cannot overemphasize*** the importance of this technology as a means for strengthening our ***compliance with the law***." ¶334.

As the Fifth Circuit recognized in this case, "Amedisys touted its billing-related compliance programs and reassured investors that compliance is central to everything we do as a company." *Amedisys*, 769 F.3d at 318. The Complaint alleges how Borne stated that Point of Care "enhanced compliance efforts by mandating and standardizing documentation while validating clinical necessity for all care provided." ¶291; *see also* ¶¶309-10, 332, 334 (statements by Graham, Redman and Schwartz).[15] Amedisys also claimed that it used "centralized automated compliance

---

[15] Borne also made false statements concerning purported compliance, touting the Company's "strong compliance program" (¶283), and stressing that "***compliance is central to everything we do***" (¶327). On July 15, 2010, Amedisys published an "Open Letter to Shareholders," which stated falsely that "[o]ur therapy visits track patient acuity" and "we simply deliver the care patients need"; "[o]ur policies respect that recommending and ordering therapy are strictly clinical responsibilities, and prohibit our business people from improperly interfering"; "[o]ur physician consultants are not compensated for referrals"; and "[w]e have a Zero Tolerance Policy for fraud and abuse." ¶383.

recertification[,]" and maintained "comprehensive ethics, compliance, and quality improvement programs as a component of the ***centralized corporate services***[.]" ¶¶296, 316, 343, 368. Contrary to those claims, Defendants designed their computer systems not to ensure compliance, but to identify potentially unprofitable patients and to code the most profitable therapy. ¶¶60-84.

Defendants also made materially false and misleading statements concerning Amedisys's internal controls, and Borne, Browne, Giblin and Redman signed certifications attesting to the Company's internal controls. ¶¶343-45, 368-70. Jeter touted the Company's "multi-layer" compliance program (¶333), which he told investors focused on "three key areas" that were "susceptible because of the ***inherent revenue impacts of each***": "excessive therapy," "LUPA exaggeration," and "up-coded case mixes." ¶335. Jeter also represented that the "compliance plan articulates a zero tolerance policy for healthcare fraud and abuse." ¶336. In fact, Amedisys routinely manipulated the specific areas Jeter identified, including through its computer systems. ¶¶55-84. Amedisys's compliance and internal controls were so inadequate that it was forced to enter into the CIA requiring training, branch-level certifications of compliance with federal law, and an internal Risk Evaluation and Mitigation Program. ¶¶393(m)-(n).

Courts regularly hold allegations of false statements concerning regulatory compliance to be actionable. *See, e.g.*, *LHC*, 2013 WL 1100819, at *3-4; *In re BP p.l.c. Sec. Litig.*, 852 F. Supp. 2d 767, 805-06 (S.D. Tex. 2012) (falsity pled for statements that "BP's safety and operations audits assess compliance," including a "rigorous check" on compliance and risk management); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 729-30 (S.D.N.Y. 2015) ("allegations allow for the inference that BioScrip could not have believed the veracity of its legal compliance statements").

Defendants primarily argue in response that their statements were puffery. D.Br. at 11-12. They are wrong. In the Fifth Circuit, "concrete factual and material misrepresentations and

omissions concerning statements that discuss the very specific benefits of the [programs] … are not 'vague' or 'generalizations' and therefore cannot be considered mere 'puffery.'" *Lormand*, 565 F.3d at 249 n.14; *see also Bachow v. Swank Energy Income Advisers, LP*, 2010 WL 70520, at *5 (N.D. Tex. Jan. 6, 2010) (statements not "'puffery' as they could be found to contain material misrepresentations and there is nothing vague or merely optimistic about them"). Here, Defendants themselves stressed that compliance with Medicare was one of the "***most important***" aspects of their business, and the statements challenged in the Complaint identified specific compliance programs (*e.g.*, Point of Care) and focus areas (excessive therapy, LUPAs and upcoding), and assured investors that Amedisys enforced a zero-tolerance policy for fraud, while failing to disclose material facts to the contrary.[16]

Nor can there be any serious dispute that the omitted facts – that Amedisys was defrauding Medicare – would have been highly material to a reasonable investor. *See Lormand*, 565 F.3d at 248 (fact material if there is "a substantial likelihood ... the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available"). "It is plausible that a reasonable investor would view [alleged Medicare fraud] significant to an investment decision." *Gentiva*, 932 F. Supp. 2d at 368; *see also In re Galena Biopharma, Inc. Sec. Litig.*, 2015 WL 4643474, at *32 (D. Or. Aug. 5, 2015) ("There is a substantial likelihood that a reasonable investor would have found the fact that Galena[] ... did not disclose that the Company and its offers were engaging in fraud or market manipulation to have

---

[16] *Compare, e.g.*, ¶291 (Point of Care "enhanc[ed] [the Company's] compliance efforts by ***mandating and standardizing documentation while validating clinical necessity for all care provided***") and ¶335 (Amedisys actively audited practices with "a potential for improprieties," such as "excessive therapy," "LUPA exaggeration," and "up-coded case mixes") with *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) ("quality comes first" and "quality a top priority"); *Rosenweig v. Azurix Corp.*, 332 F.3d 854, 869-70 (5th Cir. 2003) ("Our fundamentals are strong," "pipelines ... remains strong," and "making steady progress").

significantly altered the 'total mix' of information.").[17]

C.    **Materially False And Misleading Statements About Payments To Physicians**

Defendants' argument that the Complaint fails to allege that the Company used kickbacks to induce doctors to certify plans of care for medically unnecessary treatment (D.Br. at 20) is wrong. In stark contrast to Borne's explicit representation that "[o]ur physician consultants are <u>not</u> compensated for referrals" (¶383), the Complaint sets forth numerous allegations from CWs describing improper payments to doctors. *See* ¶191.[18] In any event, Defendants admitted that from some period of time since December 2007 Amedisys did not "compl[y] in certain respects with … the Stark Law referral prohibition." ¶393(h).

