## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**ROBERT F. BACH, ET AL.**                              **CIVIL ACTION**

**VERSUS**

**AMEDISYS, INC., ET AL.**                     **NO.: 10-00395-BAJ-RLB**

## RULING AND ORDER

Before the Court is **Defendants' Motion to Dismiss Plaintiffs' First Amended Consolidated Securities Class Action Complaint (Doc. 279)** filed by Defendants Amedisys, Inc. ("Amedisys" or the "Company"), William F. Borne ("Borne"), Larry R. Graham ("Graham"), Dale E. Redman ("Redman"), John F. Giblin ("Giblin"), Gregory H. Browne ("Browne"), Alice Ann Schwartz ("Schwartz"), and Jeffrey D. Jeter ("Jeter") (collectively, "Defendants"). Defendants, in short, seek to have Plaintiffs' First Amended Consolidated Securities Class Action Complaint (Doc. 270) ("Plaintiffs' Complaint") dismissed for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). Plaintiffs have submitted a memorandum in opposition, (Doc. 283), Defendants have submitted numerous replies, (Docs. 290, 291), and Plaintiffs have submitted a sur-reply (Doc. 288). Jurisdiction is proper pursuant to 28 U.S.C. § 1331. For the reasons explained herein, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**.

1

## I.      Introduction

Lead Plaintiffs Public Employees' Retirement System of Mississippi ("Mississippi PERS") and Puerto Rico Teachers' Retirement System ("Puerto Rico TRS") (collectively, "Plaintiffs") bring this consolidated class action on behalf of all who purchased or otherwise acquired Amedisys's publicly traded securities from August 2, 2005 to September 30, 2011 (the "Class Period"). They allege that Amedisys and seven current or former members of Amedisys's senior management ("Individual Defendants") defrauded investors by concealing a Medicare fraud scheme in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5,[1] 17 C.F.R. § 240.10b-5, as promulgated thereunder. (Doc. 270 at ¶¶ 505—15). Plaintiffs also bring claims against Individual Defendants under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). (Doc. 270 at ¶¶ 516—18).

### A.      The Parties

Mississippi PERS is a pension fund established for the benefit of current and retired public employees of the State of Mississippi. (*Id*. at ¶ 18). Puerto Rico TRS is a single employer pension plan that provides retirement, death, and disability benefits to teachers in the Commonwealth of Puerto Rico, including all current and

---

[1] As stated by the Supreme Court in *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005):

> Private federal securities fraud actions are based upon federal securities statutes and their implementing regulations. Section 10(b) of the Securities Exchange Act of 1934 forbids (1) the "use or employ[ment] . . . of any . . . deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of" Securities and Exchange Commission "rules and regulations." 15 U.S.C. § 78j(b). Commission Rule 10b-5 forbids, among other things, the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements made ... not misleading. 17 C.F.R. § 240.10b-5.

pensioned teachers of the Department of Education. (*Id.* at ¶ 19). Both purchased Amedisys common stock during the Class Period and allege to have suffered damages as a result of Defendants' federal securities violations. (*Id.* at ¶¶ 18—19).

Amedisys is a provider of home health services. (*Id.* at ¶ 20). Its common stock is traded on the NASDAQ Global Select Market under the trading symbol "AMED", and its principal offices are located in Baton Rouge, Louisiana. (*Ibid.*). Medicare reimbursements constituted approximately 90% of the Company's net service revenue from 2005-2009. (*Ibid.*).

Individual Defendants all served as high-ranking Amedisys officers at various times throughout the Class Period: Borne (Chief Executive Officer and Chairman of the Board from 1982 to 2014); Graham (Chief Operating Officer from January 1999 to September 2009); Redman (Chief Financial Officer from February 2007 to January 2012); Giblin (Chief Financial Officer from October 2007 to February 2007); Browne (Chief Financial Officer from May 2002 to October 2006); Schwartz (Chief Information Officer from September 2004 until September 2009); and Jeter (Chief Compliance Officer and Corporate Counsel from 2001 to present). (*Id.* at ¶¶ 21—27). All are alleged to have played "a direct, substantial and primary" role in the securities fraud that is the subject of this litigation. (*Ibid.*).

### B.    The Alleged Fraud

Medicare uses a prospective payment system ("PPS") that reimburses home healthcare companies like Amedisys based, in part, on the provider's pre-treatment assessment of the patient's condition and the provider's pre-treatment 60-day

("episode") proposed plan of care. (*Id.* at ¶ 28). Before a patient begins receiving home healthcare treatment, he or she is given a long questionnaire covering characteristics and attributes specified in the Medicare guidelines. (*Id.* at ¶ 30). This questionnaire is known as an OASIS form. (*Ibid.*). The home healthcare service provider then submits the OASIS form to the Centers for Medicare and Medicaid Services ("CMS"), which utilizes it to determine the patient's Home Health Resource Group ("HHRG") score, which ultimately dictates "the amount that Medicare will pay for providing home care services to that patient." (*Id.* at ¶ 29).

Home healthcare companies are reimbursed on an episode-by-episode basis. If a patient seeks to be treated beyond the initial 60-day episode, he or she must be "re-certified" before a subsequent 60-day episode can commence. (*Id.* at ¶ 32). There are, for purposes of this Ruling and Order, two kinds of episodes: "therapy" episodes and "non-therapy" episodes. A "therapy episode" includes at least one "therapy visit."[2] (*Ibid.*). A "non-therapy episode" does not. (*Ibid.*).

Financially, not all "therapy visits" are the same. (*Id.* at ¶¶ 34—35). "Under the 2000-2007 PPS system, . . . once a patient received his or her tenth therapy visit, the home health care provider received an additional payment of approximately $2,200. Medicare did not generally provide additional payments for therapy visits beyond the 10 visit threshold." (*Id.* at ¶ 34). "Beginning January 1, 2008, the PPS system changed." (*Id.* at ¶ 35). Home healthcare companies no longer received additional payments when a patient reached his or her tenth therapy visit. (*Ibid.*).

---

[2] A therapy visit is a home health visit by a certified therapist, as opposed to, for example, a nurse.

Instead, home healthcare companies now received additional payments when a patient received his or her sixth therapy visit, when a patient received his or her fourteenth therapy visit, and when a patient received his or her twentieth therapy visit. (*Ibid.*). These 2008 PPS thresholds lie at the heart of this litigation.