## II.    THE COMPLAINT RAISES A STRONG INFERENCE OF SCIENTER

At the pleading stage, a plaintiff "must only 'plead facts rendering an inference of scienter at least as likely as any plausible opposing inference.'" *Lormand*, 565 F.3d at 250. This may be done by alleging either an "intent to deceive" or "severe recklessness." *Spitzberg*, 785 F.3d at 684. The inference of scienter "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Lormand*, 565 F.3d at 251. "If a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could

---

[17] Finally, in contrast to Defendants' argument (D.Br. at 12-14), under Supreme Court jurisprudence the statements at issue here are statements of fact, not opinion. "[A] statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not." *Omnicare, Inc. v. Laborers Dist. Council Constr. Ind. Pension Fund*, 135 S. Ct. 1318, 1325 (2015). Defendants' statements express certainty or discuss events that have passed. *See, e.g.*, ¶310 ("***We have benefited*** from a system-wide rollout of our point of care system, ***which has enabled*** ... our compliance."); ¶309 ("the design of our point-of care system ***was very purposeful*** in order to further enhance [our compliance controls.]" Even if such statements were opinions, they were objectively and subjectively false, and omitted material facts (¶391), and are thus actionable. *Omnicare*, 135 S. Ct. at 1326-27.

[18] Amedisys also hired "Physician Consultants" or "Medical Directors" for services not rendered (¶187), provided lavish trips for physicians and their families (¶188), and gave financial incentives to encourage referrals (¶¶192-96). This misconduct eviscerates Defendants' fact-based mantra that medical care provided by Amedisys was mandated by independent outside physicians. *See, e.g.*, D.Br. at 41. "Mercury Doc," a software that Amedisys used to facilitate improper payments to doctors in exchange for referrals (¶¶173-85), was also a thinly veiled kickback scheme in which the incentive was unwittingly paid by Medicare. Amedisys has admitted that Mercury Doc provided Amedisys with 14% more physician referrals than the national average. ¶185.

draw from the facts alleged." *Id.* at 324. Stated differently, "a tie favors the plaintiff." *Spitzberg*, 758 F.3d at 686. Courts must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, *not* whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs Inc. v. Makor Issues & Rights*, *Ltd.*, 551 U.S. 308, 322-23 (2007). In addition, the particularity rules do not "require the pleading of facts which, because of the lack of discovery, are in defendants' exclusive possession." *In re Fleming & Co. Inc.*, 2004 WL 5278716, at *6 (E.D. Tex. June 16, 2004).

Defendants incorrectly argue that the Complaint engages in "group pleading." D.Br. at 29. To the contrary, the Complaint details allegations concerning each Defendant – including $23.4 million in insider stock sales – that, taken together, raise a strong inference that the Individual Defendants and Amedisys acted with fraudulent intent or at least, severe recklessness.

## A.    **Defendant Borne Acted With Scienter**

Defendant Borne – Amedisys's founder and former CEO and Chairman – had ultimate control over Amedisys's operations and public statements, and knew of or was reckless in not knowing that Amedisys's earnings were driven primarily by manipulating the Medicare reimbursement system. ¶395. Throughout 2007, Defendants had high-level strategy meetings, "spearheaded" by Borne, Schwartz and Graham, to analyze in detail what the changes to the Medicare reimbursement thresholds meant for Amedisys's revenues, and how Amedisys would tailor and modify its fraudulent practices to capitalize on those changes. *See* ¶¶92-100.

Borne was personally involved in discussions to modify the Company's procedures in light of the impending 2008 changes to Medicare. Borne told Amedisys's Board that those changes were an opportunity to "*enhance shareholder value* despite the payment changes," a fact that the SFC Report found supports the conclusion that Borne improperly directed employees to meet reimbursement thresholds rather than focus on medical need. ¶398. Borne's familiarity with the

clinical tracks adopted for 2008 (like Balanced for Life) is also shown by how he cited those programs as a factor that distinguished Amedisys from its competitors. *See, e.g.*, ¶376.

The fraudulent nature of Amedisys's modifications to its practices in light of the 2008 Medicare changes is further evidenced by orders from corporate headquarters in 2010 to **shred** materials concerning Amedisys's response to the new thresholds. ¶142(b). This is highly probative of a culpable state of mind. *See Szulik v. Tagliaferri,* 966 F. Supp. 2d 339, 365-66 (S.D.N.Y. 2013) (attempts to conceal records in face of looming SEC investigation supported scienter).