**Plaintiffs' first allegation**: Throughout the Class Period, Amedisys provided medically unnecessary[3] therapy visits in order to maximize profits. (*Id.* at ¶ 49—50). Plaintiffs maximized profits by: (1) hitting the aforementioned 2008 PPS thresholds, (*id.* at ¶¶ 89—91, 139—58), and (2) avoiding LUPAs, (*id.* at ¶ 159). LUPAs are low-utilization payment adjustments that apply to episodes involving four or fewer total visits.[4] (*Id.* at ¶ 38). LUPA patients are "expensive and undesirable" for home healthcare service providers, as they command "only a low, service-specific, per-visit" reimbursement. (*Ibid.*). In order to "systematically achieve 'high-therapy' bonus thresholds, Amedisys . . . created proprietary 'clinical tracks'" that improperly expanded its therapy-eligible customer base and "standardized" its treatment of certain diagnoses in order to "maximize reimbursement" irrespective of medical need. (*Id.* at ¶ 85).

Take, for instance, Amedisys's Wound Care Clinical Tracks. (*Id.* at ¶ 101). Wound care is a "common service traditionally performed by trained *nurses*." (*Id.* at ¶ 102) (emphasis added). Nonetheless, "[b]eginning in 2007, Amedisys attempted to

---

[3] Medicare defines as "medically necessary" those therapy visits that are needed "to diagnose or treat an illness, injury, condition, disease, or its symptoms ad that meet accepted standards of medicine." *Glossary*, https://www.medicare.gov/glossary/M.html.

[4] Therapy or non-therapy.

reinvent wound care . . . as [a] 'therapy'" performed by therapists. (*Ibid.*). This served to "inflate" Amedisys's "therapy visit numbers" in order to maximize Amedisys's Medicare reimbursements. (*Ibid.*).

There were only two Therapy Wound Care Tracks: Therapy Wound Care I and Therapy Wound Care II. (*Id.* at ¶¶ 103—04). Amedisys assigned patients with "uncomplicated wound[s]" to Therapy Wound Care I, and they automatically received 14 therapy visits by virtue of their assignment. (*Id.* at ¶ 104). Amedisys assigned patients with "complex" wounds to Therapy Wound Care II, and they "automatically received 20 or more therapy visits" by virtue of their assignment. (*Ibid.*). Plaintiffs suggest that this type of grouping, pursuant to which every Amedisys Therapy Wound Care patient hit one of the 2008 PPS thresholds, constituted Medicare fraud, insofar as it effectively ensured that at least some Amedisys patients received medically unnecessary therapy visits in violation of 42 U.S.C. § 1395y(a)(1)(A) and 42 C.F.R. § 411.15(k).

Amedisys's "Balanced for Life" ("BFL") program raises similar concerns. It contained three clinical tracks: BFL001, BFL002, and BFL003. (*Id.* at ¶¶ 106—08, 120). "According to Medicare guidelines . . . , 'services involving activities for the general welfare of any patient, *e.g.*, general exercises to promote overall fitness or flexibility and activities to provide diversion or general motivation, do not constitute skilled therapy.'" (*Id.* at ¶ 109). Nonetheless, under Balanced for Life, "general exercises" were improperly characterized as "therapy visits" in order to qualify for additional PPS reimbursements. (*Id.* at ¶¶ 109, 111—13).

Seemingly everyone qualified for BFL. All he or she had to do was answer "yes" to 3 of these 13 questions: (1) "Are you 65 or older?" (2) "Have you fallen within the last 3 months?" (3) "Are you unsteady on your feet or have a general weakness?" (4) "Are you taking any medications that cause fatigue or dizziness?" (5) "Have you had a stroke in the past?" (6) "Do you have a progressive neurological disease?" (7) "Do you have diabetes?" (8) "Do you have neuropathy, arthritis or joint disease of the lower extremities?" (9) "Do you have visual disturbances?" (10) "Do you have fatigue, dizziness or declined agility" (11) "Do you have a fear of falling?" (12) "Do you have painful feet?" and (13) "Do you have to rush to get to the bathroom in time?" (*Id.* at ¶¶ 110—11). "As part of its Balanced for Life Operations Manual," Amedisys recommended "*exactly 14 therapy visits*" for those assigned to BFL001, and approximately 22 therapy visits for those assigned to BFL002 and BFL003. (*Id.* at ¶ 122) (emphasis in original). This effectively ensured that all 20,000 of Amedisys's BFL patients reached one of the 2008 PPS thresholds, regardless of medical necessity and in violation of 42 U.S.C. § 1395y(a)(1)(A) and 42 C.F.R. § 411.15(k). (*See id.* at ¶ 124).

**Plaintiffs' second allegation**: Throughout the Class Period, Amedisys engaged in fraudulent "upcoding" of patient OASIS forms to increase reimbursements. (*Id.* at ¶ 51). "Upcoding" refers to a scheme by which home healthcare companies enter OASIS scores that reflect illnesses and conditions that are far "more severe" than the illnesses and conditions that give rise to the need for therapy. (*Id.* at ¶ 161). "Upcoding" allows home healthcare companies such as

7

Amedisys to provide care that, while unnecessary, generates higher Medicare reimbursement payments.

    ***Plaintiffs' third allegation***: Throughout the Class Period, "Amedisys paid improper and illegal remuneration to doctors to solicit the certification of profitable Medicare patients and [to] facilitate improper patient recertifications." (*Id.* ¶ 52). More specifically, Plaintiffs allege that Amedisys utilized various kickback schemes "to induce patient referrals both from physicians and from hospitals, in violation of the federal Anti-Kickback Statute," 42 U.S.C. § 1320a-7b. (*Id.* at ¶ 172). One of those schemes involved an Amedisys computer program known as "Mercury Doc." (*Id.* at ¶¶ 173—85). Plaintiffs allege Mercury Doc effectively allowed doctors to earn Care Plan Oversight ("CPO") payments by simply having their nurse log on to their computers.

> Account executives are trained to explain to physicians that when they (or anyone who has their login and password) opens Mercury Doc on their computer, they will be able to see all their Amedisys patients' files. In fact, as soon as the files are opened, an internal timer in Mercury Doc will record a continuous log accounting for every minute patient files remain open. At month's end, Mercury Doc generates an invoice for the time the patient files were opened that month, thereby allowing the physician to bill Medicare for services purported to be CPO.