Borne and the other Defendants' statements about Amedisys's clinical tracks, computer system, and compliance further support a strong inference of scienter.[19] As Judge Ellison explained in *In re BP p.l.c. Securities Litigation*, the CEO's "own actions as the spokesperson and champion for BP's reform efforts weigh strongly in favor of the inference that [he] paid special attention to [those] efforts or, at the least, was reckless in not doing so while continuing to publicly" speak. 843 F. Supp. 2d 712, 783 (S.D. Tex. 2012); *see also Nathenson v. Zonagen Inc.*, 267 F.3d 400, 425 (5th Cir. 2001) (statements concerning a patent supported scienter with respect to the patent). Borne was also intimately familiar with the Point of Care system. Borne knew that Point of Care, through "care algorithms" and "clinical tracks," was used to "**prescribe**" the care to be delivered. ¶376. Yet he falsely represented that the system was used to "enhance ... compliance efforts" and improve patient outcomes (rather than its true purpose: manipulating diagnoses to maximize reimbursement). ¶291.[20]

---

[19] Borne made false statements, and held himself out as knowledgeable, regarding Amedisys's sources of revenues (¶¶265, 268, 273, 276-80, 282-84, 286, 288, 290, 292, 294-96, 299-301, 303, 305, 307, 309, 311, 314-16, 318-20, 323-24, 327, 337, 339, 340, 342, 344, 346-47, 349, 354-55, 357, 360-62, 364-69, 374, 377, 382-83, 385, 387, 388; *see also* ¶¶222, 228, 233, 238, 243-44), compliance (¶¶296, 301, 305, 311, 316, 320, 324, 327, 337, 344, 349, 357, 361-62, 367-69, 374, 377, 382-83, 388; *see also* ¶¶268, 273, 280, 283-84, 288, 291-92, 450), computer systems (¶¶291, 376, 450; *see also* ¶55), clinical tracks (¶¶366, 376), payments to referring doctors (¶383), and internal controls (¶¶268, 273, 280, 284, 288, 292, 296, 301, 305, 311, 316, 320, 324, 337, 344, 349, 357, 362, 367-69, 377, 383, 388). Amedisys is liable with respect to each of the Individual Defendants' false statements.

[20] Borne, Browne, Giblin and Redman also signed Sarbanes-Oxley Act certifications stating that they had reviewed

At a 2006 Company conference in Florida, Borne personally pressured representatives and branch directors to reach 10 therapy visits and, in all events, to avoid LUPAs, regardless of medical necessity. ¶91(b). CW5 and CW53 described Borne as going on a "tirade," exhorting branch managers not to cooperate with a government investigation into misconduct at Amedisys, and threatened that "if he [Borne] was sinking in the ocean, *he would step on our heads, hold our heads underwater, and take our last breath of air and come up above water*." ¶396. Borne warned that anyone who cooperated with the government would "*be sitting right there by him at the defendants' table*." ¶396.[21]

The ready availability to Borne and others of information showing Medicare reimbursement manipulation (¶¶55-59) supports scienter. In *Brody v. Zix Corp.*, the court found a strong inference of scienter "based on the testimony of [CWs], that Defendants regularly received computer tracking reports from internal reporting systems which would have alerted them to the fact that their statements … were materially misleading." 2006 WL 2739352, at *7 (N.D. Tex. Sept. 26, 2006). Amedisys's computer systems monitored patient profitability and therapy status, and generated weekly tracking reports. ¶¶83-90, 142(b), 335. The Fifth Circuit's recognition that "an egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of recklessness" is directly applicable. *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 700 (5th Cir. 2005) (citing *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)); *see also Fleming*, 2004 WL 5278716, at *10-11 (scienter where "defendants failed to review or check information

---

and evaluated Amedisys's internal controls, which, as discussed above, were flawed. This adds to the strong inference of scienter. *See LHC*, 2013 WL 1100819, at *4-5 (scienter where CEO signed Sarbanes-Oxley certifications). Contrary to Defendants' contention (D.Br. at 8 n.5), they may be liable for false and misleading Sarbanes-Oxley certifications. *See Wieland v. Stone Energy Corp.*, 2007 WL 2903178, at *15 (W.D. La. Aug. 17, 2007).

[21] Contrary to Defendants' argument (D.Br. at 23 n.17), Rule 9(b) does not mandate dismissal of a securities caser merely to protect a defendant's reputation from detailed allegations of fraud. *See, e.g.*, *Sater v. Chrysler Grp. LLC*, 2015 WL 736273, at *12 (C.D. Cal. Feb. 20, 2015) (in light of "extraordinarily detailed set of factual allegation[s]"; "it is difficult to see how ... that risk of reputation harm should shield" defendant); *In re First Merchants Acceptance Corp. Sec. Litig.*, 1998 WL 781118, at *9 (N.D. Ill. Nov. 4, 1998) (rejecting "reputational harm" argument).

that they had a duty to monitor or ignored obvious signs of fraud").

As the Fifth Circuit recognized in *Nathenson*, 267 F.3d at 425, an inference of scienter may be shown when "there was ample opportunity to become familiar" with the true facts.[22] Defendants' repeated denials of reports of Amedisys's manipulation of the Medicare system (*e.g.*, ¶¶199-202, 212, 216, 221, 382-83) support a strong inference that they were at least reckless:

- On July 13, 2010, Borne sought to discredit the April 26, 2010 *WSJ* article and said that the article presented "an unbalanced story, excluding much of the data that we shared with her [the author] in the spirit of full cooperation." ¶382; and

- On July 15, 2010, Amedisys issued an "Open Letter to Shareholders," signed by Borne, that falsely claimed, among other things, that "we simply deliver the care patients need and their doctors prescribe"; "Our policies ... prohibit our business people from improperly interfering or attempting to influence [therapy decisions]"; and the *WSJ* incorrectly suggested that Amedisys "changed their therapy utilization to take advantage of the new Medicare reimbursement methodology." ¶ 383.