(*Id.* at ¶ 178). "CMS regulations allow physicians to bill for CPO services for time spent in oversight of complex cases often involving consultation with specialists." (*Id.* at ¶ 179). But, according to a former Amedisys Account Executive, "once a patient goes home and is out of the acute phase of illness where he need[s] a doctor – well, the Docs just don't have the time to go checking files on Mercury Doc for a patient that is in home care. A couple might. Most don't. So it winds up be[ing] the secretary

or the office manager or a nurse that opens [up] the files." (*Id.* at ¶ 181). "The more Amedisys patients that a physician has, the more potential files the physician has to view, the more minutes there are to log and the higher the potential CPO reimbursement for the physician." (*Id.* at ¶ 182). "Amedisys has publicly claimed that Mercury Doc . . . has resulted in 14% more physician referrals (*i.e.* episodes) than the national average." (*Id.* at ¶ 185).

Plaintiffs also allege that Ameidsys took doctors on "lavish trips" during which they and their families were treated to "rounds of golf, dinners and spa appointments . . . ." (*Id.* at ¶¶ 188—89, 191). Some of these doctors were even retained as corporate "directors or consultants" in order to circumvent Medicare regulations that preclude home healthcare companies from "compensating outside physicians for referring patients." (*Id.* at ¶ 191).

## C. The Alleged Fraud Comes To Light

On August 12, 2008, Citron Research published an online report (the "2008 Citron Report") entitled "Seeking Healthy Returns in Amedisys? Better get a Second Opinion . . . ." (*Id.* at ¶ 197). The report "raised material questions about the legitimacy of Amedisys's accounting and Medicare billing practices." (*Ibid.*). More specifically, it alleged that Company headquarters was pressuring employees to manipulate OASIS forms in a way that would produce higher Medicare billings. (*Ibid.*). The report admitted that Citron cannot yet conclude that Amedisys is "committing Medicare fraud, but there are many indications that this inquiry needs

deeper scrutiny . . . . Due to these concerns, Amedisys's near total dependence upon Medicare has to be factored as a business risk." (*Ibid.*).

Amedisys management, however, quickly moved to dismiss the report in the court of public opinion. (*Id.* at ¶¶ 199—201). One investment bank, for example, reported that "[a]fter speaking to [Amedisys] management and analyzing the supporting details of the report, we believe the report is irresponsible in its innuendos of an underlying problem at Amedisys." (*Id.* at ¶ 199). Another was more blunt: "In a nutshell, we believe [after speaking with Amedisys management] that [Amedisys] . . . has set forth appropriate operating procedures to enable more accurate coding and improve its overall Medicare reimbursement. As a result, we side with the company." (*Id.* at ¶ 200).

In October 2009, Citron Research published a second online report (the "2009 Citron Report") entitled "Amedisys: Caught between a RAC and a Hard Place." (*Id.* at ¶ 204). The report noted that on a 2008 conference call, Graham (the then Chief Compliance Officer) and Schwartz (the then Chief Information Officer) justified Amedisys's "higher than industry margins" by asserting that its patients are "sicker" than those of its competitors. (*Ibid.*). Citron, apparently, was unconvinced.

> Former employees have consistently reported . . . that [Amedisys's] laptop-based Point of Care program, in which every healthcare staffer records every patient visit, is specifically designed to prompt workers to skew their OASIS scoring for higher reimbursement. It is Citron's opinion that this explains why Amedisys's margins are the highest in the industry, not that their patients are "sicker" than their competitors.

(*Id.* at ¶ 205).

On April 26, 2010, The Wall Street Journal ("WSJ") published a front-page article questioning "whether Amedisys was taking advantage of the Medicare reimbursement system." (*Id*. at ¶ 210). The article observed that "[i]n 2005, 2006, and 2007, very few Amedisys patients received nine therapy visits while a much higher percentage got 10 visits or more." (*Ibid*.). The article also observed that in 2008, the percentage of Amedisys patients getting 10 therapy visits dropped by 50%. (*Id*. at ¶ 211). Meanwhile, the percentage of Amedisys patients getting six therapy visits increased by 8%; the percentage of Amedisys patients getting 14 therapy visits increased by 33%; and the percentage of Amedisys patients getting 20 therapy visits increased by 41%. (*Ibid*.). These statistics suggested to the WSJ that Amedisys was providing care based on profit rather than need. In the WSJ article, Amedisys spokesman Kevin Leblanc (who is not a defendant in this case) assured investors that that such a conclusion was misguided and that the Company's home visit statistics were "in line with industry trends." (*Id*. at ¶ 270). The suggestion, he stated, that Amedisys increases its therapy visits in order to receive higher reimbursements is "both incendiary and inaccurate." (*Ibid*.).

On an April 27, 2010 conference call, Borne attempted to spin the WSJ's allegations:

> The WSJ article clearly states that treating sick patients in their homes rather than paying for costly hospitalizations can help save billions of dollars. In the era of a growing elderly population, this is exactly the role Amedisys serves in the healthcare industry.
>
> . . .
>
> CMS has designed Medicare reimbursement to incentivize the transformation of healthcare from expensive facility-based care to more

innovative, less expensive and more effective homecare. And Amedisys
is accomplishing this transformation.

(*Id.* at ¶ 374).

On May 12, 2010, the Senate Finance Committee ("SFC") launched an
investigation into Amedisys to determine whether it had "deliberately boosted the
number of home therapy visits to trigger higher Medicare reimbursements." (*Id.* at ¶
214). In a joint letter authored by Senators Max Baucus (Committee Chairman) and
Charles Grassley (Ranking Minority Member), the SFC opined that the home therapy
numbers cited in the WSJ article suggest that companies such as Amedisys are
providing whatever care will trigger "higher reimbursements." (*Id.* at ¶ 215). The
SFC, moreover, sought from Amedisys a variety of documents that it believed to be
relevant to the SFC investigation. (*Ibid.*).

The next day, on May 13, 2010, Amedisys issued a public statement asserting
that:

> The letter of inquiry received from Senators Grassley and Baucus
> references an article published recently in the Wall Street Journal. The
> article told an incomplete story about the value of home health to
> patients, their families, and the overall healthcare system.
>
> . . .
>
> Amedisys provides home care to more than 35,000 elderly patients every
> day. We are proud to be an organization that leads by putting our
> patients first and [we] are proud of the work we do on their behalf.