Courts routinely recognize that false denials such as Borne's are powerful evidence of scienter. In *In re ArthroCare Corp. Securities Litigation*, defendants "were directly confronted by the financial media with evidence" of their false statements, but "[n]onetheless, [] continued to reassure investors the reports were lies, rumor-mongering, and propaganda." 726 F. Supp. 2d 696, 712 (W.D. Tex. 2010). The court held that despite those false denials, "[e]ven if [defendants] did somehow manage to remain unaware of any improprieties at [the Company] … the red flags in the media should have led them to investigate discrepancies between the media reports and their own knowledge, and thus are strong indicia they acted with scienter." *Id*. at 718.[23]

---

[22] *Id*. at 425; *see also In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 460 (S.D.N.Y. 2005) ("significant length of time (several years) during which the arrangements were not disclosed" supported scienter).

[23] Other courts are in accord. *See, e.g.*, *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1338 (S.D. Fla. 1999) ("denials indicate that [defendants] were either sufficiently familiar with the facts, or severely reckless in not being familiar, to be in a position to issue a denial"); *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653 (E.D. Pa. 2015) ("In the context of specific inquiries … and the consistent content of [defendants'] responses, defendants' omission of actual circumstances that were contrary to their answers presents 'an obvious risk of misleading investors.'") (quoting *Inst. Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 269-70 (3d Cir. 2009) (direct denials despite contradictory evidence support scienter, as "the most powerful evidence of scienter is the content and context of [a defendant's] statements themselves")).

The critical importance of Medicare reimbursements to Amedisys also strengthens the inference that Borne and the other Defendants understood, or were severely reckless in not understanding, the Company's Medicare abuses before speaking on the subject. *See LHC*, 2013 WL 1100819, at *4 ("the vast importance of Medicare to LHC's business" supported "a strong inference that [the CEO] was aware that the company was inflating its reported financial results through abusive practices").[24]

Finally, as the market recognized, Borne's abrupt resignation on the heels of the announcement of the $150 million DOJ Settlement strongly supports an inference of scienter. ¶¶393(k), 397. *See, e.g.*, *North Port Firefighters' Pension-Local Option Plan v. Temple-Inland, Inc.*, 936 F. Supp. 2d 722, 754 (N.D. Tex. 2013) ("resignation of high level officials may contribute to an inference of scienter"); *In re BP p.l.c.*, 843 F. Supp. 2d at 784 n.36 ("a forced departure is another factor supporting … scienter"); *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 2005 WL 3504860, at *16 (S.D. Tex. Dec. 22, 2005) ("the market may learn of possible fraud from a number of sources [such as] ... resignations"). The DOJ Settlement and the settlement of the related derivative action also support a strong inference of scienter, as "an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit" are "relevant to show scienter." *See Greebel v. FTP Software, Inc.*, 194 F.3d 185, 196 (1st Cir. 1999); *Frank v. Dana Corp.*, 646 F.3d 954, 958 n.2 (6th Cir. 2011); *In re Pfizer Inc. S'holder Deriv. Litig.*, 722 F. Supp. 2d 453, 457 (S.D.N.Y. 2010) (complaint corroborated by government's charges and fsettlement).

---

[24] When misrepresentations or misleading statements relate to a company's key business segment or product, courts in the Fifth Circuit and elsewhere routinely hold that senior executives were likely aware of the truth, supporting a strong inference of scienter. *See, e.g., Plotkin,* 407 F.3d at 700 (reversing dismissal and finding scienter "given the importance of these deals [multi-million dollar contracts] to the company"); *Nathenson*, 267 F.3d at 425 (scienter as to CEO where statements related to "obviously important" part of the company); *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008) ("very hard to credit" that "no member of the company's senior management who was involved in authorizing or making public statements about the demand for the [company's 'most important products'] knew that they were false.").

Defendants grossly misconstrue *In re Gentiva Securities Litigation*. D.Br. at 23-24. Defendants cite to the *Gentiva* court's March 25, 2013 opinion, which held that the plaintiff had adequately pled falsity but not scienter, and granted leave to replead with regard to scienter. Defendants ignore *Gentiva*'s subsequent history, including the court's decision sustaining the plaintiff's Section 10(b) claim against the CEO (including scienter) – and the multimillion-dollar settlement of that action. *Gentiva*, 971 F. Supp. 2d 305, 337-38 (E.D.N.Y. 2013); Case No. 10-cv-5064 (E.D.N.Y.) (ECF No. 130 (order approving settlement)). Moreover, the *Gentiva* scienter allegations were ***not*** "identical to Plaintiffs' here" (D.Br. at 24), as the allegations here are far stronger. Gentiva's settlement with the government was much smaller ($25 million) and the SFC Report did not reach the same conclusions about Gentiva as it did with Amedisys. Moreover, the *Gentiva* complaint had only eight CWs, all many levels removed from the individual defendants, and none provided evidence of knowledge or access to information of the alleged fraudulent conduct. 932 F. Supp. 2d at 378-79. Here, the 47 CWs directly connect the Individual Defendants to Amedisys's Medicare fraud, as discussed above.