(*Id.* at ¶ 216).

On June 30, 2010, Amedisys issued a press release announcing that it had
received a notice of formal investigation from the Securities and Exchange

Commission ("SEC"). (*Id.* at ¶ 219). The press release further stated that the SEC

had subpoenaed documents related to the ongoing SFC investigation. (*Ibid.*).

On a July 13, 2010 conference call, Borne came out swinging:

The article in the Wall Street Journal . . . is cited in the Senate Finance
Committee's inquiry . . . , and . . . appears to have received the attention
of the SEC as well. We believe this article has shown a lack of
understanding about our industry and overlooked some important facts.
We shared quite a bit of information with the Wall Street Journal
reporter explaining how the home health industry works, highlighting
our business model, innovations, clinical outcomes, and our focus on
quality.

In fact, we provided the reporter with an opportunity to meet with our
patients, visit our offices, and speak with our staff. After countless hours
of correspondence with this reporter[,] we were disappointed that she
presented what we believe to be an unbalanced story, excluding much of
the data that we shared with her in the spirit of full cooperation.

(*Id.* at ¶ 382).

Borne reiterated that position in an Open Letter to Shareholders published on

July 15, 2010:

We believe the WSJ article is based upon an inaccurate understanding
of a very complex industry and the ever-changing population that we
serve, and that it overlooked some important facts . . . . For example, the
WSJ article focused on the change in therapy utilization in the home
health industry from 2007 to 2008, appearing to suggest that providers
in the industry changed their therapy utilization to take advantage of
the new Medicare reimbursement methodology that CMS implemented
in 2008, without giving proper consideration to whether patients needed
the care.

However, the WSJ story appeared to assume a static patient population
when in fact the needs of the patients under our care in 2008 were quite
different from those of the patients under our care in 2007, including a
more diverse distribution of patients based upon primary diagnoses and
acuity mix. The key factors impacting our shifting patient population
include the trend that Amedisys has been taking care of patients who
are increasingly sicker and debilitated, and therefore who need more

13

therapy visits. At the same time, other factors have resulted in Amedisys also taking care of more low[] acuity patients who require relatively fewer visits . . . .

. . .

Our compliance program includes all elements recommended by the Office of Inspector General of the Department of Health and Human Services, and is run by a seasoned former state Medicaid fraud and abuse prosecutor, Jeffrey Jeter. We have a Zero Tolerance Policy for fraud and abuse, and manipulation of therapy thresholds is and has been an express violation of our compliance policies.

(*Id.* at ¶ 383).

On September 28, 2010, Amedisys issued a press release announcing that it had received a civil investigative demand ("CID") from the United States Attorney's Office for the Northern District of Alabama "pursuant to the federal False Claims Act." (*Id.* at ¶ 231). The CID asked for a wide range of documents and information related to the Company's "clinical and business operations, including reimbursement and billing claims submitted to Medicare." (*Ibid.*). As the WSJ noted at the time, if a company is found to have submitted a false claim to a federal agency, such as the Centers for Medicare & Medicaid Services, it could, *inter alia*, be precluded from doing future business with that agency, thereby depriving Amedisys of its right to seek Medicare reimbursements. (*Ibid.*).

On October 3, 2011, the Senate Finance Committee released its report, which concluded that Amedisys and others "encouraged therapists to target the most profitable number of therapy visits, even when patient need alone may not have justified such patterns." (*Id.* at ¶¶ 248—49, 251). More specifically, the report found that "Amedisys management directed employees to adjust the number of home health

14

therapy visits to maximize Medicare payout to the company after the 2008 changes to the Medicare payment system." (*Id.* at ¶ 256). Such behavior, the report concluded, represents Medicare abuse at best, and Medicare fraud at worst. (*Id.* at ¶ 253).

On November 12, 2013, Amedisys issued a press release announcing that it had agreed to enter into a $150 million settlement with the Department of Justice based upon the aforementioned allegations ("DOJ"). (*Id.* at ¶ 393(j)). In a press release announcing the settlement on April 23, 2014, the Department of Justice stated, in part:

> The settlement announced today resolves allegations that, between 2008 and 2010, certain Amedisys offices improperly billed Medicare for ineligible patients and services. Amedisys allegedly billed Medicare for nursing and therapy services that were medically unnecessary or provided to patients who were not homebound, and otherwise misrepresented patients' conditions to increase its Medicare payments. These billing violations were the alleged result of management pressure on nurses and therapists to provide care based on the financial benefits to Amedisys, rather than the needs of patients.

> Additionally, this settlement resolves certain allegations that Amedisys maintained improper financial relationships with referring physicians. . . .

> This settlement illustrates the government's emphasis on combating health care fraud and marks another achievement for the Health Care Fraud Prevention and Enforcement Action Team (HEAT) initiative, which was announced in May 2009 by Attorney General Eric Holder and Secretary of Health and Human Services Kathleen Sebelius.

(*Id.* at ¶ 393(l)).

## II.   Standard of Review

To defeat a Rule 12(b)(6) motion to dismiss, a complaint must (a) state a claim upon which relief can be granted, *Neitzke v. Williams*, 490 U.S. 319, 326 (1989), and

(b) provide the Court with sufficient factual content from which "to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). When evaluating a Rule 12(b)(6) motion to dismiss, the Court accepts all well-pleaded facts as true and views them in a light most favorable to the plaintiff. *Bustos v. Martini Club Inc.*, 599 F.3d 458, 461 (5th Cir. 2010).

## III.    Section 10(b) and Rule 10b-5

In cases involving publicly traded securities and purchases or sales in public securities markets, the action's basic elements are: (1) a material misrepresentation (or omission), (2) scienter, *i.e.*, a wrongful state of mind, (3) a connection with the purchase or sale of a security, (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation"; (5) economic loss; and (6) "loss causation," *i.e.*, a causal connection between the material misrepresentation and the loss. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 238–39 (5th Cir. 2009). Defendants move to dismiss Plaintiffs' Complaint for failing to adequately allege: (1) a material misrepresentation and (2) scienter. (*See* Doc. 279-1 at pp. 6—43).