## B.    Defendant Schwartz Acted With Scienter

As Amedisys's Chief Information Officer, Schwartz directly perpetrated Amedisys's Medicare fraud through the computer systems that she designed and oversaw. ¶¶402, 449-53. Schwartz was responsible for the OASIS system that fraudulently upcoded patients, and her statements confirm that she was fully familiar with all of Amedisys's computer systems.[25] *Id*. Schwartz had control over Point of Care, which, as numerous CWs and *qui tam* relators describe, was used to pressure clinicians to provide services targeted towards revenue rather than medical need. ¶¶55-84. CW2 and CW3 described how these systems generated daily reports on each

---

[25] Schwartz made false statements, and held herself out as knowledgeable, regarding Amedisys's sources of revenues (¶¶331, 351), compliance and computer systems (¶¶331-32; *see also* ¶451), and clinical tracks (¶352).

patient's profitability. ¶¶59; 161(c). Indeed, CW54 was reprimanded for trying to override the system and input accurate (but less remunerative) answers. Relator CAF likewise described how Point of Care was designed to send nurses prompts, known as "smart edits," to trigger therapy recommendations that maximized reimbursements. The smart edits were virtually impossible to override. ¶¶63-64; *see also* ¶¶76-77.

Schwartz publicly claimed that Amedisys's computer systems were designed to improve "compliance control" (¶451) – when they were actually designed to prompt workers to skew OASIS scoring for higher reimbursement. ¶205. Indeed, Schwartz personally rejected attempts by IT managers to curtail improper data changes. ¶170. As the *qui tam* complaints, CWs, SFC Report, and DOJ Settlement all provide, the programs that Schwartz developed to record co-morbidities with the highest level of reimbursement as primary diagnoses were designed to abuse Medicare by providing and billing for unnecessary therapy services. ¶100.

Schwartz also headed Amedisys's "A-Team," set up after the release of the new 2008 Medicare thresholds to provide services that had not been considered necessary, solely to meet the new thresholds. ¶403. For instance, Schwartz and the A-Team instituted Balanced for Life to garner higher reimbursements by targeting "trigger payments" rather than medical need. ¶106. Schwartz herself stated that the A-Team would "address[] the [anticipated loss of revenue resulting from the] 'case mix adjustment' rules recently proposed." ¶¶94, 99, 256, 406. Schwartz distributed a "Therapy Initiatives Update" to the A-Team for an August 31, 2007 call, projecting an increase in the average Balanced for Life reimbursement, and Schwartz notified the A-Team that therapy was being added to other "clinical track" programs beginning in 2008. ¶¶257(d)-(e), 407, 409.

Schwartz's sudden, unexplained resignation also supports a strong inference of scienter. ¶416. Analysts recognized that Schwartz's resignation was a "red flag" and a "warning indicator

of a more dangerous problem" at the Company, because she "kn[ew] the design and architecture of [Point of Care] better than anyone" and "oversaw its system specifications, development, implementation, training, scalability, and ... 'enhancements.'" ¶¶204-05. Schwartz's resignation "add[s] one more piece to the scienter puzzle." *Fouad v. Isilon Sys.*, 2008 WL 5412397, at *11 (W.D. Wash. Dec. 29, 2008); *see also* cases cited *supra*.[26]

### C.     Defendant Jeter Acted With Scienter

Jeter, Amedisys's Chief Compliance Officer, was – as he himself told analysts – "the person responsible for oversight of the compliance functions of Amedisys." ¶¶422-23. Jeter was responsible for and had access to all relevant information concerning Amedisys's legal and regulatory compliance. ¶424. He also made false statements regarding, and held himself out as knowledgeable about, Amedisys's compliance. ¶¶333, 336. Rather than ensure compliance, however, Jeter encouraged improper manipulation of Medicare. As CW7 stated, at a 2006 Company conference in Florida, Jeter (along with Borne and others) exhorted employees to reach 10 therapy visits and, in all events, to avoid LUPAs. ¶91(b).

Jeter also regularly received information concerning compliance problems at the Company, including as the senior officer responsible for the Company's fraud hotline. ¶425. Multiple CWs confirmed that hotline calls reporting compliance problems went to Jeter, including one CW who *personally* called the hotline twice to report Medicare fraud. *Id*. Jeter also served on the Compliance Committee, which was responsible for all compliance issues, as did Defendants Borne, Schwartz, Graham, and Redman.[27] ¶424. Jeter's responsibility over compliance functions,

---

[26] Defendants cite to *Odyssey*, 424 F. Supp. 2d at 889-90 to suggest that "Plaintiffs have failed to allege the existence of any specific reports" that alerted Schwartz to the Medicare fraud at Amedisys. D.Br. at 27-28. As opposed to *Odyssey*, where plaintiffs alleged only the *existence* of monitoring systems, the Complaint here alleges that Schwartz personally told investors that *she was responsible* for the computer system, that she resisted attempts to halt improper data changes (¶410), and through the A-Team drove the Company's provision of medically unnecessary therapy. *See, e.g.*, ¶¶402-17.