### A.    Material Misrepresentations

Pursuant to Rule 9(b) of the Federal Rules of Civil Procedure, when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "The particularity demanded by Rule 9(b) is supplemental to the Supreme Court's recent interpretation of Rule 8(a)

requiring 'enough facts [taken as true] to state a claim to relief that is plausible on its face.'" *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009) (quoting *Twombly*, 550 U.S. at 570)) (alteration in original). "A dismissal for failure to plead fraud with particularity under Rule 9(b) is treated as a dismissal for failure to state a claim under Rule 12(b)(6)." *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 901 (5th Cir. 1997).

The Private Securities Litigation Reform Act ("PSLRA") "requires a plaintiff to identify each allegedly misleading statement with particularity and explain why it is misleading." *Lormand*, 565 F.3d at 239 (citing 15 U.S.C. § 78u–4(b)(1)). In *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336 (5th Cir. 2002), the Fifth Circuit "coalesced the pleading requirements in the PSLRA and Rule 9(b) into a succinct directive for litigants . . . ." *See Goldstein v. MCI WorldCom*, 340 F.3d 238, 245 (5th Cir. 2003).

> [A] plaintiff pleading a false or misleading statement or omission as the basis for a section 10(b) and Rule 10b-5 securities fraud claim must, in order to avoid dismissal pursuant to Rule 9(b) and [the PSLRA]: (1) specify . . . each statement alleged to have been misleading, *i.e.*, contended to be fraudulent; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representations; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, *i.e.*, why the statement is fraudulent. This is the 'who, what, when, where, and how' required under Rule 9(b) in our securities fraud jurisprudence and under the PSLRA.

*Id.* (some internal quotations omitted).

A duty to say anything imposes a duty to speak the full truth. *Lormand*, 565 F.3d at 249 (quoting *Rubinstein v. Collins*, 20 F.3d 160, 170 ((5th Cir. 1994)); *City of*

*Omaha Police & Fire Ret. Sys. v. LHC Grp., Inc.*, No. 6:12-1609, 2013 WL 1100819, at *7 (W.D. La. Mar. 15, 2013). "A corporation does not have a duty to disclose information simply because it is material, or because it suggests that the corporation or its employees engaged in uncharged illegal conduct." *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 353 (S.D.N.Y. 2008). "However, when a corporation does make a disclosure—whether it be voluntary or required—there is a duty to make it complete and accurate." *Id.* (internal quotations and alterations omitted).

Plaintiffs allege that "[d]uring the Class Period, Defendants made a series of materially false and misleading statements that concealed Defendants' improper practices and artificially inflated the value of Amedisys's publicly-traded securities." (*See* Doc. 270 at ¶ 264). Most of these statements were related to Amedisys's quarterly and year-end earnings reports and can effectively be divided into two categories: (1) those concerning Amedisys's financial results and (2) those concerning Amedisys's regulatory compliance. (*Id.* at ¶¶ 265—390).

Defendants first allege that Plaintiffs have failed to explain *why* Amedisys's statements concerning financial results and regulatory compliance are false. To that end, Defendants cite *In re Odyssey Healthcare, Inc. Sec. Litig.*, 424 F. Supp. 2d 880, 894—95 (N.D. Tex. 2005), wherein the court held that:

> The allegedly misleading statements are in the nature of projections of revenue growth, which has no direct relationship to regulatory compliance and gives rise to no inference or implication of regulatory compliance.
>
> Although the Complaint does not articulate any connection, the logic behind it appears to be that the issue of Medicare and Medicaid compliance is so severe and so pervasive that any statement regarding

18

> Odyssey that does not disclose that issue is misleading. From this
> perspective, an Odyssey officer who said "Good morning" during the
> class period would have committed a Rule 10b–5 violation. This view
> would require a defendant to choose between an affirmative duty to
> disclose everything if anything is said and a vow of silence. The
> securities laws do not require such an election. Absent such a broad view
> of the duty to disclose, it does not appear that the failure to disclose the
> issue of Medicare and Medicaid compliance rendered the otherwise
> truthful statements misleading.

Initially, the Court recognizes that every Rule 10b-5 "inquiry will necessarily differ with the facts of each case . . . ." *See Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992). However, *Odyssey* seems to represent a bridge too far. Companies such as Amedisys are governed by CMS regulations. Those who fail to comply with CMS regulations suffer consequences – sometimes civil, sometimes criminal. A publicly traded company cannot insulate its shareholders from those consequences. The market winces at the mere mention of an SEC or SFC investigation. Companies such as Amedisys know that. The Court therefore deems it improper to suggest that "projections of revenue growth . . . give[] rise to no inference or implication of regulatory compliance." *Odyssey*, 424 F. Supp. 2d at 894. To the contrary, investors have the *right* to assume that their financial future does not hinge upon the continuation of a fraud.

The Court acknowledges that Plaintiffs have not, in every instance, identified which "particular statements are false or misleading . . . ." *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 710 (W.D. Tex. 2010). "But the reason for this is relatively simple: most of Plaintiff[s'] falsity allegations are centered around the major allegation that . . . Defendants failed to disclose and omitted certain material

information . . .  from the [second] quarter of 2005 through the [second] quarter of 20[10]." *Id.*   There is a "substantial likelihood that the disclosure of [Amedisys's fraudulent Medicare practices] . . . would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231—32 (1988) (internal quotations omitted). Amedisys's decision to withhold that information therefore constitutes a material misrepresentation within the meaning of Rule 10b-5.[5]

The Court further finds that Amedisys's compliance-related statements were not mere puffery. They were not "of the vague and optimistic type . . . ." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004). Rather, they detailed the "very specific benefits" of Amedisys's compliance program, *see Lormand*, 565 F.3d at 249 n.14, a program that Amedisys touted as "central to everything we do," *Pub. Employees Ret. Sys. of Mississippi, Puerto Rico Teachers Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 318 (5th Cir. 2014).