[27] The cases Defendants cite to argue that mere membership on a compliance committee does not support scienter are

and direct receipt of reports of Medicare fraud, support a strong inference of scienter.[28]

Jeter was also familiar with Point of Care, stating that it was "fundamental" to and helped "improve" Amedisys's "adherence to Medicare rules and regulations," and that "one simply cannot overemphasize the importance of this technology as a means for strengthening our compliance with the law." ¶427. Jeter described how he and others had personally monitored the system for auditing purposes, including instances of "excessive therapy," "LUPA exaggeration," and "up-coded case mixes," all of which Jeter recognized had "inherent revenue impacts" that posed "a potential for improprieties," "warrant[ing] a complete compliance review." ¶¶428-29.

Moreover, Jeter was involved in implementing the improper "Mercury Doc" kickback scheme. ¶433. Jeter himself requested to include "Physician Consultant invoice capabilities" to Mercury Doc in order to ensure that the same physicians who received unearned reimbursements for referring patients could also receive revenue or benefits as Physician Consultants. ¶435.

### D.    Defendant Graham Acted With Scienter

Graham served as Amedisys's COO beginning in January 1999, was responsible for and had control over the Company's operations, and was primarily responsible for speaking on Amedisys's behalf to the investing public. ¶418.[29] Schwartz directly reported to Graham (¶402),

---

unavailing. D.Br. at 25 (citing *In re Affiliated Comp. Servs. Deriv. Litig.*, 540 F. Supp. 2d 695 (N.D. Tex. 2007); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611 (S.D.N.Y. 2007); *In re Enron Corp. Sec. Deriv. & ERISA Litig.*, 258 F. Supp. 2d 576 (S.D. Tex. 2003)). Because the Compliance Committee was responsible for all compliance issues at Amedisys (¶¶424-25), and because Jeter himself told investors that he was not merely on the committee but "the person responsible for oversight of the compliance functions of Amedisys" (¶¶422-23), the Complaint alleges far more than mere committee membership.

[28] Defendants cite to inapposite cases to suggest that Jeter's personal knowledge of severe compliance issues does not support scienter. *See Goldstein v. MCI Worldcom*, 340 F.3d 238, 245 (5th Cir. 2003) (discussing false statements, not scienter); *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002) (pled only that defendants should have known of problems based on their positions). Here, Plaintiffs allege that Jeter was aware of specific compliance problems due to specific reports, such as calls to the hotline (¶425) and assured investors that that he personally monitored whether Amedisys was engaged in Medicare manipulation. ¶¶428-29.

[29] Graham made false statements regarding, and held himself out as knowledgeable about, Amedisys's sources of revenues (¶¶266, 329-30, 341-42, 348, 356; *see also* ¶¶61, 115), compliance (¶309; *see also* ¶¶3, 450), computer systems (¶¶309; *see also* ¶450), and clinical tracks (¶115).

who was aware of the Company's efforts to alter its services in order to take advantage of the revised 2008 incentive thresholds. ¶419. With regard to Point of Care, Graham repeatedly discussed Amedisys's "care coordination abilities" and "compliance controls," which he told investors was the Company's "most important" area of focus. ¶¶3, 309, 450. Graham also knew that Amedisys's "clinical tracks" were a key way to increase reimbursements regardless of medical need. ¶115. Graham's abrupt resignation after more than 10 years at the Company to "pursue other interests" (at age 49) further supports an inference of scienter against him. ¶¶203, 416.

### E.    Defendants Browne, Giblin, And Redman Acted With Scienter

Amedisys's *three* Class Period CFOs, the circumstances of their service with the Company, and the fact that Amedisys's revenues were inflated by fraud, support a strong inference of scienter. Browne's resignation was announced February 22, 2006, but no successor was named until *eight months* later. ¶443. Browne's successor, Giblin, resigned after only *four months*, and walked away from $418,000 in stock options. *Id.*[30] Giblin's exceedingly short service gives rise to a strong inference of scienter. *See Kunzweiler v. Zero.Net, Inc.*, 2002 WL 1461732, at *6 (N.D. Tex. 2002) (strong inference of scienter where CEO "resigned or was terminated ... so soon"). In addition, with regard to Point of Care, on an October 30, 2007 earnings conference call, Redman discussed Amedisys's "care coordination" and "enhanced … compliance." ¶310.[31] Redman's service on the

---

[30] The cases Defendants cite to argue that the resignations here do not support scienter are readily distinguishable. D.Br. at 36-37. *See In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 898 (W.D. Tex. 2008) (executives resigned *almost a year after the end of the Class Period*); *Abrams*, 292 F.3d at 428, 434 (news source attributed resignations of *non-defendant* executives to "cost overruns and operational glitches," and complaint did not allege any knowledge of misconduct). In *ArthroCare*, 726 F. Supp. 2d at 725, the Court actually held that the plaintiff adequately pled scienter, while recognizing that "the timing of the resignations ... coupled with the fact that Gluk expressly resigned as a result of facts identified in the Review, does strongly indicate the resignations were related to" misconduct at the company.