For example, on an October 25, 2006 conference call, Borne stated that Amedisys's new Point-of-Care system would "enhance [the Company's] compliance efforts by mandating and standardizing documentation while validating clinical necessity for all care provided." (Doc. 270 at ¶ 291). Jeter also, just two months after

---

[5] Citing non Fifth Circuit case law, Defendants allege that "the law is clear that a duty to disclose illegal conduct can arise only when the declarant has actual knowledge of uncharged illegal conduct at the time the allegedly misleading statement of regulatory compliance was made." Doc. 279-1 at p. 14. But Plaintiffs have alleged that "when making the material misstatements concerning the April 26, 2010 WSJ article and the Senate Finance Committee investigation, Defendants knew . . . at the time, and failed to disclose, that they were engaged in a fraudulent scheme to improperly manipulate the Medicare reimbursement system . . . ." Doc. 270 at ¶ 379. Accordingly, the PSLRA's "safe harbor provision is inapplicable . . . ." *Lormand*, 565 F.3d at 244.

the release of the 2008 Citron Report, sought to reassure investors of the Company's compliance program with specific reference to many of the fraudulent practices alleged in this suit.

> Beginning in early 2005, we identified three key areas to which any home healthcare agency maybe susceptible because of the inherent revenue impacts of each. These are first, excessive therapy, where a high number of therapy visits are conducted, which results in increased reimbursement and may be potentially suggestive of fabricated or unnecessary visits just to increase reimbursement.

> Second, LUPA exaggeration, which is where an agency has an exceptionally low number of Low Utilization Payment Adjustments, otherwise known as LUPAs, which may be suggestive of potentially fabricated or unnecessary visits so as to avoid having reimbursement automatically reduced by the government.

> And third, up-coded case mixes, where an agency has a higher-than-average case-mix weight that may be suggestive of possible manipulation of coding occasioned by scoring patients as sicker than they actually are. These are big-bang-for-the-buck kinds of risk areas for fraud.

> Since 2005, one of the primary functions that my compliance auditors have performed is the proactive review of agencies that perform well in each of these areas. We have focused on those Amedisys agencies performing very well with respect to having a higher percentage of high profitability therapy episodes and having a lower incidence of low reimbursement LUPAs and in having overall higher-reimbursement case-mix scores.

> Now, it should be noted that just because an agency has a high percentage of high profitability therapy or a lower occurrence of LUPAs or a higher case mix does not necessarily mean that there is something improper or untoward occurring. In each instance, there may well be wholly appropriate justifications for each risk category. However, because of the revenue implications of each, there exists a potential for improprieties, which we feel warrants a compliance review.

(*Id.* at ¶ 335). Jeter went on to assure the investing public that "Amedisys has long had stiff enforcement policies for compliance violations" and that Amedisys has "zero tolerance . . . for healthcare fraud and abuse." (*Id.* at ¶ 336).

Defendants assert that even if their compliance-related statements "were not mere puffery, they are statements of opinion, and are therefore actionable only if the speaker is aware of a 'gross disparity between prediction and fact.'" (Doc. 279-1 at p. 13). Even assuming *arguendo* that is true, Plaintiffs have alleged that Defendants *were aware* of a "gross disparity between prediction and fact." For example, Defendants allege that Jeter knowingly lied when he, in 2008, touted Amedisys's "point-of-care system" as "the sort of technology that helps us improve not only what we do in terms of clinical care but how we do it in terms of our adherence to Medicare rules and regulations." (Doc. 270 at ¶ 334). In 2014, Amedisys all-but admitted that it engaged in Medicare fraud and entered into a $150 million settlement agreement with the DOJ.

Defendants note that the DOJ has expressly stated that "[t]he claims settled by the [settlement] agreement are allegations only, and there has been no determination of liability." *See Amedisys Home Health Companies Agree to Pay $150 Million to Resolve False Claims Act Allegations*, DEPT. OF JUSTICE, https://www.justice.gov/opa/pr/amedisys-home-health-companies-agree-pay-150-million-resolve-false-claims-act-allegations. However, that is of no relevance to this Ruling and Order. Defendants do not stand accused of committing Medicare fraud.

Defendants stand accused of violating sections 10(b) and 20(a) of the Securities Exchange Act of 1934.

### B.   Scienter

The securities-fraud scienter inquiry "focuses on the state of mind of the corporate official[]" who made, issued, or approved the misleading statement, "rather than the 'collective knowledge of all the corporation's officers and employees.'" *Local 731 I.B. of T. Excavators & Pavers Pension Trust Fund v. Diodes, Inc.*, 810 F.3d 951, 957 (5th Cir. 2016) (quoting *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008)); *see also* 15 U.S.C. § 78u-4(b)(2)(A). It is, in this sense, an individualized inquiry that seeks to determine whether a statement was issued with an intent to deceive or with severe recklessness as to its veracity. *Id.*

Severe recklessness constitutes an "extreme departure from the standard of ordinary care . . . ." *Ibid.* (internal quotations omitted). It is in fact "limited to [those] highly unreasonable omissions or misrepresentations that involve" more than "merely simple or even inexcusable" neglect. *Ibid.* (internal quotations omitted). In order to find that a defendant acted with severe recklessness, the Court must find that he or she knew or "must have" known that certain statements or omissions presented "a danger of misleading buyers or sellers . . . ." *Ibid.* (internal quotations omitted). Those who consciously avoid "learning the truthfulness of a statement" are considered to be severely reckless. *Fine v. Am. Solar King Corp.*, 919 F.2d 290, 297 (5th Cir.1990) (quoting *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 962 (5th

Cir.1981)). So too are those who misspeak as a result of their "refusal to see the obvious, or to investigate the doubtful . . . ." *In re AthroCare*, 726 F. Supp. 2d at 732 (quoting *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 693 (6th Cir. 2004)); *see also Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (same).

"The facts must be evaluated collectively, not in isolation, to determine whether a strong inference of scienter has been pled." *Indiana Elec.*, 537 F.3d at 533. The Court must "consider plausible inferences supporting as well as opposing a strong inference of scienter." *Local 731*, 810 F.3d at 956—57 (internal quotations omitted). However, "[a]t the pleading stage . . . a plaintiff . . . must only plead facts rendering an inference of scienter at least as likely as any plausible opposing inference." *Lormand*, 565 F.3d at 250 (internal quotations omitted).