[31] In addition, Browne made false statements, and held himself out as knowledgeable, regarding Amedisys's sources of revenue (¶¶265-67, 270-73, 277-79, 282-84), and compliance and internal controls (¶¶268, 273, 280, 284). Giblin similarly made false statements, and held himself out as knowledgeable, regarding Amedisys's sources of revenue (¶¶294-95), and compliance and internal controls (¶296). Redman also made false statements, and held himself out as knowledgeable, regarding Amedisys's sources of revenue (¶¶300-301, 304-05, 309, 311, 315-16, 319-20, 323-24, 328, 337, 340, 342, 344, 347, 349, 355, 357, 360, 362, 365, 367, 369, 373, 377, 385, 388), computer systems (¶310; *see also* ¶450), and compliance and internal controls (¶¶301, 305, 310-11, 316, 320, 324, 337, 342, 344, 349, 357,

Compliance Committee, discussed above, further supports a strong inference of scienter.[32]

### F.    Defendants Sold Massive Amounts Of Stock During The Class Period

"Insider trading can be a strong indicator of scienter if the trading occurs at suspicious times or in suspicious amounts." *Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.*, 497 F.3d 546, 552-53 (5th Cir. 2007); *see also LHC*, 2013 WL 1100819, at *5 (CEO's sale of $20 million of personal holdings at fraudulently inflated price evidenced "a motivation for making the false and/or misleading statements"). Indeed, motive "meaningfully enhance[s] the strength of the inference of scienter." *Lormand*, 565 F.3d at 267. Here, the Individual Defendants engaged in highly suspicious insider sales of *$23.4 million* in stock. For example:

- In the fourth quarter of 2007 – right before the new Medicare reimbursement thresholds went into effect – Borne (and Borne's family members), Schwartz, Graham and Jeter liquidated *$4.6 million* worth of Amedisys stock. ¶¶463, 469, 475, 480. This was after an October 25, 2007 meeting, attended by these Defendants, at which Schwartz discussed the potential impacts of the new thresholds. ¶¶99, 256. By contrast, these individuals only sold approximately *$40,000* of Amedisys stock during all of 2006; their fourth quarter 2007 sales were *115 times* that amount (¶¶476, 481);

- Between August 1 and 8, 2008, Borne sold 52,500 Amedisys shares for a total value of *$3.3 million*. ¶464. These trades occurred near the highest prices the stock would ever trade. In addition, on August 12, 2008, Citron Research published its report on Amedisys (based on interviews of Amedisys employees at the time), which caused the stock to drop 17.86%. *Id.*; ¶198.

- Between July 28 and 31, 2009, Borne and Graham (and Graham's spouse) sold *$2.9 million* of Amedisys stock. ¶¶464, 470. These trades were suspicious because, on

---

362, 367, 369, 377, 388; *see also* ¶450).

[32] Defendants also mischaracterize the Complaint by arguing that Senior VP of Operations Cheryl Lacey was merely a "mid-level employee" who cannot support a finding of scienter against Amedisys. D.Br. at 31. But as the Fifth Circuit has held, "[f]or purposes of determining whether a statement made by the corporation was made by it with the requisite Rule 10(b) scienter" it is "appropriate to look to the state of mind of the individual corporate official or officials who ... furnish information or language for inclusion therein, or the like." *Southland*, 365 F.3d at 366. Lacey was a senior Amedisys officer who ordered Amedisys employees to participate in Medicare abuse. ¶393(s). CWs 5, 7, 11, 33, and 46 consistently identify Lacey as the conduit through which the Individual Defendants communicated to the rest of the Company. *See* ¶¶91(a)-(c), 142(c), 159, 393(s). In addition, Lacey furnished materially false and misleading information to Senior Vice President Jill Cannon concerning the critical business metrics that are included in Amedisys's financial statements, including information with respect to "revenue per agency" and "new admissions and discharges." *See* ¶393(s). Lacey's knowledge of the fraud is (like the other Defendants') attributable to Amedisys and supports a finding of corporate scienter. *See Southland*, 365 F.3d at 366; *Lee v. Active Power, Inc.*, 29 F. Supp. 3d 876, 881-85 (W.D. Tex. 2014) (knowingly false information furnished by a corporate employee, with knowledge that the information would be republished to investors, established scienter against the corporate defendant).

September 3, 2009, Schwartz and Graham resigned simultaneously, and the price of the stock dropped 21.68%. ¶203. Graham had sold most of his stock in a single day, and did not give a reason for leaving the Company, and Schwartz also gave no explanation and had no succession plan. ¶204.

Defendants incorrectly argue that the Complaint fails to "set forth the amount of trading defendants conducted before or after the class period that might support a finding of unusualness." D.Br. at 38. First, "prior trading history does not need to be pleaded as a per se matter; instead, the court looks at the information that is pleaded and determines whether the timing or scope is unusual." *Cent. Laborers*, 497 F.3d at 553. Second, the Complaint does so anyway:

- Borne's total direct sales in the ten-year period preceding the Class Period totaled only $3,238,778, whereas during the Class Period he sold $15,594,704. ¶465.

- Jeter's 20,631 shares sold during the Class Period dwarf his sales of 2,100 shares prior to the Class Period, and his overall net accumulation from 2002 through 2005. ¶476.