Plaintiffs, in this case, allege that every Individual Defendant acted with the requisite scienter. (*See* Doc. 283 at pp. 18—29). These Individual Defendants include: Borne (Chief Executive Officer and Chairman of the Board from 1982 to 2014); Graham (Chief Operating Officer from January 1999 to September 2009); Redman (Chief Financial Officer from February 2007 to January 2012); Giblin (Chief Financial Officer from October 2007 to February 2007); Browne (Chief Financial Officer from May 2002 to October 2006); Schwartz (Chief Information Officer from September 2004 until September 2009); and Jeter (Chief Compliance Officer and Corporate Counsel from 2001 to present). (Doc. 270 at ¶¶ 21—27). The Fifth Circuit "has rejected the group pleading approach to scienter . . . ." *Indiana Elec.*, 537 F.3d at 533. Accordingly, if the Court cannot infer scienter as to any of the Individual

Defendants, Plaintiffs Section 10(b) and Rule 10b-5 claim against Amedisys fails as a matter of law.

It is well-established that "pleading[s] of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions with the company." *Id.* at 535 (alteration in original). That alone disqualifies Browne and Giblin, as both left Amedisys long-before the release of the 2008 Citron Report and neither was "directly [or indirectly] confronted by the financial media with evidence of" Amedisys's fraudulent practices. *In re ArthroCare*, 726 F. Supp. 2d at 712.

Graham was also never directly or indirectly confronted by the financial media with evidence of Amedisys's fraudulent practices. Yet allegations that Graham engaged in insider trading are worthy of the Court's analysis. (Doc. 270 at ¶ 204). "Insider trading can be a strong indicator of scienter if the trading occurs at suspicious times or in suspicious amounts." *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.,* 497 F.3d 546, 552—53 (5th Cir. 2007). "'Suspicious' in this context generally means that the 'sales are out of line with prior trading practices or at times calculated to maximize personal profit.'" *Id.* at 553 (quoting *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 435 (5th Cir. 2002)). Graham, who worked for Amedisys for over 10 years, sold most of his stock holdings just five weeks prior to his resignation. (Doc. 270 at ¶ 204). This stock sale "exceeded all of [Graham's] prior stock sales combined." (*Id.*). Still, the Fifth Circuit has instructed that "insider trading cannot create a strong inference of scienter . . . ." *Cent. Laborers'*, 497 F.3d at 553. At

most, it "may meaningfully *enhance*" other scienter allegations. *Southland*, 365 F.3d at 368 (emphasis added). The Court therefore cannot infer that Graham acted with a strong inference of scienter.

The crux of Plaintiffs' scienter allegations against Schwartz is that she designed and helped implement the very system that perpetuated the fraud underlying this litigation. (Doc. 270 at ¶¶ 402—17). This is a classic example of "fraud by hindsight . . . where a plaintiff alleges that the fact that something turned out badly must mean [a] defendant knew earlier that it would turn out badly." *Lormand*, 565 F.3d at 254. "Congress enacted the PSLRA to put an end to the practice of pleading fraud by hindsight.*" In re Daou Sys., Inc.*, 411 F.3d 1006, 1021 (9th Cir. 2005) (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 988 (9th Cir. 1999)); *see also Owens v. Jastrow*, 789 F.3d 529, 544 (5th Cir. 2015) (rejecting fraud by hindsight allegations). The Court therefore cannot infer scienter on the part of Schwartz. *See In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 866 (N.D. Tex. 2005) (holding that "[f]raud by hindsight is not an actionable claim under the securities laws"). Plaintiffs note that Schwartz *resigned* as CIO on September 3, 2009. (Doc. 270 at ¶ 416). Yet that cannot, in and of itself, serve as proof of fraud. *See In re Dell Inc., Sec. Litig.,* 591 F. Supp. 2d 877, 898 (W.D. Tex. 2008). Resignations, at most, "add one more piece to the scienter puzzle." *Fouad v. Isilon Sys., Inc.*, No. C07-1764 MJP, 2008 WL 5412397, at *11 (W.D. Wash. Dec. 29, 2008).

Many of the scienter allegations against Jeter rely upon confidential sources, which provide "no basis" for the Court to draw a strong inference of scienter. *Indiana*

*Elec.*, 537 F.3d at 535; *see also Local 731*, 810 F.3d at 957 n.2 (questioning whether confidential sources can even be "considered in determining the complaint's sufficiency"). "Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007). The scienter inquiry "requires judges to weigh the strength of plaintiffs' favored inference in comparison to other possible inferences; anonymity frustrates that process." *Id.* Nonetheless, the Court finds that Jeter acted with severe recklessness when he touted Amedisys's compliance program just two months after the release of the 2008 Citron Report. *See supra* pp. 21—22. The 2008 Citron Report alleged "major improprieties" at Amedisys and was "based on . . . information" that was "readily available to" Jeter as CCO. *In re ArthroCare*, 726 F. Supp. 2d at 717. Jeter could and should have investigated these allegations, considering he held himself out "as the spokesperson and champion" of Amedisys's compliance program. *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 783 (S.D. Tex. 2012). Instead, Jeter assured the investing public that Amedisys was not engaged in any fraudulent practices and emphasized that Amedisys had "zero tolerance . . . for healthcare fraud and abuse." (*See* Doc. 270 at ¶¶ 335—36). Jeter, of course, is not "obligated to respond to every potentially disparaging news story." *In re ArthroCare*, 726 F. Supp. 2d at 716. However, once he chose to respond to the 2008 Citron Report, he was "required to speak the full truth and accurately inform, rather than mislead, investors." *Id.*

The same is true of Borne. He referred to the WSJ article as "inaccurate" and "unbalanced" approximately two months after its publication. (Doc. 270 at ¶¶ 382—

83). He assured investors that Amedisys's compliance program "is run by a seasoned former state Medicaid fraud and abuse prosecutor, Jeffrey Jeter" who enforces a "Zero Tolerance Policy for [healthcare] fraud and abuse . . . ." (*Id.* at ¶ 383). These statements were at best severely reckless and at worst intentionally deceptive. *Local 731,* 810 F.3d at 957. Borne did not just feign ignorance. *See Fine*, 919 F.2d at 297. He affirmatively sought to delegitimize allegations that threatened Amedisys's "continued vitality." *See Local 731,* 810 F.3d at 959; (*see also* Doc. 270 at ¶ 1) (noting that "[t]hroughout the Class Period, Amedisys's business model depended almost exclusively on its ability to collect Medicare reimbursement payments, which accounted for approximately 90% of the Company's net service revenue from 2005 through 2011").