- As of December 20, 2007, Schwartz's total remaining holdings were only 2,022 shares, in stark contrast to her accumulation of shares prior to the Class Period. ¶481.[33]

## III.    PLAINTIFFS PLEAD CONTROL PERSON LIABILITY

Pleading control person liability is governed by Rule 8's notice pleading requirements. *Wieland*, 2007 WL 2903178, at *14-16. "In pleading control [person liability], plaintiffs must plead facts indicating that the defendant 'had the requisite power to directly or indirectly control or influence corporate policy," and "Plaintiffs need not allege that the controlling person actually

---

[33] Defendants argue that Plaintiffs failed to consider that many of the stock sales were made pursuant to Rule 10b5-1 trading plans. D.Br. at 39. However, "whether or not the stocks in this case were sold pursuant to a 10b5-1 trading plan is irrelevant at this stage …, as the existence of such a plan is an affirmative defense, which requires evidence of the plan itself and of details such as the date the plan was entered into and whether it wholly removed trades from the defendant's discretion." *ArthroCare*, 726 F. Supp. 2d at 724. Defendants are also incorrect that Plaintiffs do not account for vested stock options. Plaintiffs allege that the percentage of holdings sold included stock and available "options." ¶¶472, 476. Defendants' argument that there ***could be*** an innocent explanation for Schwartz and Graham to have liquidated their holdings before their resignations lacks merit. *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 278 (3d Cir. 2006) ("the timing of the sales" was "suspect in that they occurred just six weeks before [the defendant] resigned"). As for Schwartz, her last alleged sale was December 20, 2007, which makes it unlikely that the purpose of the sale was to liquidate her holdings when she did not resign until September 3, 2009, nearly two years later. ¶¶203, 478. Finally, contrary to Defendants' arguments, the 73-month length of the Class Period is not out of the ordinary for securities fraud class actions. *See, e.g.*, *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 2013 WL 6577020, at *1 (C.D. Cal. Dec. 5, 2013) (112-month class period; settled for $500 million); *In re Comverse Tech., Inc. Sec. Litig.*, 2010 WL 2653354, at *1 (E.D.N.Y. June 24, 2010) (80-month class period; settled for $225 million).

participated in the underlying primary violation to state claim for control person liability." *Id.* at *44; *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2016 WL 215476 (S.D. Tex. Jan. 19, 2016) (finding the Fifth Circuit employs a "relaxed" and "lenient" pleading standard for control person claims).

In addition to alleging underlying securities fraud violations and each Defendants' position as a senior level executive of Amedisys, Plaintiffs have alleged that each Defendant was a direct, substantial, and primary participant in the fraud (¶¶21-27), and that each had key responsibilities and controlled the Company and the fraudulent scheme alleged (¶¶395-448).[34] Courts in the Fifth Circuit have found similar allegations sufficient to plead violations of Section 20(a). *See*, *e.g*, *In re OCA, Inc.*, 2006 WL 3747560, at *23 (E.D. La. Dec. 14, 2006) (20(a) liability adequately pled where Defendants were "top officers" serving as CEO and CFO, put their names on the company's SEC filings and the Sarbanes-Oxley certifications, helped develop the company's accounting systems, had actual control or influence over its accounting and reporting policies and had "direct and supervisory involvement in" day-to-day operations); *Wieland*, 2007 WL 2903178, at *14-16; *Bamburg v. Axis Onshore LP*, 2009 WL 1579512, at *9 (W.D. La. June 4, 2009).

<u>**CONCLUSION**</u>

The Court should deny Defendants' motion in its entirety.[35]

Dated:  January 29, 2016
Respectfully submitted by:
RICHARD P. IEYOUB (26287)
/s/Richard P. Ieyoub_____
Email: rieyoub@hotmail.com
*Liaison Counsel for Plaintiffs*

**IEYOUB LAW FIRM**
3741 Highway 1 South
Port Allen, LA 70767
Telephone: (225) 298-8118
Facsimile: (225) 298-8119

---

[34] For example, Borne spearheaded strategic planning in response to the reimbursement threshold changes (¶95); Graham "was responsible for and had control over the Company's operations" (¶418); Jeter was "responsible for and had control over the Company's compliance with policies, regulations, and laws" (¶423); Schwartz had "control over Amedisys's information systems" (¶¶96-98, 402-03, 406); Browne, Giblin, and Redman were each "responsible for and had control over the Company's financial matters" (¶439); and Borne, Jeter, Graham, Redman, and Schwartz served on the Compliance Committee and were responsible for Amedisys's compliance. ¶393(d).

[35] If the Court grants Defendants' motion, in part or in full, Plaintiffs respectfully request leave to amend pursuant to Rule 15. *In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *15 (S.D. Tex. May 20, 2014).

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
John C. Browne
Email: Johnb@blbglaw.com
Adam H. Wierzbowski
Email: Adam@blbglaw.com
Adam Hollander
Email: Adam.Hollander@blbglaw.com
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
G. Anthony Gelderman, III
Email: Tony@blbglaw.com
2727 Prytania Street, Suite 14
New Orleans, LA 70130
Telephone: (504) 889-2339
Facsimile: (504) 899-2342

*Lead Counsel for Lead Plaintiffs*

**WOLF POPPER LLP**
Marian P. Rosner
Email: mrosner@wolfpopper.com
Robert C. Finkel
Email: rfinkel@wolfpopper.com
Joshua W. Ruthizer
Email: jruthizer@wolfpopper.com
Sean M. Zaroogian
Email: szaroogian@wolfpopper.com
845 Third Avenue
New York, NY 10022
Telephone: (212) 759-4600
Facsimile: (212) 486-2093

*Lead Counsel for Lead Plaintiffs*