Redman is a close call. He was on the April 27, 2010 conference call during which Borne posited that:

> The WSJ article clearly states that treating sick patients in their homes rather than paying for costly hospitalizations can help save billions of dollars. In the era of a growing elderly population, this is exactly the role Amedisys serves in the healthcare industry.
>
> CMS has designed Medicare reimbursement to incentivize the transformation of healthcare from expensive facility-based care to more innovative, less expensive and more effective homecare. And Amedisys is accomplishing this transformation.

(Doc. 270 at ¶¶ 373—74). The notion that Redman's decision not to "personally address the" WSJ article immunizes him of liability is inaccurate, as "he was undisputedly present and had the opportunity to correct [Borne] at the time [Borne] was making the inaccurate and misleading statements to the investing public." *In re*

*ArthroCare*, 726 F. Supp. 2d at 716. "[A] high ranking company official cannot sit quietly [on] a conference [call] with analysts, knowing that another official is making false statements and hope to escape liability for those statements. If nothing else, [one could argue that Redman] is at fault for . . . failing to correct" the false statements that he knew Borne was making. *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 262 (5th Cir. 2006). Yet one cannot ignore that the WSJ article was published just one day prior to the April 27, 2010 conference call. (*See* Doc. 270 at ¶¶ 210, 374). 24 hours is not enough time for any corporate official to reasonably investigate allegations of systemic fraud and abuse. Unless one assumes that Redman, as CFO, must have already known about the fraud by virtue of his position within the company – an assumption that is prohibited within the Fifth Circuit. *See Indiana Elec.*, 537 F.3d at 535. Borne and Jeter waited approximately two months to issue their misleading statements. Throughout that period, contradictory information was "readily available" to both. *In re ArthroCare*, 726 F. Supp. 2d at 717. The same cannot be said of Redman. For that reason, the Court finds that his silence does not constitute the severe recklessness necessary to infer scienter.

## IV. Section 20(a)

To prove a violation of Section 20(a), 15 U.S.C. § 78t(a), "a plaintiff must first prove an underlying securities fraud violation and prove that the controlling person had actual power over the controlled person . . . ." *In re BP p.l.c. Sec. Litig.*, 922 F. Supp. 2d 600, 639 (S.D. Tex. 2013); *see also Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 862 (5th Cir. 2003) (noting that section 20(a) "imposes joint and several liability upon

persons who 'control' defendants that violate the Exchange Act"). "The Fifth Circuit has stated that a plaintiff need only show that the alleged control persons possessed 'the power to control [the primary violator], not the exercise of the power to control.'" *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 869 n.17 (S.D. Tex. 2001) (quoting *Abbott v. Equity Grp.*, Inc., 2 F.3d 613, 620 (5th Cir. 1993)) (alteration in original). "Nevertheless, a plaintiff needs to allege some facts beyond a defendant's position or title that show that the defendant had actual power or control over the controlled person." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 595 (S.D. Tex. 2002). "While an individual defendant cannot have § 20(a) liability for their own statements, an individual defendant can have § 20(a) liability for statements attributed to a corporate entity such as [Amedisys], e.g., for statements contained in press releases and SEC filings that are not attributable to any single individual but were clearly made on behalf of [Amedisys]." *Fitzpatrick v. Uni-Pixel, Inc.*, 35 F. Supp. 3d 813, 835 (S.D. Tex. 2014). "The heightened pleading requirements of the PSLRA and Rule 9(b) do not apply to control person violation claims." *In re ArthroCare*, 726 F. Supp. 2d at 729.

"Control is a question of fact that will not ordinarily be resolved summarily at the pleading stage." *Mississippi Pub. Employees' Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 93 (1st Cir. 2008) (internal quotations omitted). "However, a plaintiff cannot simply base a control person claim on boilerplate allegations; instead, the plaintiff must provide some factual support which indicates the control person defendant was in a position to control a primary violator." *In re ArthroCare.*, 726 F. Supp. 2d at 730.

Plaintiffs allege that the controlled person in this case was Amedisys rather than Borne or Jeter. (Doc. 270 at ¶ 517). "This assertion requires a showing that [Individual Defendants] had the requisite power to directly or indirectly control or influence . . . the specific transaction or activity upon which the primary violation is based." *In re ArthroCare.*, 726 F. Supp. 2d at 730 (internal quotations omitted).

Plaintiff has adequately pled Section 20(a) claims against Borne, Jeter,[6] Schwartz, Redman, and Graham. All served as high-ranking corporate officers at the time of the 2008 Citron Report, and all are alleged to have had either direct or indirect "control over Amedisys's business and public statements." (Doc. 270 at ¶¶ 395, 402, 418, 423, 439).

Plaintiffs, however, have not adequately pled Section 20(a) claims against Browne and Giblin. Browne and Giblin did not work for Amedisys at the time of the 2008 Citron Report. They therefore had no ability to directly or indirectly influence the material misrepresentations that are the subject of this litigation. *See In re ArthroCare*, 726 F. Supp. 2d at 731 (holding that a defendant "cannot be held liable as a control person simply due to his involvement in the underlying activities about which [others] . . . are alleged to have misled investors"); *cf. Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177, 184 (1994) (holding that the Exchange Act, including § 20(a), "does not itself reach those who [merely] aid and abet a § 10(b) violation").

---

[6] Defendants do not object to the notion that Plaintiffs can "assert both Section 10(b) and Rule 10b-5 claims and Section 20(a) claims against" Borne and Jeter. *See PR Diamonds*, 364 F.3d at 697 n.4.

V.    Conclusion

**IT IS ORDERED** that **Defendants' Motion to Dismiss Plaintiffs' First Amended Consolidated Securities Class Action Complaint (Doc. 279)** is **GRANTED IN PART** and **DENIED IN PART.**  Defendants' Motion to Dismiss is **GRANTED** insofar as Plaintiffs' Section 10(b) and Rule 10b-5 claims against Graham, Redman, Giblin, Browne, and Schwartz are **DISMISSED WITH PREJUDICE**, and Plaintiffs' Section 20(a) claims against Browne and Giblin are **DISMISSED WITH PREJUDICE**. With respect to Plaintiffs' Section 10(b) and Rule 10b-5 claims against Amedisys, Borne, and Jeter, and Plaintiffs' Section 20(a) claims against Borne, Jeter, Schwartz, Redman, and Graham, Defendants' Motion to Dismiss is **DENIED**.

Baton Rouge, Louisiana, this _____ day of August, 2016.

_____
**BRIAN A. JACKSON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

32